1 | Valerie L. Chang (SBN 295147)
2 | **SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**
3 | 11755 Wilshire Blvd.
  | 15th Floor
  | Los Angeles, CA 90025
4 | Phone: (323) 510-4060
  | Fax: (866) 300-7367
5 | vchang@sfmslaw.com

6 | Timothy N. Mathews (admitted *pro hac vice*)
  | Christina Donato Saler (admitted *pro hac vice*)
7 | **CHIMICLES & TIKELLIS LLP**
  | One Haverford Centre
8 | 361 West Lancaster Avenue
  | Haverford, PA 19041
9 | Phone: (610) 642-8500
  | Fax: (610) 649-3633
10 | tnm@chimicles.com
   | cds@chimicles.com

11

12 | *Counsel for Plaintiffs, on behalf of themselves and all others similarly situated*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SANTA ANA DIVISION

| STEVE ODDO, RAJENE REARDON, ANTHONY LASALA, LINDA LAMM, KEITH KIMBALL, NORMAN KLINGE and DAN GALLAGHER, on behalf of themselves and all others similarly situated, | Case No. 8:15-cv-01985-CAS-E |
| | |
| Plaintiffs, | **AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| ARCOAIRE AIR CONDITIONING AND HEATING, CARRIER CORPORATION, BRYANT HEATING AND COOLING SYSTEMS, COMFORTMAKER AIR CONDITIONING & HEATING, INTERNATIONAL COMFORT PRODUCTS LLC, and UNITED TECHNOLOGIES CORPORATION, | **JURY TRIAL DEMANDED** |
| Defendants. | |

AMENDED CLASS ACTION COMPLAINT

### AMENDED CLASS ACTION COMPLAINT

Plaintiffs, Steve Oddo ("Oddo"), Rajene Reardon ("Reaadon"), Anthony Lasala ("Lasala"), Linda Lamm ("Lamm"), Keith Kimball ("Kimball"), Norman Klinge ("Klinge"), and Dan Gallagher (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, for their Amended Class Action Complaint against Defendants, Arcoaire Air Conditioning and Heating ("Arcoaire"), Carrier Corporation ("Carrier"), Bryant Heating and Cooling Systems ("Bryant"), Comfortmaker Air Conditioning & Heating ("Comfortmaker"), International Comfort Products LLC ("ICP"), and United Technologies Corporation ("UTC"), (collectively, "Defendants"), allege the following based on personal knowledge as to themselves and their own acts, and information and belief as to all other matters based upon, *inter alia*, the investigation of counsel, which included an analysis of Plaintiffs' documentation, industry repair bulletins, Defendants' public statements, and other publicly available information.

### INTRODUCTION AND NATURE OF THE ACTION

1.      This lawsuit seeks to recover damages sustained by consumers and contractors arising from a manufacturing defect that has caused widespread failures of Thermal Expansion Valves ("TXV(s)") used in heating ventilation and air conditioning ("HVAC") systems manufactured by the defendant subsidiaries of UTC.  The defect arises from a chemical rust inhibitor added to the manufacturing process beginning in or about 2013 and continuing through at least late-2014, which was incompatible with the refrigerant and lubricating oil used in the HVAC systems.  The rust inhibitor reacts with the refrigerant and/or oil and causes a tar or sludge to form when the systems are put into service.  This sticky substance then circulates through the system, and builds up layers of deposits on the inside of the

system.  The TXV is a precision valve that controls the expansion of refrigerant central to the cooling process, and, as such, is a bottle neck in the system. Frequently, within just weeks or months of installation of a brand-new HVAC system, the tar can cause the TXV to become stuck, rendering the system inoperable.  Defendants have admitted the existence of the defect in several dealer service bulletins, but have nevertheless refused to provide adequate remedies to repair affected units.

2.  Even where the contamination has not yet resulted in a complete TXV or system failure, this known defect is likely to cause a failure at some point in the future.  Further, even a partial clog can impact system performance and efficiency, and the tar can coat the inside of the heat-exchangers and other components, such that the defective HVAC systems are not capable of performing to the efficiency standards advertised by Defendants even when there is not an acute failure.

3.  Defendants have foisted the costs of repairs and system inefficiency onto not only consumers but also contractors, who, in order to protect the reputations of their businesses, have often been forced to perform repairs without charge to their customers when a brand-new system fails within just weeks or months of installation.   How could a contractor, who had just been paid several thousands of dollars to install a brand-new HVAC system only a few weeks or months before, charge his customer several hundreds or thousands of dollars more to repair a manufacturing defect?  If he did, his reputation could be ruined.

4.  Moreover, upon information and belief, Defendants have been aware of the defect since at least 2013, but continued to sell affected units unabated.  In fact, even after Defendants admitted the existence of the manufacturing defect in dealer service bulletins in 2014, Defendants never pulled the affected systems from the shelves of distributors.  At the same time, however, the dealer service bulletins

were not distributed publicly, and therefore consumers and contractors were never informed of this known defect.

5. The root of the defect relates to Defendants' failure to ensure that their HVAC manufacturing processes and controls were adequate in light of changes in technology used by Defendants and the HVAC industry generally. As a result of changes in environmental regulations, since around 2010, virtually all HVAC systems rely on a mixture of 410A refrigerant and Polyolester (POE) oil, which replaced the less environmentally-friendly combination of R-22 refrigerant and mineral oil commonly used previously. The refrigerant in the mixture performs the cooling functions for the HVAC system, and the oil with which it is mixed serves to lubricate the compressor and other moving parts within the system. (*See* below for additional detail.)

6. Critically, however, the combination of 410A refrigerant and POE oil requires significant, additional care in manufacturing to ensure that no physical or chemical contaminants remain as a result of manufacturing processes. For example, POE oil is more hygroscopic than the mineral oil previously used, meaning it absorbs moisture. When POE oils are exposed to moisture and heat, they may react, forming acid that is harmful to the system.

7. POE oils are also solvents. This means that extra care must be taken in the manufacturing processes of HVAC equipment to ensure that the system is free of impurities or contaminants, which can include chemical, as well as physical contaminants and moisture.

8. As the POE circulates throughout the system, it can also act as a detergent, cleaning microscopic oxides and contaminants from the insides of tubing and other components, and any contaminants on component parts will be pulled off and mixed with the POE to form a new substance.

9.     These qualities of POE oil have been well-known to HVAC manufacturers, including Defendants, since they began using POE oil, and they also knew that extra care was required during manufacturing to ensure that no contaminants or moisture remain in the equipment that could react with POE oil or 410A refrigerant.

10.     The need to ensure that HVAC manufacturing processes do not leave residual contaminants is further amplified by another recent development in HVAC equipment manufacturing, namely the use of TXVs, which have become ubiquitous due to energy efficiency requirements.

11.     Almost ten years ago, new regulations took effect that required HVAC equipment to meet certain minimum efficiency standards.  As a result of those standards, beginning in 2006 most HVAC systems began using TXVs. TXVs are precision devices designed to regulate the rate of refrigerant-liquid flow. Unlike fixed orifice valves, which are either open or closed, a TXV meters the refrigerant's flow rate in proportion to the rate of evaporation of the refrigerant in the evaporator.  This means TXVs are much more efficient.  It also means that TXVs are more sensitive and can fail if there is contamination in the system.

12.     The TXV is, by nature, a "bottleneck" in the HVAC system.  It typically operates by using a movable valve pin to precisely control the flow of liquid refrigerant.  Any contaminants or impurities that may be flowing through the system are likely to collect around the TXV pin.   If such contaminants collect on the TXV it may operate inefficiently, or the system may cease to function altogether.  With the use of 410A and POE oils, in conjunction with TXVs, it is imperative to ensure no physical or chemical contaminants are circulated within the system that could clog the TXV or cause the pin to stick.

13.     Defendants knew that the use of 410A refrigerant and POE oil required significant care during manufacturing of component parts to ensure the

absence of contaminants or impurities, and that the use of precision TXVs also required care to ensure the TXV would function as intended. Indeed, as seen below, Defendants placed labels on HVAC systems which advise technicians to "verify system is free of contaminants and moisture" prior to replacing a TXV.



Source: HVAC system (Model: 225BNA042-A).

14.     Defendants, however, ignored these industry standards and engaged in lax manufacturing processes that came to a head in 2013 and 2014, when Defendants' new HVAC systems began failing in the field at alarming numbers within just weeks or months of installation. Diagnostic assessments from contractors conducting repairs indicated widespread TXV failures. These TXV failures were not the result of defective TXVs but, rather, contaminants left by manufacturing processes that caused the TXV to stick or fail to operate properly.

15.     Diagnosing the problem as a stuck TXV typically requires a significant investment of time by contractors. Ultimately, contractors would find that the TXV pin had become covered with a dark sticky substance, and the TXV would need to be replaced, once again involving a significant investment of labor and materials. The problem was given its own moniker, the "frozen coil issue,"

derived from a common symptom of a stuck TXV, which is that the indoor coil of the unit becomes encased in ice.

16.     In dealer service bulletins issued as early as 2014, Defendants admitted that their systems manufactured from *at least* late 2013 through late 2014 contained a chemical contaminant that was reacting with the refrigerant and/or POE oil, causing TXVs to stick.  Defendants eventually determined that the chemical contaminant was an anti-rust inhibitor applied to the Copeland Scroll Compressors that Defendants purchase from Emerson Climate Technologies, Inc. ("Emerson"), which Defendants incorporated into many of their completed HVAC systems.  Defendants knew or recklessly disregarded that it was necessary to ensure that all parts used in their HVAC systems were free from contaminants that could react with the POE oil and refrigerant.

17.     Further, despite their admission that the HVAC systems were defective, Defendants' response to the manufacturing defect has been wholly inadequate in that:

(a)     Defendants did not widely publicize or distribute their dealer service bulletins so that consumers could become aware of the defect prior to purchasing one of Defendants' HVAC systems;

(b)     Defendants continued to sell defective equipment to contractors and consumers and failed to pull contaminated equipment off the shelves of their distributors;

(c)     Defendants failed to disclose this known defect to consumers or contractors at the time of purchase; and

(d)     Defendants refused to either replace the defective systems or provide full compensation for repairs that clear the systems of all contaminants.

18.    Given the nature of the defect, even though some consumers may not have experienced a complete TXV failure (yet), it is likely that, unbeknownst to consumers, all of the impacted HVAC systems – even those that have not experienced an acute failure – cannot provide the energy efficiency Defendants claim they can achieve due to the chemical impurities which clog the TXV and coat the internal surfaces of coils and other components.

19.    Defendants' purported solution for the manufacturing defect under their warranty program does not cure the defect.

20.    Initially, between July 2014 and late October 2014, Defendants provided replacement TXVs (*i.e.*, the part itself) under warranty and a labor credit of $400.  This credit was insufficient because it failed to cover the entire labor and material costs involved in replacing the TXVs or otherwise repairing the underlying defect.  Further, simply replacing the gunked-up TXVs did not, and could not, clear the contaminants fully from the affected HVAC systems.  Thus, the systems continued to fail, and even those that did not experience an immediate failure are at risk of future failure because the contaminants remain in the HVAC system.

21.    On October 23, 2014, Defendants adopted an even worse approach when they began instructing service personnel that the "sole solution" for this defect was to inject another chemical, called A/C Re-New, into the systems in an attempt to break apart the sludge that was clogging the TXV.  Defendants agreed to provide contractors with the A/C Re-New at no cost and a $195 labor credit.  However, this course of action manifestly fails to remedy the defect -- *i.e.*, remove the contamination -- and creates a whole host of other problems.

22.    A/C Re-New is an after-market chemical additive that is marketed as a way to squeeze out some extra life of HVAC equipment that is on its last legs, "particularly older systems where performance may have diminished over the

years."  Indeed, ordinarily, injecting A/C Re-New into an HVAC system would void the manufacturer's warranty on new HVAC systems.  A/C Re-New changes the chemical composition of the POE and refrigerant and can impact longevity and performance.

23.   Injecting A/C Re-New does *not* remove the pre-existing contamination.   To the contrary, adding A/C Re-New *merely adds more contamination*, none of which should be in a brand-new air conditioning system. The chemical tar continues to circulate through the HVAC system, posing a likelihood of future re-occurrence.

24.   Defendants are nevertheless telling contractors to inject this chemical into HVAC systems that are only weeks or months old because it purportedly breaks apart the sludge that is causing TXVs to stick.  In other words, rather than replacing or paying to fix the equipment properly by flushing the system to remove chemical impurities from the HVAC systems and replacing TXVs, Defendants are advising contractors to inject yet another chemical impurity into the HVAC systems, in hopes that the chemical cocktail will break apart the sludge impeding the TXV.  The sole reason is that it is cheaper for Defendants than a real fix.

25.   The long-term effects of this so-called fix are, at best, unknown. Since the tar is still circulating through the systems, it is likely that adding A/C Re-New will merely forestall problems to a future date, at which time Defendants hope the systems will no longer be under warranty.  Moreover, A/C Re-New changes the chemical properties and viscosity of the 410A refrigerant/POE oil mixture. Changing the viscosity of the oil, in particular, may cause additional wear and tear on the compressor and other components.   Likewise, changes to the thermodynamic properties of the refrigerant from the original tar and addition of A/C Re-New can cause premature failure of equipment and loss of energy efficiency.   Thus, the injection of A/C Re-New itself may shorten the lifespan of

the equipment or cause other issues in the future, after the warranty has expired, while the original contamination still remains in the system. Contractors have acknowledged the potential harmful effects of A/C Re-New because it is highly acidic, and could cause damage to coils and premature system failure.

26.    More importantly, Defendants have acknowledged that A/C Re-New can be harmful to these new energy efficient systems, when they emphatically warned contractors servicing defective systems as follows:

> **DO NOT** inject a system twice with the additive. A second injection could have negative long term system effects.

Source: Carrier Enterprise Dealer Service Bulletin, DSB 14-0012 (Supersedes DSB 14-0008), dated October 23, 2014.

27.    Defendants should have provided their customers with an adequate remedy under the warranty, which should have included flushing the contaminated refrigerant and oil from the systems, replacing filters, and replacing TXV valves. Instead, through their grossly inadequate warranty program, Defendants have shifted the costs associated with their manufacturing defect onto consumers and contractors. Defendants have been covering, at best, some parts' costs and a small labor allowance under their warranty, but this is grossly insufficient to rectify the defect. Further, either the consumer is forced to bear the remaining, substantial labor and materials costs, or, more often than not, the contractor who installed the brand-new system just weeks or months previously is forced to perform repairs at his own expense, or else risk serious, reputational detriment to his business. Contractors have been forced by Defendants to choose between their short-term financial requirements and potentially serious long-term reputational consequences of charging customers to purge the system and replace parts and fluids in new HVAC systems that should have been working perfectly but were not, due to a manufacturing defect.

28.    Consumers and contractors should not be required to bear the costs of Defendants' manufacturing defect.  Nor should they be required to bear the risk of later, out-of-warranty problems that may arise from the presence of contaminants or the A/C Re-New that Defendants have instructed contractors to inject into brand-new HVAC systems.

29.    Moreover, even though some affected consumers may not have experienced a complete TXV failure (yet), it is substantially likely that almost all of the impacted HVAC systems are not functioning as efficiently as they would have functioned absent impurities in the manufacturing process.  In other words, consumers are not receiving the advertised system efficiency to which they are entitled.

