EXHIBIT 103

# Rebuttal Report of Melissa Pittaoulis, Ph.D.

May 25, 2018

# Table of Contents

| | | |
|---|---|---|
| **I.** | **Qualifications and Assignment** | **1** |
| A. | Qualifications | 1 |
| B. | Assignment | 2 |
| **II.** | **Background** | **3** |
| **III.** | **Description of Professor Dhar's Survey** | **4** |
| **IV.** | **Summary of Opinions** | **8** |
| **V.** | **Evaluation of Professor Dhar's Survey** | **9** |
| A. | Professor Dhar's Survey Questions are Flawed and His Analysis is Based on Unsupported and Faulty Assumptions | 10 |
| B. | Professor Dhar's Population is Overinclusive and He Failed to Use a Probability Sample | 20 |
| **VI.** | **Conclusion** | **25** |

# I.    Qualifications and Assignment

## A.    Qualifications

1.      I, Melissa Pittaoulis, am an Associate Director at NERA Economic Consulting ("NERA") where I am a member of the Survey and Sampling Practice. My business address is 1717 Arch Street, Suite 1100, Philadelphia, PA 19103. NERA was founded in 1961 and provides economic, financial, and statistical research and analysis.

2.      I earned a Ph.D. in Sociology from Temple University. My courses in graduate school focused on quantitative analysis. Among the courses I took are Research Design, Survey Research, Statistical Sampling, Social Statistics, Multivariate Statistics, and Hierarchical Linear Modeling. I have also taken "short courses" offered by the Joint Program in Survey Methodology, which is run by the University of Maryland. While I was a graduate student, I served as a teaching assistant in a graduate-level multivariate statistics class and as an instructor for undergraduate courses on statistics at Temple University.

3.      I have worked on survey and sampling projects at NERA since 2003. As part of my survey work, I design research, write questionnaires, supervise data collection, and analyze data. As part of my sampling work, I select samples and calculate sample estimates and confidence intervals. In my over fifteen years of experience, I have worked on survey and sampling projects in a wide variety of industries, including: alcoholic beverages, automobiles, beverages, beauty products, clothing apparel, computers, durable goods, electronics, financial products, insurance, mobile phones, personal care products, pharmaceuticals, snack foods, and video games. The majority of these projects have been conducted in connection with legal disputes, primarily intellectual property and consumer class action matters. I have also worked on projects involving antitrust issues and employment-related litigation.

4.      I am a member of the American Association of Public Opinion Research, the American Sociological Association, and the International Trademark Association. My curriculum vitae is attached as Exhibit A.

5.      NERA is being compensated for my services in this matter at my standard rate of $505 per hour. No part of NERA's or my compensation depends on the conclusions I reach or the outcome of this litigation. Throughout this report, I have used the terms "I" and "my" to refer to work performed by me and/or others under my direction.

6.      A list of the documents I considered in preparing this expert report is attached as Exhibit B.

## B.    Assignment

7.      I was retained by counsel for Plaintiffs in the matter of *Steve Oddo, Rajene Reardon, Anthony Lasala, Linda Lamm, Keith Kimball, Norman Klinge and Dan Gallagher v. Arcoaire Air Conditioning and Heating, Carrier Corporation, Bryant Heating and Cooling Systems, Comfortmaker Air Conditioning & Heating, International Comfort Products LLC, and United Technologies Corporation* to review and evaluate a survey conducted by Professor Ravi Dhar on behalf of Defendants. Professor Dhar's survey had two objectives. The first was to estimate the proportion of HVAC system owners "who acquire their HVAC system in each of [three] different ways."[1] The second was to "opine on the sources of information that consumers who have a role in selecting the brand of their air conditioner or heat pump review before making a purchase."[2]

8.      I was asked to evaluate Professor Dhar's survey to determine whether his survey supports the conclusions he draws from it and to determine whether the survey provides a basis for drawing conclusions about whether consumers were exposed to information from Defendants.

9.      The remainder of this report is organized as follows: In Section II, I provide a brief summary of the allegations against Defendants. In Section III, I describe Professor Dhar's survey design and results. Section IV contains a summary of my opinions, while Section V provides my detailed evaluation of Professor Dhar's survey.

---

[1] Expert Report of Ravi Dhar, Ph.D., submitted April 12, 2018 (hereinafter "Dhar Report"), ¶19.

[2] Dhar Report, ¶20.

## II.    Background

10.    United Technologies Corporation ("UTC"), through its subsidiary International

Comfort Products ("ICP"), manufactures and distributes HVAC systems, including HVAC

brands Carrier, Bryant, Arcoaire, Comfortmaker, and Heil.[3] Plaintiffs allege that certain models

of Defendants' HVAC systems contain a manufacturing defect known to cause failures of the

systems' Thermal Expansion Valves ("TXV(s)").[4] As stated in the Amended Class Action

Complaint:

> "The defect arises from a chemical rust inhibitor added to the manufacturing
> process beginning in or about 2013 and continuing through at least late-2014,
> which was incompatible with the refrigerant and lubricating oil used in the HVAC
> systems. The rust inhibitor reacts with the refrigerant and/or oil and causes a tar or
> sludge to form when the systems are put into service. This sticky substance than
> circulates through the system, and builds up layers of deposits on the inside of the
> system."[5]

11.    Plaintiffs allege that Defendants were aware of the defect but, nevertheless, failed

to disclose the defect to potential purchasers, resulting in the consumers being damaged.[6]

Plaintiffs, thus, seek to certify a nationwide class that would include:

> "All persons and entities who purchased an HVAC system manufactured by Defendants
> between 2013 and 2015 utilizing 410A refrigerant, POE oil, a TXV, and a Copeland
> Scroll Compressor, and all persons and entities that have not been fully reimbursed for
> parts, materials, or labor expended in diagnosing and/or servicing such HVAC systems
> for performance issues caused by chemical contaminants remaining from the
> manufacturing process."[7]

---

[3] Amended Class Action Complaint, *Steve Oddo, Rajene Reardon, Anthony Lasala, Linda Lamm, Keith Kimball, Norman Klinge, and Dan Gallagher. v. Arcoaire Aire Conditioning and Heating, Carrier Corporation, Bryant Heating and Cooling Systems, Comfortmaker Air Conditioning and Heating, International Comfort Products LLC, and United Technologies Corporation,* Case No. 8:15-cv-01985 CAS (Ex), dated March 7, 2016 (hereinafter "Amended Class Action Complaint"), ¶¶51-52.

[4] Amended Class Action Complaint, ¶1-2 and Exhibit A, p. 88.

[5] Amended Class Action Complaint, ¶1.

[6] Amended Class Action Complaint, ¶¶108-111.

[7] Amended Class Action Complaint, ¶80.

I understand that Plaintiffs are also seeking to certify, alternatively, subclasses of California, Georgia, Indiana, and Missouri consumers.[8]

## III.    Description of Professor Dhar's Survey

12.    As described above, Professor Dhar's survey had two purposes. The first purpose was to determine how HVAC system owners acquire their systems. Professor Dhar describes this objective as follows:

> "I was asked to opine on the proportion of owners who acquire their HVAC system in each of several different ways: those who personally select the HVAC system, those who rely on professionals such as a contractor or dealer to select the HVAC system, and those who acquire an HVAC system because they purchased a home that had an HVAC system already installed."[9]

The second purpose was to determine the sources of information consumers who were fully or partially responsible for selecting the brand of HVAC system reviewed before purchasing their system. Professor Dhar describes this objective as follows:

> "I was asked to determine empirically, for those who have a role in selecting the brand of their air conditioner or heat pump, the proportion of relevant owners who were not exposed to and hence could not have considered a manufacturer's printed brochure or website, and/or who did not speak to a manufacturer directly before purchasing or acquiring their unit."[10]

13.    To address his research objectives, Professor Dhar conducted an online survey of 1,787 respondents using the Research Now survey panel.[11] The interviews were conducted between March 19 and March 30, 2018,[12] and he submitted his report on April 12, 2018.[13]

---

[8] Amended Class Action Complaint, ¶81. Dhar Report, ¶17.

[9] Dhar Report, ¶19.

[10] Dhar Report, ¶20.

[11] Dhar Report, ¶¶53, 78.

[12] Dhar Report, ¶75.

