KIRKLAND & ELLIS LLP
Daniel A. Bress (State Bar No. 257305)
daniel.bress@kirkland.com
Katherine R. Katz (*pro hac vice*)
katherine.katz@kirkland.com
Devin S. Anderson (*pro hac vice*)
devin.anderson@kirkland.com
655 Fifteenth Street NW
Washington, DC  20001
Telephone: (202) 879-5000
Facsimile: (202) 879-5100

Attorneys for Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVE ODDO, RAJENE REARDON, ANTHONY LASALA, LINDA LAMM, KEITH KIMBALL, NORMAN KLINGE, and DAN GALLAGHER, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>v.<br><br>ARCOAIRE AIR CONDITIONING AND HEATING, CARRIER CORPORATION, BRYANT HEATING AND COOLING SYSTEMS, COMFORTMAKER AIR CONDITIONING & HEATING, INTERNATIONAL COMFORT PRODUCTS LLC, and UNITED TECHNOLOGIES CORPORATION,<br><br>          Defendants. | CASE NO. 8:15-cv-01985 CAS (Ex)<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO LIMIT CONSIDERATION OF THE EXPERT REPORT AND TESTIMONY OF PROFESSOR RAVI DHAR**<br><br>**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**<br><br>Judge:     Christina A. Snyder<br>Hearing:  March 11, 2019<br>Time:     10:00 AM<br>Courtroom:    8D |

# TABLE OF CONTENTS

INTRODUCTION...................................................................................................1

BACKGROUND ...................................................................................................2

    A.    Dr. Dhar's Credentials and Experience.............................................2

    B.    Professor Dhar's Survey....................................................................3

    C.    Plaintiffs' Rebuttal Expert.................................................................6

ARGUMENT .........................................................................................................7

I.    PLAINTIFFS' ATTEMPT TO DISMISS DR. DHAR'S SURVEY RESTS ON A MISUNDERSTANDING OF THE GOVERNING LEGAL STANDARDS ...............................................................................7

II.    PLAINTIFFS' CRITICISMS OF DR. DHAR'S SURVEY ARE UNFOUNDED.................................................................................12

    A.    Dr. Dhar's Selection Of Sources For The Survey Was Appropriate ...........12

    B.    Plaintiffs' Remaining Criticisms Are Equally Meritless .............................22

III.    DR. DHAR'S MATERIALITY OPINION IS RELEVANT AND RELIABLE...............................................................................25

CONCLUSION...............................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 5-Hour Energy Mrktg & Sales Practices Litig.*,
  2017 WL 2559615 (C.D. Cal. June 7, 2017) ........................................................ 12, 25

*Apple, Inc. v. Samsung Elecs. Co.*,
  2012 WL 2571332 (N.D. Cal. June 30, 2012) ............................................................ 12

*Arthur v. United Indus. Corp.*,
  2018 WL 2276636 (C.D. Cal. May 17, 2018) ............................................ 8, 10, 11, 12

*Baranco v. Ford Motor Co.*,
  294 F. Supp. 3d 950 (N.D. Cal. 2018) .............................................................. 14, 15, 16

*Berger v. Home Depot USA, Inc.*,
  741 F.3d 1061 (9th Cir. 2014) ................................................................................ 14, 15

*Biscotti Inc. v. Microsoft Corp.*,
  2017 WL 2536962 (E.D. Tex. May 18, 2017) .............................................................. 3

*Butler v. Porsche Cars N. Am., Inc.*,
  2017 WL 1398316 (N.D. Cal. Apr. 19, 2017) .................................................. 9, 11, 18

*Carriulo v. Gen. Motors Corp.*,
  823 F.3d 977 (11th Cir. 2016) ...................................................................................... 21

*Clicks Billiards, Inc. v. Sixshooters, Inc.*,
  251 F.3d 1252 (9th Cir. 2001) ...................................................................................... 12

*Colman v. Theranos, Inc.*,
  325 F.R.D. 629 (N.D. Cal. 2018) ................................................................................... 8

*Daniel v. Ford Motor Co.*,
  2016 WL 8077932 (E.D. Cal. Sept. 23, 2016) ............................................................ 17

*Daniel v. Ford Motor Co.*,
  806 F.3d 1217 (9th Cir. 2015) .................................................................. 9, 14, 15, 16, 20

*Dei Rossi v. Whirlpool Corp.*,
  2015 WL 1932484 (E.D. Cal. Apr. 28, 2015) ............................................................ 20

ii

*Jones v. ConAgra Foods, Inc.*,
  2014 WL 2702726 (N.D. Cal. June 13, 2014) .............................................................. 12

*Justice v. Rheem Mfg. Co.*,
  318 F.R.D. 687 (S.D. Fla. 2016) .................................................................. 1, 6, 7, 13

*Mazza v. Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) ........................................... 2, 8, 9, 14, 15, 21, 22

*McVicar v. Goodman Global, Inc.*,
  2015 WL 4945730 (C.D. Cal. Aug. 20, 2015) ............................ 1, 6, 9, 11, 13, 20, 23

*Moab Indus., LLC v. FCA US, LLC*,
  2016 WL 5859700 (D. Ariz. Oct. 6, 2016) ........................................................... 3

*Morales v. Kraft Foods Grp., Inc.*,
  2017 WL 2598556 (C.D. Cal. June 9, 2017) ...................................................... 12

*In re NJOY, Inc. Consumer Class Action Litig.*,
  120 F. Supp. 3d 1050 (C.D. Cal. 2015) ............................................................ 21

*Philips v. Ford Motor Co.*,
  2016 WL 7428810 (N.D. Cal. Dec. 22, 2016) ...................................................... 9

*Playtex Prod., LLC v. Munchkin, Inc.*,
  2016 WL 1276450 (S.D.N.Y. Mar. 29, 2016) ..................................................... 25

*POM Wonderful LLC v. Coca Cola Co.*,
  2016 WL 5929336 (C.D. Cal. Mar. 9, 2016) ...................................................... 12

*Sloan v. Gen. Motors LLC*,
  287 F. Supp. 3d 840 (N.D. Cal. 2018) ...................................... 8, 10, 14, 15, 16, 17

*Southland Sod Farms v. Stover Seed Co.*,
  108 F.3d 1134 (9th Cir. 1997) .................................................................. 2, 12

*Stearns v. Ticketmaster Corp.*,
  655 F.3d 1013 (9th Cir. 2011) ........................................................................ 8

*Todd v. Tempur-Sealy Int'l, Inc.*,
  2017 WL 2833997 (N.D. Cal. June 30, 2017) ................................................ 9, 18, 21

*United States v. Bonds*,
  608 F.3d 495 (9th Cir. 2010) ........................................................................ 15

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ........................................................................... 11

*Webb v. Carter's Inc.*,
    272 F.R.D. 489 (C.D. Cal. 2011) .................................................. 10, 11

**Statutes**

Cal. Bus. & Prof. Code § 7159.5 ........................................................ 19

Ga. Code § 10-1-399(a) ........................................................................ 8

Ind. Code § 24-5-0.5-2(8) ..................................................................... 8

Ind. Code § 24-5-0.5-5(a) ..................................................................... 8

**Rules**

Fed. R. Civ. P. 23 ............................................................................... 11

**Regulations**

16 C.F.R. § 305.12 .............................................................................. 19

16 C.F.R. § 305.12(g)(15) .................................................................... 19

# INTRODUCTION

One of the fundamental problems with plaintiffs' motion for class certification is that they have no classwide evidence showing that consumers "*actually reviewed*" statements by Carrier when purchasing their HVAC systems, 1/27/17 Order 30–31 [ECF No. 57], which is indispensable for showing causation, *i.e.*, "that had the omitted information been disclosed, [consumers] would have been aware of it and behaved differently." *McVicar v. Goodman Global, Inc.*, 2015 WL 4945730, at *11 (C.D. Cal. Aug. 20, 2015). Indeed, it would be unprecedented to certify a class on plaintiffs' theory that tens of thousands of HVAC purchasers—who bought different models, from different sources, based on different preferences, and at different times—all would have read statements by Carrier and uniformly changed their purchasing decisions accordingly, based solely on the fact that a small percentage of units experienced easily remediable TXV clogs that were covered by warranty. Plaintiffs have offered literally no evidence to support this momentous request, and courts have denied certification in HVAC class actions based on the same lack of evidence of classwide exposure to manufacturer information. *See id.* at *12; *Justice v. Rheem Mfg. Co.*, 318 F.R.D. 687, 697–98 (S.D. Fla. 2016).