30.    Defendants' HVAC systems are sold with a ten-year limited parts warranty if the consumer registers the units, otherwise the limited warranty lasts five years.  Defendants' warranties state: "If a part fails due to defect during the applicable warranty period ICP will provide a new or remanufactured part, at ICP's option, to replace the failed defective part at no charge for free."

31.    As noted above, Defendants ceased replacing stuck TXVs and instead are merely injecting additional contaminants into the defective systems. Further, Defendants have never taken steps to actually remove the original contamination.

32.    Moreover, Defendants' warranty provides no coverage for labor or refrigerant.  Thus, despite the fact that Defendants knowingly sold defective HVAC systems, which frequently fail within weeks or months of installation, they are refusing to provide non-defective replacements and/or fully compensate consumers and contractors.  The limitations of Defendants' warranty are unconscionable given that, *inter alia*, these brand-new HVAC systems frequently fail within just weeks or months of installation, Defendants knew or should have known that their

manufacturing processes failed to adequately remove contaminants, Defendants continued to sell defective units even after they specifically identified the defect, and customers unknowingly agreed to a grossly one-sided, warranty contract of adhesion, which they had no opportunity to negotiate.

33.     Plaintiffs seek relief on behalf of consumers and contractors alike to remedy Defendants' violations of the consumer protection statutes, the Magnuson-Moss Warranty Act, breaches of express and implied warranties, negligent misrepresentation and unjust enrichment.  Plaintiffs seek to require Defendants to, *inter alia*, completely clean the defective systems of all contaminants and replace TXVs, fully compensate consumers for their economic damages and out-of-pocket costs resulting from the defective HVAC systems, compensate contractors for the full amount of labor and material costs they incurred to diagnose and repair the Defendants' defective equipment, and cover TXV or related failures that may occur in the future.

## JURISDICTION AND VENUE

34.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because it arises under the laws of the United States, and pursuant to 28 U.S.C. § 1332(d) because: (i) there are 100 or more class members; (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs; and (iii) because at least one Plaintiff and Defendants are citizens of different states.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

35.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1)-(2) because Plaintiff Oddo is a resident of California and Defendants conduct business throughout the State of California.

1

## PARTIES

2

### Plaintiffs

3

4      36.    Plaintiff Oddo is a resident of Costa Mesa, California.  In May 2015,

5  he purchased and installed a new Arcoaire-branded HVAC System (Model:

6  HXA630GKA100).   Based upon Arcoaire's representations about its products,

7  Oddo believed the system to be of high quality.   Prior to his purchase, Oddo

8  extensively reviewed Arcoaire's website and marketing materials provided by his

9  Arcoaire distributor.  Arcoaire's website states that its HVAC systems are "BUILT

10  TO LAST."   Further, the materials Oddo reviewed advertised that the system he

11  purchased was "high efficiency" and capable of up to a 16 Seasonal Energy

12  Efficiency Ratio ("SEER").   None of those materials disclosed the existence of a

13  manufacturing defect.  If they had, Oddo would not have purchased the system. At

14  the time of purchase and installation of his system, Oddo was unaware of

15  Defendants' dealer service bulletins concerning the manufacturing defect.

16      37.    In August 2015, Oddo's system failed due to a sticking TXV.  Per

17  the manufacturer's recommendation, his system was injected with A/C Re-New.

18  Due to the manufacturing defect in his Arcoaire system, Oddo's energy bills have

19  increased and he has incurred out-of-pocket expenses for the injection of A/C Re-

20  New.    The original chemical contaminant and now additional chemical

21  contaminants remain in Oddo's HVAC system.

22      38.    On September 8, 2015, Oddo, through his counsel, notified

23  Defendants of breach of warranty claims and other claims on behalf of himself and

24  all other similarly situated persons in the exact manner required by the terms of the

25  warranty.  Specifically, as required by the warranty, Oddo sent a letter via certified

26  mail to Warranty Claims, P.O. Box 4808, Syracuse, NY 13221, stating that, "UTC

27  and/or its subsidiaries have failed to comply with the terms of their express

28  warranties by failing to replace the defective systems and/or component parts,"

1  and demanding on behalf of himself and similarly situated persons that UTC, *inter*
2  *alia*, "Replace the defective HVAC Systems, or all such parts (including
3  refrigerant and oil) as are necessary to fully remove all contaminants" and
4  "Compensate Claimant and all purchasers and contractors who incurred costs
5  and/or labor to repair defective systems."  To date, Defendants have refused to
6  provide the relief requested.

7      39.    Plaintiff Reardon is a resident of Surprise, Arizona.  In October
8  2013, Reardon purchased a new home which came with two brand-new 3-ton
9  Carrier HVAC systems included in the price.    Reardon received product
10 information from her home builder which indicated, among other things, that
11 Reardon's systems was capable of up to 16 SEER.  None of those documents
12 disclosed the existence of a manufacturing defect.  If they had, Reardon would
13 have insisted that her home builder provide a non-defective HVAC system.  At the
14 time of the purchase and installation of her systems, Reardon was unaware of
15 Defendants' dealer service bulletins concerning the manufacturing defect.

16     40.    Between October 2013 and March 2015, Reardon's systems were
17 rarely used as she was living in Alaska at the time.  Soon after she began using the
18 systems in April 2015, she noticed that one of the systems (Model: CA16NA036-
19 A) was blowing hot air.  Reardon immediately contacted an authorized contractor
20 who diagnosed the problem as a sticking TXV.  On May 1, 2015, the contractor
21 replaced the TXV, pumped out the refrigerant, added new refrigerant and then
22 installed a new filter so that there would not be any "cross contamination."
23 Although the parts were provided under warranty, the labor was not.  Reardon paid
24 $885 for the diagnostic visit and labor costs to fix her Carrier system, which was
25 defective due to the contamination defect.

26     41.    Plaintiff LaSala is a resident of Boynton Beach, Florida.  In April
27 2014, a new Carrier HVAC system (Model: FF1ENP031) was purchased and

installed in LaSala's home.  LaSala received product information with the new system, which was advertised as being capable of up to 15 SEER.  None of those documents disclosed the existence of a manufacturing defect.  If they had, LaSala would not have had the system purchased and installed.  At the time of the purchase and installation of his system, LaSala was unaware of Defendants' service bulletins concerning the manufacturing defect.

42.     As the weather became warm in the spring of 2015, LaSala noticed that his system was not cooling so he contacted the HVAC contractor that had installed the unit.  The contractor diagnosed the problem as a sticking TXV and serviced the unit by injecting it with A/C Re-New.  The contractor did not charge LaSala for the additive or the labor, and he informed LaSala that the A/C-Renew is "just a bandaid," indicating that the additive does not resolve or cure the manufacturing defect.  The original chemical contaminant and now additional chemical contaminants remain in LaSala's system.

43.     Plaintiff Lamm is a resident of Marietta, Georgia.  In March 2015, she purchased and had installed two new Bryant HVAC systems (Model: 126BNA030; 126BNA0240) costing her approximately $10,000.  Prior to purchase, Lamm reviewed Bryant's website, as well as information from her installer which provided efficiency and capacity information.  Bryant's website describes Lamm's model air conditioner as follows:

> Whether you choose the 1- or 2-stage unit or the Preferred™ Compact model, **you'll enjoy reliable, whole-home comfort**. These mid-tier air conditioners are **designed to operate consistently and quietly with SEER ratings of 15 or higher**.

(Emphasis added.)   The Certificate of Product Ratings for her system states that it has a 16 SEER.   None of those documents disclosed the existence of a manufacturing defect.  If they had, Lamm would not have purchased the system.

Lamm was unaware of Defendants' dealer service bulletins at the time she purchased the systems.

44.     Lamm first turned on the new systems in June 2015 and within a few weeks, the downstairs system (Model: 126BNA030) completely shut down. She contacted the authorized contractor who installed the system, and a service technician was dispatched to her home on June 25, 2015.  The service technician informed her that "sludge" had collected around the TXV, causing it to stick, and that he had previously seen this "issue with this model."  The service technician informed Lamm that Bryant's protocol to "fix" the sticking TXV was to add A/C Re-New to the system.  Lamm questioned the service technician as to whether adding A/C Re-New could have long-term impacts, but he did not know.  Lamm then contacted Bryant customer service on or about July 8, 2015 and spoke with a customer service representative and also a Supervisor for Customer Care, both of whom also stated that they did not know what the long term effects of A/C Re-New would be.  Nevertheless, Lamm was told that Bryant's protocol was to use the additive for this manufacturing defect and so A/C Re-New was added.  The original chemical contaminant and now additional chemical contaminants remain in Lamm's system.

45.     Plaintiff Kimball is a resident of Towson, Maryland.  In March 2013, he purchased and had installed a new Bryant HVAC system (Model: 225BNA042-A).  Prior to purchase, Kimball reviewed Bryant brochures that he received from his installer and reviewed Bryant's website.  Kimball wanted a very high-efficiency system.  The system he purchased was advertised as being capable of up to 22 SEER.  None of the Bryant documents disclosed the existence of a manufacturing defect.  If they had, Kimball would not have purchased the system. Kimball was unaware of Defendants' dealer service bulletins at the time he purchased the system.

46.     In April 2015, Kimball noticed that the heat pump was not working well and when he switched it to air condition mode in May 2015, the system did not blow cool air.  Kimball had the unit serviced by an authorized contractor, who diagnosed it as a sticking TXV and advised that the repair would entail installation of a new valve, draining of old refrigerant, adding new refrigerant and a purging of the system with nitrate to clear all contaminants, costing Kimball $900.  After spending $12,000 on his system, Kimball did not want to incur such high out-pocket-expenses so he contacted another technician, who charged him $411 to install a new TXV and filter dryer.  Kimball has noticed that his system's performance is slowly declining.

47.     Plaintiff Klinge is a resident of Kansas City, Missouri.  In April 2015, Klinge purchased a Comfortmaker HVAC system (Model: R4A324GKC).  Prior to purchase, Klinge reviewed Comfortmaker's product efficiency and capacity information.  Klinge's system was advertised as being capable of 13 SEER which is also stated in the product specifications booklet he received at the time of purchase.   None of the materials disclosed the existence of a manufacturing defect.  If they had, Klinge would not have purchased the system.  At the time of the purchase and installation of his system, Klinge was unaware of Defendants' dealer service bulletins concerning the manufacturing defect.

48.     Almost immediately after Klinge began using the system in the summer of 2015, he noticed that it was not working properly.  Klinge called the authorized installer, who thought it was possible the system was not fully charged since it was installed during the cool weather, so he added approximately four ounces of 410A refrigerant, but this did not solve the problem.  Klinge then called another service technician, who diagnosed a sticking TXV.  In September 2015, a technician replaced the TXV (which Klinge purchased).  The system, however, continued to fail and the service technician injected it with A/C Re-New.  Klinge

1
2
3
4
5
6

has incurred approximately $433 in out-of-pocket expenses to have the system diagnosed and serviced.  Even after the system was injected with A/C Re-New, it has failed to operate properly.  Klinge contacted Comfortmaker's customer service but was told that they would not do anything about this problem and would not reimburse him for his out-of-pocket expenses.  The original chemical contaminant and now additional chemical contaminants remain in Klinge's system.

7
8
9
10
11
12
13
14
15

49.    Plaintiff Gallagher is a resident of Brownsburg, Indiana.  In May 2014, Gallagher purchased and had installed a new Bryant HVAC system (Model: CNPVP4211ALA-AAAA).  Gallagher reviewed Bryant's website and marketing materials.  Gallagher's system was advertised as being capable of up to 16 SEER but at installation it was specified as 13 SEER since there was not a variable speed blower on the existing furnace/air handler.  None of those documents disclosed the existence of a manufacturing defect.  If they had, Gallagher would not have purchased the system.  Gallagher was unaware of Defendants' dealer service bulletins at the time he purchased the system.

16
17
18
19
20
21
22
23
24
25
26

50.    Within 90 days of Gallagher's unit being turned on, he had two system failures.  On the first failure, the indoor coil iced up and the service technician replaced the TXV and four hours later, the second failure occured.  On the second failure, the indoor coil iced up again and the service technician replaced the TXV and the indoor coil.  Gallagher contacted Bryant by phone on August 26, 2014, but Bryant did not reveal the ongoing TXV problem.  Then again, in early May 2015, Gallagher's system stopped working and the coil was frozen.  He had it serviced and the system was injected with A/C Re-New.  The original chemical contaminant and now additional chemical contaminants remain in Gallagher's system.

27
28

17    AMENDED CLASS ACTION COMPLAINT

**Defendants**

51.    UTC's world headquarters is located at One Carrier Place, Farmington, CT.  UTC provides high technology products and services to the building systems and aerospace industries worldwide.  UTC manufactures and distributes HVAC systems through its subsidiary, Defendant ICP.

52.    ICP is headquartered at 640 Heil Quarter Avenue, Lewisburg, TN 37901.  ICP is a wholly owned subsidiary of UTC and manufactures HVAC brands including, but not limited to, Carrier, Bryant, Arcoaire, Comfortmaker and Heil.

53.    Arcoaire is headquartered at 640 Heil Quarter Avenue, Lewisburg, TN 37901.  Arcoaire manufactures HVAC systems and represents that its systems "give you rugged reliability" and that "each product is 100% run tested."

54.    Comfortmaker is located at 640 Heil Quarter Avenue, Lewisburg, TN 37901. Comfortmaker manufacturers HVAC systems and represents that "[e]ach unit is 100% run tested" and that the products are designed "to give you the best in quality, energy efficiency and reliability."

55.    Bryant is located at 1423 Selinda Avenue, Shepherdsville, KY 40165.  Bryant manufactures HVAC systems and represents itself "as an "experienced" manufacturing in producing "durable heating and cooling systems" whom consumers can "rely on."

56.    Carrier is headquartered at 7310 West Morris Street, Indianapolis, IN 46231.  Carrier manufactures HVAC systems and represents itself as the "world's leader in high-technology heating, air-conditioning and refrigeration solutions" because its "experts provide sustainable solutions, integrating energy-efficient products, building controls, and energy services for residential, commercial, retail, transport and food service customers."

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **ADDITIONAL FACTS**

### **HVAC Systems' Air Cooling Process**

57.    The basic principle by which an air conditioner works is Gay-Lussac's Law, which essentially states that the temperature of a gas rises as pressure increases and falls as pressure decreases.

58.    An HVAC system utilizes three primary components: a **compressor** that is driven by an electric motor which compresses the refrigerant, causing its temperature to change; a **condenser coil** typically located outside the building with tubing and fins for refrigerant flow over which air is blown, to change the temperature of the refrigerant; and an **evaporator coil** typically located inside the building with tubing and fins over which air is blown to change the temperature of the indoor air.  The following diagram illustrates the process.



**Central Air-Conditioning & Heating System**

Graphic courtesy: Air-Conditioning & Refrigeration Institute

59.    The refrigerant arrives at the compressor as a cool, low-pressure gas. The compressor squeezes the refrigerant, causing its molecules to be closer together, and the temperature to rise.  The compressed, hot refrigerant is then circulated through the outdoor condenser coil, where a fan blows air over the

1  condenser coil.  Even though the outdoor temperature may be high, the
2  temperature of the refrigerant is higher, so blowing air over it removes heat from
3  the refrigerant in the outdoor unit.  The condensers' fins act like a radiator to
4  quickly dissipate the heat.  As the refrigerant leaves the condenser, its temperature
5  is much cooler and it has changed from a gas to a liquid under pressure.