[13] Dhar Report, p.61.

14.    To qualify for the <u>entire</u> survey, respondents had to report that: (1) they own their primary residence;[14] (2) their home has either a central air conditioner or heat pump;[15] (3) the central air conditioner or heat pump was installed in their home within the past five years;[16] and (4) they were either fully or partially responsible for selecting the brand of air conditioner or heat pump.[17, 18] In addition to respondents who met these four criteria, Professor Dhar also counted as "complete" those respondents who met the first three criteria and who reported that either a professional was fully responsible for selecting the brand of air conditioner or heat pump OR that they did not select the brand of the HVAC system because it was already installed when they moved into their home.[19] These additional respondents were not asked any additional survey questions.

15.    Professor Dhar did not screen out respondents based upon the brand of HVAC system they owned. However, his screening questionnaire did include a question asking respondents to report the brand or brands of HVAC systems they owned and he set quotas based on the answers to this question. Qualified respondents who reported they owned one of the Carrier brands were classified as belonging to the Carrier Group, while all others were assigned to the Non-Carrier Group.[20] Professor Dhar indicated that he set the quota for the Carrier group at 30 percent for those respondents who knew their brand.[21]

16.    Because Professor Dhar desired "a total analyzable sample of at least 200 respondents in the four states (minimum of 50 per state)" for which Plaintiffs seek to certify sub-

---

[14] Dhar Report, ¶61.

[15] Dhar Report, ¶63.

[16] Dhar Report, ¶69.

[17] Dhar Report, ¶71.

[18] In addition to these criteria, respondents also had to pass a CAPTCHA challenge question, be at least 18 years old, live in the United States, and report that neither they, nor anyone in their household, were employed by a marketing or market research firm, a public relations or advertising agency, or by a company that makes or sells heating or cooling systems.

[19] Dhar Report, ¶¶70-71.

[20] These brands are Carrier, Bryant, Payne, Arcoaire, Comfortmaker, Day & Night, Grandaire, Heil, KeepRite, Lincoln, and Tempstar. See Dhar Report, ¶¶72, 90.

[21] Dhar Report, page 30, footnote 69, ¶72.

classes (California, Georgia, Indiana, and Missouri), he oversampled respondents from this group, recruiting an additional 37 respondents who lived in one of these states.[22]

17.     In the main survey, Professor Dhar asked a series of questions about how respondents selected the brand of HVAC system installed in their home and the sources of information they reviewed in making that decision. Only those respondents who qualified for the survey by reporting that they were either fully or partially responsible for selecting the brand of air conditioner or heat pump in their home were asked these questions.[23] Professor Dhar began by asking respondents an open-ended question about how they selected the brand of HVAC system.[24] The second question in the survey was a filter question asking whether respondents consulted any sources for information on any of the brands of HVAC system before making their purchase.[25] Respondents who answered "No" were taken to the end of the survey, while all other respondents were asked an open-ended question about the information sources they consulted on any of the brands before making their purchase.[26]

18.     Professor Dhar then asked respondents a closed-ended question asking which information sources they consulted on any of the brands before making their purchase and provided respondents with a list of 13 different response options.[27] Respondents who indicated that they either visited a manufacturer's website or reviewed a printed brochure were then asked a series of follow-up questions.[28] Specifically, respondents who reported visiting a manufacturer's website were asked an open-ended question and a closed-ended question about which manufacturers' websites they looked at before making their purchase.[29] Respondents who reported reviewing a printed brochure were asked an open-ended question and a closed-ended

---

[22] Dhar Report, page 8, footnote 11, ¶79.

[23] Dhar Report, ¶80.

[24] Dhar Report, ¶¶82-83.

[25] Dhar Report, ¶84.

[26] Dhar Report, ¶84.

[27] Dhar Report, ¶¶85-86.

[28] Dhar Report, ¶87.

[29] Dhar Report, ¶91.

question about which type of brochure they reviewed, as well as a closed-ended question about which brand's brochures they reviewed.[30]

19.    Based on these survey questions, Professor Dhar stated the following opinions:

- "[F]or a clear majority of respondents (68.2%), any statements (and therefore omissions) made by a manufacturer played no role at all in their acquisition of the HVAC system."[31]

- "[T]he vast majority of those who acquire an HVAC system—more than 90%-- could not have considered any statements or omissions made in a manufacturer's printed brochure.[32]

- "[T]he vast majority of those who acquire an HVAC system—more than 80%— could not have even considered any statements or omissions on a manufacturer's website."[33]

- "[N]early all consumers who acquire an HVAC system—98%—could not have considered any statements made (or not made) by a manufacturer directly to a consumer on a telephone call."[34]

20.    He concludes that:

- "[A] large majority of relevant consumers who acquire an HVAC system either relied solely on a professional or purchased a home with an already installed HVAC system or were never exposed to a manufacturer's printed brochure and website, and/or spoke to a manufacturer directly and hence would not have been aware even if the omitted information was disclosed."[35]

- "[O]nly a minority of respondents in the Primary U.S. Representative Sample could have even *considered* statements or omissions from the manufacturer before purchasing or acquiring their unit."[36]

---

[30] Dhar Report, ¶ ¶89-90.

[31] Dhar Report, ¶98.

[32] Dhar Report, ¶101.

[33] Dhar Report, ¶107.

[34] Dhar Report, ¶112.

[35] Dhar Report, ¶37.

[36] Dhar Report, ¶115.

- "[O]nly a small minority of those who acquire an HVAC system would have even considered any information provided directly from the manufacturer when making their decision to purchase an HVAC system."[37]

## IV. Summary of Opinions

21. I have reviewed Professor Dhar's report, survey data, and other supporting documentation, and, in my opinion, Professor Dhar's study suffers from the following flaws:

    i. Professor Dhar's conclusions are neither reliable nor valid due to his assumption that respondents would be able to accurately recall whether they reviewed specific marketing materials up to five years prior to taking the survey;

    ii. Professor Dhar's opinions concerning the percentages of consumers who considered manufacturer statements are not valid due to his unsupported assumptions that respondents who relied upon a professional to select their *brand* of HVAC system, as well as those who acquired their system through the purchase of their home, were not exposed to any materials or information from the manufacturer. The fact that the brand was selected by a contractor, for example, does not mean that a consumer did no research, did not select the model, or was not exposed to any materials or information from the manufacturer. Professor Dhar's unsupported assumptions in this regard infect his entire analysis, and result in skewed tables throughout his report;

    iii. Professor Dhar's conclusions about consumers' exposure to statements from manufacturers are based on questions about just three forms of information: manufacturers' websites, printed brochures, and direct calls to manufacturers. His survey does not measure whether respondents were exposed to other forms of information from a manufacturer prior to completing their purchase, such as product packaging and labels, television, radio, and print advertising, and manuals or documents provided with the systems. By focusing solely on three forms of

---

[37] Dhar Report, ¶122.

information, Professor Dhar's survey ignores these other forms of information provided by manufacturers to consumers;

iv.    Professor Dhar surveyed an overinclusive universe that differs from the putative class. His survey includes non-Carrier owners, those who purchased HVAC systems outside of the relevant time period, and homeowners who acquired an HVAC system through the purchase of an existing, rather than newly-constructed home;

v.    Professor Dhar's survey overestimates both the proportion of respondents who rely on a professional to select the brand of HVAC system and the proportion who acquired their HVAC system through the purchase of their home; and

vi.    Professor Dhar's sample was selected using non-probability methods, making it unsuitable for extrapolating the results to the larger population.

In the next section, I describe my opinion in more detail.

## V.    Evaluation of Professor Dhar's Survey

22.    In order for a survey to produce reliable and valid results, the survey must be designed to minimize potential sources of error in the survey estimates. The term "reliability" refers to the ability of the survey to produce consistent measurements across individuals, settings, and time.[38] The term "validity" refers to whether the conclusions drawn from the survey are supported by the data, as well as the ability of the survey results to be extrapolated to a larger population.[39] In my professional opinion, Professor Dhar's survey suffers from problems of both reliability and validity, and these problems are serious enough that I believe his survey cannot be used to support his conclusions. In the sections below, I have divided my evaluation into two parts. The first discusses the flaws in Professor Dhar's survey questions and analysis, while the second describes the problems with his definition of the universe and sampling procedures.