Plaintiffs try to make Carrier the scapegoat for their own lack of classwide proof by attempting to limit the testimony of Dr. Ravi Dhar, a widely-published professor of marketing and psychology at Yale University. But plaintiffs' motion rests on fundamental misconceptions about plaintiffs' own claims, misrepresentations about Dr. Dhar's opinions, and irrelevant quibbles with the phrasing of survey questions, none of which justifies disregarding any portion of Dr. Dhar's opinion. Over the course of his career, Dr. Dhar has worked on hundreds of surveys and has published in leading journals dozens of papers on consumer decision-making. Dr. Dhar's survey in this case showed that, at best, a minority of HVAC purchasers would have considered and deemed material statements from a manufacturer like Carrier when deciding whether to purchase an HVAC system, so that whether such exposure occurs requires individualized analysis.

To avoid the devastating impact of Dr. Dhar's survey on plaintiffs' omission-based

claims, plaintiffs proclaim the survey "irrelevant" because Dr. Dhar supposedly did not analyze all "available channels" through which plaintiffs claim Carrier could have made a disclosure.  Pls. Dhar Mot. 1 [ECF No. 166].  But plaintiffs badly misstate the standard applicable to their claims at class certification.  The question is not whether, in theory, Carrier could have communicated with consumers through some means.  It is always the case that a company could have provided information through some channel (such as the Internet), and if plaintiffs' theory were correct, classes would always be certified in omissions cases.  Instead, the question is whether, in fact, "everyone in the class [would] have been *exposed to* the omissions." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012) (emphasis added).  Drawing on his experience and the record in this case, Dr. Dhar appropriately designed and conducted a survey that bears directly on this key issue.  Plaintiffs—who performed no survey or analysis of their own as to consumer decision-making—have no basis for trying to discredit Dr. Dhar's survey as irrelevant.

   Under Ninth Circuit precedent, "as long as they are conducted according to accepted principles, survey evidence should ordinarily be found sufficiently reliable under *Daubert*." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 n.8 (9th Cir. 1997).  Plaintiffs' challenges to Dr. Dhar's survey consist of semantic nitpicking, misplaced attacks on Dr. Dhar's well-supported methodologies, or else turn on plaintiffs' pressing of their own baseless theories, such as that all HVAC purchasers review stickers on the unit prior to purchase or would have all received uniform information through the tens of thousands of individualized interactions they had with Carrier's unaffiliated dealers.  Consistent with the other evidence in the record, Dr. Dhar's survey confirms that individual inquiry would be necessary to determine both whether consumers would have reviewed information from Carrier prior to purchase and the materiality of that information.  Plaintiffs' motion to limit Dr. Dhar's opinions should thus be denied.

## BACKGROUND

### A.    Dr. Dhar's Credentials and Experience

Dr. Dhar is the George Rogers Clark Professor of Management and Marketing as

well as the Director of the Center for Customer Insights at the Yale School of Management. Ex. 1 (Dhar Rep.) ¶ 1.  He is also a Professor of Psychology at Yale University.  *Id.*  Dr. Dhar's numerous articles have appeared in the nation's leading journals, including the Harvard Business Review and the Journal of Consumer Research.  *Id.* ¶ 2.  His research focuses on how consumers acquire and process information making purchasing decisions, and his dozens of papers have garnered many awards.  *Id.* ¶¶ 3–4, Ex. A.  Dr. Dhar has "conducted, supervised, or evaluated more than 350 surveys, as well as analyzed questions relating to different aspects of consumer behavior" in a variety of markets.  *Id.* ¶¶ 4–6.  In addition, courts have credited his surveys and his opinions regarding consumer behavior.  *See Biscotti Inc. v. Microsoft Corp.*, 2017 WL 2536962, at *2 (E.D. Tex. May 18, 2017); *Moab Indus., LLC v. FCA US, LLC*, 2016 WL 5859700, at *6 (D. Ariz. Oct. 6, 2016).

### B.    Professor Dhar's Survey

In this case, Dr. Dhar designed, conducted, and analyzed a survey to examine two aspects of consumer behavior relating to consumers' selection of their HVAC systems: (1) "the proportion of owners who acquire their HVAC system in several different ways: those who personally select the HVAC system, those who rely on professionals such as a contractor or dealer to select the HVAC system, and those who acquire an HVAC system because they purchased a home that had an HVAC system already installed"; and (2) "the sources of information that consumers who have a role in selecting the brand of their air conditioner or heat pump review before making a purchase."  Ex. 1 ¶¶ 19–20.  Based on the results of this survey and Dr. Dhar's extensive experience with consumer behavior, he concluded "with a high degree of scientific certainty that a large majority of relevant consumers who acquire an HVAC system either relied solely on a professional or purchased a home with an already installed HVAC system or were never exposed to a manufacturer's printed brochure or website, and/or spoke to a manufacturer directly and hence would not have been aware even if the omitted information was disclosed."  *Id.* ¶ 37.

Working with Applied Marketing Science, Inc., a market research firm with extensive experience administering surveys, Dr. Dhar oversaw the survey in March 2018.

3

*Id.* ¶¶ 42, 75.  The survey consisted of 13 screening questions—designed to ensure that only respondents who fell within the relevant population proceeded—followed by three primary questions regarding sources of information, with multiple subparts.  *Id.*, Ex. D. The questions were all pre-tested to ensure survey respondents would understand them.  *Id.* ¶ 49.  The survey population consisted of adults in the United States who own their primary residence and who had acquired an air conditioner or heat pump within the last five years. *Id.* ¶ 51.  Additional respondents were recruited in Georgia, Indiana, and Missouri to generate a statistically significant number of responses in the putative subclass States.  *Id.* ¶ 79.  The final population sample consisted of 1,787 responses.  *Id.* ¶ 78.

One screening question asked respondents about "your role in the selection of the brand of the [central air conditioner] in your home."  *Id.* ¶ 70.  This question was designed to determine empirically how many consumers actually selected the unit themselves and to ensure that only those respondents who actually made that relevant decision—*i.e.*, those respondents who said they were fully or partially responsible for the selection of the brand of their HVAC system—went on to answer questions about the materials they reviewed. Ex. 2 (Dhar Tr.) at 41:17–42:9; 44:22–45:11.  Those who said that somebody else picked the unit for them (whether a dealer, the previous homeowner, or a home builder), were considered "complete" and were not asked about any specific materials they reviewed.  Ex. 1 ¶ 71.  The results showed that 835 respondents (46.8%) said they had some role in selecting their unit, 584 said a professional chose the unit (32.7%), and 368 (20.6%) said they had acquired a home with an HVAC unit already installed.  *Id.* ¶ 95.

Although respondents were considered "complete" if they reported that a professional, homebuilder, prior homeowner, or home builder selected the unit, Dr. Dhar included those individuals in his calculations and tables about the various sources of information that consumers reviewed prior to purchase.  *Id.* ¶¶ 95–116.  As Dr. Dhar explained, this was because any information these respondents potentially saw or reviewed necessarily played no role in their selection of their system because they said somebody *else* selected the unit.  *Id.* ¶ 96; Ex. 2 at 41:23–42:9.  This is especially the case for

individuals who acquired an HVAC system in connection with the purchase of a home, because for those individuals the relevant purchase decision was the house, not the pre-installed appliance.

Respondents who indicated they were fully or partially responsible for the selection of their unit went on to the next part of the survey. Ex. 1 ¶¶ 80–91. These respondents were asked whether they consulted any sources of information prior to making their purchase. *Id.* ¶ 84. The results showed that 267 respondents (14.9% of all respondents and 31.9% of those who said they had responsibility for selecting the brand) reported that they did not consult any information sources. *Id.* ¶ 97. These 267 respondents were considered "complete" and did not go on to answer the specific questions about the sources of information, because they said that they did not do this type of research. *Id.* ¶ 84.