6      60.    When it arrives at the evaporator coil inside the building, the
7  pressure of the refrigerant is released, and as the liquid changes to gas and
8  evaporates, its temperature drops significantly.  This cold refrigerant is circulated
9  through the evaporator, which also has metal fins to facilitate the exchange of
10 thermal energy with the surrounding air.  A large fan circulates air over these fins
11 to be cooled and then throughout the interior of the building.  When the refrigerant
12 leaves the evaporator, it is returned to a cool, low-pressure gas to cycle back
13 through the compressor to repeat the process.  This process continues until the
14 building reaches the desired temperature.

15     61.    A valve on the indoor evaporator unit serves as the pressure relief
16 valve necessary to the cooling process.  In most modern equipment, this valve is a
17 TXV, which, as noted above, meters the amount of refrigerant that enters the
18 evaporator to achieve improved efficiency over older designs.

19     62.    A heat pump is an air conditioner that can also run in reverse,
20 heating the interior of the building in winter and cooling in summer.  A heat pump
21 contains a reversing valve that lets it switch between "air conditioner" and
22 "heater."  The valve allows the condenser (hot coil) and evaporator (cold coil) to
23 reverse places in the winter.  In the cooling mode, the valve slides to a position
24 that permits the hot refrigerant gas from the compressor to flow through the top
25 port to the bottom port to the water coil.  Thus, the heat pump functions like an air-
26 conditioner.  This diagram illustrates the process:

27

28

Source: "How Ground/Water Source Heat Pumps Work," Steve Kavanaugh, Professor Emeritus of Mechanical Engineering, University of Alabama.

**TXVs Play Critical Role in HVAC Systems**

63.     Metering devices regulate how much liquid refrigerant, such as 410A, enters the evaporator.  As stated above, most manufacturers now use TXVs for metering devices.

64.     TXVs are precision devices. These valves meter the refrigerant's flow rate in exact proportion to the rate of evaporation of the refrigerant in the evaporator.  The TXV has a sensing bulb attached to the outlet of the evaporator. This bulb senses the superheat[1] from the suction line temperature as it leaves the evaporator and sends a signal to the TXV, allowing it to adjust the flow rate. Superheat gives an indication if the amount of refrigerant flowing into the evaporator is appropriate for the load.  If the superheat is too high, then not enough refrigerant is being fed, resulting in poor refrigeration and excess energy use.  If

---

[1] Superheat is the temperature of vapor above its saturation temperature (boiling point).  It is found by measuring the actual temperature at the outlet of the evaporator and subtracting the temperature corresponding to the evaporating pressure from it. Thus, superheat is a temperature difference, not just a temperature.

the superheat is too low, then too much refrigerant is being fed, possibly resulting in liquid getting back to the compressor and causing compressor damage.

65.     Normally, TXVs are set to maintain around 10 degrees F of superheat. That means that the gas returning to the compressor is at least 10 degrees F away from the risk of having any liquid return.



TXV Pressure Balance Equation
**P1+P4 = P2+P3**
P1 = Bulb Pressure (Opening Force)
P2 = Evaporator Pressure (Closing Force)
P3 = Superheat Spring Pressure (Closing Force)
P4 = Liquid Pressure (Opening Force)

Source: Emerson Climate Technologies, "How Thermostatic Expansion Valves (TXV) Work."[2]

66.     Essentially, TXVs are intended to maintain/control accurate superheat evaporation and increase system efficiency.  The TXV opens and closes in response to the superheat at the evaporator outlet.  As a result, it adjusts its flow rate to balance with the actual load and operating conditions. This enables systems with TXVs to operate at ideal efficiency levels.   In addition, the TXV closes tightly when the compressor is not operating.  This prevents pressure equalization during the off cycle, allowing the system to return to optimum efficiency more quickly when the compressor is restarted.   It also leads to additional energy-efficiency gains.

67.     The efficiency of air conditioners is often rated by the SEER.  Since 2007, the United States requires that all residential systems manufactured after

---

[2] *See* http://www.ac-heatingconnect.com/how-thermostatic-expansion-valves-txv-work/.

1    2005 have a minimum SEER 13 rating.  Consequently, when this requirement

2    became effective, manufacturers – including Defendants – uniformly redesigned

3    their HVAC units to utilize TXVs for improved efficiency.

4         **410A Refrigerant and POE Oils**

5         68.    In 2010, manufacturers in the United States were required to phase

6    out   ozone-depleting   refrigerants   and   transition   to   ozone-friendly

7    hydrofluorocarbon ("HFC") refrigerants like 410A for new HVAC systems.

8         69.    As an alternative to the previous industry standard R-22 refrigerant,

9    410A is a blended refrigerant that requires special lubricants.  The chemistry of

10   410A refrigerant makes it incompatible with mineral-based lubricants.   The

11   preferred lubricants for 410A are the Polyolester or ester based oils such as POE

12   oils.

13        70.    Defendants' products are designed with a TXV metering device and

14   utilize 410A zero ozone depletion refrigerant.

15        71.    Because the use of POE oil with TXVs is industry standard,

16   Defendants have been well aware of the necessity for extra care in manufacturing

17   high-efficiency HVAC systems utilizing 410A, POE oil and TXVs.

18        **Defendants' Equipment Is "Plagued" by Sticking TXVs**

19        72.    As early as 2013, Defendants began receiving reports from the field

20   concerning TXV problems in newly-installed HVAC systems.

21        73.    By 2014, TXV failures had reached a crescendo. Frustrated

22   contractors describe Defendants' widespread HVAC system failures that

23   consumers were experiencing.  Just as examples:

24

25

26

27

28

1

| 08-20-2014,  07:52 PM | #157 |

zekehvac ○
New Guest

Join Date: Oct 2010
Posts: 5

Post Likes ⌃

We are having folks on their 3rd and 4th TXV failure.
Its happening on the units both with Copeland compressors and with LG Compressor in the Carrier 2.0 and 2.5 ton 13 SEER models.
We are collecting 400.00 labor to change them out yet our customers are not happy to say the least. I am working on a way to install an chatlett fitting style piston body directly to the carrier aluminum coil to reduce the chance of the customer having additional failures. Don't know what else to do since Carrier wont come up with a resolution outside of replacing the failed txv with a new one. We proposed suction filters with solid cores and they said no. We proposed ADP coils with orifices factory installed , they say no.??!!
I really wonder if the "sticky substance" is the coating on the compressor windings being dissolved by something used in the manufacturing process. You know what that means for the future of these affected units. 😡
I manage a large service fleet and we do around 2 Million a year with our Carrier dist.
We have a pretty good sampleing base..

Source: http://hvac-talk.com/vbb/showthread.php?1586931-Bryant-txv/page13 (errors in original) (last visited November 12, 2015).

| 08-25-2014,  11:37 AM | #166 |

FireEMT978 ○
Professional Member

Join Date: Sep 2013
Location: Minnesota, United States
Posts: 105

Post Likes ⌃

I am curious if anybody else has had the same issue with a 1.5 ton system? I am a Carrier dealer in MN. I have a 1.5 ton Payne (Carrier/Bryant) PA13NA018 that I installed on July 3rd that has been having the exact same issues. Ironically, I received the bulletin 5 minutes after calling tech support at the distributor. They keep telling me that the bulletin only covers the specific 2-2.5 ton coils, and not the 1.5 ton. It uses the exact same damn Danfoss TXV as the 2-2.5 ton coils. I have been doing this for 22 years, and feel like Carrier is like "too bad, **** rolls downhill". I have already replaced the entire coil, filter drier, and replaced the refrigerant at my own at my expense to try to verify that it was not a refrigerant issue. I leave the jobsite with subcooling at 10 degrees, and a week later, same damn issue. The replacement coil has the exact same txv as the original.
Sorry for the rant, just feel like it's a numbers game, and the only reason they haven't included the 1.5 ton is because there are not as many installed as the 2-2.5 ton where there aren't enough complaints.

Source: http://hvac-talk.com/vbb/showthread.php?1586931-Bryant-txv/page13 (last visited November 12, 2015).

[−] Dehno34  Tech   3 points 1 year ago
We've had to change pretty much every new coil/txv we've installed in the last 6 months. It's getting old.

Source:https://www.reddit.com/r/HVAC/comments/2fike4/update_r410a_txv_failings_across_many_brands/ , archived entry posted on or about November 2014 (last visited November 12, 2015).

⟶

📍Falls Church, Virginia    May 31    41 views    0 comments

Cyprus Air-Heating & Cooling|7525 Richmond Hwy Alexandria VA 22306 installed a brand new Carrier HVAC (a/c and gas heat) June 2014.The last week in May 2015 the A/C broke.

When I called for a repairman they said someone would be out at 1230, 6:30pm a technician showed up, troubleshot the unit said he has to get a part for it they didn't carry it in the shop.

Here it is three days later I learned from the company that Carrier has a problem with their Coils and the TXV unit.Basically Carrier is building A/C unit with sub-standard parts to save a buck.

Source:   http://carrier-corporation.pissedconsumer.com/unit-broke-within-a-year-the-coils-txv-unit-had-to-be-replaced-20150531643279.html   (last visited November 12, 2015).

74.    On July 3, 2014, Defendants issued a Dealer Service Bulletin (Main Number DSB 14-0008) pertaining to this issue.  Defendants' testing and chemical analyses pointed to a chemical reaction (hydrolysis or polymerization) causing organic compounds to form a dark and sticky substance that adheres to the orifice cone of the TXV, noting that this sticky substance either retards or entirely disables the TXV from opening and closing to meter the rate of refrigerant-liquid flow into the evaporator of the HVAC system.  Defendants' Dealer Bulletin (Revised) dated August 22, 2014 described the issue as "start-up only," meaning that the new systems were sold with the manufacturing defect that rendered the systems contaminated:

Internal and field testing have confirmed that this is a start-up only issue and not caused by the TXV or furnace coil. The TXV is acting as a filter and is capturing a "sticky" substance, which is causing the TXV to operate improperly.  Internal testing has confirmed that replacing a TXV after a field failure resolves the issue in a high percentage of cases,.  Replacing the factory installed TXV at the time of furnace coil installation does not prevent the customer from experiencing the issue.

Source:   Carrier Enterprise Dealer Service Bulletin, DSB 14-0012, dated August 22, 2014.

75.      The picture below at left shows a clean pin, spring and cap and the picture at right shows a sludge-coated TXV pin, spring and cap:

 

Source: Virginia Air Distributors, Inc., VAST-14-006 Service Tip, September 9, 2014.

Ultimately, it was determined that at least one major contributor to the contamination of Defendants' systems was coming from the Copeland scroll compressors that Defendants sourced from Emerson.  These compressors were manufactured with a chemical rust inhibitor that reacts with the POE oil in the HVAC systems that causes the dark sticky substance to form on the TXV. Nevertheless, even after this precise cause of the defect was discovered, Defendants continued to manufacture and sell defective units without warning contractors or consumers in order to use up existing inventory in their pipeline.

**Nu-Calgon's A/C Re-New Additive**

76.      Rather than flushing the chemical contaminants from the systems and replacing TXVs that have become coated with the contaminant, Defendants

began advising service personnel in a Dealer Bulletin dated October 23, 2014, that the "sole solution" was to inject the systems with a chemical additive, A/C Re-New, to dissolve the sticky substance that was clogging TXVs. (DSB 14-0012, Supersedes DSB 14-0008) (emphasis in original). As noted above, A/C Re-New was generally marketed as a means to squeeze out a few more years from old systems that are on their last-legs. Ordinarily, injecting A/C Re-New into a brand-new HVAC system would void the warranty.

77.     A/C Re-New does nothing to remove the contamination that is impacting TXV performance. Instead, it adds new contaminants that should not be in the HVAC system to begin with, defers problems to a future date, devalues the equipment, and impacts performance.

78.     Recognizing the potential for serious harm, Defendants have emphatically warned service technicians:

> **DO NOT** inject a system twice with the additive. A second injection could have negative long term system effects.

Source:     Carrier Enterprise Dealer Service Bulletin, DSB 14-0012 (Supersedes DSB 14-0008), dated October 23, 2014.

## CLASS ACTION ALLEGATIONS

79.     Plaintiffs bring this lawsuit, both individually and as a class action, on behalf of all similarly situated individuals, pursuant to Federal Rule of Civil Procedure 23(b)(2) and (3).

80.     For Plaintiffs' claims under the Magnuson-Moss Act, 15 U.S.C. §§ 2301-2312 (Count I), Plaintiffs seek to certify the following nationwide class (the "Nationwide Class"):

> **Nationwide Class**
> All persons and entities who purchased an HVAC system manufactured by Defendants between 2013 and 2015

utilizing 410A refrigerant, POE oil, a TXV, and a Copeland Scroll Compressor, and all persons and entities that have not been fully reimbursed for parts, materials, or labor expended in diagnosing and/or servicing such HVAC systems for performance issues caused by chemical contaminants remaining from the manufacturing process.

81.   In addition to Plaintiffs' request for a nationwide class under federal law, Plaintiffs seek to certify subclasses for their common law and state statutory claims under California law (the "California Sub-Class"), Arizona law ("Arizona Sub-Class"), Florida law ("Florida Sub-Class"), Georgia law ("Georgia Sub-Class"), Indiana law ("Indiana Sub-Class), Maryland law ("Maryland Sub-Class") and Missouri law ("Missouri Sub-Class") (collectively with the Nationwide Class, the "Class"):

**California Sub-Class (represented by Oddo)**

All persons and entities in California that purchased an HVAC system manufactured by Defendants between 2013 and 2015 utilizing 410A refrigerant, POE oil, a TXV, and a Copeland Scroll Compressor, and all persons and entities who have not been fully reimbursed for parts, materials, or labor expended in diagnosing and/or servicing such HVAC systems for performance issues caused by chemical contaminants remaining from the manufacturing process.

**Arizona Sub-Class (represented by Reardon)**

All persons and entities in Arizona that purchased an HVAC system manufactured by Defendants between 2013 and 2015 utilizing 410A refrigerant, POE oil, a TXV, and a Copeland Scroll Compressor, and all persons and entities who have not been fully reimbursed for parts, materials, or labor expended in diagnosing and/or servicing such HVAC systems for performance issues caused by chemical contaminants remaining from the manufacturing process.

**Florida Sub-Class (represented by LaSala)**

All persons and entities in Florida that purchased an HVAC system manufactured by Defendants between 2013 and 2015 utilizing 410A refrigerant, POE oil, a TXV, and a Copeland Scroll Compressor, and all persons and entities who have not been fully reimbursed for parts, materials, or labor expended in diagnosing and/or servicing such HVAC systems for performance issues caused by chemical contaminants remaining from the manufacturing process.

**Georgia Sub-Class (represented by Lamm)**

All persons and entities in Georgia that purchased an HVAC system manufactured by Defendants between 2013 and 2015 utilizing 410A refrigerant, POE oil, a TXV, and a Copeland Scroll Compressor, and all persons and entities who have not been fully reimbursed for parts, materials, or labor expended in diagnosing and/or servicing such HVAC systems for performance issues caused by chemical contaminants remaining from the manufacturing process.