---

[38] Singleton, Royce A. and Bruce C. Straits. 1999. *Approaches to Social Research*. New York: Oxford University Press (hereinafter "Singleton & Straits"), p.114.

[39] Singleton & Straits, p. 114.

## A.    Professor Dhar's Survey Questions are Flawed and His Analysis is Based on Unsupported and Faulty Assumptions

### 1.    Respondents' Memories of the Information They Consulted are Likely Incomplete or Inaccurate

23.    The reliability and validity of Professor Dhar's survey hinges on respondents' ability to accurately recall specific details about the purchase of their HVAC system, namely their involvement in the selection of the brand of HVAC system they purchased and the sources of information that they consulted prior to making their purchase. Both of these subjects require respondents to have not just a general recollection of the purchase process, but also detailed memories about a specific decision (the brand to purchase) and the information considered in making that decision. The survey research literature suggests that these recall tasks, as designed by Professor Dhar, are too onerous and that respondents are unlikely to be able to perform such recall tasks accurately.

24.    Much of the literature on survey research considers the cognitive processes that underlie the question and answer process. Prominent experts in the survey research field have written books on this topic, discussing theories about the response process and their implications for questionnaire design.[40] The topic of memory is discussed extensively in this literature, as many surveys ask respondents autobiographical questions or questions about past behavior. These texts discuss the conditions under which retrospective reports can be accurate.[41] First, this literature suggests that how long ago the events being asked about occurred is key to whether respondents' answers will be accurate. As Roger Tourangeau and his colleagues, in their book *The Psychology of Survey Response*, note:

---

[40] See, for example, Tourangeau, Roger, et al. 2000. *The Psychology of Survey Response*. Cambridge: Cambridge University Press (hereinafter "Tourangeau et al."); Sudman, Seymour, Norman M. Bradburn, and Norbert Schwarz. 1996. *Thinking About Answers: The Application of Cognitive Processes to Survey Methodology*. San Francisco: Jossey-Bass Publishers.

[41] As noted in one textbook on research design, "the ease with which material may be recalled depends on three factors: how long ago the event occurred, how significant the event was when it occurred, and how relevant the event is to respondent's life currently." Singleton & Straits, p. 306.

> "By far the best-attested fact about autobiographical memory is that the longer the interval between the time of the event and the time of the interview, the less likely that a person will remember it."[42]

In addition to the time period at issue, the salience of the event is another factor that can affect respondents' memories. As Seymour Sudman and Norman Bradburn explain:

> "[M]emory about highly salient events is satisfactory for periods of a year or possibly more. Unfortunately, little work has been done on periods much longer than a year; but for highly salient events, such as major accidents or illnesses, periods of two or three years appear to be possible."[43]

25.    In designing his survey, Professor Dhar has failed to consider whether the events that he is asking respondents to report on are salient enough to be remembered years after they occurred. Professor Dhar's survey requires respondents to recall events that occurred up to five years prior to taking the survey. Given the expense of an HVAC system, it is certainly reasonable to expect that respondents will remember whether they purchased an HVAC system within the last five years. However, it is unlikely that respondents would remember all of the information they may have reviewed or considered when making this purchase, as it is not a purchase that is frequently made.[44] Yet, Professor Dhar expected respondents to be able to remember that they looked at brochures or viewed particular websites up to five years after the purchase. This is an unreasonable expectation.

26.    Professor Dhar's survey strategy is in contrast to the surveys that Carrier has conducted itself. I note that these surveys generally ask respondents to report about purchases made in the last year, a time period that may be much more amenable to recall. For example, since at least the first quarter of 2008, KeyStat Marketing has collected quarterly purchasing and brand awareness survey data, screening households on whether an HVAC system had been purchased within the prior twelve months.[45] Whether in full reports or summaries these reports

---

[42] Tourangeau et al., p.82.

[43] Sudman, Seymour and Norman M. Bradburn. 1982. *Asking Questions*. San Francisco: Jossey-Bass, p. 43.

[44] Tourangeau et al. also note that "respondents are least accurate when the events they must report are irregular." See Tourangeau et al, p. 86.

[45] Deposition of Pamela Hoppel, taken on January 30, 2018 (hereinafter 'Hoppel Deposition'), Exhibit 22, p.2.

examined behavior within a single year's timeframe.[46] In the materials I have reviewed, I have seen only one HVAC industry study that uses a time period longer than a year. That study extended the length of time of prior purchase from one to two years.[47] None of these studies on HVAC purchases used the five-year timespan Professor Dhar employs.

27.    It is well-known in the survey research field that asking respondents questions about retrospective events can result in inaccurate, and possibly biased, reports. As Roger Tourangeau et al. state: "[t]he greater the demands a question places on memory, the less accurate the respondents' answers and, all else being equal, the less accurate the survey estimates derived from them."[48] The validity of Professor Dhar's conclusions relies upon the assumption that respondents were able to accurately recall the information about which he asked. Given the long time period about which Professor Dhar asked and the likelihood that respondents cannot remember particular materials they reviewed in that time period, this assumption is flawed.

### 2.    Professor Dhar's Assumptions about Respondents Who Did Not Select the Brand of HVAC System are Unsupported

28.    Even if Professor Dhar's respondents had been able to accurately recall the sources they consulted when purchasing their HVAC system, his conclusions lack validity due to other flaws in his survey design and analysis. Most importantly, Professor Dhar's analysis relies on unproven assumptions about whether consumers who were not fully or partially responsible for selecting the brand of HVAC system in their home reviewed any materials or information from a manufacturer. First, Professor Dhar assumes, without basis, that individuals who relied on a professional to select the brand of HVAC system installed in their home were not exposed to any materials or information from an HVAC manufacturer. Second, he assumes, again without

---

[46] See KeyStat Marketing products: Hoppel Deposition, Exhibits 21 and 23, CARRIER_0033947, CARRIER_0033948, CARRIER_0033949, CARRIER_0033941, CARRIER_0033844, CARRIER_0033845, CARRIER_0033935, CARRIER_0033846, CARRIER_0033883, CARRIER_0033877, CARRIER_0033952, CARRIER_0034021, CARRIER_0033922, CARRIER_0033899.

[47] See EMI Research Solution's 2015 Residential Air Conditioning Consumer Research Summary Report, p. 6.

[48] Tourangeau, p. 62.

basis, that when a system was installed before a consumer moved into their home, the consumer was never exposed to any information about the system prior to completing the purchase.

29.    In Table 1 of his report, Professor Dhar shows that, of his 1,787 respondents, 30.2 percent were fully responsible for the selection of the brand of the HVAC system in their home, 16.6 percent were partially responsible for the selection of the brand, 32.7 percent indicated a professional (e.g., a contractor, repair person, dealer, or salesperson) was fully responsible for the selection of the brand of HVAC system, and 20.6 percent did not select the brand of the HVAC system because the system was already installed when they moved into their home.[49] These latter two groups consist of 952 respondents, or 53.3 percent of Professor Dhar's sample. After establishing that another person selected the brand of HVAC system they purchased, Professor Dhar did not ask these 952 respondents any further questions. Importantly, he asked them no questions about any materials or information they may have seen before purchasing their air conditioner or heat pump.[50]

30.    Despite not asking these respondents any additional survey questions, Professor Dhar includes these two groups in his analysis of the survey questions asked only to those who were fully or partially responsible for the selection of their HVAC brand. In his tables, Professor Dhar assumes for these two groups that zero percent of respondents would have indicated that they consulted information about brands of HVAC systems before making their purchase. Professor Dhar fails to explain why this critical assumption is justified. Moreover, he does not indicate why he failed to ask these respondents whether they saw any materials or information about the system prior to their purchase.[51]

---

[49] Dhar Report, ¶95.

[50] See Dhar Report ¶¶ 96-97.

[51] One possibility is that Professor Dhar did not initially intend to include these respondents in his analysis of the sources of information reviewed. I note that in describing his objective, Professor Dhar reports that he was asked to opine the proportion of homeowners who were fully or partially responsible for selecting the brand of HVAC system who consulted specific sources of information (See Dhar Report, ¶20). Instead of reporting these proportions, Professor Dhar calculated his proportions out of all homeowners who acquired an air conditioner or heat pump in the past five years whose system was not selected by a friend or other member of their household.