The survey next asked those respondents who said that they undertook some research prior to purchasing a system various "open-ended" and "closed-ended" questions about the sources they considered. *Id.* ¶ 85. By using open-ended questions, the survey allowed respondents to use their own words to describe their process, and by providing closed-end lists, the survey prompted respondents to recall sources they may have forgotten. *Id.* The survey produced the following relevant results about sources of information:

- **Reviewed a print brochure:** 6.5% (14% of those who had responsibility for selecting the brand) reported reviewing a print brochure. *Id.* ¶ 101.[1]

- **Visited a Website:** 18.8% (40.2% of those who had responsibility for selecting the brand) reported consulting a website. *Id.* ¶ 107.[2]

---

[1] This number is conservative because the survey did not distinguish between brochures from manufacturers, dealers, or retailers. Ex. 1 ¶ 102. Additionally, Dr. Dhar's coding of open-ended responses was conservative and counted the following responses as printed brochures: "online local installers, mailers," "PAMPHLETS AND OTHER DOCUMENTS," and "checking out flyers mailed to me." *Id.*

[2] This is also conservative because Dr. Dhar included those who visited an independent dealer or contractor's website in the calculation, in order to account for any potential uncertainty about which website the respondent visited. Additionally, Dr. Dhar conservatively counted the following open-ended responses as manufacturer websites: "[p]roduct websites" and "online sites of competition and companies selling and installing the whole thing." Ex. 1 ¶ 108.

- **Called a Manufacturer Directly:** 1.9% (4.1% of those who had responsibility for selecting the brand) called a manufacturer directly. *Id.* ¶ 112.

In total, 21.2% of respondents (45.4% of those who had responsibility for selecting the brand) reported reviewing information from a manufacturer prior to purchase. *Id.* ¶ 114.

Based on the survey, his expertise, and review of materials, Dr. Dhar concluded "with a high degree of scientific certainty" that "only a small minority of those who acquire an HVAC system would have even considered any information provided directly from the manufacturer when making their decision to purchase an HVAC system." *Id.* ¶ 122. Accordingly, "individual inquiry would be necessary to determine whether class members even *could* have reviewed any statement from Carrier such that they would have been impacted by any omission." *Id.* ¶ 122. Courts—including in the Central District—have relied upon similar survey evidence in denying class certification in HVAC cases. *See McVicar.*, 2015 WL 4945730 at *11 & n.8; *Justice*, 318 F.R.D. at 697–98.

Dr. Dhar also reviewed and relied upon Carrier's own survey evidence (conducted independent of this case), which showed that even for the limited number of people who could have *potentially* considered information from a manufacturer, the impact of that information would not be uniform. Ex. 1 ¶¶ 40, 123–36. Dr. Dhar thus concluded that "individual analysis would also be necessary to determine whether any information about the alleged defect would have had an impact on purchasing, what the impact would be, and the extent of any such impact." *Id.* ¶ 123.

### C. Plaintiffs' Rebuttal Expert

Plaintiffs did no survey of their own and made no other attempt to generate evidence about consumer behavior in HVAC purchasing decisions. Instead, plaintiffs retained Dr. Melissa Pittaoulis, a statistician, to "review and evaluate" Dr. Dhar's surveys. Ex. 3 (Pittaoulis Rep.) ¶ 27. Although she offers some criticisms of Dr. Dhar's survey (most of which plaintiffs do not even bother to raise in their motion), Dr. Pittaoulis is not a consumer behavior expert, she collected no data, did no independent analysis, and did not conduct a survey. Ex. 4 (Pittaoulis Dep.) at 8:25–9:12; 13:16–24. Unsurprisingly, plaintiffs barely mention Dr. Pittaoulis in their motion, perhaps because another court considering her

similar criticisms of a survey in another HVAC case denied class certification while finding little value her report. *See Justice*, 318 F.R.D. at 697 n.5 ("Plaintiff's rebuttal expert Melissa Pittaoulis takes issue with the methodology of the survey evidence; however, Plaintiff fails to offer rebuttal *evidence* at this juncture." (emphasis added)).[3]

## ARGUMENT

## I.  PLAINTIFFS' ATTEMPT TO DISMISS DR. DHAR'S SURVEY RESTS ON A MISUNDERSTANDING OF THE GOVERNING LEGAL STANDARDS

Plaintiffs' primary argument is that Dr. Dhar's survey is unhelpful because it "fail[s] to address the relevant question here, which is whether a reasonable consumer would have been exposed to a disclosure about the contamination defect if Carrier had tried to convey that information through available channels." Pls. Dhar Mot. 1. In plaintiffs' view, "what is critical" is that "Carrier has the *ability* to communicate information to end users." Pls. Class Reply 9 n.8 (emphasis in original); *see also id.* at 2, 3–15 [ECF No. 165]. That is not the law. Instead, as plaintiffs' own cases confirm, the relevant question is not the theoretical existence of hypothetical channels of communication, but whether consumers *would have been aware* on a classwide basis of information disclosed by the manufacturer through those channels, and would have uniformly deemed that information material. Otherwise, and especially with modern forms of communication, omissions claims would always be certified as class actions, as plaintiffs could always claim a defendant had the "ability" to disclose information through some channel. Dr. Dhar's survey thus directly addresses the relevant question: would all class members have encountered material statements from Carrier in their research before purchasing a product? The answer is "no," and plaintiffs cannot excuse their failure to develop any evidence of consumer behavior by

---

[3] Plaintiffs have all but abandoned Dr. Pittaoulis's primary criticism of Dr. Dhar's survey, confining it to a footnote. Pls. Dhar Mot. 8 n.10. In her report, Dr. Pittaoulis argued that survey respondents cannot accurately recall "detailed memories" about specific purchases in the past, including the information considered in making a decision to purchase an HVAC system. Ex. 3 ¶ 23; Ex. 4 at 40:4–41:22. Plaintiffs must have realized that this particular criticism would preclude certification of their class, as plaintiffs' omission-based claims hinge on class members' ability accurately to recall what they reviewed prior to purchase.

1    advancing a misguided view of the law.

2        Certification of fraud claims like plaintiffs' would normally founder on the

3    inherently individualized questions of reliance and causation. *See, e.g.*, *Stearns v.*

4    *Ticketmaster Corp.*, 655 F.3d 1013, 1022–23 (9th Cir. 2011), *abrogated in nonrelevant*

5    *part by Comcast Corp. v. Behrend*, 569 U.S. 27 (2013); *Sloan v. Gen. Motors LLC*, 287 F.

6    Supp. 3d 840, 873 (N.D. Cal. 2018) ("An essential element for a fraudulent omission claim

7    is actual reliance."). In California and Missouri, though, courts may certify omission-based

8    claims under the CLRA, UCL, FAL, and MMPA, *if* plaintiffs can show at class certification

9    that they are entitled to a presumption of reliance. *See, e.g.*, *Colman v. Theranos, Inc.*, 325

10   F.R.D. 629, 641 (N.D. Cal. 2018) ("By its nature, reliance is an individualized inquiry that

11   demands individualized proof unless a presumption of reliance applies.").[4]

12       As the Ninth Circuit has made clear, however, a presumption of reliance "does not

13   arise when class members were exposed to quite disparate information" prior to purchase.