**Indiana Sub-Class (represented by Gallagher)**

All persons and entities in Indiana that purchased an HVAC system manufactured by Defendants between 2013 and 2015 utilizing 410A refrigerant, POE oil, a TXV, and a Copeland Scroll Compressor, and all persons and entities who have not been fully reimbursed for parts, materials, or labor expended in diagnosing and/or servicing such HVAC systems for performance issues caused by chemical contaminants remaining from the manufacturing process.

**Maryland Sub-Class (represented by Kimball)**

All persons and entities in Maryland that purchased an HVAC system manufactured by Defendants between 2013 and 2015 utilizing 410A refrigerant, POE oil, a TXV, and a Copeland Scroll Compressor, and all persons and entities who have not been fully reimbursed for parts,

materials, or labor expended in diagnosing and/or servicing such HVAC systems for performance issues caused by chemical contaminants remaining from the manufacturing process.

**Missouri Sub-Class (represented by Klinge)**
All persons and entities in Missouri that purchased an HVAC system manufactured by Defendants between 2013 and 2015 utilizing 410A refrigerant, POE oil, a TXV, and a Copeland Scroll Compressor, and all persons and entities who have not been fully reimbursed for parts, materials, or labor expended in diagnosing and/or servicing such HVAC systems for performance issues caused by chemical contaminants remaining from the manufacturing process.

82.     Plaintiffs may seek to certify additional subclasses and reserve the right to modify the above class definitions prior to seeking certification.

83.     Excluded from the proposed Class are the following individuals and/or entities: the Court, all Court personnel involved in the handling of this case, as well as their immediate family members; Defendants and their subsidiaries, affiliates, officers and directors, current or former employees, and any entity in which Defendants have a controlling interest; all individuals who timely elect to be excluded from this proceeding using the correct protocol for opting out; all individuals claiming personal injury; and any and all federal, state or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, councils and/or subdivisions.

84.     **Numerosity:**  Upon information and belief, the Class comprises thousands of persons throughout the United States and is so numerous that the joinder of all members of the Class is impracticable.  While the exact number of individuals and entities that purchased Defendants' HVAC systems can only be

ascertained through discovery, the identity of Class members is readily determinable from Defendants' records.

85. **Common Questions of Law and Fact Predominate:** There are questions of law and fact common to the Class, which predominate over any individual issues, including:

(a) Whether and when Defendants knew or should have known that their manufacturing processes were not adequate in light of the known properties of POE oil and consistent with Defendants' use of TXVs;

(b) Whether Defendants knowingly sold HVAC equipment that had a high propensity to clog the TXV due to defects in manufacturing;

(c) Whether the injection of A/C Re-New, which Defendants have been prescribing, will have negative long-term effects or shorten the life of the HVAC systems;

(d) Whether the injection of A/C Re-New purges the system of contaminants;

(e) Whether Defendants' HVAC systems were sold with a manufacturing defect;

(f) Whether a reasonable consumer would consider the defect or its consequences to be material;

(g) Whether Defendants concealed and/or failed to disclose the defective condition of the HVAC systems to consumers;

(h) Whether Defendants breached express and implied warranties;

(i)    Whether Defendants were unjustly enriched;

(j)    Whether Defendants are subject to liability for violating the Consumers Legal Remedies Act, Cal., Civ. Code §§1750-1784;

(k)    Whether Defendants' conduct has violated the Unfair Competition Law, Cal. Bus. Prof Code §§17200-17209;

(l)    Whether Defendants' conduct has violated the False Advertising Law, Cal. Bus. & Prof. Code §§17500-17536;

(m)    Whether Defendants' conduct has violated the Song-Bervely Warranty Act, Cal. Civ. Code §§1790-1793.2;

(n)    Whether Defendants' conduct has violated the consumer protection laws of the Arizona Consumer Fraud Act, Ariz. Rev. Stat. §§ 44-1521, *et seq.*;

(o)    Whether Defendants' conduct has violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*;

(p)    Whether Defendants' conduct has violated the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. §10-1-370, *et seq.*;

(q)    Whether Defendants' conduct has violated the Georgia Fair Business Practices Act, OCGA §§ 10-1-309, *et seq.*;

(r)    Whether Defendants' conduct has violated the Indiana Deceptive Consumer Sales Act, Ind. Code §§ 24-5-0.5-1, *et seq.*;

(s)   Whether Defendants' conduct has violated the Maryland Consumer Protection Act, Md. Code Com. Law §§ 13-101, *et seq.*;

(t)   Whether Defendants' conduct has violated the Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010, *et seq.*;

(u)   Whether Defendants' conduct has violated the express and implied warranty laws of California, Arizona, Florida, Georgia, Indiana, Maryland and Missouri;

(v)   Whether Plaintiffs' claims satisfy the criteria for class certification under Federal Rule of Civil Procedure 23 and, to the extent applicable, California Civil Code § 1781; and

(w)   Whether Plaintiffs and the Class have sustained monetary losses and, if so, the proper measure of those losses.

86.   **Typicality:** Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and all members of the Class have been similarly affected by Defendants' common course of conduct.

87.   **Adequacy of Representation:**  Plaintiffs will fairly and adequately represent and protect the interest of the Class.  Plaintiffs have retained counsel with substantial experience in handling complex class action litigation.  Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class.

88.   **Superiority of Class Action:**  A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all Class members is economically unfeasible and procedurally impracticable.  While the aggregate damages sustained by the

Class is likely in the millions of dollars, the individual damages incurred by each Class member resulting from Defendants' wrongful conduct are not substantial enough to warrant the expense of individual suits.  The likelihood of individual Class members prosecuting their own separate claims is remote, and, even if every Class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.  Individual members of the Class do not have significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay of the same factual and legal issues.  Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.  In addition, Defendants have acted on grounds generally applicable to the Class and, as such, final injunctive relief or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate.

89.    Given that Defendants engaged in a common course of conduct as to Plaintiffs and the Class, similar or identical injuries and common law and statutory violations are involved and common questions far outweigh any potential individual questions.

90.    Plaintiffs reserve the right to revise the above class definition based on facts adduced in discovery.

### COUNT I
**Violation of the Magnuson-Moss Warranty Act,**
**15 U.S.C. §§ 2301, *et seq.*, for Breach of Express and Implied Warranties**
**(On Behalf of the Nationwide Class)**

91.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

92.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

93.    The Magnuson-Moss Warranty Act, 15 U.S.C. §2301(d)(1), provides a claim for relief for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

94.    As demonstrated above, Defendants have failed to comply with the terms of their express and implied warranties on the HVAC systems that they manufactured, advertised and sold through their distribution chain.

95.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

96.    Defendants' HVAC systems are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §2301(1).

97.    Defendants are each a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §2301(4) and (5).

98.    Plaintiffs and Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §2301(3), because they are persons entitled under applicable state law to enforce against the warrantor the obligation of its express and implied warranties.

99.    Defendants provided Plaintiffs and Class members with a written warranty within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6), and an implied warranty of fitness for a particular purpose covered under 15 U.S.C. § 2301(7), which warranties Defendants cannot disclaim under the Magnuson-Moss Warranty Act, when they fail to provide merchantable goods.

100.    Defendants breached these specific warranties as described in more detail above, and also breached them generally by: (a) manufacturing Defendants HVAC systems that are defective in design, materials and workmanship and are likely to fail prematurely; (b) selling defective HVAC systems not in merchantable

condition, which present an unreasonable risk of failure and are unfit for the ordinary purpose for which HVAC units are used; (c) providing HVAC systems that were defective at the time they were purchased; (d) refusing to replace stuck TXVs as provided by the warranty and, instead, injecting additional chemical contaminants; (e) refusing to repair or replace free of charge the defective HVAC systems or any of their component parts; (f) forcing consumers to pay for out-of-pocket costs for diagnostics, labor, repair and replacement parts; and (g) not curing the defect once it was known and identified.

101.    As a direct and proximate result of Defendants' breach of implied and express warranties pursuant to 15 U.S.C. § 2310(d)(1), Plaintiffs and Class members have suffered damages, in an amount to be proven at trial.

102.    Plaintiffs and Class members are entitled to recover damages as a result of Defendants' breach of warranties.

103.    Plaintiffs and Class members are also entitled to seek costs and expenses, including attorneys' fees, under the Magnuson-Moss Warranty Act, 15 U.S.C. §2301(d)(2).

104.    Plaintiffs provided Defendants with written notice of their violations. Defendants were afforded a reasonable opportunity to cure the violations and did not do so.

## COUNT II
### Negligent Misrepresentation
### (All Plaintiffs, Individually and On Behalf Of Their Respective State Sub-Classes)

105.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

106.    Plaintiff Oddo brings this claim on behalf of himself and the California Sub-Class; Plaintiff Reardon brings this claim on behalf of herself and the Arizona Sub-Class; Plaintiff LaSala brings this claim on behalf of himself and

the Florida Sub-Class; Plaintiff Lamm brings this claim on behalf of herself and the Georgia Sub-Class; Plaintiff Gallagher brings this claim on behalf of himself and the Indiana Sub-Class; Plaintiff Kimball brings this claim on behalf of himself and the Maryland Sub-Class; and Plaintiff Klinge brings this claim on behalf of himself and the Missouri Sub-Class (collectively, "State Sub-Classes").

107.    As a manufacturer of a product sold to consumers, Defendants have and continue to have a duty to disclose to Plaintiffs and their respective State Sub-Classes the actual quality of Defendants' HVAC systems and the defect alleged herein.

108.    Defendants negligently and/or recklessly misrepresented, omitted and concealed from Plaintiffs and their respective State Sub-Classes material facts relating to the quality of Defendants' HVAC systems and the systems' capability of performing up to their advertised SEER ratings.

109.    The misrepresentations, omissions and concealments complained of herein were negligently or recklessly made to potential purchasers and the general public on a uniform and market-wide basis.  As a direct and proximate result of these misrepresentations, omissions and concealments, Plaintiffs and the State Sub-Classes have been damaged, as alleged herein.

110.    Plaintiffs and the State Sub-Classes would not have purchased the HVAC systems had Defendants disclosed the defect, which was highly material.

111.    As alleged above, in deciding whether to spend thousands of dollars and pay a premium price for Defendants' new HVAC systems, Plaintiffs reviewed and relied upon the statements contained in Defendants' marketing and warranty materials.  Further, Defendants failed to disclose the existence of the defect in any marketing material or other publicly available disclosures.   Had Defendants disclosed the defect, Plaintiffs would not have purchased the defective systems.

112.    Based on such reliance, Plaintiffs and the State Sub-Classes purchased Defendants' HVAC systems and, as a result, suffered and will continue to suffer damages and economic loss in an amount to be proven at trial.

113.    Plaintiffs and their respective State Sub-Classes are also entitled to damages and injunctive relief as claimed below.

## COUNT III
### Unjust Enrichment
### (All Plaintiffs, Individually and On Behalf Of Their Respective State Sub-Classes)

114.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

115.    Plaintiffs bring this claim on behalf of themselves and the State Sub-Classes.

116.    Contractor Class members conferred a substantial benefit on Defendants by purchasing, re-selling, and installing Defendants' HVAC systems for consumers.  Contractor Class members also conferred a substantial benefit on Defendants by subsequently diagnosing and/or repairing the defective HVAC systems at reduced rates or for no compensation.  Contractor Class members also frequently incurred unreimbursed, out-of-pocket expenses for materials, tools, and other supplies necessary to repair the defective systems, which rightfully should have been covered by Defendants.  Contractor Class members have not been compensated for these benefits conferred on Defendants, and it is unjust for Defendants to retain those benefits.  Contractors conferred a tangible economic benefit upon Defendants by absorbing the labor and materials costs not covered by Defendants' warranty, but necessary to diagnose and attempt to fix the stuck TXVs.

117.    Consumer Class members have also conferred substantial benefits on Defendants by purchasing, at a premium price, the defective HVAC systems that

1   were worth far less and, in many situations, have also incurred out-of-pocket
2   expenses to have their systems' diagnosed and serviced due to the defect.

3       118.    Failing to require Defendants to provide remuneration under these
4   circumstances would result in Defendants being unjustly enriched at the expense of
5   contractors and consumers.

6       119.    Defendants' retention of the benefit conferred upon them by Plaintiffs
7   and the State Sub-Classes would be unjust and inequitable.

## COUNT IV
### Breach of Contract of Warranty
### (All Plaintiffs, Individually and On Behalf Of Their Respective State Sub-Classes)

12      120.    Plaintiffs repeat and reallege the allegations above as if fully set
13  forth herein.

14      121.   Plaintiffs bring this claim on behalf of themselves and the State Sub-
15  Classes.

16      122.    When Plaintiffs and the State Sub-Classes' members purchased their
17  HVAC systems from Defendants and/or their authorized dealers, a contract was
18  formed.

19      123.    Defendants' Limited Warranty, as well as advertisements, and any
20  other marketing materials formed the basis of the bargain that was reached
21  between Defendants and the State Sub-Classes.  The express warranty provided
22  with all Defendants' HVAC systems states, "If a part fails due to defect during the
23  applicable warranty period ICP will provide a new or remanufactured part, at
24  ICP's option, to replace the failed defective part at no charge for the part."
25  Further, Defendants warranted that their HVAC systems were capable of
26  performing to the advertised SEER rating.

27
28

124.    Defendants breached the contract with Plaintiffs and the State Sub-Classes by failing to replace defective parts.  Defendants have not replaced stuck TXVs, or replaced Plaintiffs and the State Sub-Classes' HVAC systems.  Rather, Defendants have instructed service personnel to inject yet another chemical contaminant, which further devalues the systems and presents a likelihood of future problems and reduced longevity.  Further, by adding the foreign additive, Defendants are not purging the system of the contaminants which degrade the efficiency of the systems and cause a likelihood of reoccurrence in the future, perhaps after Defendants' warranties have expired.

125.    As a direct and proximate result of the above-described wrongful conduct and breaches committed by Defendants, Plaintiffs and the State Sub-Classes have been harmed and will continue to suffer economic loss in an amount to be proven at trial.  Plaintiffs and the State Sub-Classes are entitled to damages and injunctive relief as specified below.

**COUNT V**
**Fraudulent Concealment**
**(All Plaintiffs, Individually and On Behalf Of Their Respective State Sub-Classes)**

126.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

127.    Plaintiffs bring this claim on behalf of themselves and the State Sub-Classes.

128.    Plaintiffs allege that Defendants intentionally suppressed and concealed the defect, or acted with reckless disregard for the truth, and denied Plaintiffs and the State Sub-Classes information that was highly relevant to their purchase decision.

129.    Defendants further affirmatively misrepresented to Plaintiffs and the State Sub-Classes, including in standard and uniform material provided with the

purchase of each HVAC system, that the systems would perform and operate properly under normal usage, and were capable of performing up to the advertised SEER ratings.

130.    Defendants knew or recklessly disregarded that these representations and omissions were false or misleading.

131.    Defendants' HVAC systems purchased by Plaintiffs and the State Sub-Classes were, in fact, defective because of the manufacturing defect alleged herein.

132.    Defendants had a duty to disclose that their HVAC systems were defective, inefficient and unreliable and essentially rendered inoperative due to the manufacturing defect, and that the limited warranty provided was grossly insufficient to repair the defect.