31.    Professor Dhar's assumption that none of the respondents who relied on their contractor to select the brand of HVAC system, or who bought a new construction home, saw any materials or information from the manufacturer is faulty for several reasons. There are many ways consumers could have been exposed to manufacturer materials or information prior to purchase, even though someone else selected the brand or they purchased an air conditioner as part of a new construction home.

32.    First, Professor Dhar ignores the possibility that the contractor or homebuilder may have shown respondents materials or information concerning the system. Pamela Hoppel, Carrier's Senior Director of Product Marketing, testified that Carrier assists dealers in marketing to consumers by providing ad kits that provide guidance on communicating with consumers.[52] Even if a contractor selected the brand of a system (for example, because the consumer's chosen contractor is an exclusive dealer for that brand), that does not mean the contractor provided no information concerning the system. Professor Dhar's assumptions entirely ignore the possibility that respondents may have been presented materials or information by the contractor or homebuilder, even though Carrier facilitates the dissemination of information in precisely that manner. In assuming that consumers who relied on their contractor to select the brand of HVAC system reviewed no materials or information, Professor Dhar assumes that dealers did not show such advertising to their clients. This assumption is untested in his survey and Professor Dhar points to no outside sources to justify it.

33.    Second, Professor Dhar does not account for the possibility that a consumer who purchases a Carrier air conditioner because their contractor or dealer selected that brand may still be involved in the decision about which particular model to buy. In other words, even if a contractor or dealer selects the particular brand of HVAC system for the consumer, the consumer may have selected the particular model. In any given size of air conditioner, Carrier offers different models that vary by efficiency, noise level, and other features, and these are often presented as "Good/Better/Best" options. For example, through its HVAC Partners website,

---

[52] For example, see Comfortmaker Residential Heating & Cooling Products foldout (CARRIER_0025596 - CARRIER_0025603)

dealers can create customized brochures featuring Carrier products using the Carrier Customer Brochure tool.[53] Carrier describes this tool as:

> [A] marketing tool tailored to promote your dealership in addition to the Best/Better/Good Carrier equipment that you specifically advertise and sell. The brochure is designed by you with the opportunity to select Carrier Residential and DLS Products. And, it's very cost effective - making it a terrific tool to use at home shows or to leave behind after sales calls with potential customers.

> You can feature up to 18 products in the full color eight-page brochure or 6 products in the DLS four-page brochure. Leave your prospective customer one comprehensive piece complete with your contact information rather than a half dozen brochures that include products you may not even offer.[54]

34.     The Carrier website currently lists 18 air conditioner models and 14 heat pump models, and I understand Carrier offered a variety of models during the time period at issue too.[55] It is reasonable to believe that a consumer might know they are going to purchase a Carrier product, but still see product information. In addition to the website which shows the various options available, Carrier also produces brochures that may help consumers with such decisions. For example, some Carrier brochures inform respondents about the different lines of air conditioners Carrier sells (e.g., the Infinity Series, the Performance Series, and the Comfort Series).[56] Other brochures compare different models, showing respondents "good," "better," and "best" options for energy efficiency.[57] Professor Dhar should not have assumed that respondents who did not personally select the brand would never have seen any manufacturer materials or information. Rather than making such an unfounded assumption, Professor Dhar could have asked these respondents questions that directly addressed these possibilities.

---

[53]Hoppel Deposition, Exhibits 10-11.

[54] Hoppel Deposition, Exhibits 10.

[55]To see the complete list of available Carrier air conditioners see: https://www.carrier.com/residential/en/us/products/air-conditioners/;  To see the complete list of available Carrier heating pumps see: https://www.carrier.com/residential/en/us/products/heat-pumps/

[56] See Carrier Comfort Series Air Conditioners brochure (CARRIER_0008349 - CARRIER_0008352), Carrier Performance Series Air Conditioners brochure (CARRIER_0008371 - CARRIER_0008374), Carrier Everything You Need for Total Comfort brochure (CARRIER_0008454 - CARRIER_0008469), Carrier Family of Indoor Comfort brochure (CARRIER_0008385 - CARRIER_0008392) , Carrier Family of Indoor Comfort brochure (CARRIER_0008353 - CARRIER_0008356)

[57] For examples, see Heil Split System Air Conditioners & Heat Pumps brochure (CARRIER_0043517 - CARRIER_0043520), Tempstar Split System Air Conditioners & Heat Pumps brochure (CARRIER_0043457 - CARRIER_0043460) Bryant: The 2007 Family of Air Conditioners (CARRIER_0046667 - CARRIER_0046686).

35.     Professor Dhar also ignores other information streams from manufacturers that
consumers who did not personally select their brand may have seen. For example, Pamela
Hoppel testified that Carrier conducts a variety of advertising, such as TV and radio advertising,
print advertising, and digital advertising.[58] She also testified that Carrier provides numerous
forms of marketing materials to its dealer network, including TV, radio, and digital advertising,
as well as advice and content for social media marketing. Professor Dhar simply assumes that
anyone who did not personally select the brand was never exposed to any source of information
concerning their air conditioner or heat pump.

36.     Professor Dhar's assumption that consumers who acquired their HVAC system as
part of the purchase of a new home is similarly unsupported. Professor Dhar did not ask such
respondents whether their homebuilder showed them any materials or information about the
HVAC system, or provided different HVAC options. He did not ask whether the contract of sale
or home specifications included HVAC information. Professor Dhar also failed to ask whether
home purchasers conducted any research about the HVAC system prior to completing the
purchase. His survey also does not consider whether these respondents had seen TV, radio, print,
digital, or other advertising. He chose not to ask these questions, and, instead, made a baseless
assumption that anyone who purchased a new home never saw any information about the air
conditioner until after the purchase was complete.

37.     Professor Dhar's survey, thus, provides no information about the share of
respondents in these two groups who were exposed to information from the manufacturer.
Professor Dhar assumes it is zero percent without any support for this assumption. For example,
Professor Dhar states "for a clear majority of respondents (68.2%), any statements (and therefore
omissions) made by a manufacturer played no role at all in their acquisition of the HVAC
system."[59] However, his 68.2 percent figure includes respondents who were never asked whether

---

[58] For example, she stated that national television ads are used for the Carrier brand, radio ads are used for the Bryant and Carrier
brands, and digital advertisements are used by all Carrier brands. She also testified that Carrier uses print ads (including
those that appear in magazines) and digital ads on websites. Hoppel Deposition, 117:14 – 120:5; See also Hoppel Deposition
90:18-23; 96:12-97:24.

[59] Dhar Report, ¶98.

they consulted any sources of information. Of the respondents who were actually asked whether they consulted sources of information, the clear majority answered affirmatively. This faulty assumption infects all of Professor Dhar's tables summarizing the main survey results, as well as his conclusions.

### 3.    Professor Dhar Fails to Consider Other Exposures to Materials or Information from the Manufacturer

38.    Putting aside the issue of memory, even with respect to those respondents who indicated that they selected the brand, Professor Dhar's survey is also flawed in that it does not consider all of the ways in which a consumer could be exposed to information from a manufacturer. First, Professor Dhar failed to ask about the complete array of marketing materials that Carrier uses. Professor Dhar asked respondents about 11 different sources of information they may have consulted when choosing their HVAC brand. Specifically, Professor Dhar asked respondents whether they:

(1) Visited a manufacturer's website;

(2) Visited a contractor's or dealer's website;

(3) Visited a retail store's website;

(4) Visited a website containing consumer reviews of a product;

(5) Reviewed a printed brochure;

(6) Reviewed Consumer Reports magazines or similar magazines;

(7) Reviewed social media;

(8) Talked to friends, relatives or colleagues;

(9) Talked with a contractor or dealer;

(10) Talked with a retail store representative or salesperson at the store; or

(11) Called a manufacturer directly.[60]

39.    This list, and Professor Dhar's survey in general, focuses on materials that the respondent may have consulted when selecting their HVAC brand. However, Professor Dhar's

---

[60] Respondents were also given "Other" and "Don't recall/Unsure" options.

survey questions did not account for all of the sources of information that Carrier makes available. Professor Dhar made no effort to determine the extent to which respondents were exposed to Carrier's marketing generally. As noted above, Carrier uses media, such as TV, radio, print and digital advertising, to increase brand awareness. Moreover, the surveys that Carrier commissions show that these advertisements are cited by consumers as increasing their brand awareness. For example, the KeyStat HVAC Consumer Tracking Study shows that approximately one-quarter of Carrier purchasers reported that television advertising contributed to their awareness of the brand.[61] Radio advertising, print advertising, and Internet advertising were also cited by some respondents as sources of their brand awareness.