14   *Mazza*, 666 F.3d at 596. That is why courts—including this one—deny certification when

15   plaintiffs fail to show that the putative class members would have actually reviewed the

16   defendant's statements when they were making their purchasing decision. *See, e.g.*, *Arthur*

17

18   ─────────────
     [4] Critically, no presumption of reliance is available in Georgia and Indiana. Carrier Class
19   Opp. 18–19 [ECF No. 140]. In contending otherwise, plaintiffs conflate the distinct
     elements of a duty to disclose with reliance or causation and ignore that Georgia and
20   Indiana law contain express reliance requirements. Pls. Class Reply 17–18. Plaintiffs lack
     any classwide evidence of reliance, and, in any event, their failure to establish classwide
     exposure necessarily precludes certification of the Georgia and Indiana subclasses.
21       Those subclasses also suffer from other fundamental problems. The Georgia Fair
     Business Practices Act expressly disallows class actions, Ga. Code § 10-1-399(a)), and
22   courts have enforced this provision. Carrier Class Opp. 33–34. Although plaintiffs cite a
     few cases going the other way, Pls. Class Reply 33, unlike Carrier's cases, the cases
23   plaintiffs cite contain no meaningful analysis of the Georgia provision. With respect to
     Indiana, plaintiffs do not dispute the default pre-suit notice requirement, Ind. Code § 24-5-
24   0.5-5(a), but claim Mr. Gallagher need not provide such notice because he intends to argue
     a "deceptive act that is incurable," Pls. Class Reply 33, which requires an "intent to defraud
25   or mislead." Ind. Code § 24-5-0.5-2(8). That Mr. Gallagher must make this heightened
     showing due to his failure to comply with the notice, makes him a poor representative and
26   atypical of an Indiana class. Mr. Gallagher also errs in claiming he provided sufficient
     notice to Carrier. Pls. Class Reply 34 n.38. The email correspondence he cites does not
27   remotely "state fully the nature of the alleged deceptive act and the actual damages suffered
     therefrom." Ind. Code § 24-5-0.5-5(a).

28

*v. United Indus. Corp.*, 2018 WL 2276636, at *11 (C.D. Cal. May 17, 2018) ("[P]laintiff and the proposed class members had varied exposure to defendant's mixing instructions—plaintiff admittedly never read them; some class members followed the mixing instructions on the rear label; and some class members purchased products that buried the instructions inside a taped pamphlet."); *McVicar,* 2015 WL 4945730, at *12 ("Granting class certification is inappropriate in this case where Defendants have proffered overwhelming evidence that owners of the subject air conditioners were not exposed to the alleged misrepresentation and omissions for myriad reasons."); *Todd v. Tempur-Sealy Int'l, Inc.*, 2017 WL 2833997, at *3–4 (N.D. Cal. June 30, 2017) ("Unlike in *Daniel*, there is no reason to think that Plaintiffs would have been aware of [a] disclosure" about its products, "even if that disclosure were part of its advertising plan."); *Butler v. Porsche Cars N. Am., Inc.*, 2017 WL 1398316, at *11 (N.D. Cal. Apr. 19, 2017) (similar).[5]

Moreover, the Ninth Circuit in *Mazza* necessarily considered and rejected plaintiffs' suggestion that they need only "establish a plausible *method* of disclosure."  Pls. Dhar Mot. 1 (emphasis added); Pls. Class Reply 2, 3.  In *Mazza*, the plaintiffs claimed Honda failed to disclose braking issues with certain Acura models.  666 F.3d at 585–87. The plaintiffs emphasized that Honda mentioned the braking system in various advertisements and argued that they should be entitled to a presumption of reliance.  *Id.* at 586–87, 595–96. The Ninth Circuit rejected this argument because the record showed "class members were exposed to quite disparate information," with plaintiffs failing to show that "everyone in the class … ha[d] viewed the allegedly misleading advertising."  *Id.* at 596.  Consistent with this principle, plaintiffs' primary case confirms that liability in an omissions case turns

---

[5] Although plaintiffs try to cabin the *Mazza* exposure principle to misrepresentations, Pls. Class Reply 3, the Ninth Circuit was unequivocal that establishing uniform class-wide exposure is equally necessary for omission-based claims: "For everyone in the class to have been exposed to the omissions, … it is necessary for everyone in the class to have viewed the allegedly misleading advertising."  666 F.3d at 596; *see also Philips v. Ford Motor Co.*, 2016 WL 7428810, at *15 (N.D. Cal. Dec. 22, 2016) ("Plaintiffs argue that *Mazza* is inapplicable because the instant case involves Ford's omissions despite a duty to disclose, rather than misleading advertising.  However, the holding in *Mazza* cannot be so limited; *Mazza* itself involved alleged omissions as well as allegedly misleading advertising.").

not merely on whether "a plausible method of disclosure" exists, but also whether a plaintiff "*would have been aware* of information disclosed using that method." *Sloan*, 287 F. Supp. 3d at 874. At class certification, that standard requires proof that the class members reviewed information the defendant provided through that method. And that is precisely the hypothesis that Dr. Dhar's survey tested and soundly rejects.

Because plaintiffs did no work of their own and have "no expert declaration or consumer survey demonstrating a class-wide method of proof with respect to liability," *Arthur*, 2018 WL 2276636, at *11, they try to claim survey evidence like Dr. Dhar's is irrelevant on the theory that "these elements—that the plaintiffs would have been aware of the disclosure and that they would have decided not to buy the HVAC units—are proven with reference to a 'reasonable consumer' standard." Pls. Class Reply 4; Pls. Dhar Br. 1. Plaintiffs are once again wrong on the law, and the very case they rely on—*Webb v. Carter's Inc.*, 272 F.R.D. 489 (C.D. Cal. 2011)—explains why.

In *Webb*, the district court *denied* certification in a case involving consumers who claimed that a manufacturer of children's clothing failed to disclose that certain labels would cause skin irritations. Critically relevant here, the court explained that the "reasonable consumer" standard and presumption of reliance do not kick in "if the issue of materiality or reliance is a matter that would vary from consumer to consumer." *Id.* at 502 (quotations omitted). And in *Webb* itself, the Court found that "Defendants have put forward persuasive evidence that materiality and reliance would vary from consumer to consumer, *such that the reasonable consumer standard cannot be applied.*" *Id.* (emphasis added). Specifically, the plaintiffs could not invoke a reasonable consumer standard or presumption of reliance because they lacked evidence that class members were uniformly *exposed* to the allegedly misleading information in the first place: "plaintiffs would not have been aware of disclosures had [defendant] made them" because plaintiffs "never researched [the product] online" and because "consumers would not likely notice warnings posted in stores or on [the product] themselves." *Id.* So too here. Dr. Dhar's survey and other record evidence shows that most HVAC consumers are not exposed to statements

1  from manufacturers.  "Because this evidence establishes that awareness of a disclosure
2  would almost certainly vary from consumer to consumer, it shows that the element of
3  reliance cannot be established by the reasonable consumer standard."  *Id.*  Thus, the very
4  case plaintiffs cite confirms they misinterpret the law and that "individual issues
5  predominate" on the question of "materiality and reliance."  *Id.* at 502–03.[6]

6      *Webb*'s focus on actual evidence—the same emphasis seen in *Arthur* and other cases
7  denying certification of omission claims—refutes plaintiffs' assertion that they "need not
8  *prove* anything at the class certification stage."  Pls. Class Reply 5.  "Rule 23 does not set
9  forth a mere pleading standard," and plaintiffs must "affirmatively demonstrate [their]
10 compliance with the Rule."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011).
11 For example, in *Butler*—the lead case plaintiffs cite, Pls. Class Reply 5—the "[p]laintiff
12 ha[d] failed to meet his burden to show that the elements of exposure and reliance are
13 amenable to class-wide proof," because he "g[ave] the Court no basis to find that all class
14 members were exposed to a Porsche representation with omissions, or that class members
15 'would have been aware' of a disclosure about the defect form Porsche in a common way
16 had a disclosure been made."  2017 WL 1398316, at *10–11.  Plaintiffs similarly have
17 failed to substantiate their claims with actual classwide evidence.