133.    The aforementioned concealment was material because if it had been disclosed, Plaintiffs and the State Sub-Classes would not have bought the defective HVAC systems, or would have not have bought them at the premium price paid.

134.    The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing a new HVAC system.  Defendants knew or recklessly disregarded that their representations were false because they knew that in order for them to sell their inventory of defective HVAC systems, they would need to conceal the defect and intentionally make the false statements.

135.    Plaintiffs relied on Defendants' omissions and affirmative misrepresentations about the efficiency, reliability and quality of the HVAC systems in purchasing their systems.

136.    Plaintiffs and the State Sub-Classes have been injured in an amount to be proven at trial.

137.   Defendants' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the State Sub-Classes.  Plaintiffs and the State Sub-Classes are therefore entitled to an award of punitive damages.

## COUNT VI
### Violation of the California Unfair Competition Law,
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*
### (On Behalf of the California Sub-Class)

138.   Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

139.   Plaintiff Oddo brings this claim on behalf of himself and the California Sub-Class.

140.   California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

141.   Defendants' conduct, as described herein, was and is in violation of the UCL.  Defendants' conduct violates the UCL in at least the following  ways:

> (a)   Representing that their HVAC systems have qualities, characteristics, and uses they do not have;
>
> (b)   Advertising the HVAC systems with the intent not to sell them as advertised;
>
> (c)   Selling merchandise that they knew was defective;
>
> (d)   Intentionally failing to disclose and/or concealing the defect;
>
> (e)   By violating federal law such as the Magnuson-Moss Warranty Act; and

(f)   By violating other California laws, including those claimed herein.

142.   Defendants' misrepresentations and omissions alleged herein caused Oddo and the California Sub-Class to make their purchases of HVAC systems. Absent those misrepresentations and omissions, Oddo and the California Sub-Class would not have purchased Defendants' HVAC systems, would not have purchased Defendants' HVAC systems at the prices they paid, and/or would have purchased less expensive or other HVAC systems that did not have the manufacturing defect described herein.

143.   Defendants have deceived Oddo and the California Sub-Class.

144.   Oddo and the California Sub-Class have suffered injury in fact, including lost money or property, as a result of Defendants' misrepresentations and omissions.

145.   By engaging in the above-described acts and practices, Defendants have committed one or more acts of unfair competition within the meaning of the UCL.  Specifically, by failing to disclose and concealing that the manufacturing defect and knowingly failing and refusing to honor their warranty and other legal obligations to Oddo and the California Sub-Class, Defendants have engaged in unfair conduct within the meaning of the UCL.  The benefit of any actions undertaken by Defendants in connection with the HVAC systems is grossly outweighed by the harm caused to Plaintiffs and the California Sub-Class as a result of Defendants' misconduct.  Moreover, the nature of Defendants' misconduct has been consistently recognized as unfair conduct within the meaning of the UCL, as it offends established public policy and/or is immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers.

146.   Defendants' business acts and practices are fraudulent within the meaning of the UCL.  Specifically, as entities with exclusive knowledge regarding

1    the manufacturing defect in the HVAC systems, Defendants had a duty to disclose

2    the existence of the defect to Oddo and the California Sub-Class.  Oddo and the

3    California Sub-Class reasonably expected that Defendants would disclose the

4    existence of any defect in the HVAC systems to them, which information is and

5    was material to Oddo and members of the California Sub-Class under all of the

6    circumstances.  Oddo and the California Sub-Class also reasonably expected that

7    Defendants would not sell, at a premium price, new HVAC systems that were

8    substantially likely to fail during their useful life.  By failing and refusing to

9    disclose the existence of the defect in the HVAC systems, Defendants have

10   engaged in actionable, fraudulent conduct within the meaning of the UCL.

11       147.   Oddo requests that this Court enter such orders or judgments as may

12   be necessary to enjoin Defendants from continuing their unfair, unlawful and/or

13   deceptive practices and to restore to Oddo and the California Sub-Class any money

14   Defendants acquired by unfair competition, including restitution and/or

15   restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203.

16

17                            **COUNT VII**
                      **False and Misleading Advertising,**
18                  **Cal. Bus. & Prof. Code §§ 17500,** *et seq.*
                      **(On Behalf of the California Sub-Class)**
19

20       148.   Plaintiffs repeat and reallege the allegations above as if fully set

21   forth herein.

22       149.   Plaintiff Oddo brings this claim on behalf of himself and the

23   California Sub-Class for violations of the California Business & Professions Code

24   § 17500, which states, in relevant part:

25               It is unlawful for any . . . corporation . . . with

26           intent directly or indirectly to dispose of real or personal

27           property  .  .  .  to  induce  the  public  to  enter  into  any

28

obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or . . . any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, . . . or . . . not to sell that personal property . . . as so advertised.

Cal. Bus. & Prof. Code § 17500.

150.     Defendants have engaged in the advertising and marketing alleged herein with an intent to directly or indirectly induce consumers' purchases of their HVAC systems.

151.     Defendants' representations regarding the characteristics, uses and benefits of their HVAC systems as efficient, high-quality systems, capable of performing to a specific SEER, were false, misleading and deceptive.

152.     The false and misleading representations were intended to, and did, deceive reasonable consumers, including Oddo and the California Sub-Class.

153.     The false and misleading misrepresentations and omissions were material to Oddo and the California Sub-Class in connection with their respective decisions to purchase Defendants' HVAC systems at a premium price.

154.     Oddo and the California Sub-Class relied on the false and misleading representations and omissions, which played a substantial part in influencing their decision to purchase Defendants' HVAC systems at a premium price.

155.    At the time they made and disseminated the representations alleged herein, Defendants knew, or should have known, that the statements were untrue or misleading, and acted in violation of California Business and Professions Code §§ 17500, *et seq.*

156.    Oddo, on behalf of himself and the California Sub-Class, seeks restitution, disgorgement, injunctive relief, and all other relieved provided under §§ 17500, *et seq.*

## **COUNT VIII**
**Violation of California Consumers Legal Remedies Act ("CLRA"),**
**Cal. Civ. Code §§ 1750, *et seq.***
**(On Behalf of the California Sub-Class)**

157.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

158.    Plaintiff Oddo brings this claim on behalf of himself and the members of the California Sub-Class who are "consumers" as defined in California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*

159.    The CLRA proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

160.    Defendants' defective HVAC systems are "goods" as defined in Cal. Civ. Code § 1761(a).

161.    As alleged herein, Defendants made numerous representations and omissions concerning the characteristics, uses, benefits, and quality of the HVAC systems that were misleading.

162.     In purchasing the defective HVAC systems, Oddo and the California Sub-Class were deceived by Defendants' failure to disclose that their HVAC systems were contaminated, which would impact the systems' performance.

163.     Defendants' conduct, as described herein, was and is in violation of the CLRA.  Defendants' conduct violates at least the following enumerated CLRA provisions:

(a)     California Civil Code Section 1770(a)(5), as Defendants represent that their HVAC systems have characteristics, uses, or benefits which they do not have;

(b)     California Civil Code Section 1770(a)(7), as Defendants represent that their HVAC systems are of a particular standard, quality, or grade, but are of another;

(c)     California Civil Code Section 1770(a)(9), as Defendants advertise their HVAC systems with the intent not to sell them as advertised;

(d)     California Civil Code Section 1770(a)(16), as Defendants represent that their HVAC systems had been supplied in accordance with a previous representation, when they had not; and

(e)     California Civil Code Section 1170(a)(19), as Defendants insert an unconscionable provision in the contract, *i.e.*, warranty.

164.     Oddo and the California Sub-Class have suffered injury in fact and actual damages resulting from Defendants' material omissions and misrepresentations, including repair costs and paying a premium price for the systems.

165.    Defendants knew, should have known, or were reckless in not knowing of the manufacturing defect in the HVAC systems and that the systems were not suitable to perform as advertised.

166.    The facts concealed and omitted by Defendants are material in that a reasonable consumer, like Oddo and the California Sub-Class, would have considered the omissions to be important in deciding whether to purchase Defendants' HVAC systems or pay a lower price.  Had Oddo and the California Sub-Class known about the defective nature of Defendants' HVAC systems, they would not have purchased them, or would not have paid the premium price they paid.

167.    In accordance with Cal. Civ. Code § 1780(a), Oddo and the California Sub-Class seek injunctive relief for Defendants' violations of the CLRA.

168.    In accordance with Cal. Civ. Code § 1782(a) & (d), Oddo has provided Defendants with the appropriate notice and demand but Defendants have failed to make any offer of Class-wide relief.  Attached as Exhibit A is Oddo's CLRA notice letter.

169.    Oddo seeks, for himself and the California Sub-Class, compensatory and punitive damages under the CLRA and also to recover attorneys' fees and costs pursuant to Cal. Civ. Code §§ 1780 and 1781.

## COUNT IX
**Breach of Express Warranty,**
**Cal. Com. Code § 2313**
**(On Behalf of the California Sub-Class)**

170.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

171.   Plaintiff Oddo brings this claim on behalf of himself and the California Sub-Class.

172.   The express warranty provided with all Defendants' HVAC systems states that Defendants "warrant[] this product against failure due to defect in materials or workmanship under normal use and maintenance …"  The warranty then states, "If a part fails due to defect during the applicable warranty period ICP will provide a new or remanufactured part, at ICP's option, to replace the failed defective part at no charge for the part."  Further, Defendants warranted that their HVAC systems were capable of performing to the advertised SEER rating.

173.   Defendants' limited warranty, as well as advertisements and other marketing materials which stated, *inter alia*, SEER ratings, formed the basis of the bargain that was reached when Oddo and the California Sub-Class purchased HVAC systems from Defendants and/or their authorized dealers, thereby constituting express warranties under Cal. Com. Code § 2313.

174.   Defendants breached the express warranty to replace defective parts. Defendants have not replaced stuck TXVs, or replaced Oddo and the California Sub-Class' HVAC systems.  Rather, Defendants have instructed service personnel to inject yet another chemical contaminant, which further devalues the systems and presents a likelihood of future problems and reduced longevity.  Further, by adding the foreign additive, Defendants are not purging the system of the contaminants which degrade the efficiency of the systems and cause a likelihood of reoccurrence in the future, perhaps after Defendants' warranties have expired.

175.   Furthermore, the limited warranty is unconscionable and fails in its essential purpose because the contractual remedy is insufficient to make Oddo and the California Sub-Class whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time. The warranty is a contract of adhesion, presented solely on a take-it or leave-it

1    basis, which Plaintiff and California Sub-Class members have no opportunity to

2    negotiate.  Given that Defendants knew about the defect at the time the systems

3    were sold, and also knew that the defect would require expensive repairs, the

4    limited warranty is unconscionable.

5          176.   Also, any provisions contained in Defendants' express warranties

6    that attempt to limit remedies to the exclusion of labor and other expenses incurred

7    in repairing or replacing the defective products are unconscionable, fail to conform

8    to the requirements for limiting remedies under applicable law, and cause

9    Defendants' express warranties to fail of their essential purpose, and are therefore

10   void.

11         177.   Accordingly, recovery by Oddo and the California Sub-Class is not

12   limited to the limited warranty of repair to or replacement of parts defective in

13   materials or workmanship, and Oddo, individually and on behalf of the California

14   Sub-Class, seeks all remedies as allowed by law.

15         178.   Defendants were put on notice of these issues by numerous

16   complaints and the industry-wide investigation – including their own investigation

17   – concerning the TXV failures that began in mid-2013.

18         179.   Further, Oddo, on behalf of himself and all others similarly situated,

19   provided notice of the alleged breach of warranty in full compliance with the

20   requirements of Defendants' warranty.

21         180.    Oddo and the California Sub-Class members suffered direct and

22   consequential damages as a direct and proximate result of Defendants' breach of

23   their express warranties of future performance, and are entitled to such damages

24   under Cal. Com. Code § 2313.

25

26

27

28

1
2
3
4

## COUNT X
### Violation of the Song-Beverly Act, Breach of Implied Warranty of Merchantability, Cal. Civ. Code §§ 1790, *et seq.*
### (On Behalf of the California Sub-Class)

5
6

181.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

7
8

182.    Plaintiff Oddo asserts this claim on behalf of himself and the California Sub-Class.

9
10
11

183.    This cause of action is brought for breach of implied warranties of merchantability and fitness on all new consumer goods sold at retail pursuant to the Song-Beverly Act, Civ. Code §§ 1790, *et seq.*

12
13
14
15

184.    Defendants' HVAC systems are a "consumer good" within the meaning of Civ. Code § 1791(a), Oddo and the California Sub-Class members are "buyers of consumers goods" within the meaning of Civ. Code § 1791(b), and Defendants are each a "manufacturer" within the meanings of Civ. Code § 1791(l).

16
17
18

185.    Defendants' warranty of merchantability of and fitness for a particular purpose arose out of and/or were related to their manufacture of HVAC systems that were sold to consumers through Defendants' distribution network.

19
20

186.    As set alleged herein, Defendants have failed to comply with their obligation under the implied warranties of merchantability and fitness.

21
22
23
24
25
26

187.    Oddo and the California Sub-Class have been damaged and will continue to be damaged as a result of Defendants' failure to comply with their warranty obligations.  Plaintiff Oddo and the California Sub-Class are, therefore, entitled to recover damages under the Song-Beverly Act, including damages pursuant to Cal. Civ. Code §§ 1791(d) and 1974.

27
28

188.  Defendants' breaches of warranty, as set forth above, were willful which, under the Song-Beverly Act, permits the imposition of a civil penalty in an amount not to exceed twice the amount of actual damages.

### COUNT XI
**Violation of the Arizona Consumer Fraud Act,
Ariz. Rev. Stat. §§44-1521, *et seq.* ("ACFA")
(On Behalf of the Arizona Sub-Class)**

189.  Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

190.  Plaintiff Reardon brings this claim on behalf of herself and the Arizona Sub-Class.

191.  This cause of action is brought pursuant to the Arizona Consumer Fraud Act, Ariz. Rev. Stat. §§ 44-1521, *et seq.* (the "ACFA"), which provides, in pertinent part:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

*Id.* § 44-1522.

192.  Reardon and other members of the Arizona Sub-Class are "persons" as defined by Ariz. Rev. Stat. § 44-1521(6), Defendants' HVAC systems are "merchandise" as defined by Ariz. Rev. Stat. § 44-1521(5), and Defendants are engaged in the "sale" of the merchandise, as defined by Ariz. Rev. Stat. § 44-1521(7).

193.    Defendants, in connection with the sale and advertisement of merchandise, engaged in deceptive and unfair acts and practices within the meaning of the AFCA, Ariz. Rev. Stat. § 44-1522, by:

(a)    Representing that their HVAC systems have qualities, characteristics, and uses they do not have;

(b)    Representing that their HVAC systems are of a particular standard, quality, or grade;

(c)    Advertising their HVAC systems with the intent not to sell them as advertised;

(d)    Selling merchandise that they know is defective;

(e)    Failing to notify Reardon and the Arizona Sub-Class that repairs were necessary for these new HVAC systems due to the contaminants in the system when they left Defendants' manufacturing plants; and

(f)    Failing to notify Reardon and the Arizona Sub-Class that they had no intention of replacing and/or adequately fixing the systems and, therefore, Plaintiffs and the Arizona Sub-Class would incur out-of-pocket expenses related to the diagnosing and servicing of the defective systems.