40.    Moreover, in addition to its direct-to-consumer advertising, as described above, Carrier provides marketing materials to be used by dealers and retailers. These marketing materials include ad kits that contain guidelines for television, radio, and print ads.[62] Professor Dhar's survey does not consider whether consumers have been exposed to this type of manufacturer-supported advertising. Professor Dhar inappropriately assumes that consumers who viewed only a contractor's website, a retail store website, a blog, a magazine, social media, or talked with a contractor or store representative were not exposed to information from the manufacturer. This assumption ignores that Carrier provides marketing materials to dealers and retailers to be used by them.[63]

41.    As a result of Professor Dhar's failure to address whether consumers have been exposed to these various forms of manufacturer-provided marketing information when selecting the brand of system, his survey likely underestimates the proportion of consumers who are exposed to information from the manufacturer. Professor Dhar assumes that those respondents who did not review a printed brochure, visit a manufacturer's or dealer's website, or call a manufacturer directly were not exposed to any information from the manufacturer; however, this

---

[61] Hoppel Deposition, Exhibit 21.

[62] Hoppel Deposition,  90:9-23, 96:12-19, 96:20-97:24, Exhibit 11.

[63] See, for example, Hoppel Deposition, 90:9-23

assumption ignores the possibility that these respondents were exposed to other types of materials and information provided directly or indirectly by the manufacturer.

42.    In addition to failing to ask about the full range of information and materials that a manufacturer may provide, Professor Dhar's survey also uses question wording that may have led respondents to under-report the sources of information they reviewed. Professor Dhar's survey questions repeatedly focus respondents' attention on the selection of the "brand" of air conditioner or heat pump. In fact, each of the key questions asked respondents about the information they consulted in selecting a "brand":

Q1: How did you select the brand of the [SYSTEM] that is installed in your home?

Q2: Did you consult any sources for information on any of the brands of [SYSTEM] before making your purchase?

> Q2a. What information sources did you consult on any of the brands before making your purchase?

> Q2b. You may have already said this, but which of the following information sources did you consult on any of the brands before making your purchase? *(Select all that apply)*

As already noted, however, selecting a brand is only one aspect of the decision-making process in selecting an air conditioner. Professor Dhar did not ask respondents about all of the information they may have consulted or seen in connection with purchasing a new HVAC system, including when selecting a "model" within the brand. This is significant because Carrier offers many different models with different features at different price points. It is well-known in the survey research literature that "[v]ery small changes in wording or in the response categories offered can result in large differences in results."[64] Because respondents were asked about the process of selecting the "brand" of air conditioner, when answering the survey questions, they

---

[64] Bradburn, Norman, Seymour Sudman, and Brian Wansink. 2004. *Asking Questions: The Definitive Guide to Questionnaire Design—For Market Research, Political Polls, and Social and Health Questionnaires*. San Francisco: John Wiley & Sons, Inc., p.26.

may not have focused on recalling and reporting the research they may have done on models of air conditioners.

43.     I also note that although respondents who were partially responsible for selecting the brand of HVAC system were qualified for the survey, Professor Dhar did not ask respondents with whom they shared this responsibility, or whether the other partially-responsible person consulted any sources of information. Almost 17 percent of the survey respondents shared decision-making responsibility for choosing the brand of system.[65] Professor Dhar does not know whether the other decision maker reviewed any marketing materials. It is quite possible that the survey respondent, who was partially responsible for the selection of the brand, did not review the materials Professor Dhar asked about, but the other decision-maker did.

44.     Lastly, I understand that Plaintiffs' allege that the defect at issue impairs product performance. I am also informed that certain product performance information is provided on the product itself, including on a yellow energy rating sticker required by federal law. Professor Dhar's study does not address whether consumers saw these yellow stickers or any other product labeling, manuals, warranties, or packaging prior to completing their purchase.

45.     Because Professor Dhar did not consider or ask survey respondents about a wide variety of potential sources of information provided by the manufacturer, his conclusion that only a small minority of HVAC purchasers "could have been exposed to and considered a statement from the manufacturer"[66] is not valid.

## B.    Professor Dhar's Population is Overinclusive and He Failed to Use a Probability Sample

### 1.    Professor Dhar's Population is Over-Inclusive

46.     Professor Dhar defined his survey universe as "owners of air conditioners or heat pumps who purchased their units separately or in connection with the purchase of their home in

---

[65] Dhar Report ¶95.

[66] Dhar Report, ¶39–40.

the last five years within the United States."[67] This universe is overinclusive and differs from the putative class that Plaintiffs seek to certify in three ways. First, his universe is not restricted to the brands at issue in this litigation. Of his 1,787 respondents, only 388, or 21.7 percent, reported purchasing a Carrier brand within the past five years.[68] Professor Dhar does not explain why he chose to include owners of non-Carrier brands in his survey, nor does he explain why he believes their experiences are relevant given that such respondents are not eligible for the putative class.

47.    The second way in which Professor Dhar's universe differs from the putative class concerns the timeframe of purchases. Professor Dhar qualified any respondent who purchased their systems within the past five years and met the other screening criteria. He did not ask respondents when during that five year period they purchased their system. Professor Dhar thus is unable to determine whether those respondents who purchased systems during the time period that the systems at issue were sold (i.e., 2013 to 2015) gave answers similar to those given by respondents who purchased their systems more recently.

48.    Third, and most importantly, Professor Dhar's universe fails to exclude some HVAC system owners who would not be eligible for the putative class. I understand that the putative class would not include HVAC system owners who acquired a used air conditioner or heat pump through the purchase of an existing home from a previous owner. However, in Professor Dhar's survey, such individuals could have qualified for the survey as part of the group who indicated "I did not select the brand of the [SYSTEM] because the [SYSTEM] was already installed when I moved into my home." This category likely also includes consumers who would be eligible for the putative class, namely those who acquired their HVAC system after moving into a newly-constructed home. Professor Dhar's survey does not allow for these two groups of respondents to be distinguished from each other.

49.    Professor Dhar's inclusion of HVAC system owners who would not be eligible for the putative class because they acquired their system through the purchase of an existing

---

[67] Dhar Report, ¶51.

[68] Dhar Report, ¶118.

home has serious implications for his analysis. First, because Professor Dhar calculated his percentages using all 1,787 respondents, his base incorrectly includes respondents who are ineligible for the putative class. His estimates of the percentage of consumers who consult sources of information are therefore artificially deflated.

50.    Second, because Professor Dhar did not ask respondents whether they acquired their HVAC system by moving into an existing home or a newly-constructed one, his estimates cannot be corrected by excluding ineligible respondents from the analysis. The 368 respondents who indicated they did not select their HVAC system brand because the system was already installed in the house when they moved in comprise 20.6 percent of the total sample; Professor Dhar does not know how many of these 368 respondents moved into an existing home.[69]

## 2.    Professor Dhar's Estimates of the Percentage of Consumers Who Did Not Select the Brand of HVAC System are Likely Inflated

51.    Professor Dhar's screening criteria exclude some respondents who are part of the population of air conditioner or heat pump owners who purchased their system within the past five years. Specifically, he screened out respondents who said a friend or someone else in their household was fully responsible for the selection of the brand of air conditioner or heat pump purchased for their home.[70] While it is true that these respondents likely would not have been able to report on the sources of information their friend or household member consulted, the exclusion of these types of consumers from the analysis may have biased Professor Dhar's estimates. First, by failing to count these respondents in his analysis of the role consumers play in selecting their brand of HVAC system, Professor Dhar has over-estimated the proportions of consumers in the population who have a professional select their brand or acquired their HVAC system with the purchase of their home. Professor Dhar does not disclose how many respondents screened out of the survey because they reported that a friend or household member selected the brand, so I cannot calculate the impact this error has on his estimates.