18     At bottom, plaintiffs' attack on Dr. Dhar's survey is just a desperate attempt to evade
19 *McVicar*, where a court considered and rejected a similar class on a similar record.  2015
20 WL 4945730, at *12.  Although plaintiffs claim that "[u]nlike *McVicar*," they "have
21 provided strong evidence that a reasonable class member would have been exposed to a
22 disclosure if one had been made," plaintiffs cite no factual, expert, or record evidence
23 whatsoever.  Pls. Class Reply 13 & n.14.  Because plaintiffs have no survey evidence or
24 expert testimony of their own to rebut Dr. Dhar's survey, this case resembles *McVicar* and

---

25
26 [6] *Webb* confirms that even after showing exposure, the following step (showing materiality
   to a reasonable consumer) is not easily met, either.  Plaintiffs fail to satisfy the reasonable
27 consumer standard where, for example, "consumers would differ in what they considered
   material."  *Webb*, 272 F.R.D. at 502.  As Dr. Dhar explains, that is clearly the case in the
   context of HVAC purchases, which turn on various individualized considerations.  Ex. 1
28 ¶¶ 123–36.

the many cases denying certification of similar claims.  *See*, *e.g.*, *Arthur*, 2018 WL 2276636, at *11 (C.D. Cal. May 17, 2018); *In re 5-Hour Energy Mrktg & Sales Practices Litig.*, 2017 WL 2559615, at *8 (C.D. Cal. June 7, 2017); *Jones v. ConAgra Foods, Inc.*, 2014 WL 2702726, at *16 (N.D. Cal. June 13, 2014).

## II.  PLAINTIFFS' CRITICISMS OF DR. DHAR'S SURVEY ARE UNFOUNDED

Plaintiffs' specific critiques of Dr. Dhar's survey largely center on the phrasing and design of certain questions.  But issues of "methodology, survey design, reliability, … critique of conclusions, and the like go to the weight of the survey rather than its admissibility."  *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001); *see also Southland Sod Farms*, 108 F.3d at 1143; *Morales v. Kraft Foods Grp., Inc.*, 2017 WL 2598556, at *11–13 (C.D. Cal. June 9, 2017); *POM Wonderful LLC v. Coca Cola Co.*, 2016 WL 5929336, at *8 (C.D. Cal. Mar. 9, 2016).  If plaintiffs wanted to meaningfully rebut Dr. Dhar's survey, they should have offered one of their own.  Having failed to do so, plaintiffs can hardly ask to exclude Dr. Dhar, especially when their criticisms only stress the individualized issues with their classes.

### A.  Dr. Dhar's Selection Of Sources For The Survey Was Appropriate

Plaintiffs' primary claim is that Dr. Dhar's survey was "underinclusive" because the survey did not ask about other purportedly "plausible method[s] of disclosure," such as: whether respondents prior to purchase reviewed information from Carrier that had been filtered through one of the thousands of independent Carrier dealers or distributors, whether respondents reviewed a sticker that is on the physical air conditioner itself, or whether respondents reviewed television, digital, print, or radio advertisements.  Pls. Dhar Mot. 1– 6, 15–17.  As a threshold matter, this is not an argument for exclusion.  The alleged under- inclusivity of a survey is a classic example of an issue that goes to the weight, not the admissibility of survey evidence.  *See, e.g.*, *Apple, Inc. v. Samsung Elecs. Co.*, 2012 WL 2571332, at *10 (N.D. Cal. June 30, 2012) ("Generally, underinclusiveness of a survey goes to weight, not admissibility."); *POM Wonderful*, 2016 WL 5929336, at *8.

In any event, plaintiffs' attack on Dr. Dhar's list of sources in question 2b of the survey is meritless.  The list included the following sources of information:

- Visited a manufacturer's website (e.g., Carrier, Lennox, Goodman, etc.)
- Visited a contractor's or dealer's website
- Visited a retail store's website (e.g., Sears, Lowe's, Home Depot, etc.)
- Visited a website containing consumer reviews of a product (e.g., a consumer review forum or blog)
- Reviewed a printed brochure
- Reviewed Consumer Reports magazines or similar magazines
- Reviewed social media (e.g., Instagram, Facebook, Twitter)
- Talked to friends, relatives or colleagues
- Talked with a contractor or dealer
- Talked with a retail store representative or salesperson at the store (e.g., at Sears, Lowe's, Home Depot, etc.)
- Called a manufacturer directly (e.g., Carrier, Lennox, Goodman, etc.)
- Other. Please specify:
- Don't recall/Unsure

Ex. 1 ¶ 85 (Q2b).

Dr. Dhar selected these sources for the "closed-end" list because they are the primary sources of information consumers consult when performing research ahead of selecting an HVAC system.  In making that decision, Dr. Dhar reviewed the surveys that courts have credited in other HVAC class actions, *see McVicar*, 2015 WL 4945730 at *11 & n.8; *Justice*, 318 F.R.D. at 697–98, which involved similar types of sources of information.  Dr. Dhar also reviewed other relevant surveys, including surveys from Carrier and Emerson. *See* Defs. Class Opp. 13–14.  The lists of information sources in these surveys resemble Dr. Dhar's in all material respects.  Finally, Dr. Dhar looked at the named plaintiffs' interrogatories responses and testimony.  To the extent plaintiffs reported reviewing any Carrier information at all, they said they looked at a "leaflet," Ex. 5 at 8, "product literature," Ex. 6 at 8, or a "website," Ex. 5 at 8; Ex. 6 at 8; Ex. 7 at 9.  No plaintiff reported reviewing stickers on HVAC units or television, radio, digital, or print advertisements.  Dr. Dhar's list of information sources thus appropriately focused on the sources consumers

13

were most likely to consider.

None of plaintiffs' specific arguments about their hypothesized "channels of communication" supports class certification or undermines Dr. Dhar's approach:

**1. Manufacturer Statements Relayed by Distributors and Dealers.**  Although plaintiffs devoted all of two sentences in their opening class motion to arguing that they can show uniform exposure to Carrier statements because "*all* sales of Carrier units occur through Carrier distributors, and most purchases occur through Carrier dealers," Pls. Class Mot. 15 [ECF No. 117], plaintiffs' subsequent briefs rely heavily on the existence of a distribution chain as a claimed basis for finding common exposure.  Pls. Class Reply 6–9 & n.10; Pls. Dhar Mot. 2–4, 16.  But plaintiffs' argument proves far too much.  *Every* manufacturer has some sort of distribution chain through which it "could have instructed its distributors and dealers to disclose the defect."  Pls. Dhar Mot. 2.  Plaintiffs' boundless theory would result in automatic class certification of omission claims against these entities, which, of course, is not the law.  *See supra*, § I; Defs. Class Opp. 12–18.

Plaintiffs cite a trio of cases to justify their argument that a distribution chain creates predominance: *Sloan v. Gen. Motors LLC*, 287 F. Supp. 3d 840 (N.D. Cal. 2018), *Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950 (N.D. Cal. 2018), and *Daniel v. Ford Motor Co.*, 806 F.3d 1217 (9th Cir. 2015).  These cases come nowhere close to endorsing plaintiffs' view.  To begin, none of these opinions addressed a motion to certify a class and so did not address the critical class certification requirement that plaintiffs establish classwide exposure to the alleged omission.  That much is evident from the Ninth Circuit's decisions in *Mazza*, where the court *vacated* class certification in an omissions case where the Honda cars were purchased through dealerships, *see* 666 F.3d at 586–87, 595–96, and in *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061 (9th Cir. 2014), *abrogated in non-relevant part by Microsoft Corp. v. Baker*, 137 S. Ct. 1702 (2017), where the court affirmed denial of certification of an omissions case where the class members purchased the product *directly* from the defendants' own stores, *see id.* at 1067–71.

Plaintiffs nevertheless point to the discussion in *Sloan*, *Baranco*, and *Daniel* about

14

the named plaintiffs' interactions with car dealerships to claim they can establish classwide exposure to Carrier statements where "class members were likely exposed to interactions with dealers." Pls. Class Reply 6; Pls. Dhar Mot. 2–3. But as *Mazza*, *Berger*, and the other cases denying certification demonstrate, any assumption about information flow in a distribution model plainly does not translate to the class certification context, where plaintiffs must show that classwide exposure actually took place. And here, the evidence is that *not* all consumers purchase directly from dealers, because many buy an HVAC system through a home purchase and because HVAC systems can also be purchased through other non-dealer sources. Ex. 8 (Carrier 30(b)(6) Marketing Dep.) at 22:8–22; Ex. 9 (Klinge Dep.) at 60:13–61:5. In fact, plaintiffs Oddo and Klinge did not buy their HVAC systems from dealers. Ex. 10 (Oddo Dep.) at 28:12–17; Ex. 9 at 52:5–10.