194.   In addition, Defendants' failure to disclose the manufacturing defect in their HVAC systems constitutes deceptive and/or unfair acts or practices because Defendants knew such facts would (a) be unknown to and not easily discoverable by Reardon and the Arizona Sub-Class; and (b) defeat Reardon and the Arizona Sub-Class' ordinary, foreseeable and reasonable expectations concerning the performance of their HVAC system.

195.   Defendant intended that Reardon and the Arizona Sub-Class rely on their concealment, suppression or omission, in connection with the sale of their

defective HVAC systems, in violation of the AFCA.  Ariz. Rev. Stat. § 44-1522. Reardon and members of the Arizona Sub-Class did, in fact, rely upon Defendants' representations, including but not limited to the advertised SEER ratings, in purchasing HVAC systems.

196.    Reardon and the Arizona Sub-Class have been damaged by Defendant's deception, and these damages include, but are not limited to, the premium price paid for the defective HVAC systems, but also all out-of-pocket expenses to have the defective systems diagnosed and serviced.

197.     Reardon also seeks court costs and attorneys' fees as a result of Defendants' violations of the AFCA as provided in Ariz. Rev. Stat. § 12-341-01.

## COUNT XII
### Breach of Implied Warranty
### Ariz. Rev. Stat. §47-2314
### (On Behalf of the Arizona Sub-Class)

198.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

199.    Plaintiff Reardon brings this claim on behalf of herself and the Arizona Sub-Class.

200.     At the time Defendants' designed, manufactured, produced,  tested, studied, inspected, labeled, marketed, advertised, sold, promoted, and distributed their HVAC systems for use by Reardon and the Arizona Sub-Class, Defendants knew of the use for which their systems were intended.

201.     Defendants impliedly warranted their products to be of merchantable quality and safe and fit for their intended use.

202.     Contrary to such implied warranty, Defendants' HVAC systems were not of merchantable quality or fit for their intended use because the systems

1    were and are defective and unfit for the ordinary purposes for which they were

2    used, as alleged herein.

3        203.    As a direct and proximate result of Defendants' breaches of their

4    implied warranties of merchantability, Reardon and the Arizona Sub-Class have

5    incurred and will continue to incur damages and losses as alleged herein.

6

7                                   **COUNT XIII**
     **Violation of the Florida Deceptive and Unfair Trade Practices Act,**
8                    **Fla. Stat. §501.201, *et seq.* ("DUTPA")**
                      **(On Behalf of the Florida Sub-Class)**
9

10       204.    Plaintiffs repeat and reallege the allegations above as if fully set

11   forth herein.

12       205.    Plaintiff LaSala brings this count individually and on behalf of the

13   Florida Sub-Class.

14       206.    The Florida Deceptive and Unfair Trade Practices Act ("DUTPA"),

15   FLA. STAT. § 501.201, *et seq.*, makes unlawful any "[u]nfair methods of

16   competition, unconscionable acts or practices, and unfair or deceptive acts or

17   practices in the conduct of any trade or commerce."

18       207.    Defendants' misrepresentations and material omissions regarding the

19   defective nature of their HVAC systems constitute unconscionable, unfair, and

20   deceptive acts or practices, in violation of the DUTPA.

21       208.    Defendants' misrepresentations concerning the systems' capability

22   of performing up to their advertised SEER ratings constitute unconscionable,

23   unfair, and deceptive acts or practices, in violation of the DUTPA.

24       209.    Defendants' unconscionable, unfair, and deceptive acts and

25   omissions took place in the conduct of trade or commerce.

26

27

28

210.   Defendants' intended for LaSala and the Florida Sub-Class to rely on these unconscionable, unfair, and deceptive acts and omissions when LaSala and the Florida Sub-Class purchased the HVAC systems.

211.   LaSala and the Florida Sub-Class have suffered injuries in fact, ascertainable loss and actual damages, resulting from Defendants' violation of DUTPA. These injuries are of the type the DUTPA was designed to prevent, and are the direct and proximate result of Defendants' unlawful conduct.

212.   Under the DUTPA, § 501.211(2) and § 501.2105, LaSala and the Florida Sub-Class are entitled to actual damages, injunctive relief and attorney's fees and costs.

### COUNT XIV
**Breach of Express Warranty, Fla. Stat. §672.313**
**(On Behalf of the Florida Sub-Class)**

213.   Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

214.   Plaintiff LaSala asserts this claim on behalf of himself and the Florida Sub-Class.

215.   Defendants are and were at all relevant times merchants with respect to HVAC systems.

216.   The express warranty provided with all Defendants' HVAC systems states that Defendants "warrant[] this product against failure due to defect in materials or workmanship under normal use and maintenance …" The warranty then states, "If a part fails due to defect during the applicable warranty period ICP will provide a new or remanufactured part, at ICP's option, to replace the failed defective part at no charge for the part." Further, Defendants warranted that their HVAC systems were capable of performing to the advertised SEER rating.

217.   Defendants' limited warranty, as well as advertisements and other marketing materials which stated, *inter alia*, SEER ratings, formed the basis of the bargain that was reached when LaSala and the Florida Sub-Class purchased HVAC systems from Defendants and/or their authorized dealers, thereby constituting express warranties.  Fla. Stat. §672.313.

218.   Defendants breached the express warranty to replace defective parts andhave not replaced stuck TXVs, or replaced Plaintiff LaSala and the Florida Sub-Class' HVAC systems.  Rather, Defendants have instructed service personnel to inject yet another chemical contaminant, which further devalues the systems and presents a likelihood of future problems and reduced longevity.  Further, by adding the foreign additive, Defendants are not purging the system of the contaminants which degrade the efficiency of the systems and cause a likelihood of reoccurrence in the future, perhaps after Defendants' warranties have expired.

219.   Furthermore, the limited warranty is unconscionable and fails in its essential purpose because the contractual remedy is insufficient to make LaSala and the Florida Sub-Class whole and because Defendants have failed and/or refused to adequately provide the promised remedies within a reasonable time. The warranty is a contract of adhesion, presented solely on a take-it or leave-it basis, which LaSala and the Florida Sub-Class members have no opportunity to negotiate.  Given that Defendants knew about the defect at the time the systems were sold, and also knew that the defect would require expensive repairs, the limited warranty is unconscionable.

220.   Also, any provisions contained in Defendants' express warranties that attempt to limit remedies to the exclusion of labor and other expenses incurred in repairing or replacing the defective products are unconscionable, fail to conform to the requirements for limiting remedies under applicable law, and cause

1  Defendants' express warranties to fail of their essential purpose, and are therefore
2  void.

3       221.    Accordingly, recovery by LaSala and the Florida Sub-Class is not
4  limited to the limited warranty of repair to or replacement of parts defective in
5  materials or workmanship, and LaSala, individually and on behalf of the Florida
6  Sub-Class, seeks all remedies as allowed by law.

7       222.    Defendants were put on notice of these issues by numerous
8  complaints and the industry-wide investigation – including their own investigation
9  – concerning the TXV failures that began in mid-2013.

10      223.    Further, Plaintiff Oddo, on behalf of himself and all others similarly
11 situated, provided notice of the alleged breach of warranty in full compliance with
12 the requirements of Defendants' warranty.

13      224.    LaSala and the Florida Sub-Class members suffered direct and
14 consequential damages as a direct and proximate result of Defendants' breach of
15 their express warranties of future performance, and are entitled to such damages
16 under Fla. Stat. §672.313.

**COUNT XV**
**Breach of Implied Warranty of Merchantability,**
**Fla. Stat. §672.314**
**(On Behalf of the Florida Sub-Class)**

20      225.    Plaintiffs repeat and reallege the allegations above as if fully set
21 forth herein.

22      226.    Plaintiff LaSala asserts this claim on behalf of himself and the
23 Florida Sub-Class.

24      227.    Defendants are and were at all relevant times merchants with respect
25 to HVAC systems.

26      228.    At the time Defendants designed, manufactured, produced,  tested,
27 studied, inspected, labeled, marketed, advertised, sold, promoted, and distributed

their HVAC systems for use by LaSala and the Florida Sub-Class, Defendants knew of the use for which their systems were intended.

229.    Defendants impliedly warranted their products to be of merchantable quality and safe and fit for their intended use.

230.    Contrary to such implied warranty, Defendants' HVAC systems were not of merchantable quality, safe or fit for their intended use because the systems were and are defective and unfit for the ordinary purposes for which they were used, as alleged herein.

231.    As a direct and proximate result of Defendants' breaches of their implied warranties of merchantability, LaSala and the Florida Sub-Class members have incurred and will continue to incur damages and losses as alleged herein.

### COUNT XVI
**Violation of the Georgia Uniform Deceptive Trade Practices Act,**
**O.C.G.A. §10-1-370, *et seq.***
**(On Behalf of the Georgia Sub-Class)**

232.    Plaintiffs repeat and reallege the allegations above as if set forth fully herein.

233.    Plaintiff Lamm asserts this claim on behalf of herself and the Georgia Sub-Class.

234.    Georgia's Uniform Deceptive Trade Practices Act ("GA UDTPA") prohibits certain deceptive trade practices in the course of business, vocation or occupation.

235.    Defendants, in the course of their business, by their above alleged conduct, engaged in one or more acts characterized as "deceptive," pursuant to O.C.G.A. § 10-1-372, in that they, *inter alia*:

(a)   Represent that their HVAC systems have characteristics, uses, benefits, or quantities that they do not have, O.C.G.A. § 10-1-372(a)(5); and

(b)   Engage in other conduct which similarly creates a likelihood of confusion or of misunderstanding, O.C.G.A. § 10-1-372(a)(12).

236.   Defendants have engaged in deceptive, unconscionable, unfair, fraudulent and misleading commercial practices in the design, manufacture, marketing, promotion, distribution, sale and servicing or repair of HVAC systems they knew to be defective, in violation of the GA UDTPA.

237.   Defendants, upon information and belief, have or should have had actual knowledge of the defect when they placed their HVAC systems in the stream of commerce, based on their knowledge of the properties of POE oil, the need to ensure component parts are free from contaminants, and the sensitivity of the TXV as a metering device.

238.   In addition, Defendants were notified by consumers and contractors making warranty claims as late as 2014 regarding system shutdowns and TXV failures.  Furthermore, upon notification of these problems, Defendants conducted their own testing in 2014, identified the problem and determined that the sticking TXVs were caused by a manufacturing defect which allowed contaminants in the system and that the presence of these contaminants prevented the systems to perform up to their advertised SEER ratings.

239.   Months prior to Lamm's purchase of her HVAC system, Defendants identified it as a defective model in their Dealer Service Bulletin, dated October 23, 2014, but failed to pull the model from their distribution lines.

240.   Accordingly, Defendants, in the course of their business, by their above-described conduct, engaged in one or more acts characterized as "deceptive," pursuant to the GA UDTPA.

241.    Defendants' actions impact the public interest because Lamm was injured in exactly the same way as thousands of others purchasing the defective HVAC systems as a result of Defendants' generalized course of deception. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business.

242.    Defendants' conduct threatens to cause future injuries to Lamm in that the proffered "fix" does not clear the contaminants in the systems, guarantee that the TXVs will remain unclogged or that the AC-Renew will not degrade the system or shorten its lifespan.

243.    As a direct and proximate result of Defendants' violations of the GA UDTPA, Lamm has suffered injury-in-fact and/or actual damage.

244.    In accordance with the UDTPA, Lamm put Defendants on notice of these issues more than 30 days prior to the filing of this action by first making a warranty claim and then speaking with Carrier's supervisor of customer service. Defendants were also put on notice of these issues by numerous complaints and the industry-wide investigation – including their own investigation – concerning the TXV failures that began in mid-2013.

245.    Lamm seeks an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the GA UDTPA, O.C.G.A. § 10-1-373.

## COUNT XVII
### Violations of the Georgia Fair Business Practices Act,
### OCGA §§ 10-1-309, *et seq.*
### (On Behalf of the Georgia Sub-Class)

246.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

247.    Plaintiff Lamm brings this claim on behalf of herself and the Georgia Sub-Class.

248.    The Georgia Fair Business Practices Act ("GFBPA"), OCGA §§ 10-1-309, *et seq.*, prohibits unfair or deceptive acts or practices in the conduct of consumer transactions and consumer pacts or practices in trade or commerce.

249.    Defendants have engaged in deceptive, unconscionable, unfair, fraudulent and misleading commercial practices in the design, manufacture, approval, marketing, promotion, distribution, sale and servicing or repair of their HVAC systems that they knew to be defective, in violation of the GFBPA.

250.    Defendants had actual knowledge of the defect by mid-2013 when they began their own testing concerning the defect but they nevertheless placed the defective HVAC systems in the stream of commerce.

251.    In addition, Defendants were notified by consumers registering complaints and making warranty claims in 2013 regarded sticking TXVs and degraded cooling capabilities that rendered the systems incapable of performing up to their advertised SEER ratings.

252.    This defect is latent and is not something that Lamm or the Georgia Sub-Class, in the exercise of reasonable diligence, could have discovered independently prior to purchase.

253.    In its marketing, sale and servicing or repair of the HVAC systems, Defendants undertook active and ongoing steps to conceal the defects and withheld information about the defective systems.  Nothing on the HVAC systems or in the product materials and warranty disclosed the defect nor indicated that Defendants' HVAC systems were incapable of performing up to their advertised SEER ratings.

254.    Defendants' conduct was objectively deceptive and was likely to deceive reasonable consumers under the circumstances.  The fact that a defect in a

brand new HVAC system, which costs thousands of dollars, could cause the HVAC system to shut down and then require extensive servicing to fully purge the system of contaminants, was a material fact that a reasonable consumer would attach importance to at the time of purchase.  This fact would influence a reasonable consumer's choice of action during the purchase of a HVAC system.

255.   Defendants had a duty to disclose their knowledge of this material defect because, *inter alia*, they possessed superior and exclusive knowledge. Defendants failed to disclose to Lamm and the Georgia Sub-Class the material fact that the HVAC systems were defective and would fail within weeks or months of initial operation.

256.   Additionally, Defendants advertised and marketed the HVAC systems with the intent not to sell them as advertised.  Specifically, Defendants advertised their systems as being energy efficient and having a specific SEER even though Defendants knew at all relevant times that the defect degraded the systems' ability to cool.

257.   Defendants intended that Lamm and the Georgia Sub-Class rely on Defendants' acts of concealment and omissions by purchasing the HVAC systems at a premium price rather than paying less for them or purchasing a competitor's product.

258.   Had Defendants disclosed all material information regarding the defect, Lamm and the Georgia Sub-Class would not have purchased the HVAC systems, or they would have paid less for them.

259.   Defendants' conduct had an impact on the public interest because the acts were part of a generalized course of conduct that affected numerous consumers.

260.   As a result of the foregoing acts, omissions and unconscionable commercial practices, Lamm and the Georgia Sub-Class have suffered an

ascertainable loss by purchasing defective HVAC systems that are unable to perform their essential function of efficiently cooling homes. Lamm and the Georgia Sub-Class have incurred additional costs to diagnose and have their HVAC systems serviced, have been denied use of their HVAC systems, and/or have suffered unreasonable diminution of value in their HVAC systems as a result of Defendants' conduct.