---

[69] Of the 388 Carrier brand owners, 59 (15.2 percent) fell into this category.

[70] Dhar Report, ¶¶70-71.

52.     Second, by overestimating the proportion of respondents who had a professional
select their HVAC brand or acquired their system through the purchase of their home, Professor
Dhar also inflates his estimates concerning the proportion of respondents who did not consult
information about HVAC systems before making their purchases.

### 3.    Professor Dhar Did Not Use a Probability Sample

53.     In his report, Professor Dhar explains that Internet surveys are an accepted mode
for collecting survey data and notes that such surveys are relied on by courts and used by
businesses for market research.[71] Professor Dhar, however, fails to discuss the different
recruitment methods that Internet surveys use. These differences affect how results from Internet
surveys should be considered.

54.     In general, survey respondents can be sampled through either probability or non-
probability methods of selection. In a probability sample, often referred to as a random sample,
each member of the sampling frame has a known, non-zero probability of being selected for the
sample. The fact that the selection is rooted in probability theory allows for survey results from a
probability sample to be generalized to the larger population. In contrast, results from non-
probability samples cannot be generalized to the larger population with any known confidence
level.[72] Respondents in non-probability samples are often composed of volunteers who were
recruited using a variety of different recruitment strategies.

55.     The term "Internet survey" refers to the mode in which the data are collected—
respondents read and answer the survey questions online without the assistance of an interviewer.
However, Internet surveys vary with respect to how the sample of respondents was recruited.[73]

---

[71] Dhar Report, ¶52.

[72] The American Association of Public Opinion Researchers is a professional organization of public opinion and survey research
professionals. The AAPOR Task Force on Online Panels cautioned, "Researchers should avoid nonprobability opt-in panels
when a key research objective is to accurately estimate population values. There currently is no generally accepted
theoretical basis from which to claim that survey results using samples from nonprobability online panels are projectable to
the general population. Thus, claims of 'representativeness' should be avoided when using these sample sources." AAPOR
Report on Online Panels March 2010, p. 5.

[73] With respect to non-probability sampling in Internet surveys, I have limited the discussion in this paragraph to online panels as
this is the type of sample source used by Professor Dhar.

Some Internet surveys are based on probability samples in which a sample was randomly selected from a pre-existing list of potential respondents. Such surveys are only possible when a list (e.g., a customer list, an employee list, etc.) is available for sampling. Because there is no list that can be used to sample the general population for an online survey, market research companies have built pre-recruited panels of individuals who have agreed to take online surveys on an ongoing basis in exchange for small rewards or incentives. The majority of these panels recruit respondents via non-probability methods. There are, however, a small number of panels, including GfK's KnowledgePanel, that have recruited respondents using probability methods and are representative of households both with and without Internet access.

56.     Professor Dhar's sample is drawn from the Research Now panel, a pre-recruited, non-probability panel. It is true that online panels such as the Research Now panel are routinely used in litigation for Lanham Act surveys and other types of experimental survey designs. I use these panels in my own survey work for such purposes. Using these panels in survey experiments that use random assignment of respondents to different test conditions limits the impact of any biases attributable to the use of a non-probability panel.[74] However, they have serious limitations when it comes to estimating population estimates, as Professor Dhar has done here.

57.     As Professor Diamond states in her chapter on survey research in the *Reference Manual of Scientific Evidence,* "The use of probability sampling techniques maximizes both the representativeness of the survey results and the ability to assess the accuracy of estimates obtained from the survey."[75] Professor Diamond further states that "when respondents are not selected randomly from the relevant population, the expert should be prepared to justify the method used to select respondents."[76] Professor Dhar does not explain why he chose to use a

---

[74] Lanham Act surveys typically use an experimental design in which respondents are randomly assigned to a test or control group. The key statistic of interest to the researcher is the difference in the survey estimates (e.g., the confusion rate) between the test and control group.

[75] Diamond, Shari Seidman (2011). "Reference Guide on Survey Research." pp. 359-423 in the *Reference Manual on Scientific Evidence,* Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence, Federal Judicial Center, National Research Council (hereinafter 'Diamond'), p. 380.

[76] Diamond, p. 380.

non-probability panel when his research objectives were better suited to a probability sample.[77]
Professor Dhar should have used a probability sample for his survey. His options for doing so
would have included a telephone survey or an online panel that recruits its respondents via
probability methods, such as GfK's Knowledge Panel.

## VI.    Conclusion

58.     After reviewing Professor Dhar's survey, it is my professional opinion that his
survey does not provide a reliable or valid method for determining the proportion of consumers
of Carrier HVAC systems who were exposed to information from Carrier.

59.     My opinions and conclusions as expressed in this report are to a reasonable
degree of professional certainty. My work is ongoing and my opinions will continue to be
informed by any additional material that becomes available to me.

60.     I declare under penalty of perjury under the laws of the United States of America
that the foregoing is true and correct and that I am competent to testify to the facts contained in
this report if called as a witness.


Melissa Pittaoulis, Ph.D.

---

[77] Professor Dhar suggests that Internet panels have an advantage over telephone surveys because they avoid the issue of
wireless-only households (Dhar Report, ¶52). This argument ignores the fact that telephone surveys are able to both employ
probability sampling and include cell-phones. A main advantage of an Internet survey over a telephone survey is cost.

# Exhibit A



**Melissa Pittaoulis**
Associate Director

National Economic Research Associates, Inc.
Three Logan Square, Suite 1100
Philadelphia, Pennsylvania 19103
+1 215 864 3880 Fax +1 215 864 3849
Direct dial: 215-864-3879
melissa.pittaoulis@nera.com
www.nera.com

# Melissa Pittaoulis
## Associate Director

Dr. Pittaoulis is an Associate Director based in NERA's Philadelphia office. Dr. Pittaoulis specializes in survey research, statistical sampling, and demography. Her survey research experience includes designing research, writing questionnaires, supervising data collection, and analyzing data. In addition to designing surveys, Dr. Pittaoulis also reviews and evaluates third-party surveys.

Dr. Pittaoulis has extensive experience working on surveys used in intellectual property disputes concerning false advertising and trademark and trade dress infringement. In the area of trademark and trade dress infringement, Dr. Pittaoulis' project experience includes participating in the design of surveys used to establish likelihood of confusion, secondary meaning, and genericness. She has conducted false advertising and trademark surveys using different modes of data collection, including telephone, mall-intercept, and the Internet.

Dr. Pittaoulis also has experience designing and evaluating conjoint surveys used to assess the value of product features. Such surveys are used in a variety of contexts, including patent cases, class actions, and antitrust matters.

Dr. Pittaoulis' sampling expertise includes designing sampling plans, selecting samples, and calculating sample estimates and confidence intervals. Her demography work has concentrated on producing population estimates used in determining class certification.

Dr. Pittaoulis has worked on survey and sampling projects in a wide variety of industries, including: automobiles, beverages, beauty products, clothing apparel, computers, financial products, insurance, mobile phones, personal care products, pharmaceuticals, snack foods, and video games. In addition, Dr. Pittaoulis has considerable experience with radio and television audience measurement. She has also conducted studies on cost-sharing in the Medicare Part D program.

In addition to her work at NERA, Dr. Pittaoulis has taught statistics at the undergraduate level at Temple University.

Melissa Pittaoulis

## Education

**Temple University**
Ph.D., Sociology 2012
M.A., Sociology, 2004

**La Salle University**
B.A., Sociology and Criminal Justice, 2000

## Professional Experience

|              | **NERA Economic Consulting** |
| ------------ | --------------------- |
| 2017-Present | Associate Director    |
| 2013-2017    | Senior Consultant     |
| 2011-2013    | Consultant            |
| 2006-2011    | Senior Analyst        |
| 2003-2006    | Research Associate    |

| 2003-2005 | **Temple University** |
| --------- | --------------------- |
|           | Instructor |
|           | Taught undergraduate courses in statistics |
|           | Teaching Assistant |
|           | Taught lab sections for undergraduate courses in statistics |

## Honors and Professional Activities

University Fellowship, Temple University, 2002-2006
University Scholarship, La Salle University, 1996-2000
Member, American Association of Public Opinion Research
Member, American Sociological Association
Member, International Trademark Association
Member, DRI

## Presentations

**Presenter**

"How to Effectively Use Statistical Sampling in Class Action Litigation: Tips and Strategies in 2018." Webinar presented by The Knowledge Group in 2017.