In addition, and critically, as *Sloan* and *Baranco* confirm, *Daniel*'s reliance on Ford's ability to communicate through its authorized dealers, *see* 806 F.3d at 1226–27, applies only when the plaintiffs had pleaded or presented evidence that the car dealerships in question were acting as *agents* of the car manufacturers. *See Sloan*, 287 F. Supp. 3d at 876 ("[I]t is fair to treat Plaintiffs' opportunity to receive information from GM's authorized dealerships as an opportunity to receive the information directly from GM because an agency relationship has plausibly been pled."); *Baranco*, 294 F. Supp. 3d at 967–68 (plaintiffs "allege that the dealerships acted as Ford's agents"). The bedrock principle of agency is that the principal (the car manufacturer) and the agent (the dealership) "manifest[ed] assent" to principal's "right to control" the agent's activities. *United States v. Bonds*, 608 F.3d 495, 506 (9th Cir. 2010). The *Daniel* information-flow theory is necessarily limited to the agency context, otherwise, as noted, a class could be certified whenever a manufacturer has a distribution model, which is to say in every case.

An agency theory could never work here because plaintiffs have *never* argued that an agency relationship exists between Carrier and the thousands of independent Carrier dealers and distributors. Nor could they. The very distributor agreements plaintiffs reference, Pls. Class Reply 8, expressly state that ███████████████████████



Pls. Ex. 97 at 14–15; *see also* Pls. Ex. 98 at 6[7] (

).[8]

The Carrier HVAC distribution model also differs in fundamental and dispositive ways from the car dealerships in *Sloan*, *Baranco*, and *Daniel*.  Unlike car manufacturers that sell vehicles directly to their authorized dealers, Carrier sells its equipment directly to a few dozen regional distributors, who, in turn, sell that equipment to thousands of contractors or dealers throughout the country.  Ex. 8 at 21:20–24, 22:16–22, 30:17–31:11, 67:24–68:1.  Distributors and dealers are independent of Carrier.  Carrier exercises no control over the sales that distributors make to dealers and that dealers make to consumers. *Id.* at 40:20–25 ("Every distributor sets their own requirements as to who they sell their equipment to."); *id.* at 41:6–10 ("Q: [A]m I correct that a distributor can sell a Carrier air conditioner system to a contractor who is not a Carrier dealer?  A: That is correct."); *id.* at 42:16–18 ("[W]e do not require that distributors sell to dealers that only sell Carrier

---

[7] References to Pls. Ex. here are to the exhibits plaintiffs filed with their class reply.

[8] In a few places, plaintiffs refer to Carrier's Factory Authorized Dealer program.  Pls. Class Reply 8, 9 n.8, 29.  But this is a limited *branding* opportunity available to certain dealers, not an agency relationship, and it thus bears no relationship to the authorized dealers in *Sloan*, *Baranco*, and *Daniel*.  In this case, the Carrier Factory Authorized Dealer

Ex. 11 at 5–6.  In fact, it is actually the independent *distributors* that approve a dealer's application to become a Factory Authorized Dealer.  Ex. 8 at 42:21–43:6, 44:6–9.  Only two of Carrier's brands had a Factory Authorized Dealer program during the relevant time period anyway.  *Id.* at 40:2–12, 42:7–12; 66:8–10.

equipment."); *id.* at 43:9–12 ("Q: How does one become a standard dealer for a Carrier brand? A: That would vary by distributor."); *id.* at 44:11–17 ("Q: Somebody who wants to become a standard dealer, in order to start that process would approach a distributor?  A: [S]ince we don't audit or authorize standard dealer, I would not have visibility as to how the distributor sets up that dealer.").  Moreover, dealers frequently sell equipment of multiple brands.  Ex. 8 at 42:16–18.

In this regard, *Sloan* actually cuts sharply against plaintiffs.  Some of the plaintiffs in *Sloan* did not purchase their vehicle through the manufacturer's agents and instead purchased them from non-GM dealerships.  *See* 287 F. Supp. 3d at 876 & n.23.  If there is any analogue to the HVAC distribution chain in the car cases, it would be these non-agent dealers of multiple brands of equipment.  But the *Sloan* court *dismissed* those claims—at the 12(b)(6) stage, no less—because the "inference that effective disclosure would have been made by Defendant cannot be drawn as to those Plaintiffs."  *Id.* at 876.[9]

Plaintiffs ultimately ask the Court to indulge the assumption that had Carrier disseminated information to the dozens of independent distributors, that information would have made its way to the thousands of disparate contractors and dealers—many of whom sell multiple brands of equipment—and from them to consumers prior to the consumers' decision to purchase the system, all in a cohesive, classwide fashion.  Plaintiffs cite no case that has ever endorsed such a theory, nor have they developed evidence that shows such a theory would be sound in this case.  Plaintiffs get no mileage out of Carrier's HVAC systems expert's statement about the "standard stream of information."  Pls. Dhar Mot. 2, 3, 9, 16; Pls. Class Reply 2, 7, 9, 15.  Mr. Schneyer explained that when a *post-sale* "product quality issue" arises that requires field repairs, the industry standard is for the manufacturer

---

[9] In their class reply, plaintiffs cite the district court's subsequent decision to certify the class in *Daniel v. Ford Motor Co.*, 2016 WL 8077932 (E.D. Cal. Sept. 23, 2016).  The court determined that plaintiffs' omission-based claims were amenable to class treatment because the class "includes only purchasers of new Focuses" who would have necessarily interacted "with authorized Ford dealers."  *Id.* at *8.  As discussed, however, the HVAC distribution chain differs in dispositive ways from the Ford authorized car dealership model.  There is no basis in this case for presuming that each interaction between the class members and the thousands of dealers—let alone homebuilders—necessarily would have resulted in the dissemination of Carrier-provided information about temporary TXV clogs.

to issue "Service Manager Bulletins (SMBs)" to the distributor, and that the distributor "would pass … the information contained therein to our dealers and contractors so that they could be aware of potential issues in the field." Ex. 12 (Schneyer Rep.) ¶¶ 51, 52. Mr. Schneyer offered no opinion on whether the thousands of independent dealers actually convey information from the manufacturer to consumers prior to purchase. Similarly, plaintiffs' citation to other bulletins Carrier has issued regarding post-sale repairs, Pls. Dhar Br. 2; Pls. Class Reply 8, does nothing to establish that information from a manufacturer passes uniformly through the distribution chain to a consumer prior to the consumer's decision to purchase the product, which is what plaintiffs needed to show. *See Todd*, 2017 WL 2833997, at *4 (denying class certification where plaintiffs "provided virtually no evidence that Defendants' third party retailers were disseminating Defendants' marketing campaign," and where there was "no reason to think that Plaintiffs would have been aware of a disclosure"); *Butler*, 2017 WL 1398316, at *2, *10 (similar).

In addition, plaintiffs are incorrect that Dr. Dhar's list of sources failed to account for manufacturer statements passed on by dealers. Dr. Dhar's survey asked respondents whether they "[r]eviewed a printed brochure." Ex. 1, Ex. D at 8 (Q2b). Dr. Dhar placed no limitations on the type or source of the brochure. Even in plaintiffs' hypothetical world, the way a dealer would pass along a Carrier statement would would be something similar to a bulletin—in other words, a printed brochure. Pls. Dhar Mot. 2–3. Of course, only a very small number of survey respondents said they viewed a brochure, which further confirms the need for individual inquiry on the issue of exposure.

**2. Product Stickers.** Plaintiffs separately fault Dr. Dhar for "ask[ing] no questions about" "stickers" or rating plates located on the physical air conditioning unit. Pls. Dhar Br. 4. Setting aside the fact that survey respondents had multiple opportunities to list stickers on the new unit as something they reviewed prior to purchase (none did), plaintiffs have zero evidence, much less class-wide evidence, that consumers actually do this. The named plaintiffs certainly did not. Carrier asked each named plaintiff to "[i]dentify in detail all documents or types of documents that you saw or relied on in your decision to

18

purchase an HVAC system from Carrier."  Ex. 7 at 8.  Although plaintiffs indicated that they *received* labels and stickers as part of their units, *e.g.*, *id.* ("[i]n addition, her system components have various stickers and/or plates on them"), no plaintiff identified these stickers as something they actually looked at prior to purchase.  Indeed, this Court already dismissed two putative class representatives (Reardon and LaSala) because although they alleged they had "received" certain information from Carrier, they had not alleged they had "actually reviewed" it.  1/24/17 Order 30–31 [ECF No. 57].