261.    Lamm and the Georgia Sub-Class are entitled to recover such damages, together with appropriate penalties, including exemplary damages, as well as attorneys' fees and costs of suit.

262.    Lamm put Defendants on notice that the HVAC systems were defective by making a warranty claim and speaking with Bryant representatives on July 8, 2015. Further, Plaintiff Oddo provided Defendants with notice of the deceptive acts and practices alleged herein. (*See* Exhibit A.) As Defendants have nonetheless failed to cure, Plaintiff Lamm seeks all available statutory remedies on behalf of herself and the Georgia Sub-Class. A copy of this Amended Complaint will be mailed to the State Administrator of Georgia.

**COUNT XVIII**
**Breach of Express Warranty,**
**O.C.G.A. §11-2-313**
**(On Behalf of the Georgia Sub-Class)**

263.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

264.    Plaintiff Lamm brings this claim on behalf of herself and the Georgia Sub-Class.

265.    The express warranty provided with all Defendants' HVAC systems states that Defendants "warrants this product against failure due to defect in materials or workmanship under normal use and maintenance …" The warranty then states, "If a part fails due to defect during the applicable warranty period ICP

1    will provide a new or remanufactured part, at ICP's option, to replace the failed

2    defective part at no charge for the part."  Further, Defendants warranted that their

3    HVAC systems were capable of performing to the advertised SEER rating.

4        266.    Defendants' limited warranty, as well as advertisements and other

5    marketing materials which stated, *inter alia*, SEER ratings, formed the basis of the

6    bargain that was reached when Lamm and the Georgia Sub-Class purchased

7    HVAC systems from Defendants and/or their authorized dealers, thereby

8    constituting express warranties under O.C.G.A.§ 11-2-313.

9        267.    Defendants breached the express warranty to replace defective parts

10   and have not replaced stuck TXVs, or replaced Lamm and the Georgia Sub-Class'

11   HVAC systems.  Rather, Defendants have instructed service personnel to inject yet

12   another chemical contaminant, which further devalues the systems and presents a

13   likelihood of future problems and reduced longevity.  Further, by adding the

14   foreign additive, Defendants are not purging the system of the contaminants which

15   degrade the efficiency of the systems and cause a likelihood of reoccurrence in the

16   future, perhaps after Defendants' warranties have expired.

17       268.    Furthermore, the limited warranty is unconscionable and fails in its

18   essential purpose because the contractual remedy is insufficient to make Lamm

19   and the Georgia Sub-Class whole and because Defendants have failed and/or have

20   refused to adequately provide the promised remedies within a reasonable time.

21   The warranty is a contract of adhesion, presented solely on a take-it or leave-it

22   basis, which Lamm and the Georgia Sub-Class members have no opportunity to

23   negotiate.  Given that Defendants knew about the defect at the time the systems

24   were sold, and also knew that the defect would require expensive repairs, the

25   limited warranty is unconscionable.

26       269.    Also, any provisions contained in Defendants' express warranties

27   that attempt to limit remedies to the exclusion of labor and other expenses incurred

28

in repairing or replacing the defective products are unconscionable, fail to conform to the requirements for limiting remedies under applicable law, and cause Defendants' express warranties to fail of their essential purpose, and are therefore void.

270.    Accordingly, recovery by Lamm and the Georgia Sub-Class is not limited to the limited warranty of repair to or replacement of parts defective in materials or workmanship, and Lamm, individually and on behalf of the Georgia Sub-Class, seeks all remedies as allowed by law.

271.    Defendants were put on notice of these issues by numerous complaints and the industry-wide investigation – including their own investigation – concerning the TXV failures that began in mid-2013.

272.    Lamm and the Georgia SubClass members suffered direct and consequential damages as a direct and proximate result of Defendants' breach of their express warranties of future performance, and are entitled to such damages under O.C.G.A.§ 11-2-313.

**COUNT XIX**
**Breach of Implied Warranty of Merchantability,**
**O.C.G.A. § 11-2-314**
**(On Behalf of the Georgia Class)**

273.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

274.    Plaintiff Lamm asserts this claim on behalf of herself and the Georgia Sub-Class.

275.    At the time Defendants designed, manufactured, produced, tested, studied, inspected, labeled, marketed, advertised, sold, promoted, and distributed their HVAC systems for use by Lamm and the other members of the Georgia Sub-Class, Defendants knew of the use for which their systems were intended.

276.    Defendants impliedly warranted their products to be of merchantable quality and safe and fit for their intended use.

277.    Contrary to such implied warranty, Defendants' HVAC systems were not of merchantable quality, safe or fit for their intended use because the systems were and are defective and unfit for the ordinary purposes for which they were used, as alleged herein.

278.    As a direct and proximate result of the Defendants' breaches of their implied warranties of merchantability, Plaintiff Lamm and the Georgia Sub-Class members have incurred and will continue to incur damages and losses as alleged herein.

**COUNT XX**
**Indiana Deceptive Consumer Sales Act**
**Ind. Code Ann. § 24-5-0.5-1, *et seq.***
**(On Behalf of the Indiana Sub-Class)**

279.    Plaintiffs repeat and reallege the allegations above as if set forth fully below.

280.    Plaintiff Gallagher asserts this claim on behalf of himself and the Indiana Sub-Class.

281.    The Indiana Deceptive Consumer Sales Act ("IDCSA"), Ind. Code § 24-5-0.5-1 to 24-5-0.5-11, clarifies that its purpose is to protect consumers from suppliers who commit deceptive and unconscionable sales acts.

282.    Plaintiff Gallagher and the members of the Indiana Sub-Class are "persons" within the meaning of Ind. Code § 24-5-0.5-2(a)(2).

283.    Defendants, as manufacturers, are "suppliers" within the meaning of Ind. Code § 24-5-0.5-2(a)(3).

284.    Defendants' HVAC systems are the "subject of a consumer transaction" within the meaning of Ind. Code § 24-5-0.5-2(a)(4).

285.    Defendants have engaged in "consumer transaction(s)" within the meaning of Ind. Code § 24-5-0.5-2(a)(1).

286.   Defendants have engaged in "uncured deceptive acts" within the meaning of Ind. Code § 24-5-0.5-2(a)(7) because, upon notice, Defendants have failed to cure the manufacturing defect in their HVAC systems sold to Plaintiff Gallagher and the members of the Indiana Sub-Class.

287.   The IDCSA makes unlawful the "act, omission, or practice [of] . . . both implicit and explicit misrepresentations" in the context of a "consumer transaction." Ind. Code § 24-5-0.5-3(a). In connection with selling their HVAC systems, Defendants omitted, suppressed and concealed that their HVAC systems were defective, as described herein, and did so with the intent that others rely upon such concealment, suppression or oppression in connection with the sale of the HVAC systems.  By failing to disclose the defect or the facts about the defect described herein known to Defendants or knowable to them upon reasonable inquiry, Defendants deprived consumers, such as Gallagher and the Indiana Sub-Class, of all material facts about the efficiency and reliability of their HVAC systems and capability of actually performing up to their advertised SEER ratings. By failing to release and/or affirmatively hiding material facts about the defect, Defendants curtailed or reduced the ability of consumers to take notice of material facts about their HVAC systems.  Defendants, therefore, have engaged in activities with the tendency or capacity to deceive in violation of Ind. Code § 24-5-0.5-3(a).

288.   The ICSA also specifically defines 37 different deceptive acts by a supplier made either orally, in writing, or by electronic means concerning the subject matter of a consumer transaction which include:

> (a) Representing that the subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have; and

(b)  Representing that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not.

Ind. Code § 24-5-0.5-3(b).

289.    Because Defendants knew or believed that their statements regarding efficiency, performance and reliability were not in accord with the facts and/or had no reasonable basis for such statements in light of their knowledge of the manufacturing defect, Defendants engaged in deceptive acts pursuant to Ind. Code § 24-5-0.5-3(b).

290.    Defendants knew or should have known that their conduct violated the IDCSA because Defendants:

(a)  Possessed exclusive knowledge that their manufacturing process was not tooled to eliminate contaminants in the HVAC systems, thereby allowing defective systems to enter the stream of commerce;

(b)  Intentionally concealed the foregoing from Gallagher and the Indiana Sub-Class; and/or

(c)  Made incomplete, false or misleading representations about the efficiency, performance and quality of their HVAC systems while purposefully withholding material facts from Gallagher and the Indiana Sub-Class that contradicted these representations.

291.    Defendants further violated the IDCSA pursuant to Ind. Code § 24-5-0.5-10(b), by engaging in the deceptive act of selling HVAC systems with a limited warranty that Defendants knew unduly limited the person's remedies, the terms of the warranty were oppressively one-sided and the price was unduly

excessive in light of the fact that Defendants' knew, or reasonably should have known, that their brand new systems contained a manufacturing defect that degraded the system's efficiency and rendered the systems worth far less than the premium price paid by Gallagher and the Indiana Sub-Class.

292.    Because Defendants' HVAC systems are worth far less than paid for by Gallagher and the Indiana Sub-Class and these defective systems have caused him and the Indiana Sub-Class to incur out-of-pocket expenses, they have suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

293.    In accordance with the IDCSA, Gallagher put Defendants on notice of these issues by making a warranty claim and communicating with Bryant's customer service on August 26, 2014.  Defendants were also put on notice of these issues by numerous complaints and the industry-wide investigation – including their own investigation – concerning the TXV failures that began in mid-2013.

294.    Pursuant to Ind. Code § 24-5-0.5-4, Gallagher and the Indiana Sub-Class seek actual damages, attorneys' fees, and any other just and proper relief available under the IDCSA.

**COUNT XXI**
**Breach of Express Warranty,**
**Ind. Code Ann. § 26-1-2-313**
**(On Behalf of the Indiana Sub-Class)**

295.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

296.    Plaintiff Gallagher brings this claim on behalf of himself and the Indiana Sub-Class.

297.    The express warranty provided with all Defendants' HVAC systems states that Defendants "warrant[] this product against failure due to defect in

materials or workmanship under normal use and maintenance …"  The warranty then states, "If a part fails due to defect during the applicable warranty period ICP will provide a new or remanufactured part, at ICP's option, to replace the failed defective part at no charge for the part."  Further, Defendants warranted that their HVAC systems were capable of performing to the advertised SEER rating.

298.    Defendants' limited warranty, as well as advertisements and other marketing materials which stated, *inter alia*, SEER ratings, formed the basis of the bargain that was reached when Gallagher and the Indiana Sub-Class purchased HVAC systems from Defendants and/or their authorized dealers, thereby constituting express warranties under Ind. Code Ann. § 26-1-2-313.

299.    Defendants breached the express warranty to replace defective parts and have not replaced stuck TXVs, or replaced Plaintiff Gallagher and the Indiana Sub-Class' HVAC systems.  Rather, Defendants have instructed service personnel to inject yet another chemical contaminant, which further devalues the systems and presents a likelihood of future problems and reduced longevity.  Further, by adding the foreign additive, Defendants are not purging the system of the contaminants which degrade the efficiency of the systems and cause a likelihood of reoccurrence in the future, perhaps after Defendants' warranties have expired.

300.    Furthermore, the limited warranty is unconscionable and fails in its essential purpose because the contractual remedy is insufficient to make Gallagher and the Indiana Sub-Class whole and because Defendants have failed and/or refused to adequately provide the promised remedies within a reasonable time. The warranty is a contract of adhesion, presented solely on a take-it or leave-it basis, which Gallagher and the Indiana Sub-Class members have no opportunity to negotiate.  Given that Defendants knew about the defect at the time the systems were sold, and also knew that the defect would require expensive repairs, the limited warranty is unconscionable.

301.    Also, any provisions contained in Defendants' express warranties that attempt to limit remedies to the exclusion of labor and other expenses incurred in repairing or replacing the defective products are unconscionable, fail to conform to the requirements for limiting remedies under applicable law, and cause Defendants' express warranties to fail of their essential purpose, and are therefore void.

302.    Accordingly, recovery by Gallagher and the Indiana Sub-Class is not limited to the limited warranty of repair to or replacement of parts defective in materials or workmanship, and Gallagher, individually and on behalf of the Indiana Sub-Class, seeks all remedies as allowed by law.

303.    Defendants were put on notice of these issues by numerous complaints and the industry-wide investigation – including their own investigation – concerning the TXV failures that began in mid-2013.

304.    Gallagher and the Indiana Sub-Class members suffered direct and consequential damages as a direct and proximate result of Defendants' breach of their express warranties of future performance, and are entitled to such damages under Ind. Code Ann. § 26-1-2-313.

**COUNT XXII**
**Breach of Implied Warranty of Merchantability,**
**Ind. Code Ann. § 26-1-2-314**
**(On behalf of the Indiana Sub-Class)**

305.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

306.    Plaintiff Gallagher asserts this claim on behalf of himself and the Indiana Sub-Class.

307.    At the time Defendants designed, manufactured, produced, tested, studied, inspected, labeled, marketed, advertised, sold, promoted, and distributed

1  its HVAC systems for use by Gallagher and the members of the Indiana Sub-
2  Class, Defendants knew of the use for which their systems were intended.

3       308.    Defendants impliedly warranted their products to be of merchantable
4  quality and safe and fit for their intended use.

5       309.    Contrary to such implied warranty, Defendants' HVAC systems
6  were not of merchantable quality, safe or fit for their intended use because the
7  systems were and are defective and unfit for the ordinary purposes for which they
8  were used, as alleged herein.

9       310.    As a direct and proximate result of the Defendants' breaches of
10  implied warranties of merchantability, Gallagher and the members of the Indiana
11  Sub-Class have incurred and will continue to incur damages and losses as alleged
12  herein.

**COUNT XXIII**
**Violations of the Maryland Consumer Protection Act,**
**Md. Code Com. Law §§13-101, *et seq.***
**(On Behalf of the Maryland Class)**

16       311.    Plaintiffs repeat and reallege the allegations above as if fully set
17  forth herein

18       312.    Plaintiff Kimball brings this claim on behalf of himself and the
19  Maryland Sub-Class.

20       313.    The Maryland Consumer Protection Act ("Maryland CPA") provides
21  that a person may not engage in any unfair or deceptive trade practice in the sale of
22  any consumer good.  Md. Code Com. Law § 13-303.  Defendants participated in
23  misleading, false or deceptive acts that violated the Maryland CPA.  By
24  fraudulently advertising the systems as, *inter alia*, capable of performing up to the
25  advertised SEER ratings, and selling their HVAC systems with a known defect as
26  described herein, Defendants engaged in deceptive business practices prohibited
27  by the Maryland CPA.

314.   Kimball and the Maryland Sub-Class are "consumers" within the meaning of Md. Code Com. Law § 13-101(c), and Defendants are each a "person" within the meaning of Md. Code Com. Law § 13-101(h).

315.   Defendants' actions as set forth above occurred in the conduct of trade or commerce.

316.   In the course of its business, Defendants failed to clear the contaminants and moisture from the HVAC systems as they were manufacturing them and then concealed that their HVAC systems were contaminated and otherwise engaged in activities with the tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission, in connection with the sale of their HVAC systems.

317.   Defendants have known since as early as 2013 that their manufacturing process was inadequate in clearing contaminants and moisture from the HVAC systems but concealed all of that information.