Participant on panel entitled "Building a Defensive IP Strategy: Leveraging the Favorable Landscape." Centerforce IP Strategy Summit Series, June 7, 2017.

"Competitor's Comparative Advertising: Practical Guide and Best Practices in Winning Your Claims in 2016." Webinar presented by The Knowledge Group in 2016.

"Hot Topics in Online Behavioral Advertising for 2015 Explored!"  Webinar presented by The Knowledge Group in 2015.

"Attitudes and Approaches Towards Choosing a College Major" at American Sociological Association in 2013.

"Designing and Defending Surveys Used in Commercial Litigation" at American Association of Public Opinion Research in 2013.

"College Students' Motivations for Choosing Academic Majors," at Eastern Sociological Society in 2010.

 "The Impact of Work-Family Conflict on Job Satisfaction," at Eastern Sociological Society in 2005.

**Presider**
Eastern Sociological Society, Philadelphia, Pennsylvania March 2010

## Papers and Publications

"Control Groups in Lanham Act Surveys," with Eugene P. Ericksen, *The Trademark Reporter*, May-June 2014 Vol. 104 No. 3.

"Comments on EPA's Notice of Data Availability for §316(b) Stated Preference Survey," with David Harrison et al., NERA Working Paper, July 2012.

"How Much Does that Medication Cost? A Study of Medicare Beneficiaries' Knowledge of Out-of-Pocket Costs for Prescription Drugs on the Specialty Tier," with Eugene P. Ericksen, NERA Working Paper, August 2011.

Melissa Pittaoulis

## Expert Testimony

*Tracy Sanborn and Louis Lucrezia et al.\* v. Nissan North America Inc., Nissan Motor Company, LTD.*, United States District Court, Southern District of Florida [Deposition: February 11, 2016]

*Terrance Justice, Andrea Hatfield et al.\* v. Rheem Manufacturing Company,* United States District Court, Southern District of Florida [Deposition: March 1, 2016]

*Edible Arrangements International, LLC and Edible Arrangements, LLC v. 1-800-Flowers.com, Inc., 800-Flowers, Inc.\*, and June V. Delaney and David Delaney d/b/a Fruit Bouquets Staten Island*, United States District Court, District of Connecticut [Deposition: May 3, 2016]

*In Re: Fluidmaster, Inc. Water Connector Components Products Liability Litigation*, United States District Court, Northern District of Illinois [Deposition: June 6, 2016]

*Trump Old Post Office, LLC\* v. CZ-National, LLC and BVS Acquisition Co.*, LLC Superior Court for the District of Columbia, Civil Division [Deposition: July 7, 2016]

*Wendy and Nicholas Grasso et al.\* v. Electrolux Home Products, Inc.*, United States District Court, Middle District of Florida, Tampa Division [Deposition: October 12, 2016]

*The Hilsinger Company\* v. FBW Investments, LLC and Kleen Concepts, LLC.*, United States District Court, District of Massachusetts [Deposition: February 15, 2017]

*Hi-Tech Pharmaceuticals, Inc.\* v. Dynamic Sports Nutrition, LLC d/b/a Anabolic Research, PBB Trademark Holdings, LLC, and Brian Clapp.*, United States District Court, Northern District of Georgia, Atlanta Division [Deposition: March 15, 2017]

*Central Bank & Trust Co. v. Gannett Satellite Information Network, Inc.\* and James Pilcher*, Commonwealth of Kentucky, Fayette Circuit Court, Division 4 [Deposition: August 8, 2017]

*Fratelli Branca Distilleries S.R.L. v. F. LLI Gancia & C.S.P.A.\**, United States Patent and Trademark Office, Trademark Trial and Appeal Board [Deposition : November 17, 2017]

*Hypnotic Hats, LTD.\* v. Wintermantel Enterprises, LLC; Hype Socks, LLC; and Hype Cheer, LLC.*, United States District Court, Southern District of New York [Deposition: December 19, 2017]

*Kars 4 Kids Inc. v. America Can!\*,* United States District Court, District of New Jersey [Deposition: April 4, 2018]

*Republic Technologies (NA), LLC and Republic Tobacco, L.P.\* v. BBK Tobacco & Foods, LLP d/b/a HBI International*, United States District Court, Norther District of Illinois [Deposition: May 17, 2018]

\*Retaining Party

# Exhibit B

**Exhibit B**
**Documents Relied Upon**

**Legal Documents**

–   Amended Class Action Complaint, *Steve Oddo, Rajene Reardon, Anthony Lasala, Linda Lamm, Keith Kimball, Norman Klinge, and Dan Gallagher. v. Arcoaire Aire Conditioning and Heating, Carrier Corporation, Bryant Heating and Cooling Systems, Comfortmaker Air Conditioning and Heating, International Comfort Products LLC, and United Technologies Corporation*, Case No. 8:15-cv-01985 CAS (Ex), dated March 07, 2016.

**Expert Report and Data**

–   Expert Report of Professor Ravi Dhar, submitted April 12, 2018.

–   Appendix K – Data Listing.xlsx

**Interrogatories**

–   Plaintiff Dan Gallagher's Objections and Corrected Responses to Defendants' First Set of Interrogatories, *Steve Oddo, Rajene Reardon, Anthony Lasala, Linda Lamm, Keith Kimball, Norman Klinge, and Dan Gallagher. v. Arcoaire Aire Conditioning and Heating, Carrier Corporation, Bryant Heating and Cooling Systems, Comfortmaker Air Conditioning and Heating, International Comfort Products LLC, and United Technologies Corporation*, Case No. 8:15-cv-01985 CAS (Ex), dated February 22, 2018.

–   Plaintiff Norman Klinge's Objections and Corrected Responses to Defendants' First Set of Interrogatories, *Steve Oddo, Rajene Reardon, Anthony Lasala, Linda Lamm, Keith Kimball, Norman Klinge, and Dan Gallagher. v. Arcoaire Aire Conditioning and Heating, Carrier Corporation, Bryant Heating and Cooling Systems, Comfortmaker Air Conditioning and Heating, International Comfort Products LLC, and United Technologies Corporation*, Case No. 8:15-cv-01985 CAS (Ex), dated November 28, 2017.

–   Plaintiff Linda Lamm's Objections and Corrected Responses to Defendants' First Set of Interrogatories, *Steve Oddo, Rajene Reardon, Anthony Lasala, Linda Lamm, Keith Kimball, Norman Klinge, and Dan Gallagher. v. Arcoaire Aire Conditioning and Heating, Carrier Corporation, Bryant Heating and Cooling Systems, Comfortmaker Air Conditioning and Heating, International Comfort Products LLC, and United Technologies Corporation*, Case No. 8:15-cv-01985 CAS (Ex), dated January 10, 2018.

–   Plaintiff Steve Oddo's Objections and Corrected Responses to Defendants' First Set of Interrogatories, *Steve Oddo, Rajene Reardon, Anthony Lasala, Linda Lamm, Keith Kimball, Norman Klinge, and Dan Gallagher. v. Arcoaire Aire Conditioning and Heating, Carrier Corporation, Bryant Heating and Cooling Systems, Comfortmaker Air*

1

*Conditioning and Heating, International Comfort Products LLC, and United Technologies Corporation*, Case No. 8:15-cv-01985 CAS (Ex), dated November 29, 2017.

**Affidavit**

–   Affidavit of Megan Hacker-Schnitzler, *Steve Oddo, Rajene Reardon, Anthony Lasala, Linda Lamm, Keith Kimball, Norman Klinge, and Dan Gallagher. v. Arcoaire Aire Conditioning and Heating, Carrier Corporation, Bryant Heating and Cooling Systems, Comfortmaker Air Conditioning and Heating, International Comfort Products LLC, and United Technologies Corporation*, Case No. 8:15-cv-01985 CAS (Ex), dated April 12, 2018.

**Depositions and Exhibits**

–   Deposition of Daniel Gallagher, taken on February 16, 2018.

–   Exhibit 40 from the Deposition of Daniel Gallagher.

–   Deposition of Pamela Hoppel, taken on January 30, 2018.