Lacking actual evidence of consumer exposure to stickers prior to purchase, plaintiffs remarkably argue that "Federal law presumes that consumers will be exposed to disclosures on HVAC systems."  Pls. Dhar Br. 4 (citing 16 C.F.R. § 305.12).  But that regulation (which requires certain labels to be placed on new HVAC systems and dictates those labels' content), does not "presume" anything about whether consumers will actually see or read those labels, much less in a sufficiently uniform manner so as to give rise to a common presumption of reliance in a class action.[10]  Nor is plaintiffs' citation to Cal. Bus. & Prof. Code § 7159.5, Pls. Dhar Mot. 5 n.6, of any use.  That regulation specifies information that should be contained in "home improvement contracts," Cal. Bus. & Prof. Code § 7159.5, and says nothing about exposure, labeling, or consumer behavior when selecting an HVAC unit.  Plaintiffs' attempt to conjure a presumption of exposure out of these irrelevant provisions is not credible and is not classwide evidence of exposure.

Plaintiffs further argue that because "purchases of new construction homes are not completed until the home has been built … purchasers are exposed to the product itself prior to purchase."  Pls. Dhar Mot. 6 & n.6; Pls. Class Reply 10–11.  Once again, the argument is remarkable.  Plaintiffs cite no evidence that home buyers—which constitute only part of plaintiffs' proposed class—commonly read stickers on their HVAC system prior to purchasing a new home.  And plaintiffs' assertions are refuted by the named

---

[10] This regulation also prevents manufacturers from altering the label's content, 16 C.F.R. § 305.12(g)(15), making the "bright yellow sticker[]" a particularly poor candidate for a plausible method of disclosure.  Pls. Dhar Mot. 4; Pls. Class Reply 9.

plaintiff in the related *Cormier* case, who purchased a new home with a Carrier-branded system already installed.  In his deposition, Mr. Cormier admitted that he looked at his HVAC system during a closing-day walkthrough only *after* he had already had the house built to specification, *after* he had entered into an agreement to purchase the house, and on the very day he closed on his house and the weekend he moved in.  Ex. 13 (Cormier Dep.) at 54:12–55:3.  Mr. Cormier did no research on the HVAC system in the home before then, *id.* at 58:6–9, and likewise did no other inspection of the HVAC system before closing, *id.* at 57:23–58:4, at which point the home was already his, *id.* at 56:5–7.

Plaintiffs' utter lack of evidence of exposure to these stickers is not surprising, because the idea that consumers read HVAC stickers before buying their units is completely detached from the way people actually purchase air conditioners.  There is no evidence that any person who bought a standalone HVAC system, much less *all* such persons, would ever see such stickers prior to purchase, for the obvious reason that the HVAC system is not installed until after it is bought.  *See, e.g.*, *Daniel*, 806 F.3d at 1226 n.6 (noting that materials that come with a later-delivered product "cannot be considered in determining whether Plaintiffs would have been aware of a disclosure" at the time of purchase).  And even aside from that timing problem, HVAC systems are not like usual consumer products (such as yogurt or a can of soda) or appliances (such as a refrigerator), where consumers oftentimes encounter and review statements on the product itself as they browse through grocery stores, home improvement stores, and so forth.

The nature of HVAC systems is precisely why *McVicar* did not presume exposure based on a theory that "the misrepresentations or nondisclosures were included (or would have been included) on the product itself."  2015 WL 4945730, at *11.  Plaintiffs' citations to non-HVAC cases thus prove nothing.  In *Dei Rossi v. Whirlpool Corp.*, 2015 WL 1932484 (E.D. Cal. Apr. 28, 2015), for example, the plaintiffs presented evidence that Whirlpool engaged in "a nationwide marketing campaign, displaying the Energy Star logo uniformly in advertising and *at the point of purchase* on every Refrigerator."  *Id.* at *7 (emphasis added).  Here, there is zero evidence of such a marketing campaign or that

consumers review stickers on the HVAC units "at the point of purchase."  Similarly, in *Carriulo v. Gen. Motors Corp.*, 823 F.3d 977 (11th Cir. 2016), GM had displayed prominent stickers advertising allegedly misleading 5-star safety ratings on its vehicles. *Id.* at 981–82.  *Carriulo* provided no analysis on the issue of class-wide exposure, perhaps because consumers who purchase a car invariably review the car itself prior to buying it.

**3.  Other Advertising Sources.**  Plaintiffs' criticism that Dr. Dhar did not "ask any questions about other relevant forms of marketing and product information Carrier utilizes," Pls. Dhar Mot. 6, is similarly without merit.  To begin with, Dr. Dhar did, in fact, ask questions about Carrier's marketing, including through product brochures and on its website.  Ex. 1 ¶ 85.  Although the survey did not specifically list "TV, radio, digital, magazine and newspaper" ads on the list of information sources, Pls. Dhar Mot. 6, their omission makes sense.  As Dr. Dhar explained, these types of ads are designed to raise awareness of the Carrier brand; they do not provide information about specific products, such that consumers are reviewing these advertisements as part of their decision about which product to buy.  Ex. 2 at 105:14–22, 110:13–25.  Plaintiffs' own expert agreed: "I don't think it makes sense to say I'm researching a television advertisement."  Ex. 4 at 140:4–5.

Plaintiffs here have offered no evidence about the scope, history, and reach of Carrier's marketing efforts, and are just trying to turn the mere fact that Carrier engages in some marketing as a shortcut for establishing classwide exposure.  Pls. Dhar Mot. 6. But plaintiffs make no effort to engage with the relevant case law on this issue.  Defs. Class Opp. 16–17.  As the Ninth Circuit has instructed, unless an advertising campaign is "extensive and long-term," or "massive," courts do not assume that it is a channel for class-wide exposure.  *Mazza*, 666 F.3d at 596.  Courts thus repeatedly hold that less pervasive advertising campaigns fail to support class-wide presumptions of reliance.  *E.g.*, *id.*; *Todd*, 2016 WL 5746364, at *11; *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1094 (C.D. Cal. 2015).  Plaintiffs have done no work to show that Carrier engaged in the sort of "decades-long … advertising campaign where there was little doubt that

almost every class member had been exposed to defendants' misleading statements." *Mazza*, 666 F.3d at 596.

Finally, plaintiffs are wrong that respondents had no opportunity to identify information from these various channels in Dr. Dhar's survey. At question 1, respondents were asked "How did you select the <u>brand</u> of the [SYSTEM] that is installed in your home?" Ex. 1, Ex. D at 7. Similarly question 2a asked "What information sources did you consult on any of the brands <u>before making your purchase</u>?" *Id.* Question 2b then provided a list of potential sources but allowed respondents to describe sources they considered that were not specifically listed. *Id.* at 8. These open-ended responses were reviewed, coded, and provided to plaintiffs. If respondents did research that included the sources plaintiffs identify, then they had multiple opportunities to so indicate. Tellingly and as with all of plaintiffs' criticisms of Dr. Dhar's survey, plaintiffs cite no actual evidence—including from Dr. Dhar's survey data—showing that any meaningful number of consumers actually consider manufacturer information from these sources.[11]

## B. Plaintiffs' Remaining Criticisms Are Equally Meritless

The rest of plaintiffs' motion criticizes how Dr. Dhar composed the survey population or worded particular questions. At best, these are matters for cross-examination. Nevertheless, each of plaintiffs' remaining critiques is unavailing. And it is telling that Dr. Dhar's survey produced results comparable to those observed by Carrier and Emerson in their own internal surveys. Defs. Class Opp. 13–14.