318.   By failing to disclose and actively concealing that the HVAC systems were contaminated and destined to fail or have diminished performance and efficiency, by marketing its HVAC systems as efficient and able to perform up to their advertised SEER ratings, reliable and of high quality, and by presenting themselves as reputable manufacturers that stood by their products after they were sold, Defendants engaged in unfair and deceptive business practices, in violation of the Maryland CPA.

319.   In the course of Defendants' business, they willfully failed to disclose and actively concealed the manufacturing defect in their HVAC systems, as discussed above.

320.   Defendants' unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including Kimball and the Maryland

Sub-Class, about the efficiency and performance ability of the HVAC systems, quality of the systems and the true value of the defective HVAC systems.

321.   Defendants intentionally and knowingly misrepresented material facts regarding the HVAC systems with an intent to mislead Kimball and the Maryland Sub-Class.

322.   Defendants knew or should have known that their conduct violated the Maryland CPA.

323.   Defendants owed Kimball and the Maryland Sub-Class a duty to disclose the degraded efficiency and reliability of the HVAC systems and the true value of the systems because Defendants:

(a)   Possessed exclusive knowledge that their manufacturing process was not tooled to eliminate contaminants in the HVAC systems thereby allowing defective systems to enter the stream of commerce;

(b)   Intentionally concealed the foregoing from Plaintiffs and the Maryland Sub-Class; and/or

(c)   Made incomplete, false or misleading representations about the efficiency, performance and quality of their HVAC systems while purposefully withholding material facts from Kimball and the Maryland Sub-Class that contradicted these representations.

324.   Because Defendants' HVAC systems are worth far less than paid for by Kimball and the Maryland Sub-Class and these defective systems have caused him and the Maryland Sub-Class to incur out-of-pocket expenses, they have suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

325.    As a direct and proximate result of Defendants' violations of the Maryland CPA, Kimball and the Maryland Sub-Class have suffered injury-in-fact and/or actual damage.

326.    Pursuant to Md. Code Com. Law § 13-408, Kimball and the Maryland Sub-Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

### COUNT XXIV
**Breach of Express Warranty,
Md. Code Com. §2-313
(On Behalf of the Maryland Sub-Class)**

327.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

328.    Plaintiff Kimball brings this claim on behalf of himself and the Maryland Sub-Class.

329.    The express warranty provided with all Defendants' HVAC systems states that Defendants "warrant[] this product against failure due to defect in materials or workmanship under normal use and maintenance …"  The warranty then states, "If a part fails due to defect during the applicable warranty period ICP will provide a new or remanufactured part, at ICP's option, to replace the failed defective part at no charge for the part."  Further, Defendants warranted that their HVAC systems were capable of performing to the advertised SEER rating.

330.    Defendants' limited warranty, as well as advertisements and other marketing materials which stated, *inter alia*, SEER ratings, formed the basis of the bargain that was reached when Kimball and the Maryland Sub-Class purchased HVAC systems from Defendants and/or their authorized dealers, thereby constituting express warranties under Md. Com. Code § 2-313.

1    331.    Defendants breached the express warranty to replace defective parts
2    and have not replaced stuck TXVs, or replaced Plaintiff Kimball and the Maryland
3    Sub-Class' HVAC systems.  Rather, Defendants have instructed service personnel
4    to inject yet another chemical contaminant, which further devalues the systems
5    and presents a likelihood of future problems and reduced longevity.  Further, by
6    adding the foreign additive, Defendants are not purging the system of the
7    contaminants which degrade the efficiency of the systems and cause a likelihood
8    of reoccurrence in the future, perhaps after Defendants' warranties have expired.

9    332.    Furthermore, the limited warranty is unconscionable and fails in its
10    essential purpose because the contractual remedy is insufficient to make Kimball
11    and the Maryland Sub-Class whole and because Defendants have failed and/or
12    have refused to adequately provide the promised remedies within a reasonable
13    time.  The warranty is a contract of adhesion, presented solely on a take-it or
14    leave-it basis, which Kimball and Maryland Sub-Class members had no
15    opportunity to negotiate.  Given that Defendants knew about the defect at the time
16    the systems were sold, and also knew that the defect would require expensive
17    repairs, the limited warranty is unconscionable.

18    333.    Also, any provisions contained in Defendants' express warranties
19    that attempt to limit remedies to the exclusion of labor and other expenses incurred
20    in repairing or replacing the defective products are unconscionable, fail to conform
21    to the requirements for limiting remedies under applicable law, and cause
22    Defendants' express warranties to fail of their essential purpose, and are therefore
23    void.

24    334.    Accordingly, recovery by Kimball and the Maryland Sub-Class is
25    not limited to the limited warranty of repair to or replacement of parts defective in
26    materials or workmanship, and Kimball, individually and on behalf of the
27    Maryland Sub-Class, seeks all remedies as allowed by law.

28

335.    Defendants were put on notice of these issues by numerous complaints and the industry-wide investigation – including their own investigation – concerning the TXV failures that began in mid-2013.

336.    Kimball and the Maryland Sub-Class members suffered direct and consequential damages as a direct and proximate result of Defendants' breach of their express warranties of future performance, and are entitled to such damages under Md. Code Com. § 2-313.

**COUNT XXV**
**Breach of Implied Warranty of Merchantability,**
**Md. Code Com. Law §2-314**
**(On Behalf of the Maryland Sub-Class)**

337.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

338.    Plaintiff Kimball asserts this claim on behalf of himself and the Maryland Sub-Class.

339.    At the time Defendants designed, manufactured, produced, tested, studied, inspected, labeled, marketed, advertised, sold, promoted, and distributed their HVAC systems for use by Kimball, Defendant knew of the use for which their systems were intended.

340.    Defendants impliedly warranted their products to be of merchantable quality and safe and fit for their intended use.

341.    Contrary to such implied warranty, Defendants' HVAC systems were not of merchantable quality, safe or fit for their intended use because the systems were and are defective and unfit for the ordinary purposes for which they were used, as alleged herein.

342.    As a direct and proximate result of Defendants breaches of their implied warranties of merchantability, Plaintiff Kimball and the Maryland Sub-

Class members have incurred and will continue to incur damages and losses as alleged herein.

## COUNT XXVI
### Violation of Missouri Merchandising Practices Act ("MMPA")
### Mo. Rev. Stat. §§ 407.010, *et seq.*
### (On Behalf of the Missouri Class)

343.    Plaintiffs repeat and reallege the allegations above as if set forth fully below.

344.    Plaintiff Klinge asserts this claim on behalf of himself and the Missouri Sub-Class.

345.    Klinge, the Missouri Sub-Class and Defendants are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

346.    Defendants' HVAC systems are "merchandise" within the meaning of Mo. Rev. Stat. § 407.010(4).

347.    Defendants have engaged in "trade" or "commerce" within the meaning of Mo. Rev. Stat. § 407.010(7).

348.    The Missouri Merchandising Practices Act ("MMPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce."  Mo. Rev. Stat. § 407.020.

349.    In the course of their business, Defendants omitted, suppressed and concealed that their HVAC systems were defective as described herein and did so with the intent that others rely upon such concealment, suppression or oppression in connection with the sale of the HVAC systems.  By failing to disclose the defect or the facts about the defect described herein known to Defendants or knowable to them upon reasonable inquiry, Defendants deprived consumers, such as Klinge

and the Missouri Sub-Class, of all material facts about the efficiency and reliability of their HVAC systems. By failing to release and/or affirmatively hiding material facts about the defect, Defendants curtailed or reduced the ability of consumers to take notice of material facts about their HVAC systems such as, for example, that the defect renders the HVAC systems incapable of performing up to their advertised SEER ratings. Defendants, therefore, have engaged in activities with the tendency or capacity to deceive.

350. Because Defendants knew or believed that their statements regarding efficiency, performance and reliability were not in accord with the facts and/or had no reasonable basis for such statements in light of their knowledge of the manufacturing defect, Defendants engaged in fraudulent misrepresentations pursuant to 15 Mo. Code of Serv. Reg. 60-9.100.

351. Defendants' conduct as described herein is unethical, oppressive or unscrupulous. Such acts are unfair practices in violation of 15 Mo. Code of Serv. Reg. 60-8.020.

352. Defendants knew or should have known that their conduct violated the MMPA.

353. Defendant owed Klinge and the Missouri Sub-Class a duty to disclose the true efficiency, performance ability and reliability of their HVAC systems and the true value of the systems because Defendants:

        (a)   Possessed exclusive knowledge that their manufacturing process was not tooled to eliminate contaminants in the HVAC systems thereby allowing defective systems to enter the stream of commerce;

        (b)   Intentionally concealed the foregoing from Klinge and the Missouri Sub-Class; and/or

(c)   Made incomplete, false or misleading representations about the efficiency, performance and quality of their HVAC systems while purposefully withholding material facts from Klinge and the Missouri Sub-Class that contradicted these representations.

354.   Because Defendants' HVAC systems are worth far less than paid for by Klinge and the Missouri Sub-Class and these defective systems have caused him and the Missouri Sub-Class to incur out-of-pocket expenses, they have suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

355.   As a direct and proximate result of Defendants' violations of the MMPA, Klinge and the Missouri Sub-Class have suffered injury-in-fact and/or actual damage.

356.   Pursuant to Mo. Rev. Stat. § 407.025, Klinge and the Missouri Sub-Class seek actual damages, attorneys' fees, and any other just and proper relief available under the MMPA.

**COUNT XXVII**
**Breach of Express Warranty,**
**Mo. Rev. Stat. § 400.2-313**
**(On Behalf of the Missouri Sub-Class)**

357.   Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

358.   Plaintiff Klinge brings this claim on behalf of himself and the Missouri Sub-Class.

359.   The express warranty provided with all Defendants' HVAC systems states that Defendants "warrant[] this product against failure due to defect in materials or workmanship under normal use and maintenance …"  The warranty then states, "If a part fails due to defect during the applicable warranty period ICP

will provide a new or remanufactured part, at ICP's option, to replace the failed defective part at no charge for the part."  Further, Defendants warranted that their HVAC systems were capable of performing to the advertised SEER rating.

360.   Defendants' limited warranty, as well as advertisements and other marketing materials which stated, *inter alia*, SEER ratings, formed the basis of the bargain that was reached when Klinge and the Missouri Sub-Class purchased HVAC systems from Defendants and/or their authorized dealers, thereby constituting express warranties under Mo. Rev. Stat. § 400.2-313.

361.   Defendants breached the express warranty to replace defective parts and have not replaced stuck TXVs, or replaced Klinge and the Missouri Sub-Class' HVAC systems.  Rather, Defendants have instructed service personnel to inject yet another chemical contaminant, which further devalues the systems and presents a likelihood of future problems and reduced longevity.  Further, by adding the foreign additive, Defendants are not purging the system of the contaminants which degrade the efficiency of the systems and cause a likelihood of reoccurrence in the future, perhaps after Defendants' warranties have expired.

362.   Furthermore, the limited warranty is unconscionable and fails in its essential purpose because the contractual remedy is insufficient to make Klinge and the Missouri Sub-Class whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time. The warranty is a contract of adhesion, presented solely on a take-it or leave-it basis, which Klinge and Missouri Sub-Class members had no opportunity to negotiate.  Given that Defendants knew about the defect at the time the systems were sold, and also knew that the defect would require expensive repairs, the limited warranty is unconscionable.

363.   Also, any provisions contained in Defendants' express warranties that attempt to limit remedies to the exclusion of labor and other expenses incurred

1   in repairing or replacing the defective products are unconscionable, fail to conform
2   to the requirements for limiting remedies under applicable law, and cause
3   Defendants' express warranties to fail of their essential purpose, and are therefore
4   void.

5   364. Accordingly, recovery by Klinge and the Missouri Sub-Class is not
6   limited to the limited warranty of repair to or replacement of parts defective in
7   materials or workmanship, and Klinge, individually and on behalf of the Missouri
8   Sub-Class, seeks all remedies as allowed by law.

9   365. Defendants were put on notice of these issues by numerous
10  complaints and the industry-wide investigation – including their own investigation
11  – concerning the TXV failures that began in mid-2013.

12  366. Klinge and the Missouri Sub-Class members suffered direct and
13  consequential damages as a direct and proximate result of Defendants' breach of
14  their express warranties of future performance, and are entitled to such damages
15  under Mo. Rev. Stat. § 400.2-313.

16
17  **COUNT XXVIII**
    **Breach of Implied Warranty,**
18  **Mo. Rev. Stat. 400.2-314**
    **(On Behalf of the Missouri Sub-Class)**
19

20  367. Plaintiffs repeat and reallege the allegations above as if fully set
21  forth herein.

22  368. Plaintiff Klinge asserts this claim on behalf of himself and the
23  Missouri Sub-Class.

24  369. At the time Defendants designed, manufactured, produced, tested,
25  studied, inspected, labeled, marketed, advertised, sold, promoted, and distributed
26  their HVAC systems for use by Klinge and the members of the Missouri Sub-
27  Class, Defendants knew of the use for which their systems were intended.

28

370.    Defendants impliedly warranted their products to be of merchantable quality and safe and fit for their intended use.

371.    Contrary to such implied warranty, Defendants' HVAC systems were not of merchantable quality, safe or fit for their intended use because the systems were and are defective and unfit for the ordinary purposes for which they were used, as alleged herein.

372.    As a direct and proximate result of the Defendants' breaches of implied warranties of merchantability, Klinge and the members of the Missouri Sub-Class have incurred and will continue to incur damages and losses as alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

(a)    Determining that this action is a proper class action, certifying Plaintiffs as Class representatives under Federal Rule of Civil Procedure 23 and Plaintiffs' counsel as Class Counsel;

(b)    Ordering injunctive relief;

(c)    Awarding of all actual, general, special, incidental, statutory, treble or multiple, punitive and consequential damages to which Plaintiffs and Class members are entitled;

(d)    Awarding of pre-judgment and post-judgment interest on such monetary relief;

(e)    Awarding of restitution in an amount according to proof;

(f)    Awarding Plaintiffs and Class members their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(g)    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated:  March 7, 2016                    Respectfully submitted,

                                    By:    */s/  Timothy N. Mathews*

                                          Timothy N. Mathews (admitted *pro hac vice*)
                                          Christina Donato Saler (admitted *pro hac vice*)
                                          **CHIMICLES & TIKELLIS LLP**
                                          One Haverford Centre
                                          361 West Lancaster Avenue
                                          Haverford, PA 19041
                                          Phone: (610) 642-8500
                                          Fax: (610) 649-3633
                                          tnm@chimicles.com
                                          cds@chimicles.com

                                          Valerie L. Chang (SBN 295147)
                                          **SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**
                                          11755 Wilshire Blvd.
                                          15th Floor
                                          Los Angeles, CA 90025
                                          Phone: 323-510-4060
                                          Fax: 866-300-7367
                                          vchang@sfmslw.com

                                          James C. Shah (SBN 260435)
                                          **SHEPHERD,FINKELMAN, MILLER & SHAH, LLP**
                                          35 East State Street
                                          Media, PA 19063
                                          Telephone: (610) 891-9880
                                          Facsimile: (866) 300-7367
                                          jshah@sfmslaw.com

                                          *Counsel for Plaintiffs, on behalf of themselves and all others similarly situated*