–   Signature Page and Errata for deposition by Pamela Hoppel.

–   Exhibit 1 from the Deposition of Pamela Hoppel.

–   Exhibit 2 from the Deposition of Pamela Hoppel.

–   Exhibit 3 from the Deposition of Pamela Hoppel.

–   Exhibit 4 from the Deposition of Pamela Hoppel.

–   Exhibit 5 from the Deposition of Pamela Hoppel.

–   Exhibit 6 from the Deposition of Pamela Hoppel.

–   Exhibit 7 from the Deposition of Pamela Hoppel.

–   Exhibit 8 from the Deposition of Pamela Hoppel.

–   Exhibit 9 from the Deposition of Pamela Hoppel.

–   Exhibit 10 from the Deposition of Pamela Hoppel.

–   Exhibit 11 from the Deposition of Pamela Hoppel.

–   Exhibit 12 from the Deposition of Pamela Hoppel.

&ndash; Exhibit 13 from the Deposition of Pamela Hoppel.

&ndash; Exhibit 14 from the Deposition of Pamela Hoppel.

&ndash; Exhibit 15 from the Deposition of Pamela Hoppel.

&ndash; Exhibit 16 from the Deposition of Pamela Hoppel.

&ndash; Exhibit 17 from the Deposition of Pamela Hoppel.

&ndash; Exhibit 18 from the Deposition of Pamela Hoppel.

&ndash; Exhibit 19 from the Deposition of Pamela Hoppel.

&ndash; Exhibit 20 from the Deposition of Pamela Hoppel.

&ndash; Exhibit 21 from the Deposition of Pamela Hoppel.

&ndash; Exhibit 22 from the Deposition of Pamela Hoppel.

&ndash; Exhibit 23 from the Deposition of Pamela Hoppel.

&ndash; Deposition of Christopher Kafura, taken on January 26, 2018.

&ndash; Signature Page and Errata deposition by Christopher Kafura.

&ndash; Deposition of Norman Klinge, taken on February 08, 2018.

&ndash; Deposition of Linda Lamm, taken on February 12, 2018.

&ndash; Exhibit 29 from the Deposition of Linda Lamm.

&ndash; Deposition of Steve Oddo, taken on February 27, 2018.

&ndash; Exhibit 52 from the Deposition of Steve Oddo, dated February 27, 2018.


**Bates Stamped  Documents**

&ndash; Carrier Corporation 2014 Service Bulletin - CARRIER_0006796 to  CARRIER_0006798

&ndash; Dealer Service Bulletin Issued 7/3/2014 - Residential Furnace Coils - CARRIER_0006867 to  CARRIER_0006868

&ndash; Dealer Service Bulletin Issued 7/3/2014 - Residential Split Systems - CARRIER_0007650 to  CARRIER_0007651

3

– Comfort Series Air Conditioners - CARRIER_0008349 to  CARRIER_0008352

– Performance Series Air Conditioners - CARRIER_0008353 to  CARRIER_0008356

– Performance Series Air Conditioners - CARRIER_0008371 to  CARRIER_0008374

– Infinity Series Air Conditioners - CARRIER_0008379 to  CARRIER_0008384

– The Carrier Family of Indoor Comfort - CARRIER_0008385 to  CARRIER_0008392

– Everything You Need for Total Comfort - CARRIER_0008454 to  CARRIER_0008469

– Carrier Corporation 2014 Service Bulletin - CARRIER_0013718 to  CARRIER_0013720

– Carrier Corporation 2014 Service Bulletin - CARRIER_0013721 to  CARRIER_0013727

– Dealer Service Bulletin - CARRIER_0015048 to  CARRIER_0015052

– Dealer Service Bulletin - CARRIER_0016265 to  CARRIER_0016266

– Carrier Corporation 2014 Service Bulletin - CARRIER_0016434 to  CARRIER_0016436

– Carrier Corporation 2014 Service Bulletin - CARRIER_0024433 to  CARRIER_0024435

– Carrier Corporation 2014 Service Bulletin - CARRIER_0024786 to  CARRIER_0024788

– Comfortmaker Residential Heating & Cooling Products - CARRIER_0025596 to CARRIER_0025603

– KeyStat Connect Summary Report - CARRIER_0033899 to  CARRIER_0033910

– KeyStat Connect  - CARRIER_0033922 to  CARRIER_0033928

– KeyStat Connect Summary Report April 10, 2017 - CARRIER_0033952 to CARRIER_0033978

– KeyStat Connect Topline Report HVAC 4Q16 02.08.2017 - CARRIER_0034021 to CARRIER_0034062

– KeyStat Connect HVAC - 3rd Qtr 2017 - CARRIER_0043887 to  CARRIER_0043910

– Bryant Heating & Cooling Systems - CARRIER_0044495 to  CARRIER_0044498

– Performance 13 Central Air Conditioner - CARRIER_0044687 to  CARRIER_0044690

– Infinity 16 Central Air Conditioner - CARRIER_0044733 to  CARRIER_0044737

– DuraComfort 13 Central Air Conditioner - CARRIER_0044778 to  CARRIER_0044782

– MarketSight - California Split Brand Funnel Second Quarter 2015 - Second Quarter 2017
  - CARRIER_0033844

– MarketSight - General Path to Purchase Second Quarter 2017 - CARRIER_0033845

– MarketSight - Florida Path to Purchase First Quarter 2017 - CARRIER_0033935

– Heat Pump Path ro Purchase Dashboard First Quarter 2017 - CARRIER_0033941 to
  CARRIER_0033943

– Central Air Path to Purchase Dashboard First Quarter 2017 - CARRIER_0033944 to
  CARRIER_0033946

– ICP Brand Funnel Dashboard First Quarter 2017 – CARRIER_0033947

– Bryant Brand Funnel Dashboard First Quarter 2017 -  CARRIER_0033948

– Carrier Brand Funnel Dashboard First Quarter 2017 – CARRIER_0033949

– Combined Brand Funnel Dashboard First Quarter 2017 –  CARRIER_0033950

– KeyStat Connect Consumer Trends Report - CARRIER_0033846 - CARRIER_0033865

– Most Important Factory – CARRIER_0033877

– KeyStat HVAC Consumer Tracking Study Results – CARRIER_0033883

– EMI Research Solution's 2015 Residential Air Conditioning Consumer Research
  Summary Report – EMERSON016386 - EMERSON016493

– Heil Split System Air Conditioners & Heat Pumps brochure – CARRIER_0043517 -
  CARRIER_0043520

– Tempstar Split System Air Conditioners & Heat Pumps brochure – CARRIER_0043457 -
  CARRIER_0043460

– Bryant: The 2007 Family of Air Conditioners – CARRIER_0046667 -
  CARRIER_0046686

– Generational Path to Purchase CARRIER  0033936

**Articles and Book Chapters**

– American Association of Public Opinion Researchers. AAPOR Report on Online Panels
March 2010.

– Bradburn, Norman, Seymour Sudman, and Brian Wansink. 2004. *Asking Questions: The
Definitive Guide to Questionnaire Design—For Market Research, Political Polls, and
Social and Health Questionnaires*. San Francisco: John Wiley & Sons, Inc.

– Diamond, Shari Seidman (2011). "Reference Guide on Survey Research." pp. 359-423 in
the *Reference Manual on Scientific Evidence*, Committee on the Development of the
Third Edition of the Reference Manual on Scientific Evidence, Federal Judicial Center,
National Research Council.

– Singleton, Royce A. and Bruce C. Straits. 1999. *Approaches to Social Research*. New
York: Oxford University Press.

– Sudman, Seymour and Norman M. Bradburn. 1982. *Asking Questions*. San Francisco:
Jossey-Bass Publishers.

– Sudman, Seymour, Norman M. Bradburn, and Norbert Schwarz. 1996. *Thinking About
Answers: The Application of Cognitive Processes to Survey Methodology*. San Francisco:
Jossey-Bass Publishers.

– Tourangeau, Roger, et al. 2000. *The Psychology of Survey Response*. Cambridge:
Cambridge University Press

**Websites**

– http://energy.gov/energysaver/central-air-conditioning

– https://www.carrier.com/residential/en/us/products/air-conditioners/

– https://www.carrier.com/residential/en/us/products/heat-pumps/

6