*First*, plaintiffs take issue with how Dr. Dhar treated the respondents who stated they were not responsible for selecting their unit. Plaintiffs attack Dr. Dhar for assuming that respondents "who did not personally select the brand of equipment must have received *no*

---

[11] The open-ended responses provide no support to plaintiffs. Only one response made any reference to labels. Ex. 14 (Dhar Rep., Ex. K (excerpts)) ("Not sure, Atlas Butler white labels it I believe"). Three of the 835 responses mentioned TV commercials, without identifying whether the commercials were manufacturer commercials, dealer commercials, or retailer commercials. *Id.* ("ad tv"; "ad tv, google"; and "SEEING COMMERCIALS ON TV AND RESEARCHING DIFFERENT BRANDS OF CENTRAL AIR SYSTEMS MADE ME DETERMINE TRANE WAS THE BEST PRODUCT FOR MY HOUSE"). None mentioned radio or a magazine advertisement.

*information whatsoever* concerning the system." Dhar Br. 9. But Dr. Dhar made no such assumption. The relevant question (QS11) asked respondents "[w]hich of the following best describes your role in the selection of the brand of the [SYSTEM] in your home?" Ex. 1 ¶ 70. Consistent with standard survey practice, this question ensured that only people who were responsible for selecting the unit answered questions about the information sources they consulted.

Respondents who selected the option "[a] professional (e.g., a contractor, repair person, dealer, or salesperson) was *fully* responsible for the selection of the brand of the [central air conditioner] in my home," clearly stated that they had *no* responsibility for selecting their HVAC unit. *Id.* As Dr. Dhar explained, any information these respondents could have potentially seen or reviewed could not have played a role in their selection of their system because *somebody else* selected the unit. Ex. 1 ¶ 96; Ex. 2 at 41:23–42:9. Dr. Dhar's decision not to ask these respondents about the sources they reviewed was therefore sound, because such materials could have never changed a purchasing decision that was outsourced to someone else. *See, e.g.*, *McVicar*, 2015 WL 4945730, at *11 (plaintiffs must show on a classwide basis "that had the omitted information been disclosed, one would have been aware of it and *behaved differently*") (emphasis added).

Contrary to plaintiffs' argument, it was therefore appropriate for Dr. Dhar to include in his tables about particular information sources those respondents who said a professional chose the system or the system was pre-installed in their home. Pls. Dhar Mot. 13. Those consumers who said they let a professional or somebody else choose for them necessarily did not consider the information that could have mattered to the purchase decision. As a result, they are properly included alongside those individuals who did have responsibility for the system, but reported that they did not consult the particular pieces of information. Ex. 1 ¶¶ 95–119. As Dr. Dhar explains, both groups of consumers would not have treated as material the manufacturer statements in those sources. *Id.* ¶¶ 38–40, 122.[12]

---

[12] In any event, the survey data Dr. Dhar collected was provided to plaintiffs. Plaintiffs could have analyzed the data and provided their own tables that limited the population to

*Second*, plaintiffs claim the survey fails to account for situations where consumers rely on a trusted dealer but may have selected the model or features of the unit.  Pls. Dhar Mot. 3–4, 10.  This argument, too, reflects a misunderstanding of QS11.  Consumers who selected the model or features would have been at least "partially responsible" for selecting their unit and proceeded to answer all questions about the information sources they reviewed.  Ex. 1 ¶ 70.  As Dr. Dhar pointed out, individuals who said a "professional was fully responsible for the selection of my HVAC, … tell[] me that they did not make any aspect of the decision, because otherwise, they could have selected some of the other boxes if they had some role in it."  Ex. 2 at 44:24–45:6.

*Third*, plaintiffs criticize Dr. Dhar's survey for referring to the "brand" of a system, rather than the "model."  Pls. Dhar Mot. 3–4, 10.  To the extent plaintiffs are suggesting there is a material difference between the two terms, they have presented no evidence that a consumer would perceive such a distinction.  Dr. Pittaoulis did no analysis to determine whether this distinction has any basis.  Ex. 4 at 161:14–22.  And the distinction has no basis.  As Dr. Dhar explained, "if I bought a BMW 3 series, and I said what did you consult before buying your BMW, they assume it means what are the sources I consulted….  Consumers don't use the unit separately from the brand."  Ex. 2 at 107:4–17.  In any event, Dr. Dhar's survey did focus consumers on the specific unit "that is installed in your home," satisfying plaintiffs' objection.  Ex. 1, Ex. D at 7.

*Fourth*, plaintiffs argue that Dr. Dhar should have asked those who "were partially responsible for selecting the brand of HVAC system" "whether the other partially-responsible person had consulted any sources of information."  Pls. Dhar Mot. 12.  But it would have been unsound for Dr. Dhar to ask respondents about someone else's

---

those who reported that they were responsible for selecting the brand of their unit.  Ex. 4 at 50:17–51:8.  They did not do so, almost certainly because the results still show that only a minority of respondents who selected the unit reviewed statements from Carrier.  Ex. 1 ¶¶ 95–119; Ex. 4 at 114:18–115:7.

knowledge, as plaintiffs' rebuttal expert agrees.  Ex. 4 at 159:1–161:22.[13]

## III.   DR. DHAR'S MATERIALITY OPINION IS RELEVANT AND RELIABLE

Plaintiffs characterize as "irrelevant" and "unreliable" Dr. Dhar's conclusion that "even for the small minority of individuals that could have potentially been exposed to and considered a statement directly from the manufacturer in connection with their purchase of an HVAC systems, it is well-known that any impact on consumer purchasing decisions would be highly individualized." Pls. Dhar Mot. 18–19.  But the question of materiality is central to plaintiffs' claims, and their failure to show entitlement to a presumption of materiality is fatal to certification.  *See, e.g.*, *5-Hour Energy*, 2017 WL 2559615, at *7.

Dr. Dhar's materiality opinion is also reliable.  He is eminently qualified to opine on consumer behavior given his vast experience in that area.  Ex. 1, Ex. A.  Contrary to plaintiffs' assertions, Dr. Dhar's materiality opinion is not premised solely on a textbook and "a Bonneville Power Administration survey of a few distributors, dealers, and homebuilders."  Pls. Dhar Mot. 7.  Dr. Dhar discussed the HVAC market at length in a portion of his report that plaintiffs do not even discuss.  *Id.* ¶¶ 25–36.  And his conclusion that HVAC consumers follow a highly individualized process when selecting a system draws on his expertise in consumer behavior and is confirmed by the results of his survey, internal Carrier surveys, and statements from the named plaintiffs themselves.  *Id.* ¶¶ 127–36.  In contrast, plaintiffs—who bear the burden at class certification—did not put forth a consumer behavior expert, nor did they conduct a survey or other research that would show how consumers would react.  Ex. 4 at 13:16–24.

## CONCLUSION

Plaintiffs' motion should be denied.

---

[13] Plaintiffs also make the frivolous argument that "'consulting' and 'being exposed' to information are not necessarily the same thing."  Pls. Dhar Mot. 14.  Dr. Dhar drew upon his expertise in framing the question around the information that respondents "consulted" in making a purchase decision.  There is no evidence consumers think about their pre-purchase research in terms of "exposure."  Equally baseless is plaintiffs claim that Dr. Dhar "has been known to 'ask[] the wrong questions during the survey.'" Pls. Dhar Mot. 15 (citing *Playtex Prod., LLC v. Munchkin, Inc.*, 2016 WL 1276450, at *8 (S.D.N.Y. Mar. 29, 2016).  The court in *Playtex* did not criticize the survey's methodology.

DATED:  February 4, 2019                 Respectfully submitted,


By: */s/ Daniel A. Bress*
     Daniel A. Bress

KIRKLAND & ELLIS LLP
Daniel A. Bress (State Bar No. 257305)
daniel.bress@kirkland.com
Katherine R. Katz (*pro hac vice*)
katherine.katz@kirkland.com
Devin S. Anderson (*pro hac vice*)
devin.anderson@kirkland.com
655 Fifteenth Street NW
Washington, DC  20001
Telephone: (202) 879-5000
Facsimile: (202) 879-5100

Jonathan Jeffrey Faria (State Bar No. 274019)
jonathan.faria@kirkland.com
333 South Hope Street
Los Angeles, CA 90071
Telephone:  (213) 680-8400
Facsimile:  (213) 680-8500

*Attorneys for Defendants*