# EXHIBIT 1

## PORTIONS PROPOSED UNDER SEAL

*Subject to Protective Order—Contains Highly Confidential Information*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SANTA ANA DIVISION

| | |
|---|---|
| **STEVE ODDO, RAJENE REARDON, ANTHONY LASALA, LINDA LAMM, KEITH KIMBALL, NORMAN KLINGE and DAN GALLAGHER, on behalf of themselves and all others similarly situated,** | ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| **ARCOAIRE AIR CONDITIONING AND HEATING, CARRIER CORPORATION, BRYANT HEATING AND COOLING SYSTEMS, COMFORTMAKER AIR CONDITIONING & HEATING, INTERNATIONAL COMFORT PRODUCTS LLC, and UNITED TECHNOLOGIES CORPORATION,** | ) ) ) ) ) ) ) ) ) |
| Defendants. | |

Case No. 8:15-cv-01985-CAS-E


**EXPERT REPORT OF PROFESSOR RAVI DHAR**


**CONFIDENTIAL**

*Subject to Protective Order—Contains Highly Confidential Information*

## SECTION I: QUALIFICATIONS

1.  My name is Ravi Dhar. I am the George Rogers Clark Professor of Management and Marketing at the Yale School of Management, and the Director of the Yale Center for Customer Insights at the School of Management at Yale University, New Haven, Connecticut. I also have an affiliated appointment as a Professor of Psychology at the Department of Psychology, Yale University. I have served or currently serve on the editorial board of leading consumer research journals such as *Journal of Consumer Psychology*, *Journal of Consumer Research*, *Journal of Marketing*, *Journal of Marketing Research*, and *Marketing Letters*. I am the past Associate Editor of *Journal of Marketing Research*, the past Area Editor of *Marketing Science*, and past Associate Editor of *Journal of Consumer Research*.

2.  I hold a Ph.D. and M.S. in Business Administration from the University of California at Berkeley. My doctoral dissertation ("Consumer Preference for a No-Choice Option") was focused in the area of consumer decision-making. I have published more than seventy papers in journals, proceedings, and as book chapters. I have published papers in the leading marketing, psychology, and management journals, including among others, the Harvard Business Review, Journal of Behavioral Decision Making, Journal of Business, Journal of Consumer Psychology, Journal of Consumer Research, Journal of Experimental Psychology: General, Journal of Marketing Research, Journal of Personality and Social Psychology, Management Science, Marketing Science, Nature Climate Change, Organizational Behavior and Human Decision Processes, and Sloan Management Review.

1

*Subject to Protective Order—Contains Highly Confidential Information*

3.    Several of my publications were also considered for research awards such as the Paul E. Green Award ("The Effect of Forced Choice on Choice," Finalist in 2004) and the William O'Dell Award ("Consumer Choice Between Hedonic and Utilitarian Goods," Winner in 2005; "Making Complementary Choices in Consumption Episodes: Highlighting Versus Balancing," Finalist in 2004; "The Effect of Forced Choice on Choice," Finalist in 2008, and "Preference Fluency in Choice," Finalist in 2012). The William O'Dell Award is presented to the Journal of Marketing Research article that has made the most significant, long-term contribution to marketing theory, methodology, and/or practice. The Paul E. Green Award is presented to the Journal of Marketing Research article that shows or demonstrates the most potential to contribute significantly to the practice of marketing research and research in marketing. I have been awarded the 2012 Distinguished Scientific Accomplishment Award from the Society of Consumer Psychologists, which is given annually to honor a scholar who has made significant and lasting contributions in the field of consumer psychology. My curriculum vitae is attached as Appendix A.

4.    My fields of expertise are consumer and customer behavior and consumer psychology, branding, marketing management, marketing strategy, and survey methodology and evaluation. In my work as a marketing professor and as a consultant to major corporations, I have conducted, supervised, or evaluated more than 350 surveys, as well as analyzed questions relating to different aspects of consumer behavior. Most of my research focuses on consumers' decision making— the manner in which consumers acquire and process information when forming

2

*Subject to Protective Order—Contains Highly Confidential Information*

product perception and preferences, the effect of product attributes and information presentation on consumer purchase and consumption decisions, and the effect of different marketing mix activities (such as promotions and advertising) on consumer purchase decisions.

5.    My teaching responsibilities at Yale University's School of Management include two doctoral courses that examine advanced research topics in the area of consumer behavior, survey methodology, and decision-making. I also teach or have taught several different courses for graduate students who are enrolled in the MBA program or the Executive MBA program at Yale: Consumer Behavior, E-Business and Marketing, Marketing Strategy, Marketing Management, Marketing of Financial Services, and Strategic Marketing Leadership. I have also taught and given seminars to mid-level and senior-level executives in more than a dozen countries in North and South America, Asia, and Europe. I have also worked as a consultant or adviser to companies on marketing-related issues in different types of industries (e.g., consumer products, high technology, health, and financial services).

6.    I have served as an expert witness on consumer behavior, branding, marketing research, and survey methodology in a variety of litigation matters. A list of cases in which I have testified at trial or in deposition in the last four years or more is attached as Appendix B.

7.    In forming my opinion, I reviewed materials listed in Appendix C, the survey results discussed below, and any of the other documents discussed in this report. In

*Subject to Protective Order—Contains Highly Confidential Information*

addition, I relied on general principles of marketing research and survey research as

well as consumer information processing and decision-making.

8.      I am being compensated at my standard billing rate of $825 per hour. My

compensation in this matter is not contingent or based on the content of my opinion

or the outcome of this or any other matter.

9.      I reserve the right to supplement my testimony and this report in response to any

further information provided by the parties, and/or in light of additional documents

or testimony brought forth through the ongoing discovery in this case, at trial, or

otherwise, which may be brought to my attention after the date of my signature

below.


**SECTION II: BACKGROUND**

10.     Defendant Carrier Corporation[1] (hereafter "Carrier"), a subsidiary of United

Technologies Corporation ("UTC"), manufactures, *inter alia*, residential heating,

ventilation and air conditioning ("HVAC") systems and sells those systems in the

United States and elsewhere.[2]

11.     HVAC systems consist of three components: heating, ventilation, and air

conditioning. These components can be purchased individually or in a combined

HVAC system. An air conditioner circulates cool air throughout a building or

---

[1] I understand that Plaintiffs' Amended Complaint lists the following Defendants: Arcoaire Air
Conditioning and Heating, Carrier Corporation, Bryant Heating and Cooling Systems, Comfortmaker Air
Conditioning and Heating, International Comfort Products LLC, and United Technologies Corporation. For
the purposes of this report, I refer to the Defendants collectively as "Carrier."
[2] https://www.carrier.com/carrier/en/us/about-carrier/, visited March 27, 2018.

*Subject to Protective Order—Contains Highly Confidential Information*

residence. A heat pump circulates cool air (air conditioning) throughout a building or residence during warm weather and circulates warm air throughout a building or residence during cold weather.

12.    It is my understanding that Plaintiffs will be moving for class certification in this matter.[3] According to the Amended Class Action Complaint, Plaintiffs allege that a third-party supplier's use of a process chemical in compressors that were sold to Carrier for use in outdoor air conditioning units led to failures of thermostatic expansion valves ("TXV(s)"), which control the flow of refrigerant used in air conditioners and heat pumps manufactured by Carrier, and other UTC subsidiaries.[4]

13.    Specifically, Plaintiffs allege:

> The [TXV] defect arises from a chemical rust inhibitor added to the manufacturing process beginning in or about 2013 and continuing through at least late-2014, which was incompatible with the refrigerant and lubricating oil used in the HVAC systems. The rust inhibitor reacts with the refrigerant and/or oil and causes a tar or sludge to form when the systems are put into service. This sticky substance then circulates through the system, and builds up layers of deposits on the inside of the system.[5]

14.    Plaintiffs allege that "the tar can cause the TXV to become stuck, rendering the system inoperable." Plaintiffs also allege that even without a complete TXV or system failure, the chemical "is likely to cause a failure at some point in the future"

---

[3] A determination on the certification of the class (and state subclasses) proposed by Plaintiffs has not yet been made in this case.

[4] Amended Class Action Complaint ("Compl."), pp. 1-2. For purposes of this report I focus on the following brands: Carrier, Bryant, Payne and International Comfort Products. International Comfort Products includes the following sub-brands Arcoaire, Comfortmaker, Day & Night, Grandaire, Heil, KeepRite, Lincoln, and Tempstar.

[5] Compl., pp. 1-2.

*Subject to Protective Order—Contains Highly Confidential Information*

or "impact system performance and efficiency … such that the defective HVAC

systems are not capable of performing to the efficiency standards advertised … ."[6]

15.   Plaintiffs allege that Carrier failed to disclose, to members of the class, the alleged

defect that caused the TXV to become stuck. Plaintiffs claim that putative class

members' purchasing behavior may have been different if Carrier had disclosed the

alleged defect. Specifically:

> Plaintiffs reviewed and relied upon the statements contained in Defendants'
> marketing and warranty materials. Further, Defendants failed to disclose the
> existence of the defect in any marketing material or other publicly available
> disclosures. Had Defendants disclosed the defect, Plaintiffs would not have
> purchased the defective systems.[7]

16.   According to the complaint, Plaintiffs seek to certify a putative nationwide class as

follows:

> All persons and entities who purchased an HVAC system manufactured by
> Defendants between 2013 and 2015 utilizing 410A refrigerant, POE oil, a TXV,
> and a Copeland Scroll Compressor, and all persons and entities that have not
> been fully reimbursed for parts, materials, or labor expended in diagnosing
> and/or servicing such HVAC systems for performance issues caused by
> chemical contaminants remaining from the manufacturing process.[8]

17.   In addition, it is my understanding that Plaintiffs seek to certify putative subclasses

in the following states: California, Georgia, Indiana, and Missouri.[9]

18.   Additionally, I understand that the Court dismissed claims for breach of express

---

[6] Compl., p. 2.
[7] Compl., p. 37.
[8] Compl., pp. 27-28.
[9] It is my understanding that the subclasses for Arizona, Florida and Maryland (specified in the Compl., pp.
29-30) are no longer at issue.

*Subject to Protective Order—Contains Highly Confidential Information*

warranty; breach of implied warranty; misrepresentation; negligent

misrepresentation and fraudulent concealment; unfair trade practices; and unjust

enrichment for all but the California subclass in its January 24, 2017 decision, while

allowing certain omission-based claims to proceed to discovery.[10]


**SECTION III: ASSIGNMENT**

19.     In this matter, I was asked by Counsel for Carrier to provide an opinion on aspects of

consumer behavior relating to consumers' selection of their HVAC systems.

Specifically, I was asked to opine on the proportion of owners who acquire their

HVAC system in each of several different ways: those who personally select the

HVAC system, those who rely on professionals such as a contractor or dealer to

select the HVAC system, and those who acquire an HVAC system because they

purchased a home that had an HVAC system already installed.

20.     I was also asked to opine on the sources of information that consumers who have a

role in selecting the brand of their air conditioner or heat pump review before

making a purchase. Specifically, I was asked to determine empirically, for those who

have a role in selecting the brand of their air conditioner or heat pump, the

proportion of relevant owners who were not exposed to and hence could not have

considered a manufacturer's printed brochure or website, and/or who did not speak

to a manufacturer directly before purchasing or acquiring their unit.

---

[10] 1/24/17 Order 38-40 (Dkt. 57).

*Subject to Protective Order—Contains Highly Confidential Information*

21.   To test directly for this issue, I designed and supervised a survey among relevant consumers. I analyzed these results not just for relevant owners of heat pumps and air conditioners throughout the United States (the "Primary U.S. Representative Sample"), but also for relevant owners in the putative sub-class states of California, Georgia, Indiana, and Missouri.[11]

22.   This report presents my independent analysis of consumer behavior, the details of the survey that I supervised, and the conclusions I have reached based on the data collected.

23.   The design, execution, and analysis of the survey followed accepted scientific standards of my profession and were consistent with the principles for survey research discussed in the Federal Judicial Center's Manual for Complex Litigation (3rd, Section 21.493), as well as guidelines set forth in Diamond's "Reference Guide on Survey Research."[12] To illustrate:

   a.   The survey population was properly chosen and defined.

   b.   The sample chosen was representative of that population.

   c.   The questions asked were clear and not leading.

   d.   The data gathered were accurately reported.

   e.   The data were analyzed in accordance with accepted statistical principles.

   f.   The process was conducted to ensure objectivity.

   g.   The survey was conducted by qualified people following proper interview

---

[11] As explained later, additional respondents were recruited in California, Georgia, Indiana, and Missouri (the "Oversample"), using the same screening criteria as the Primary U.S. Representative Sample, so as to obtain a total analyzable sample of at least 200 respondents in the four states (minimum of 50 per state).
[12] *See, e.g.*, many of the recommendations in "Reference Guide on Survey Research," SS Diamond, *Reference Manual on Scientific Evidence*, Third Edition, Federal Judicial Center, 2011,p. 359-423.

8

*Subject to Protective Order—Contains Highly Confidential Information*

procedures.

24.     In the rest of this report, I describe the protocol used to implement the survey, and I present my findings. **Section IV** provides an overview of the HVAC industry based on the record. **Section V** summarizes the findings and opinions contained in this report, based on the results of the survey I conducted and my analysis of consumer behavior. **Section VI** describes the methodology used in the survey. **Section VII** describes how the survey population was chosen and defined. **Section VIII** sets forth the screening criteria used to qualify respondents for participation. In **Section IX**, I discuss the rollout of the survey, and in **Section X**, I analyze the main questions in the survey. Finally, **Section XI** discusses my findings in the context of accepted understandings of consumer purchasing behavior.

## SECTION IV: HVAC INDUSTRY

### SECTION IV(A): MULTI-STEP DISTRIBUTION MODEL

25.     HVAC original equipment manufacturers in the United States typically use a multi-step distribution model. Manufacturers like Carrier sell equipment to distributors, who keep inventory at regional locations. Dealers[13] (and some limited retailers) purchase the equipment from distributors and sell the equipment directly to end users.[14]

---

[13] I understand that dealers are sometimes referred to as contractors. I use the terms interchangeably in this report.

[14] Bonneville Power Administration HVAC Market Intelligence Report, 2016 at 23; Aff. of M. Hacker ¶ 5.

9

*Subject to Protective Order—Contains Highly Confidential Information*

26.    As relevant to this case, Carrier manufactures air conditioners and heat pumps, and it sells and markets these products to distributors.[15] It does not sell products directly to dealers or end users.[16] Instead, Carrier's regional distributors sell equipment to dealers within their territory, and these dealers sell HVAC products to end consumers.

27.    Carrier also has several national accounts, including ████████████████ ███████.[17] For these national accounts ████████████████████████ ████████████████████████ the physical flow of products often still follows the multi-step industry model, meaning sales to the national accounts are carried out through distributors.[18] This is consistent with other manufacturers' approach to national accounts.[19]

28.    Like other manufacturers in the HVAC industry, Carrier has no direct transactional relationship with end consumers.[20] Its customers are the regional distributors.[21] Carrier's distributors provide automated "movement reports," which provide some identifying information about the dealers who have purchased HVAC systems from a particular distributor.[22] These reports do not include, and Carrier does not require distributors to track, the end consumers to whom the dealers ultimately sold the

---

[15] P. Hoppel Dep. Tr. at 21:20-24; P. Hoppel Dep. Ex. 3.
[16] P. Hoppel Dep. Tr. at 21:22-24.
[17] P. Hoppel Dep. Tr. at 22:8-22; Aff. of M. Hacker ¶ 11.
[18] Aff. of M. Hacker ¶ 11; Bonneville Power Administration, HVAC Market Actor Interviews 2018, at 8.
[19] Bonneville Power Administration, HVAC Market Actor Interviews 2018, at 8.
[20] C. Kafura Dep. Tr. at 143: 7-21.
[21] P. Hoppel Dep. Tr.at 21:20-24.
[22] P. Hoppel Dep. Tr. at 60:23-61:15.  Movement information is not available for every distributor from the ICP distributors. P. Hoppel Dep. Tr. at 61: 24-26.

*Subject to Protective Order—Contains Highly Confidential Information*

HVAC systems they purchase.[23] As a result of Carrier's distribution model, it has only limited visibility into the end consumers.[24]

29.    I understand that Carrier has the name and address of certain end consumers who register their warranty.[25] In some instances, dealers "batch register" a group of units, and Carrier is unable to identify who the owner of each unit is.[26] Although consumers who register their products receive a 10-year warranty (instead of a 5-year warranty), only approximately ▮ of consumers register their HVAC systems.[27] Thus, Carrier's warranty registration data provides limited identification of final purchasers of Carrier's HVAC systems.

### SECTION IV(B): INFORMATION CHANNELS

30.    The multi-step distribution model detailing the physical flow of goods discussed above also describes how the exchange of information about product quality issues occurs in the HVAC industry. Information concerning any product quality issues with the HVAC system itself flows along from the manufacturer to its customer, the distributor, from the distributor to its customer, the dealer, and from the dealer to its customer, the consumer.[28] Thus for the end consumer, the primary relationship is with the dealer. This concept is reflected in the data that I analyze below.

---

[23] P. Hoppel Dep. Tr. at 61:11-15.
[24] P. Hoppel Dep. Tr. at 61:13-15.
[25] C. Kafura Dep. Tr. at 229:2-13.
[26] C. Kafura Dep. Tr. at 229:2-13.
[27] P. Hoppel Dep. Tr. at 54:5-13.
[28] C. Kafura Dep. Tr. at 34:8-14; P. Hoppel Dep. Tr. at 69:8-12,70:22-71:8.

*Subject to Protective Order—Contains Highly Confidential Information*

31.   Although there are many types of information that can be communicated up and down among the market participants in the HVAC distribution chain, plaintiffs' claims in this case focus on information relating to a product quality issue.[29]

32.   Based on my review of the record, information relating to product quality issues passes along a defined, industry-standard channel. I understand that Carrier provides information relating to product quality issues that arise to Carrier's distributor customer base and dealers through service bulletins.

33.   In the event that Carrier needs to communicate specific information regarding a product quality issue, Carrier issues service bulletins to distributors and dealers.[30] This is the standard practice for communicating this type of information in the HVAC industry.[31] Carrier distributors receive a "Service Bulletin" and are directed to communicate the information contained therein to their dealers.[32] Carrier also issues a "Dealer Service Bulletin" that explains the issue to dealers and can be customized by the relevant distributor to suit the needs of the dealer.[33] The service bulletins contain detailed, technical information.[34]

---

[29] Am. Compl. at 37; Pls.' Resp. and Obj. to Defs. First Interrog.
[30] P. Hoppel Dep. Tr. at 98:24-99:23.
[31] P. Hoppel Dep. Tr. at 98:24-99:23.
[32] CARRIER_0013721.
[33] C. Kafura Dep. Tr. at 141:10-23.
[34] *See e.g.,* CARRIER_0013721.

*Subject to Protective Order—Contains Highly Confidential Information*

34. In this case, Carrier issued a series of bulletins to distributors, its customers, that disclosed its investigation into the clogged TXV issue and various solutions.[35] Carrier made these bulletins available to its customers and also to dealers through email and internet distribution.[36] In the HVAC industry, distributors are generally responsible for communicating product quality information to dealers.[37] Distributors also have a number of communication channels with their dealers, including regular meetings, phone calls, and email communications, where they may provide written technical information.[38] Dealers may then communicate with their customers, who are the end users.[39] Outside of making the bulletins available, I understand Carrier does not manage how this type of information is provided from distributor to dealer and from dealer to consumer.[40] This is consistent with the industry standard for the proper path of communication for product quality information.[41]

35. Although Carrier does not issue bulletins directly to end users, it is notable that three of the four named plaintiffs in this case obtained copies of the service bulletins Carrier issued. Plaintiffs Dan Gallagher, Linda Lamm, and Steve Oddo all obtained a copy of Carrier bulletins.[42] These bulletins instructed dealers to inject affected TXVs

---

[35] *See e.g.*, CARRIER_0016434 (Carrier July 3, 2014 SMB); CARRIER_0007650 (Carrier July 3, 2014 DSB); CARRIER_0006796 (Carrier July 22, 2014 SMB); CARRIER_0006867 (Carrier July 22, 2014 DSB); CARRIER_0024786 (Carrier August 13, 2014 SMB); CARRIER_0024433 (Carrier August 22, 2014 SMB); CARRIER_0016265 (Carrier August 22, 2014 DSB); CARRIER_0013718 (Carrier September 26, 2014 SMB); CARRIER_0013721; (Carrier October 23, 2014 SMB); CARRIER_0015048 (Carrier October 23, 2014 DSB).
[36] P. Hoppel Dep. Tr. at 9:5-10:4.
[37] P. Hoppel Dep. Tr. at 70:22-71:8.
[38] P. Hoppel Dep. Tr. at 70:22-71:8; 100:14-24.
[39] C. Kafura Dep. Tr. at 34:8-18.
[40] C. Kafura Dep. Tr. at 34:8-18.
[41] P. Hoppel Dep. Tr. at 99:15-23.
[42] Gallagher Dep. Ex. 40; Lamm Dep. Ex. 29; Oddo Dep. Ex. 52.

*Subject to Protective Order—Contains Highly Confidential Information*

with a chemical additive.[43] Plaintiff Gallagher testified that he could not recall where he obtained the Dealer Service Bulletin.[44] Plaintiff Lamm testified that she found the bulletin after searching on the Internet.[45] Plaintiff Oddo also testified that he located the bulletin on the Internet.[46]

36.     I have reviewed product brochures and print-outs of Carrier's website. (See Appendix C.) Carrier's website has an information page for each air conditioner and heat pump model Carrier offers, and includes an overview of the model, efficiency ratings, standard features, comfort features, and some general specifications. I understand that Carrier's goal with these marketing materials is to increase brand awareness and enable consumers to locate a dealer from whom they can make a purchase.[47] As is common in the HVAC industry, Carrier's consumer-facing materials do not contain information relating to specific product quality issues or investigations of the type discussed in the preceding paragraphs. Such information is disclosed to the technical personnel at distributors and dealers through Carrier's bulletin process.[48]

---

[43] CARRIER_0015048 (Carrier October 23, 2014 DSB).
[44] D. Gallagher Dep. Tr. at 137:16-17.
[45] L. Lamm Dep. Tr. at 147:20-21.
[46] S. Oddo Dep. Tr. at 187:13-17.
[47] P. Hoppel Dep. Tr. at 117:19-119:1.
[48] P. Hoppel Dep. Tr. at 121:11-21.

*Subject to Protective Order—Contains Highly Confidential Information*

## SECTION V: SUMMARY OF OPINIONS

37. Based on the results of the survey I conducted, as well as my education, background, professional experience, analysis, and review of relevant materials in this case, it is my opinion with a high degree of scientific certainty that a large majority of relevant consumers who acquire an HVAC system either relied solely on a professional or purchased a home with an already installed HVAC system or were never exposed to a manufacturer's printed brochure or website, and/or spoke to a manufacturer directly and hence would not have been aware even if the omitted information was disclosed.

38. In particular, my survey shows:

    a. For more than half of respondents (53.3%), statements (and therefore omissions) from the manufacturer played no role at all in their decision to acquire the HVAC system, either because they chose to have a professional select the brand for them, or because they acquired an already installed HVAC system in connection with a purchase of a home.[49] An additional 14.9% of respondents said they had some responsibility for selecting the brand of their system and yet reported that they did not consult any sources of information before making their purchase.[50]

    b. Only 6.5% of respondents reported reviewing a printed brochure,[51] 18.8% of

---

[49] See Table 1 in Section XI(A).
[50] See Table 2 in Section XI(A).
[51] See Table 3a in Section XI(A).

15

*Subject to Protective Order—Contains Highly Confidential Information*

respondents reported visiting a manufacturer or contractor's website,[52] and 1.9% of respondents reported speaking to a manufacturer directly.[53] Aggregating these results, just 21.2% of the population of HVAC owners were exposed to any information that came directly from a manufacturer prior to making a purchase[54] and that could have even potentially impacted their purchase decision.

    c.   Similar results obtain for respondents who said they purchased a Carrier brand system and for respondents in the sub-class states.

39.   These results show that had Carrier disclosed the information that plaintiffs allege Carrier omitted, at most only a small fraction of HVAC purchasers would have even considered those statements (or alleged omissions). Identifying those consumers who would have even considered the statements (or alleged omissions) directly from the manufacturer would require individual inquiry.

40.   Moreover, even for the small minority of individuals that could have potentially been exposed to and considered a statement directly from the manufacturer in connection with their purchase of an HVAC system, it is well-known that any impact on consumer purchasing decisions would be highly individualized. Because consumers value different product-related factors differently, individual inquiry would be required to determine whether any information about the alleged defect

---

[52] See Table 3b in Section XI(A).
[53] See Table 3c in Section XI(A).
[54] See Table 3d in Section XI(A).

*Subject to Protective Order—Contains Highly Confidential Information*

would have had an impact on purchasing, what the impact would be, and the extent of any such impact.

41.    One factor that consumers place significant weight on are statements by their dealers and contractors. This trend appears in the data that I have collected and also the data Carrier gathered in the ordinary course of business. Carrier's bulletins regarding the TXV issue were made available to dealers through the communication pathways described in the prior section.


### SECTION VI: SURVEY METHODOLOGY

42.    In implementing the Survey, I was assisted by Applied Marketing Science, Inc. ("AMS"), a marketing research company that has extensive experience in conducting surveys. AMS worked under my direction to conduct the online survey. They also coordinated and managed the data collection. Their compensation is not contingent upon the conclusions I reach nor on the outcome of this matter.

43.    To ensure objectivity, it is standard practice to conduct research in a double-blind manner (i.e., both the interviewer and the respondent are blind to the sponsor of the survey and its purpose).[55] The survey here was conducted under double-blind conditions. The survey did not provide any information on the sponsor of the study or about the underlying purpose. Similarly, the screening questions used to determine whether or not a respondent was in the target universe included

---

[55] See Diamond, Shari S., "Reference Guide on Survey Research" in *Reference Manual on Scientific Evidence*, Third Edition, Federal Judicial Center, 2011, p. 410-411.

*Subject to Protective Order—Contains Highly Confidential Information*

categories unrelated to the category of interest in order to disguise the main category for sample selection. The full sequence of questions for the Survey is presented in Appendix D, with screenshots of the programmed survey presented in Appendix E.

44.    To ensure the representativeness of the survey population, I balanced the inbound sample using U.S. Census data based on responses to questions regarding gender, age, and Census region.[56]

45.    It is a standard survey practice to explicitly instruct respondents not to guess. Thus, at the beginning of the survey, respondents were instructed, "If you don't know an answer to a question or if you are unsure, please indicate this in your response. Please do not guess."

46.    In addition, the survey used quasi-filters (i.e., explicitly included the response option of "Don't know / Unsure" or "Don't recall / Unsure"), which substantially decreases any potential concern that the respondent will feel pressure to provide an answer when they are unsure.[57]

---

[56] Gender, age, and census region quotas for the Primary U.S. Representative Sample were set using 2010 U.S. Census Bureau data and applied to inbound "clicks" (i.e., responses to the survey invitation). See U.S. Census Bureau, DP-1General Demographic Characteristics: 2010 Census, https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=DEC_10_DP_DPDP1& src=pt, and U.S. Census Bureau, Population Distribution and Change: 2000 to 2010, Table 1, p. 2, https://www.census.gov/prod/cen2010/briefs/c2010br-01.pdf. Oversamples in California, Georgia, Indiana and Missouri were recruited randomly as to gender and age.

[57] Diamond, Shari S., "Reference Guide on Survey Research" in Reference Manual on Scientific Evidence, Third Edition, Federal Judicial Center, 2011, p. 390.

*Subject to Protective Order—Contains Highly Confidential Information*

47.     All open-ended responses were coded by two trained coders who followed a

codebook designed under my supervision. The coded responses were also reviewed

by AMS staff and by me personally. A full codebook for the survey is in Appendix F.

48.     When presenting survey respondents with a set of options in a closed-ended

question, it is good practice to randomize the response options in order to control

for possible order effects.[58] Accordingly, I randomized response options in the

survey so that different respondents saw the options in different orders, where it

was appropriate. There are standard exceptions to the randomization rules. For

example, certain options—such as "Other," "None of the above," and "Don't Know /

Unsure"—always come last in order for the question to preserve logical flow.

Another exception to response option randomization occurs when answer options

come in a certain logical order, such as those for age. In such circumstances,

response options were not randomized.

49.     The survey was pretested to ensure that respondents understood and could respond

accurately to the questions.

---

[58] See Diamond, Shari S., "Reference Guide on Survey Research" in Reference Manual on Scientific Evidence, Third Edition, Federal Judicial Center, 2011, p. 395-396.

*Subject to Protective Order—Contains Highly Confidential Information*

## SECTION VII: SURVEY POPULATION

50.    One of the first steps in deciding whether survey results are meaningful is the selection of the appropriate target population or universe.[59] The universe is that segment of the population whose beliefs are relevant to the issues in the case.

51.    The survey universe for the survey I conducted is owners of air conditioners or heat pumps who purchased their units separately or in connection with the purchase of their home in the last five years within the United States. Specifically, the survey universe is defined as U.S. adults (18 years of age and older) who meet <u>all</u> of the following criteria:

   i.    They own their primary residence (defined in the survey as "the residence where you spend the most time"[60]); <u>AND</u>

   ii.   Their primary residence had a central air conditioner or heat pump installed within the last five years; <u>AND</u>

   iii.  The owner of the primary residence acquired their air conditioner or heat pump in <u>one</u> of the following ways:

       a.  Homeowner was fully or partially responsible for the selection of the brand of heat pump or air conditioner;

           <u>OR</u>

---

[59] Diamond, Shari S., "Reference Guide on Survey Research" in Reference Manual on Scientific Evidence, Third Edition, Federal Judicial Center, 2011, p. 376.
[60] See Appendix D.

*Subject to Protective Order—Contains Highly Confidential Information*

    b.   Homeowner relied on a professional (e.g., a contractor, repair person, dealer or salesperson) who was fully responsible for selection of the brand of heat pump or air conditioner;

OR

    c.   Homeowner did not select the brand of heat pump or air conditioner because it was already installed when they purchased their home.

52.    In order to interview relevant individuals, I designed an internet survey that screened potential respondents to determine if they were members of the appropriate population. An Internet-based survey offered many advantages over different recruiting methodologies, such as broad geographic reach to areas of the U.S. where recruiting via malls or other face-to-face methods would not be feasible. Thus, a mall-based survey would not have had the extensive geographic coverage. Moreover, in comparison to a telephone-based methodology, the internet-based approach is not affected by the increasing proportion of wireless-only households in the US,[61] which is a growing challenge for telephone surveys. Finally, internet surveys are a widely accepted form of market research. Courts have accepted the

---

[61] According to the National Health Interview Survey run by the National Center for Health Statistics in January – July 2017, more than half (52.5%) of American homes were wireless-only. See https://www.cdc.gov/nchs/data/nhis/earlyrelease/wireless201712.pdf.

*Subject to Protective Order—Contains Highly Confidential Information*

findings of internet surveys in a broad range of cases,[62] including surveys that I have personally designed (see Appendix B).

53. The internet survey was conducted by contracting with one of the numerous companies that have pre-recruited potential respondents who have indicated their willingness to participate in market research surveys. In this case, I selected Research Now, a well-established international market research service firm that maintains an invitation-only panel of over two million consumers in the United States.[63] Both AMS and I have worked with Research Now for other survey matters. We have each found them to be a high-quality supplier of qualified survey respondents.

54. As part of Research Now's recruitment process, panel members complete a questionnaire that includes basic demographic information (age, gender, state of residence, etc.). Using this information, Research Now was able to invite a demographically balanced sample, as discussed previously.

55. During the survey invitation process, Research Now included a link to the online survey, which was hosted on a website maintained by AMS. This link contained an

---

[62] See e.g., many of the recommendations of Shari S. Diamond in "Reference Guide on Survey Research" in Reference Manual on Scientific Evidence, Third Edition, Federal Judicial Center, 2011;  Gelb, G and B. Gelb, "Internet Surveys for Trademark Litigation: Ready or Not, Here They Come," *Trademark Rep.* Vol. 97, 2007; Isaacson, B., et al.,  "Why Online Consumer Surveys Can Be A Smart Choice In Intellectual Property Cases," *IPL Newsletter* (ABA Section of Intellectual Property Law) Vol. 26, No. 3, 2008; Poret, H., "A Comparative Empirical Analysis of Online versus Mall and Phone Methodologies for Trademark Surveys," *Trademark Rep.* Vol. 100, 2010; "Online Interviewing For Use in Lanham Act Litigation," A. Simonson, *Intell. Prop. Strategist* Vol. 14, 2007.

[63] Research Now's e-Rewards panel contains 1.8 million members as of August 14, 2017.

*Subject to Protective Order—Contains Highly Confidential Information*

embedded identification number that assured that only invited respondents could answer the survey, and that each respondent could only complete the survey once.

56.    Respondents who qualified and completed the survey were awarded $2.50 in e-Rewards (Research Now) currency.[64] In my experience, such honoraria are common in survey research and do not influence the accuracy of the responses.

## SECTION VIII: SCREENING CRITERIA

57.    To qualify for participation in the survey, respondents must have met the following criteria:

a.    Be at least 18 years old;

b.    They, and other members of their household, were not employed by a marketing or market research firm, a public relations or advertising agency, or by a company that makes or sells heating or cooling systems;

c.    Own their primary residence (defined in the survey as "the residence where you spend the most time");

d.    Be a current owner of a heat pump or air conditioner installed within the last five years; and

e.    Meet the relevant criteria for decision-making responsibility, as further defined below.

58.    Respondents who did not meet these criteria were terminated from the survey.

---

[64] Research Now's incentives are converted to a rewards point system. Points can be redeemed to be used towards restaurants, airlines, consumer products (e.g., electronics, crafting products, fashion, etc.), and hotels.

*Subject to Protective Order—Contains Highly Confidential Information*

59.     Respondents began by reading a brief, standard introduction assuring them of confidentiality, and instructing them not to guess when answering questions. Respondents were then prompted with a CAPTCHA challenge[65] (QS0) to ensure that their responses were not computer-generated. Next, respondents were queried as to the type of electronic device they were using to complete the survey, allowing only those with a tablet, desktop, or laptop computer to continue (QS1). Next, respondents indicated their gender (QS2) and age (QS3) to validate their responses with the information on record with the panel.[66] Respondents then indicated which state they live in (QS4), which determined their U.S. Census region. Respondents were terminated if they indicated that they do not live in one of the U.S. states ("My area is not listed here").

60.     After these demographic questions, respondents were asked a standard industry exclusion question, screening out any respondents who indicated that they, or other members of their household, were employed by a marketing or market research firm, a public relations or advertising agency, or by a company that makes or sells heating or cooling systems (QS5). The order of response options was randomized, with "None of the above" always displayed last. (See Appendix D for details.)

---

[65] A CAPTCHA challenge refers to a program that protects websites against bots (i.e., computer-generated responses) by generating and grading tests that humans can pass, but current computer programs cannot. The acronym CAPTCHA stands for Completely Automated Public Turing test to tell Computers and Humans Apart. See, e.g., "CAPTCHA: Telling Humans and Computers Apart Automatically," CAPTCHA, http://www.captcha.net, visited on April 10, 2018.

[66] As noted earlier, Research Now was the panel used for this survey.

*Subject to Protective Order—Contains Highly Confidential Information*

61.   Next, respondents were instructed, for the following questions, to focus on their primary residence, i.e., the residence where they spend the most time, if they live in or own more than one residence. Then they were asked if they own their primary residence, rent their primary residence, or they are neither a homeowner nor a renter (e.g., live at home with parents, in dorms, etc.) (QS6), with the "own" and "rent" response options rotated, and the "neither" option presented last. Respondents who indicated they "own" their home were allowed to continue to the next question, while all other respondents were terminated.

62.   The survey continued by asking respondents, "Which, if any, of the following features does your home have?" (QS7) They were instructed to select all of the response options that apply from the following list:

- ❒ Heating and/or cooling system(s)
- ❒ Automatic garage door opener
- ❒ Electric range or stove top
- ❒ Security system
- ❒ None of the above

63.   The order of response options was randomized, with "None of the above" always displayed last. Respondents who indicated their home has "Heating and/or cooling system(s)" were allowed to continue to the next question, while all other respondents were terminated.

64.   Next, the survey instructed respondents, "You indicated that your home has a heating and/or cooling system. Next you will be shown four different types of heating and cooling systems and then asked to select the system(s) in your home."

25

*Subject to Protective Order—Contains Highly Confidential Information*

Then the survey presented a series of pages, in randomized order, each page providing respondents with a definition of a common type of heating and/or cooling system:[67]

> A **<u>central air conditioner</u>** is an appliance consisting of an outdoor unit and an indoor unit that **circulates cool air** through your home. (QS8Intro2)
>
> A **<u>heat pump</u>** is an appliance consisting of an outdoor unit and an indoor unit that **both circulates cool air (air conditioning)** through your home during warm weather and **circulates warm air** through your home during cold weather. (QS8Intro3)
>
> A **<u>boiler or furnace system</u>** is an appliance that uses oil, gas, or electricity to **heat** your home. Typically housed in a garage, basement, or attic. (QS8Intro4)
>
> A **<u>window air conditioner</u>** is a portable air conditioner unit that typically mounts in a window and **circulates cool air**. (QS8Intro5)

65.    Having provided respondents with these definitions, the survey next asked, "Again, you indicated that your home has a heating and/or cooling system. Which, if any, of the following types of heating and/or cooling systems do you have?" (QS8) They were instructed to select all of the response options that apply from the following table:

---

[67] Bold and underline as shown in the survey. See Appendix E for survey screenshots.

*Subject to Protective Order—Contains Highly Confidential Information*

| | Type of system | Heats | Cools | Description |
|---|---|---|---|---|
| ❐ | **Central air conditioner** | | ✔ | An appliance consisting of an outdoor unit and an indoor unit that **circulates cool air** through your home. |
| ❐ | **Heat pump** | ✔ | ✔ | An appliance consisting of an outdoor unit and an indoor unit that **both circulates cool air (air conditioning)** through your home during warm weather and **circulates warm air** through your home during cold weather. |
| ❐ | **Boiler or furnace system** | ✔ | | An appliance that uses oil, gas, or electricity to **heat** your home. Typically housed in a garage, basement, or attic. |
| ❐ | **Window air conditioner** | | ✔ | A portable air conditioner unit that typically mounts in a window and **circulates cool air.** |
| ❐ | Other.  Please specify: _____ | | | |
| ❐ | Don't know/Unsure | | | |

66.    The order of response options was the same as the order in which the types of systems were presented in the prior pages (i.e., the same as the randomized order of QS8Intro2 through QS8Intro5), with "Other. Please specify:" and "None of the above" always displayed last. Only respondents who selected central air conditioner or heat pump were allowed to continue to the next question.

67.    Next, respondents were asked, "Without looking at your [SYSTEM], what is the brand of your [SYSTEM]?" (QS9) where [SYSTEM] was replaced with "central air conditioner" or "heat pump," according to which type of system was selected in question QS8. They were instructed to select one response option from an

27

*Subject to Protective Order—Contains Highly Confidential Information*

alphabetical list of more than 50 brands of air conditioners and heat pumps, including all of the Carrier brands at issue (Carrier, Bryant, Payne as well as International Comfort Products' sub-brands: Arcoaire, Comfortmaker, Day & Night, Grandaire, Heil, KeepRite, Lincoln, and Tempstar). Respondents were also given the options "Other. Please specify:" and "Don't recall / Unsure," which were always displayed last. As described further below, the fake HVAC brand "Osgood" was included in the list of brands shown. All respondents who selected this response option were removed from the final data set.

68.  QS10 then asked, "Approximately, when was your [SYSTEM] installed in your primary residence?" where [SYSTEM] was replaced with "central air conditioner" or "heat pump," according to which type of system was selected in question QS8. They were instructed to select one response option from the following list:

- ⊙ More than ten years ago
- ⊙ More than five years ago, less than ten years ago
- ⊙ Within the last five years
- ⊙ Don't recall/Unsure

69.  The order of response options was rotated top to bottom, with "Don't recall / Unsure" always displayed last. Only respondents who indicated their central air conditioner or heat pump was installed within the last five years were allowed to continue to the next question.

70.  As a final screening question, before the quality-control questions, respondents were asked, "Which of the following best describes your role in the selection of the brand of the [SYSTEM] in your home?" (QS11) where [SYSTEM] was replaced with

*Subject to Protective Order—Contains Highly Confidential Information*

"central air conditioner" or "heat pump," according to which type of system was selected in question QS8. They were instructed to select one response option from the following list:

- ⊙ I was fully responsible for the selection of the brand of the [SYSTEM] in my home
- ⊙ I was partially responsible for the selection of the brand of the [SYSTEM] in my home
- ⊙ A professional (e.g., a contractor, repair person, dealer, or salesperson) was fully responsible for the selection of the brand of the [SYSTEM] in my home
- ⊙ A friend or someone else in my household was fully responsible for the selection of the brand of the [SYSTEM] in my home
- ⊙ I did not select the brand of the [SYSTEM] because the [SYSTEM] was already installed when I moved into my home

71.   The order of response options was rotated top to bottom, always keeping "professional" displayed above "friend or someone else in my household." As will be discussed in more detail below, respondents who indicated that a professional was fully responsible for selection of the brand of central air conditioner or heat pump in their home, or who indicated that the system was already installed in their home, were counted as complete[68] and skipped to the end of the survey. Respondents who indicated that they were fully or partially responsible for the selection of the brand of the central air conditioner or heat pump, were allowed to continue to the quality-control questions described further below in this section. Respondents who indicated that a friend or someone else in their household was fully responsible for

---

[68] In the data file, their status was marked as "complete2" to distinguish from the status of other completes ("complete") who were fully or partially responsible for the purchase decision and therefore were asked the main survey questions relating to sources of information used in their purchase decision.

*Subject to Protective Order—Contains Highly Confidential Information*

selection of the brand of central air conditioner or heat pump in their home, were terminated.

72.     Additionally, to ensure an adequate representation of Carrier brands at issue in the survey, a quota procedure was implemented. Respondents who qualified for the survey were assigned either to the Carrier Group (if they indicated installing a Carrier brand heat pump or air conditioner, in the past five years, in screening question QS9) or the Non-Carrier Group (if they indicated purchasing a brand of heat pump or air conditioner other than a Carrier brand at issue, in the past five years, in screening question QS9). Once a given quota group had been filled, any further respondents were excluded from qualification in the group.[69]

73.     As a further quality-control measure, I inserted an "attention check" question after the main screening questions as is my standard practice, to ensure that respondents read the instructions and paid attention throughout the screening (QS12). Respondents were asked for quality control purposes to select "Yellow" from the following list, with response options randomized: Yellow, Blue, Red, or Green. If a respondent did not select "Yellow" they were terminated.

74.     Next, respondents were instructed to carefully read a set of instructions, which informed them to take the survey in one session without interruption, not to consult any other websites or other electronic or written materials, to answer all questions on their own without consulting any other person, and to wear their glasses or

---

[69] Based on my understanding of Carrier's market share, I set the Carrier quota at 30% of those who know their brand in survey screening question QS9. CARRIER_0034021.

*Subject to Protective Order—Contains Highly Confidential Information*

contact lenses while taking this survey if they normally do so when viewing a

computer screen (QS13). After reviewing these instructions, respondents were

asked to select either "I understand and agree to the above instructions," or "I do

not understand or do not agree to the above instructions." Only respondents who

selected "I understand and agree to the above instructions" were able to continue

to the main survey.

## SECTION IX: SURVEY ROLLOUT

75.     The survey ran from March 19 through March 30, 2018. To ensure that the survey

operated properly, AMS, at my direction, extensively tested the links, skip logic, and

screening questions.

76.     An invitation to participate in the survey was emailed by Research Now to 492,318

potential participants, of which 12,072 (2.5%) clicked to start the survey in the

Primary U.S. Representative sample. Appendix G presents the text of the email,

while Appendix H shows the demographic profile of the Primary U.S. Representative

Sample.[70] The invitation included the personally-encoded link that established

survey security.

77.     A number of additional steps were taken to further validate respondents. Each

respondent's age and gender were compared to values for those respondents in

Research Now's database. Any respondents whose stated age or gender did not

---

[70] Appendix H compares the demographic profile of inbound clicks into the Primary U.S. Representative
Sample with the corresponding U.S. Census data.

31

*Subject to Protective Order—Contains Highly Confidential Information*

match the values in the database were terminated from the Survey. Also, I inserted a fictitious brand ("Osgood") into the list of response options for the heat pump or air conditioner brand screening question (QS9), as well as the list of brand brochures (Q2e) and manufacturers' websites (Q2g), to identify and remove from the data set those who might be guessing.[71]

78.     Ultimately, 1892 respondents in the Primary U.S. Representative Sample completed the survey. Of these, I removed 103 respondents for taking too short or too long to complete the survey, or for providing unintelligible or irrelevant responses to open-ended questions.[72] In addition, I removed 1 respondent who selected the fictitious brand "Osgood" from any of three questions asking about HVAC brands and 1 respondent who selected more than 10 brands on any of the three questions asking about HVAC brands.[73] The remaining 1787 observations constituted the final Primary U.S. Representative Sample.

79.     Additional respondents were recruited in Georgia, Indiana and Missouri (the "Oversample") using the same screening criteria so as to obtain a total analyzable sample of at least 200 respondents (minimum of 50 in each of the four states).[74]

---

[71] See questions QS9, Q2e and Q2g in Appendix D.

[72] The fastest 1% of respondents of qualified respondents who completed the full survey (11 respondents) and the fastest 1% of respondents who skipped to the end of the survey after qualification survey (12 respondents) were removed from the Primary U.S. Representative Sample, which included survey completion times of 2 minutes and 2 seconds or less and 1 minute and 23 seconds or less, respectively. In addition, 18 respondents were removed from the Primary U.S. Representative Sample for taking more than 60 minutes to complete the survey.

[73] See questions QS9, Q2e and Q2g in Appendix D.

[74] The following additional respondents were recruited in the Oversample: 10 in Georgia, 18 in Indiana, and 9 in Missouri. No additional respondents were recruited in California because a sufficiently large sample was already achieved.

*Subject to Protective Order—Contains Highly Confidential Information*

## SECTION X: MAIN SURVEY QUESTIONS

80.   As discussed previously, all respondents who qualified for the survey (i.e., respondents who passed all screening criteria) followed one of two paths.

   a.   Those who qualified for the survey but who indicated in screening question QS11 that a professional was fully responsible for selection of the brand of central air conditioner or heat pump in their home, or who indicated that the system was already installed in their home,[75] were counted as complete[76] and skipped to the end of the survey.

   b.   Those who qualified for the survey but who indicated in screening question QS11 that they were fully or partially responsible for the selection of the brand of the central air conditioner or heat pump in their home, answered quality-control questions described previously (see Section VIII) and continued to the main survey questions, described below.

81.   All respondents who qualified for the survey by indicating they were fully or partially responsible for the selection of the brand of the central air conditioner or heat pump in their home, began the survey with instructions, "You will now be asked some questions about the [SYSTEM] that is installed in your home," where "[SYSTEM]" was replaced with the type of HVAC system ("central air conditioner" or

---

[75] See question QS11 in Appendix D.
[76] In the data file, their status was marked as "complete2" to distinguish from the status of other completes ("complete") who were fully or partially responsible for the purchase decision and therefore were asked the main survey questions relating to sources of information used in their purchase decision.

33

"heat pump"), installed in their home in the past five years, which qualified them to participate in the survey.

82. The first question in the survey asked respondents in an open-ended fashion how they selected the central air conditioner or heat pump in their home. By asking in an open-ended fashion, the survey allowed respondents to use their own words to provide an answer.

83. Specifically, respondents were asked, "How did you select the brand of the [SYSTEM] that is installed in your home?" (Q1) For this open-ended question, respondents were instructed, "(Please be as specific as possible. You are not limited by the size of the answer box.)"

84. Next, respondents were asked, "Did you consult any sources for information on any of the brands of [SYSTEM] before making your purchase?" (Q2). Respondents were required to answer "Yes," "No," or "Don't recall / Unsure." Respondents who answered "No" skipped to the end of the survey, while respondents who answered "Don't recall / Unsure" skipped to question Q2b, described further below. Respondents who answered affirmatively were asked a follow-up question, "What information sources did you consult on any of the brands before making your purchase?" (Q2a). For this open-ended question, respondents were encouraged, "(Please be as specific as possible. You are not limited by the size of the answer box.)"

85. In addition to the open-ended questions above, to be conservative, the survey also followed up with a series of closed- and open-ended questions to provide

*Subject to Protective Order—Contains Highly Confidential Information*

respondents every opportunity to recollect and report back all of the sources of information they consulted before purchase. At this point respondents who had answered affirmatively or "Don't recall / Unsure" to question Q2 were asked a closed-ended question (Q2b) about the information sources they consulted before making their purchase of central air conditioner or heat pump. By providing respondents with an explicit set of responses from which to choose, this question assists respondents in recollecting the variety of sources of information they consulted. According to Diamond, "The response alternatives in a closed-ended question may remind respondents of options that they would not otherwise consider or which simply do not come to mind as easily."[77] Specifically, respondents were asked, "You may have already said this, but which of the following information sources did you consult on any of the brands before making your purchase?" (Q2b) They were instructed to select all of the response options that apply from the following list:

- ❑ Visited a manufacturer's website (e.g., Carrier, Lennox, Goodman, etc.)
- ❑ Visited a contractor's or dealer's website
- ❑ Visited a retail store's website (e.g., Sears, Lowe's, Home Depot, etc.)
- ❑ Visited website containing consumer reviews of a product (e.g., a consumer review forum or blog)
- ❑ Reviewed a printed brochure
- ❑ Reviewed Consumer Reports magazines or similar magazines
- ❑ Reviewed social media (e.g., Instagram, Facebook, Twitter)
- ❑ Talked to friends, relatives or colleagues
- ❑ Talked with a contractor or dealer
- ❑ Talked with a retail store representative or salesperson at the store (e.g., at

---

[77] Diamond, Shari S., "Reference Guide on Survey Research" in Reference Manual on Scientific Evidence, Third Edition, Federal Judicial Center, 2011, p. 392.

*Subject to Protective Order—Contains Highly Confidential Information*

Sears, Lowe's, Home Depot, etc.)
- ❑ Called a manufacturer directly (e.g., Carrier, Lennox, Goodman, etc.)
- ❑ Other. Please specify:
- ❑ Don't recall/Unsure

86.     The order of response options was rotated such that related response options were

rotated together in blocks (e.g., website options were rotated together), while

"Other. Please specify:" and "Don't recall / Unsure" were always displayed last. (See

Appendix D for details.)

87.     Respondents who indicated in question Q2b that they reviewed a printed brochure

were asked a series of follow-up questions about the brochure (Q2c, Q2d, Q2e),

described next, and respondents who indicated that they visited a manufacturer's

website were asked a series of follow-up questions about the website (Q2f, Q2g),

described further below. Respondents who did not indicate in question Q2b that

they visited a manufacturer's website, nor that they reviewed a printed brochure,

skipped to the end of the survey.

88.     Respondents who indicated in question Q2b that they reviewed a printed brochure

were asked a series of additional questions, starting with the following: "Which

brochure(s) did you look at before making your purchase?" (Q2c) For this open-

ended question, respondents were encouraged, "(Please be as specific as possible.

You are not limited by the size of the answer box.)" Next, respondents were asked,

"You many have said this already, but which of the following best describes the

brochure(s) you looked at before making your purchase?" (Q2d) They were

instructed to select all of the response options that apply from the following list:

*Subject to Protective Order—Contains Highly Confidential Information*

       ❐  A brochure from a manufacturer (e.g., Carrier, Lennox, Goodman, etc.)

       ❐  A brochure from a contractor or dealer

       ❐  A brochure from a retailer (e.g., Sears, Lowe's, Home Depot, etc.)

       ❐  Other. Please specify:

       ❐  Don't recall/Unsure

89.    The order of response options was randomized, with "Other. Please specify:" and "Don't recall / Unsure" always displayed last.

90.    To ascertain which brand's brochures that respondents viewed, they were asked, "You may have said this already, but which of the following brand's brochures did you look at before making your purchase?" (Q2e) They were instructed to select all of the response options that apply from an alphabetical list of more than 50 brands of air conditioners and heat pumps, including all of the Carrier brands at issue (Carrier, Bryant, Payne as well as International Comfort Products' sub-brands: Arcoaire, Comfortmaker, Day & Night, Grandaire, Heil, KeepRite, Lincoln, and Tempstar). (See Appendix D.) Respondents were also given the options "Other. Please specify:" and "Don't recall / Unsure," which were always displayed last. As a further quality-control measure, described in Section VIII, the fake HVAC brand "Osgood" was included in the list of brands shown. All respondents who selected this response option were removed from the final data set.

91.    Finally, respondents who had indicated in question Q2b that they visited a manufacturer's website were asked a series of follow-up questions, starting with the following: "Which manufacturer's websites did you look at before making your purchase?" (Q2f) For this open-ended question, respondents were encouraged,

*Subject to Protective Order—Contains Highly Confidential Information*

"(Please be as specific as possible. You are not limited by the size of the answer box.)" Next, respondents were asked a closed-ended question, "You may have said this already, but which of the following manufacturer's websites did you look at before making your purchase?" (Q2g) They were instructed to select all of the response options that apply from an alphabetical list of more than 50 brands of air conditioners and heat pumps, including all of the Carrier brands at issue (Carrier, Bryant, Payne as well as International Comfort Products' sub-brands: Arcoaire, Comfortmaker, Day & Night, Grandaire, Heil, KeepRite, Lincoln, and Tempstar). (This is the same list of brands presented in question Q2e. See Appendix D.) Respondents were also given the options "Other. Please specify:" and "Don't recall / Unsure," which were always displayed last. As a further quality-control measure, described in Section VIII, the fictitious HVAC brand "Osgood" was included in the list of brands shown. All respondents who selected this response option were removed from the final data set. After answering this question, respondents completed the Survey.

## SECTION XI: ANALYSIS

92.     In the following sections, I present my findings and opinions based on the survey in the context of accepted understandings of consumer purchasing behavior. First, in Section XI(A) I analyze and opine on the key results from the survey. Then, in Section XI(B), I discuss those findings in the context of consumer purchasing decisions in the HVAC industry.

*Subject to Protective Order—Contains Highly Confidential Information*

## SECTION XI(A): CONSIDERATION OF INFORMATION FROM THE MANUFACTURER

93.     In this section, I summarize the key findings of the survey to determine empirically the proportion of relevant owners of an HVAC system who considered a manufacturer's printed brochure or website, and/or spoke to a manufacturer directly before purchasing or acquiring their unit.

94.     Below I present the results of the Primary U.S. Representative Sample. Then I present the results for the sub-sample who reported owning a Carrier unit, followed by the results for relevant owners in the putative subclass states of California, Georgia, Indiana and Missouri (collectively, the "Sub-class States"). The Primary U.S. Representative Sample included owners of all brands[78] of central air conditioners and heat pumps installed in the last five years. Analysis below shows that the owners of Carrier brands at issue did not differ meaningfully from owners of all other brands[79]; therefore it was appropriate to combine these two groups when presenting results below.

### Combined Results for the Primary U.S. Representative Sample

95.     As described previously, the Primary U.S. Representative Sample consists of four types of respondents, based on their role in the selection of the central air conditioner or heat pump in their home, as determined by survey screener question

---

[78] Including those who answered "Don't recall/Unsure" in question QS9.
[79] Including those who answered "Don't recall/Unsure" in question QS9.

*Subject to Protective Order—Contains Highly Confidential Information*

QS11. The frequency distribution of these four types of respondents is presented below in Table 1.[80]

**Table 1**: Role in Selection of Air Conditioner or Heat Pump (Closed-Ended)
*(Combined Results for All Respondents in the Primary U.S. Representative Sample)*

| QS11. "Which of the following best describes your role in the selection of the brand of the [SYSTEM] in your home? *(Select one only)*" | # | *% of Total (n=1787)* |
|---|---|---|
| I was fully responsible for the selection of the brand of the [SYSTEM] in my home | 539 | 30.2% |
| I was partially responsible for the selection of the brand of the [SYSTEM] in my home | 296 | 16.6% |
| A professional (e.g., a contractor, repair person, dealer, or salesperson) was fully responsible for the selection of the brand of the [SYSTEM] in my home | 584 | 32.7% |
| I did not select the brand of the [SYSTEM] because the [SYSTEM] was already installed when I moved into my home | 368 | 20.6% |
| **Total** | **1787** | **100%**[81] |

96.    Table 1 reveals that more than half of respondents (53.3%) in the Primary U.S. Representative Sample did not select the brand of relevant system in their home, either because they chose to have a professional select one for them, or because they acquired a system in connection with a purchase of a home. Thus, for more than half of respondents, any statements (and therefore any omissions) by the

---

[80] Unless otherwise specified, all results are based on qualified, completed survey responses, excluding those removed for quality-control purposes. (See Section VII.) Results (including Table 1) exclude all respondents who did not qualify for the survey, such as those who indicated in screener question QS11 that a friend or someone else in their household was fully responsible for the selection of the brand of the relevant system in their home.

[81] Throughout this report, column totals in some tables may not add to 100% due to rounding.

*Subject to Protective Order—Contains Highly Confidential Information*

manufacturer played no role in their purchase process because someone else selected the brand that was acquired.

97.    Those consumers in the Primary U.S. Representative Sample who said they were fully or partially responsible for selecting the brand were asked a closed-ended filter question (Q2) to determine whether or not they consulted any sources for information on any of the brands of relevant system before making their purchase. The results are shown in Table 2 below.

**Table 2: Information Sources Consulted before Purchase**
*(Combined Results for All Respondents in the Primary U.S. Representative Sample)*

| Q2. *"Did you consult any sources for information on any of the brands of [SYSTEM] before making your purchase? (Select one only)"* | # | % of Total (n=1787) |
|---|---|---|
| Yes | 516 | 28.9% |
| No | 267 | 14.9% |
| Don't recall/Unsure | 52 | 2.9% |
| A professional (e.g., a contractor, repair person, dealer, or salesperson) was fully responsible for the selection of the brand | 584 | 32.7% |
| I did not select the brand of the [SYSTEM] because the [SYSTEM] was already installed when I moved into my home | 368 | 20.6% |
| **Total** | **1787** | **100%** |

98.    Table 2 shows that an additional 14.9% of the Primary U.S. Representative Sample did not consult <u>any</u> sources for information before making the purchase, and therefore were not exposed to any statements directly from a manufacturer. When combined with the 53.3% of respondents above who either entrusted the selection of an HVAC brand to a dealer or who acquired an HVAC system in connection with the purchase of a home, it is my opinion that for a clear majority of respondents

41

*Subject to Protective Order—Contains Highly Confidential Information*

(68.2%), any statements (and therefore omissions) made by a manufacturer played no role at all in their acquisition of the HVAC system.

99.   Those consumers in the Primary U.S. Representative Sample who said they were fully or partially responsible for selecting the brand, and who either said they had consulted sources for information on any of the brands of air conditioner or heat pump, or did not recall if they consulted sources for information, were subsequently asked about the specific information sources they consulted before making their purchase of central air conditioner or heat pump.

100.  Below I present the findings for each of the methods of consulting information sources relevant to this matter—reviewing a print brochure, visiting a website, calling a manufacturer directly—and then I aggregate the results to present the total proportion of the Primary U.S. Representative Sample who would have been exposed to and considered statements directly from the manufacturer.

**Information Source Directly from a Manufacturer: Reviewing a Print Brochure**

101.  Table 3a below reveals that, despite the repeated opportunity to list the sources of information that were considered, only 6.5% of the total sample reported reviewing a print brochure before making the purchase. These results show that an extremely small subset of consumers review any printed brochures at all. Based on this data, it is my opinion that the vast majority of those who acquire an HVAC system—more than 90% —could not have considered any statements or omissions made in a manufacturer's printed brochure.

*Subject to Protective Order—Contains Highly Confidential Information*

**Table 3a: Information Sources Consulted before Purchase: Reviewed a Print Brochure**
***(Combined Results for All Respondents in the Primary U.S. Representative Sample)***

| Key Sources of Information Consulted before Purchase: Print brochure NET Q1/Q2a/Q2b[82] | # | % of Total (n=1787) |
|---|---|---|
| Reviewed a printed brochure | 117 | 6.5% |
| Did NOT review a printed brochure | 718 | 40.2% |
| A professional (e.g., a contractor, repair person, dealer, or salesperson) was fully responsible for the selection of the brand | 584 | 32.7% |
| I did not select the brand of the [SYSTEM] because the [SYSTEM] was already installed when I moved into my home | 368 | 20.6% |
| **Total** | **1787** | **100%** |

102.    I note that my analysis is conservative and thus these results likely overstate the number of people who reviewed a printed manufacturer brochure. In particular, my survey question did not distinguish between the types of brochures. Manufacturers are not the only entities that provide written brochures. Consumers may have obtained brochures from a dealer or a retailer, for example. For purposes of this survey question, I did not distinguish between the types of brochures. Likewise, my coding of open-ended questions Q1 and Q2a was conservative, counting as printed brochures such responses as the following:

- "Online local installers, mailers" (ID 4494)
- "…PAMPHLETS AND OTHER DOCUMENTS …" (ID 8537)
- "…. checking out flyers mailed to me" (ID 2473)

---

[82] Throughout this report, "NET" refers to the aggregate results across multiple questions or multiple response options. Here "NET" specifically refers to the aggregate results of survey questions Q1, Q2a and Q2b.

*Subject to Protective Order—Contains Highly Confidential Information*

103.    The data that I gathered regarding consumer exposure to printed brochures are also consistent with Carrier's own internal survey data. It is my understanding that Carrier partners with a company called KeyStat to collect information on consumer purchase behavior.[83] A screening survey, which asked about consumer purchases in more than 120 product categories, was emailed to 500,000 households. Consumers who had purchased an HVAC system within the past 12 months were eligible to complete the full survey. More than 6,000 respondents annually completed the full survey.[84] The survey focused on reasons for purchase, dealer selection, brand selection, sources of information, equipment purchase, equipment installation, and post-purchase behavior.[85]

104.    Carrier's survey asked respondents[86] which sources of information they considered in making their HVAC purchase decision.[87] Carrier found that ▉ of respondents reviewed printed materials before purchasing a new HVAC system.[88] In addition, Carrier data specific to those who purchased a Carrier, Bryant, or Payne brand unit showed that somewhere between ▉ and ▉ of respondents reported having reviewed printed materials.[89]

---

[83] P. Hoppel Dep. Tr. at 141:13-23.
[84] CARRIER_0033952.
[85] CARRIER_0033952.
[86] The Carrier survey sample was limited to purchasers of relevant HVAC systems and did not include those who acquired the systems through residential new construction or through purchase of their home.
[87] CARRIER_0043887  (Question 16a: "While you were shopping, please tell us where you got information on heating and cooling systems.").
[88] CARRIER_0033952.
[89] CARRIER_0033883.

*Subject to Protective Order—Contains Highly Confidential Information*

105.   The named plaintiffs' deposition testimony in this case further demonstrates that printed materials play no role in the purchasing decisions of many consumers. Plaintiff Linda Lamm testified that she did not review any Bryant brochures or hard copy documents prior to purchasing her Bryant air conditioner.[90] Plaintiff Norman Klinge also testified that he had not reviewed brochures or other hard copy documents when deciding to purchase his ICP air conditioner.[91] Only one named plaintiff, Steve Oddo, could identify any specific pieces of information that he learned from the printed brochure he reviewed.[92]

106.   Next, I present the results of my analysis to determine the proportion of respondents who were exposed to and therefore could have considered statements or omissions directly from the HVAC manufacturer through visiting a website.

**Information Source Directly from a Manufacturer: Visiting a Website**

107.   Table 3b below shows that only 16.5% of the total sample reported reviewing a manufacturer's website before making the purchase. Even if we conservatively include those who indicated that they visited a contractor's or dealer's website, only 18.8% of respondents visited a website prior to purchase. These results show that a small subset of consumers were exposed to any statements or omissions on the manufacturer's website. Based on this data, it is my opinion that the vast majority of

---

[90] L. Lamm Dep. Tr. at 58:24-59.
[91] N. Klinge Dep. Tr. at 57:14-18.
[92] L. Lamm Dep. Tr. at 40:5-41:6; D. Gallagher Dep. Tr. at 47:22-48:3; S. Oddo Dep. Tr. at 66:17-68:18; N. Klinge Dep. Tr. at 64:22-65:1.

*Subject to Protective Order—Contains Highly Confidential Information*

those who acquire an HVAC system—more than 80%—could not have even

considered any statements or omissions on a manufacturer's website.

**Table 3b**: Information Sources Consulted before Purchase: <u>Visited a Website</u>
*(Combined Results for All Respondents in the Primary U.S. Representative Sample)*

| Key Sources of Information Consulted before Purchase: Visited a Website NET Q1/Q2a/Q2b | # | % of Total (n=1787) |
|---|---|---|
| Visited a manufacturer's website  (e.g., Carrier, Lennox, Goodman, etc.) | 294 | 16.5% |
| Visited a contractor's or dealer's website | 126 | 7.1% |
| NET of above (manufacturer's website, or a contractor's or dealer's website)[93] | 336 | 18.8% |
| Did NOT visit a manufacturer's website, or a contractor's or dealer's website | 499 | 27.9% |
| A professional (e.g., a contractor, repair person, dealer, or salesperson) was fully responsible for the selection of the brand | 584 | 32.7% |
| I did not select the brand of the [SYSTEM] because the [SYSTEM] was already installed when I moved into my home | 368 | 20.6% |
| **Total** | **1787** | **100.0%** |

108.     These numbers are conservative in a number of ways. First, as discussed above, my

net calculation includes those who reported visiting a dealer or contractor's website.

Dealers and contractors are independent from the manufacturer. Likewise, my

coding of open-ended questions Q1 and Q2a was conservative, counting as a

relevant website such responses as the following:

- "Product websites" (ID 9061)
- "online sites of competition and companies selling and installing the whole thing" (ID 5694)

---

[93] If I conservatively include "Visited a retail store's website (e.g., Sears, Lowe's, Home Depot, etc.)" in the aggregate analysis, I find that 20.5% of respondents in the Primary U.S. Representative Sample visited a manufacturer's website or contractor's or dealer's website prior to purchase.

*Subject to Protective Order—Contains Highly Confidential Information*

109.   In addition, the numbers are conservative because simply visiting a website does not mean that the individual paused to actually consider at any length the vast amount of information contained on the website. For example, Plaintiff Norman Klinge could not recall which manufacturer websites he visited, including whether he visited a Carrier website at all.[94] Plaintiff Linda Lamm visited the Bryant website, but "only briefly."[95] As each plaintiff admitted in their Interrogatory Responses, they considered numerous factors in their decision to purchase a new HVAC system.[96] Several named plaintiffs confirmed that no single factor was determinative in their decision to purchase their new HVAC systems.[97]

110.   Carrier's surveys conducted in the ordinary course of business are consistent with this conclusion. Carrier's survey asked respondents if they searched for information on the Internet before purchasing their HVAC system.[98] Carrier found that approximately ■■■ of those who purchased an HVAC system themselves—i.e., did not acquire an HVAC system in connection with the purchase of a home—consulted the Internet in any capacity, let alone reviewed a manufacturer's website.[99]

111.   Next, I present the results of my analysis to determine the proportion of respondents who were exposed to and therefore could have considered  any

---

[94] N. Klinge Dep. Tr. at 58:9-20.
[95] L. Lamm Dep. Tr. at 57:18-22.
[96] Pl. Steve Oddo's Obj. and Resp. to Defs. First Interrog. No. 11; Pl. Norman Klinge's Obj. and Resp. to Defs. First Interrog. No. 11; Linda Lamm's Obj. and Corrected Resp. to Defs. First Interrog. No. 11; Dan Gallagher's Obj. and Corrected Resp. to Defs. First Interrog. No. 11.
[97] D. Gallagher Dep. Tr. at 75:13-14; N. Klinge Dep. Tr. at 76:25-77:4; L. Lamm Dep. Tr. at 81:14-17.
[98] CARRIER_0043887 (Question 15d).
[99] CARRIER_0033952.

*Subject to Protective Order—Contains Highly Confidential Information*

statements or omissions by the HVAC manufacturer through calling a manufacturer

directly.


**Information Source Directly from a Manufacturer: Calling a Manufacturer Directly**

112.    Table 3c below shows that only 1.9% of the total sample reported calling a

manufacturer directly before making the purchase. Based on this data, it is my

opinion that nearly all consumers who acquire an HVAC system—98%—could not

have considered any statements made (or not made) by a manufacturer directly to a

consumer on a telephone call.

**Table 3c: Information Sources Consulted before Purchase:**
**Called A Manufacturer Directly**
*(Combined Results for All Respondents in the Primary U.S. Representative Sample)*

| Key Sources of Information Consulted before Purchase: Called A Manufacturer Directly NET Q1/Q2a/Q2b | # | % of Total (n=1787) |
|---|---|---|
| Called a manufacturer directly (e.g., Carrier, Lennox, Goodman, etc.) | 34 | 1.9% |
| Did NOT call a manufacturer directly (e.g., Carrier, Lennox, Goodman, etc.) | 801 | 44.8% |
| A professional (e.g., a contractor, repair person, dealer, or salesperson) was fully responsible for the selection of the brand | 584 | 32.7% |
| I did not select the brand of the [SYSTEM] because the [SYSTEM] was already installed when I moved into my home | 368 | 20.6% |
| **Total** | **1787** | **100.0%** |

113.    Next, I present the results of my analysis to determine the overall proportion of

respondents who were exposed to and could have considered any of the various

sources of statements or omissions directly from the HVAC manufacturer.

*Subject to Protective Order—Contains Highly Confidential Information*

**Information Sources Directly from a Manufacturer**

114.  The next table summarizes the results across the Primary U.S. Representative

Sample of the various sources of information directly from a manufacturer.

**Table 3d: Information Sources Consulted before Purchase:**
**NET Sources of Information Consulted: Print Brochure, Websites, Called Manufacturer**
**(Retail website NOT included)**
*(Combined Results for All Respondents in the Primary U.S. Representative Sample)*

| Key Sources of Information Consulted before Purchase: NET of Sources Consulted NET Q1/Q2a/Q2b | # | % of Total (n=1787) |
|---|---|---|
| Visited a manufacturer's website  (e.g., Carrier, Lennox, Goodman, etc.) | 294 | 16.5% |
| Visited a contractor's or dealer's website | 126 | 7.1% |
| Reviewed a printed brochure | 117 | 6.5% |
| Called a manufacturer directly (e.g., Carrier, Lennox, Goodman, etc.) | 34 | 1.9% |
| NET of above (review a printed brochure, visit a manufacturer's website, a contractor's or dealer's website, or call a manufacturer directly)[100] | 379 | 21.2% |
| Did NOT review a printed brochure, visit a manufacturer's website, a contractor's or dealer's website or call a manufacturer directly | 456 | 25.5% |
| A professional (e.g., a contractor, repair person, dealer, or salesperson) was fully responsible for the selection of the brand | 584 | 32.7% |
| I did not select the brand of the [SYSTEM] because the [SYSTEM] was already installed when I moved into my home | 368 | 20.6% |
| **Total** | **1787** | **100.0%** |

---

[100] If I conservatively include "Visited a retail store's website (e.g., Sears, Lowe's, Home Depot, etc.)" in the aggregate analysis, I find that 22.3% of respondents in the Primary U.S. Representative Sample consulted a print brochure, visited a manufacturer's website, contractor's or dealer's website or called a manufacturer directly prior to purchase.

*Subject to Protective Order—Contains Highly Confidential Information*

115.   Thus only a minority of respondents in the Primary U.S. Representative Sample could
have even *considered* statements or omissions from the manufacturer before
purchasing or acquiring their unit. The clear majority of respondents did not
consider such statements. As discussed above, these results correspond to the
results that Carrier observed with its internal survey.

116.   While the analysis above provides a valid summary of the sources of manufacturer
statements that consumers report reviewing before purchasing their air conditioner
or heat pump, it is highly conservative for the reasons discussed above.

### Comparison of Results for Carrier Owners vs All Other Owners in the Primary U.S. Representative Sample (Carrier brands at issue vs all other brands)

117.   Owners of Carrier brands at issue did not differ meaningfully from owners of all
other brands[101] in terms of the key behaviors measured in the survey. As a result, it
was appropriate to combine these two groups when presenting results above.

118.   Of the 1787 respondents who comprised the Primary U.S. Representative Sample,
388 identified as owners of Carrier brands at issue, while the remaining 1399
respondents identified as owners of other brands of air conditioners or heat pumps,
or could not recall their brand.[102]

119.   Table 4 below shows the results for the responses to key questions across those who
reported purchasing a Carrier brand unit at issue and those who either reported
purchasing other brands or could not recall their brand.

---

[101] Including those who answered "Don't recall/Unsure" in question QS9.
[102] Based on screener question QS9.

*Subject to Protective Order—Contains Highly Confidential Information*

**Table 4**: Information Sources Consulted before Purchase:
**NET Sources of Information Consulted: Print Brochure, Websites, Called Manufacturer**
*(Combined Results for Carrier Owners vs.*
*All Others in the Primary U.S. Representative Sample)*

| Key Sources of Information Consulted before Purchase: NET of Sources Consulted NET Q1/Q2a/Q2b | # | % of Carrier Owners (n=388) | # | % of All Others (n=1399) | # | % of Total (n=1787) |
|---|---|---|---|---|---|---|
| Visited a manufacturer's website  (e.g., Carrier, Lennox, Goodman, etc.) | 78 | 20.1% | 216 | 15.4% | 294 | 16.5% |
| Visited a contractor's or dealer's website | 32 | 8.2% | 94 | 6.7% | 126 | 7.1% |
| Reviewed a printed brochure | 31 | 8.0% | 86 | 6.1% | 117 | 6.5% |
| Called a manufacturer directly (e.g., Carrier, Lennox, Goodman, etc.) | 5 | 1.3% | 29 | 2.1% | 34 | 1.9% |
| NET of above (review a printed brochure, visit a manufacturer's website, a contractor's or dealer's website, or call a manufacturer directly)[103] | 95 | 24.5% | 284 | 20.3% | 379 | 21.2% |
| Did NOT review a printed brochure, visit a manufacturer's website, a contractor's or dealer's website, or call a manufacturer directly | 110 | 28.4% | 346 | 24.7% | 456 | 25.5% |
| A professional (e.g., a contractor, repair person, dealer, or salesperson) was fully responsible for the selection of the brand | 124 | 32.0% | 460 | 32.9% | 584 | 32.7% |
| I did not select the brand of the [SYSTEM] because the [SYSTEM] was already installed when I moved into my home | 59 | 15.2% | 309 | 22.1% | 368 | 20.6% |
| **Total** | **388** | **100.0%** | **1399** | **100.0%** | **1787** | **100.0%** |

---

[103] If I conservatively include "Visited a retail store's website (e.g., Sears, Lowe's, Home Depot, etc.)" in the aggregate analysis, I find that 24.7% of Carrier Owners in the Primary U.S. Representative Sample consulted a print brochure, visited a manufacturer's website, contractor's or dealer's website, or called a manufacturer directly prior to purchase, as compared with 22.3% of respondents in in the Primary U.S. Representative Sample.

*Subject to Protective Order—Contains Highly Confidential Information*

120.    In the next section I show that the key sources of information in the HVAC selection decision that were measured in the survey did not differ meaningfully for respondents in Sub-class States as compared with respondents in the Primary U.S. Representative Sample.

### Comparison of Results for Sub-class States vs Primary U.S. Representative Sample

121.    As discussed previously, additional respondents were recruited in California, Georgia, Indiana and Missouri (the Oversample in the Sub-class States), using the same screening criteria as the Primary U.S. Representative Sample, so as to obtain a total analyzable sample of at least 200 respondents (minimum of 50 in each of the four states). Table 5 below shows the results for the key survey questions for the Sub-class States. The key sources of information in the HVAC selection decision measured in the survey did not differ meaningfully for respondents in Sub-class States as compared with respondents in the Primary U.S. Representative Sample.

*Subject to Protective Order—Contains Highly Confidential Information*

**Table 5: COMPARISON OF SUB-CLASS STATES VS PRIMARY U.S. REPRESENTATIVE SAMPLE:**

**NET Sources of Information Consulted: Print Brochure, Websites, Called Manufacturer**

*(Results for All Respondents in the Sub-class States vs All Respondents in the Primary U.S. Representative Sample)*

| Key Sources of Information Consulted before Purchase: NET of Sources Consulted NET Q1/Q2a/Q2b | # | % of Residents of Sub-class States (n=294) | # | % of Primary U.S. Rep. Sample (n=1787) |
|---|---|---|---|---|
| Visited a manufacturer's website  (e.g., Carrier, Lennox, Goodman, etc.) | 46 | 15.6% | 294 | 16.5% |
| Visited a contractor's or dealer's website | 26 | 8.8% | 126 | 7.1% |
| Visited a retail store's website (e.g., Sears, Lowe's, Home Depot, etc.) | | | | |
| Reviewed a printed brochure | 21 | 7.1% | 117 | 6.5% |
| Called a manufacturer directly (e.g., Carrier, Lennox, Goodman, etc.) | 11 | 3.7% | 34 | 1.9% |
| NET of above (review a printed brochure, visit a manufacturer's website, a contractor's or dealer's website, or call a manufacturer directly)[104] | 64 | 21.8% | 379 | 21.2% |
| Did NOT review a printed brochure, visit a manufacturer's website, a contractor's or dealer's website, or call a manufacturer directly | 85 | 28.9% | 456 | 25.5% |
| A professional (e.g., a contractor, repair person, dealer, or salesperson) was fully responsible for the selection of the brand | 100 | 34.0% | 584 | 32.7% |
| I did not select the brand of the [SYSTEM] because the [SYSTEM] was already installed when I moved into my home | 45 | 15.3% | 368 | 20.6% |
| **Total** | **294** | **100.0%** | **1787** | **100.0%** |

---

[104] If I conservatively include "Visited a retail store's website (e.g., Sears, Lowe's, Home Depot, etc.)" in the aggregate analysis, I find that 23.5% of respondents in Sub-class States consulted a print brochure, visited a website, or called a manufacturer directly prior to purchase, as compared with 22.3% of respondents in in the Primary U.S. Representative Sample.

*Subject to Protective Order—Contains Highly Confidential Information*

122. In sum, whether looking at the US population, the population of Carrier purchasers, or the population in the Sub-class States, it is my opinion with a high degree of scientific certainty based on my survey that only a small minority of those who acquire an HVAC system would have even considered any information provided directly from the manufacturer when making their decision to purchase an HVAC system. Given the data, individual inquiry would be necessary to determine whether class members even *could* have reviewed any statement from Carrier such that they would have been impacted by any omission.

### SECTION XI(B): IMPACT OF INFORMATION FROM THE MANUFACTURER

123. Setting aside the need for individualized analysis just to determine which class members would have been exposed to any information from the manufacturer, individual analysis would also be necessary to determine whether any information about the alleged defect would have had an impact on purchasing, what the impact would be, and the extent of any such impact. A consumer's decision to purchase an HVAC system at a certain price depends upon a variety of factors.

124. It is important to first understand the basic process for how consumers gather and process information, evaluate product options, and ultimately make a purchase when buying an HVAC system. Figure 1 sets forth the stages that a consumer may go through in making a choice of systems.[105] In my evaluation of consumer purchase

---

[105] Keller, Kevin L. and Philip Kotler, *Marketing Management, 14th Edition*. Prentice Hall, 2012 p. 166.

*Subject to Protective Order—Contains Highly Confidential Information*

drivers, I focus on the "information search," "evaluation of alternatives," and "purchase decision" stages below:

**Figure 1: Five-Stage Model of Consumer Buying Process**



125.   In the first stage, problem recognition, a consumer "recognizes a problem or need,"[106] such as the need to buy an HVAC system. According to information collected by Carrier, the primary reason for purchasing a new HVAC product is to replace the consumer's broken/non-working unit.[107]

---

[106] Keller, Kevin L. and Philip Kotler, *Marketing Management, 14th Edition*. Prentice Hall, 2012 p. 167.
[107] CARRIER_0033952.

*Subject to Protective Order—Contains Highly Confidential Information*

126.    In the second and third stages, a consumer may search for information from the packaging, online, or from other sources. As the data I collected and the data that Carrier collected show, consumers consult a wide variety of information sources when making their purchase decision.

127.    After reviewing the various information and evaluating the alternatives, consumers then proceed to the fourth stage, the purchase decision stage, in which consumers use a variety of rules to make a selection. When faced with alternatives that differ on numerous features, it is well known from theories of bounded rationality that consumers decide which product to purchase based on the most significant factors (e.g., cost, SEER rating, unit features). To choose among HVAC systems that differ on numerous dimensions, different consumers follow a highly individual process and would assign different weights to different factors that were significant to the person. Individualized analysis is required to understand to what extent, if any, any information contained in a disclosure would impact the class members' purchase decision. This is one of the fundamental findings in the choice literature.[108] Of course, my survey shows that the impact of any disclosure to the end consumer would be zero for the vast majority, as they did not even consider and therefore could not have relied upon any information that was provided directly from the manufacturer.

---

[108] *See, generally,* Keller, Kevin L. and Philip Kotler, *Marketing Management, 14th Edition*. Prentice Hall, 2012 pp. 168-171.

*Subject to Protective Order—Contains Highly Confidential Information*

128.   Moreover, when it comes to evaluating consumer purchasing decisions, an important consideration is that HVAC systems are complicated, complex pieces of equipment, and many residential consumers are likely to lack the technical knowledge and expertise to understand and evaluate those systems.[109] Often, for HVAC systems, an expert (usually the dealer) has assessed the consumer's needs and selected a HVAC system for the customer.[110]  These dealers play a significant role in customers' selection of HVAC systems for their homes due to the information asymmetry that exists between dealers and consumers.[111] Dealers, however, have minimal influence on HVAC purchases for commercial customers, as their selection is driven by technical needs for a particular building.[112] Thus for these types of goods, the consumer places a significant amount of reliance on the expert.

129.   This critical role of a dealer or another professional is apparent from the survey I performed and the survey data I reviewed from Carrier. Based on my survey and Carrier's survey, consumers frequently rely on HVAC dealers or contractors when deciding to purchase an HVAC system.

130.   The survey I performed shows that 32.7% of the survey population relied completely on their dealer or other professional to select the brand of their HVAC system.[113] In addition, accounting for those who played a role in the selection of their HVAC system, nearly one-third of respondents (31.7% of the total sample) reported that

---

[109] Bonneville Power Administration HVAC Market Actor Interviews 2018 at 18.
[110] Bonneville Power Administration HVAC Market Actor Interviews 2018 at 18.
[111] Bonneville Power Administration HVAC Market Actor Interviews 2018 at 18.
[112] Bonneville Power Administration HVAC Market Actor Interviews 2018 at 18.
[113] See Table 1 in Section XI(A).

*Subject to Protective Order—Contains Highly Confidential Information*

they consulted with a dealer or other professional in connection with their purchase of an HVAC system.[114]

131.    Carrier's internal survey data also reflect that consumers rely to a significant degree on the statements from their HVAC contractor or dealer when making a decision to purchase an HVAC system.

132.    Carrier's internal survey results show that the primary information source for consumers purchasing an HVAC system is their dealer or contractor.[115] Fully ██ of consumers stated that their primary information source was a dealer or contractor.[116] Not only do consumers primarily rely on their dealer or contractor, ██ stated that their dealer's expertise is "very important" in their decision-making process.[117]

133.    Dealers often recommend specific brands and models of HVAC systems and consumers are likely to rely on their dealer's recommendation. Almost ███████ ██ of consumers select an HVAC brand because their dealer recommended the brand. KeyStat's analysis of Carrier's survey noted that this trend has held constant over the past ten years.[118]

---

[114] Specifically, 31.7% of respondents met one or both of the following conditions:
(a) they were coded as reporting in open-ended questions Q1 or Q2a that they received a recommendation from / consulted with a contractor, installer or dealer (i.e., a professional) (see codebook in Appendix F) OR
(b) they indicated in closed-ended question Q2b that they talked with a contractor/dealer.
[115] CARRIER_0033922; CARRIER_0033936.
[116] CARRIER_0033952.
[117] CARRIER_0033952.
[118] CARRIER_0033952.

*Subject to Protective Order—Contains Highly Confidential Information*

134.    Moreover, once a consumer has a positive experience with a dealer, a consumer is more likely to rely on a dealer to recommend a brand.[119] Consumers often select dealers based on previous experience. ███████████ of the survey respondents purchased their new HVAC system from a dealer they had previously purchased from. Additionally, ███████████ of respondents ███████ purchased from a dealer they previously used for service or repair.[120]

135.    Two of the named plaintiffs in this case testified that they relied on dealers and their recommendations when buying new air conditioning systems. Plaintiff Gallagher testified that he trusted the recommendation of the dealer he ultimately purchased from and that "they would not provide a quote of an option that they would not recommend."[121] Plaintiff Gallagher ultimately purchased one of the models his dealer had recommended.[122] He selected his dealer, Heat & Cool LLC, because they made "recommendations to [him] as if it were their own that they were working with" and provided reliable recommendations.[123] Plaintiff Linda Lamm also purchased a Bryant model that her dealer, Wade Heating & Air Conditioning, recommended.[124] She selected Wade Heating & Air Conditioning because she trusted them and "felt like they did a good job" repairing prior issues with her HVAC system.[125] The other two named plaintiffs—Mr. Oddo and Mr. Klinge—purchased

---

[119] CARRIER_0033952.
[120] CARRIER_0033952.
[121] D. Gallagher Dep. Tr. at 41:11-18.
[122] D. Gallagher Dep. Tr. at 58:17-20.
[123] D. Gallagher Dep. Tr. at 68:3-16.
[124] L. Lamm Dep. Tr. at 42:16-43:16.
[125] L. Lamm Dep. Tr. at 75:25-77:1.

*Subject to Protective Order—Contains Highly Confidential Information*

their HVAC system directly from a distributor given their business connections with HVAC products, which I understand is highly unusual.[126]

136.   The significant role that a professional like a dealer plays in the HVAC purchasing decision is especially notable here because Carrier made available to dealers the service bulletins regarding the product issue that plaintiffs claim Carrier failed to disclose. Because of the important role that a dealer plays in the HVAC purchasing process and the information that was provided to dealers, individual inquiry would be required to determine what the impact would be, if any, of any proposed disclosure.

## CONCLUSION

137.   The survey results and the record in the case show that exposure to and consideration of product information from an HVAC manufacturer is highly variable across consumers. The results of my survey and the results from Carrier show that a significant majority of consumers do not consider information directly from the manufacturer at all before making a purchasing decision. Instead, the relationship between the dealers (who are unaffiliated with the manufacturer) and the consumers plays an important role, and consumers rely to a significant degree on their dealers' recommendations. Thus individual inquiry would be necessary to determine which consumers consulted information directly produced by the

---

[126] Pl. Steve Oddo's Obj, and Resp. to Defs'. First Interrog. No. 1; Pl. Norman Klinge's Obj. and Resp. to Defs'. First Interrog. No. 1.

*Subject to Protective Order—Contains Highly Confidential Information*

manufacturer in making their purchasing decision, i.e., which consumers did not rely

solely on a professional, did not acquire an HVAC system in connection with a home

purchase, and were exposed to a manufacturer's printed brochure or website,

and/or spoke to a manufacturer directly. Moreover, given the variation in consumer

priorities and preferences, for the small subset of individuals who may have

reviewed information directly from a manufacturer, individual inquiry would be

necessary to determine whether and to what degree any disclosure would have

affected their purchasing behavior.

I declare under penalty of perjury of the laws of the United States of America that the

foregoing is true and correct, and that this declaration was executed pursuant to 28

U.S.C. § 1746 on April 12, 2018 in New Haven, Connecticut.

_____

Ravi Dhar

61

*Subject to Protective Order—Contains Highly Confidential Information*

**LIST OF APPENDICES**

Appendix A  – Ravi Dhar's CV

Appendix B  – Ravi Dhar's Case Deposition and Testimony

Appendix C  – Materials Reviewed

Appendix D  – Survey Questionnaire

Appendix E  – Survey Screenshots

Appendix F  – Survey Codebook

Appendix G  – Survey Invitation

Appendix H  – Demographic Comparison:

                Primary U.S. Representative Sample vs U.S. Census

Appendix I  – Survey Frequency Tables

Appendix J  – Survey Data Glossary

Appendix K  – Survey Data Listing

Appendix A – Ravi Dhar's Curriculum Vitae (CV)

**March 2018**

**RAVI DHAR**

Yale School of Management

165 Whitney Avenue

Yale University

New Haven, CT 06520

(203) 432-5947

---

## Employment

| | |
|---|---|
| **George Rogers Clark Professor of Management** | **2005 - Present** |
| **Professor of Psychology (*joint appointment*)** | **2003 – Present** |
| **Director, Yale Center for Customer Insights** | **2004 – Present** |
| **Professor of Marketing,** | **2000 – Present** |
| Associate Professor of Marketing, | 1997 - 2000 |
| Assistant Professor of Marketing | 1992 - 1997 |
| Yale School of Management | |

## Other Appointments

| | |
|---|---|
| Visiting Faculty, HEC Paris | Summer 1996 |
| Visiting Associate Professor, Stanford University | Spring 1998 |
| Visiting Professor, Erasmus University | Summer 2000, 2001 |
| Visiting Professor, New York University | Spring 2005, Spring 2010 |

## Education

| | |
|---|---|
| **Haas School of Business, UC Berkeley** | **1988-1992** |
| Ph. D. (Business Administration) | 1992 |
| M.S. (Business Administration) | 1990 |
| **Indian Institute of Management** | **1987** |
| M.B.A. | |
| **Indian Institute of Technology** | **1985** |
| B.Technology | |

## Academic Honors and Fellowships

Distinguished Alumnus Award, Indian Institute of Management, 2013

Distinguished Scientific Contribution Award, SCP, 2012

Yale SOM Alumni Association Teaching Award, 2012

Finalist O'Dell Award 2012

Finalist, O'Dell Award, 2008

Winner, O'Dell Award 2005

Finalist, O'Dell Award, 2004

Finalist, Paul Green Award, 2004

AMA Consortium Faculty Fellow, 2003- 2009, 2010, 2012, 2013

INFORMS Doctoral Consortium Faculty – Multiple Years

ACR Doctoral Consortium Faculty – Multiple Years

John A. Howard Doctoral Dissertation Award (Honorable Mention), 1993
AMA Doctoral Consortium Fellow, 1991


**Research Interests**

Consumer Behavior                                Marketing Strategy
Judgment and Decision Making  Branding
E-Commerce                                       Behavioral Finance

**Teaching Interests**

Marketing Management                             Consumer Behavior
Marketing Strategy                               Behavioral Decision Theory
Financial Services                               E-Commerce Marketing

**Professional Affiliation (Member)**

American Marketing Association
Association for Consumer Research
Society of Judgment and Decision Making

**Professional Activities**

Editorial Board, *Journal of Consumer Research, 1997 – Present, <u>Past Associate Editor</u>*
                    *Journal of Consumer Psychology, 1997 – 2002, 2005 - Present*
                    *Journal of Marketing Research, 2001 – Present, <u>Associate Editor</u>*
                    *Journal of Marketing, 2005 – Present*
                    *Marketing Letters, 2000 – Present*
                    *Marketing Science, 2002 – 2011, <u>Past Area Editor</u>*

Occasional Reviewer,    *Marketing, Management, Psychology Journals, NSF, etc.*


<u>**Publications in Journals**</u>


**Approximate Number of Citations in Google Scholar: 12,000+**


1.  Apples, Oranges and Erasers: The Effect of Considering Similar versus Dissimilar Alternatives
    on Purchase Decisions (with Liz Friedman and Jennifer Savary), *Journal of Consumer
    Research*, 2018.

2.  Seeing Stars: How the Binary Bias Distorts the Interpretation of Customer Ratings (w Matt
    Fisher and George Newman), *Journal of Consumer Research*, 2018.

3. Effect of Intelligence on Consumers' Responsiveness to a Pro-Environmental Tax: Evidence from Large-Scale Data on Car Acquisitions of Male Consumers (w Jaakko Aspara and Xueming Luo), *Journal of Consumer Psychology*, 2017.

4. Proximity of Snacks to Beverages Increases Food Consumption in the Workplace: A Field Study (w E. Baskin, M. Gorlin, Z. Chance, N. Novemsky, K Huskey, M. Hatzis), *Appetite*, 2016.

5. "Mental Representation Changes the Evaluation of Green Product Benefits," (with Kelly Goldsmith and George Newman), *Nature Climate Change*, 2016.

6. "Closer to the Creator: Temporal Contagion Explains The Preference for Earlier Serial Numbers (with R. Smith and G. Newman), *Journal of Consumer Research*, 2016.

7. "Sophisticated by Design: the Nonconscious Influences of Primed Concepts and Atmospheric Variables on Consumer Preferences," (with T. Andrew Poehlman and John A. Bargh), *Customer Needs and Solutions*, 2015.

8. "Positive Consequences Of Conflict On Decision Making," (with J. Savary, T. Kleiman, and R. Hassin), *Journal of Experimental Psychology: General*, 2015.

9. "The Technological Conundrum: How Rapidly Advancing Technology Can Lead To Commoditization," (with T. Chan and W. Putsis), *Customer Needs and Solutions*, 2015.

10. "When Going Green Backfires: How firm Intentions Shape the Evaluation of Socially Beneficial Product Enhancements," (with G. Newman and M. Gorlin), *Journal of Consumer Research*, 2014.

11. Why Choosing Healthy Foods Is Hard, and How to Help: Presenting 4P's Framework for Behavior Change," (with Z. Chance and M. Gorlin), *Customer Needs and Solutions*, 2014.

12. "Giving Against the Odds: When Tempting Alternatives Increase Willingness to Donate," (with J. Savary and K. Goldsmith), *Journal of Marketing Research*, 2014.

13. Authenticity is Contagious: Brand Essence and the Original Source of Production," (with George Newman), *Journal of Marketing Research*, 2014.

14. "A Dual System Framework to Understand Preference Construction Processes in Choice," (with M. Gorlin), *Journal of Consumer Psychology*, 2013.

15. "Refining the dual-process theory of preference construction: A reply to Gawronski, Martin and Sloman, Stanovich, and Wegener and Chien," (with M. Gorlin), *Journal of Consumer Psychology*, 2013.

16. Negativity Bias and Task Motivation: Testing the Effectiveness of Positively Versus Negatively Framed Incentives, (with K. Goldsmith), Journal of Experimental Psychology: Applied, 2013.

17. Representation and Perceived Similarity: How Abstract Mindset Aids Choice from Large Assortments," (with J. Xu and Z. Jiang), *Journal of Marketing Research*, 2013.

18. "Comparing Apples to Apples or Apples to Oranges: The Role of Mental Representation in Choice Difficulty," (with U. Khan and E. Kim), *Journal of Marketing Research*, 2013.

19. "Adding small differences can increase similarity and choice," (with J. Kim and N. Novemsky), *Psychological Science*, 2013.

20. When Guilt Begets Pleasure: The Positive Effect of a Negative Emotion," (with K. Goldsmith and E. Kim), *Journal of Marketing Research*, 2012.

21. Bridging the Gap Between Joint and Individual Decisions: Deconstructing Preferences in Relationships," (with M. Gorlin), *Journal of Consumer Psychology*, 2012.

22. The Importance of the Context in Brand Extension: How Pictures and Comparisons Shift Consumers' Focus from Fit to Quality," (with T. Meyvis and K. Goldsmith), *Journal of Marketing Research*, 2012.

23. "Self-Signaling and the Costs and Benefits of Temptation in Consumer Choice," (with K. Wertenbroch), *Journal of Marketing Research*, 2012.

24. "Price Framing Effects on Purchase of Hedonic and Utilitarian Bundles," (with U. Khan), *Journal of Marketing Research*, 2010.

25. "Making Products Feel Special: When Metacognitive Difficulty Enhances Evaluation," (with A. Pocheptsova and A. Labroo), *Journal of Marketing Research*, 2010.

26. "Modeling the Under Reporting Bias in Panel Survey Data," (with Sha Yang and Yi Zhao) *Marketing Science*, 2010.

27. " The Effect of Decision Order on Purchase Quantity Decisions," (with I. Simonson and S. M. Nowlis), *Journal of Marketing Research*, 2010.

28. Tradeoffs and Depletion in Choice," (with N. Novemsky, J. Wang, R. Baumeister), *Journal of Marketing Research*, 2010.

29. Opportunity Cost Neglect" (with S. Frederick, N. Novemsky, J. Wang, and S. Nowlis), *Journal of Consumer Research*, 2009.

30. "Anticipating Adaptation to Products" (with J. Wang and N. Novemsky), *Journal of Consumer Research*, 2009.

31. Deciding Without Resources: Psychological Depletion and Choice in Context," (with O. Amir, A. Pochepstova, and R. Baumeister), *Journal of Marketing Research,* 2009.

32. Customization Procedures and Customer Preferences," (with A. Valenzuela and F. Zettelmeyer), *Journal of Marketing Research,* 2009.

33. "Beyond Rationality: The Content of Preferences," (with N. Novemsky), *Journal of Consumer Psychology*, 2008.

*34.* "Of Frog Wines and Frowning Watches: Semantic Priming of Perceptual Features and Brand Evaluation," (with A. Labroo and N. Schwarz), *Journal of Consumer Research*, 2008.

*35.* "When Thinking Beats Doing: The Role of Optimistic Expectations in Goal-Based Choice," (with A. Fishbach and Y. Zhang), 2007, *Journal of Consumer Research*.

*36.* "Seeing The Forest Or The Trees: Implications of Construal Level Theory for Consumer Choice*," (with E. Kim), Journal of Consumer Psychology, 2007*

37. "Where There Is a Way, Is There a Will? The Effect of Future Choices on Self-Control" (with U. Khan), *Journal of Experimental Psychology: General*, 2007

38. Preference Fluency in Choice," (with N. Novemsky, N. Schwarz, and I. Simonson), 2007, *Journal of Marketing Research*.

39. "The Shopping Momentum Effect," (with J. Huber and U. Khan), 2007, *Journal of Marketing Research*.

40. "Institutional Perspectives in Real Estate Investing," (with W. Goetzmann), 2006, *Journal of Portfolio Management*.

41. "Are Rheumatologists' Treatment Decisions Influenced by Patients Age?," (with L. Fraenkel and N. Rabidou)," 2006, *Rheumatology.*

42. "Sub-goals as Substitutes or Complements: The Role of Goal Accessibility," (with A. Fishbach and Y. Zhang), 2006, *Journal of Personality & Social Psychology*.

43. "Up Close and Personal: A Cross Sectional Study of the Disposition Effect" (with N. Zhu), *Management Science*, 2006.

44. "Licensing Effect in Consumer Choice," (with U. Khan), *Journal of Marketing Research*, 2006.

45. "Goals as excuses or guides: The liberating effect of perceived goal progress on choice," (with A. Fishbach), *Journal of Consumer Research*, 2005.

46. "Goal Fulfillment and Goal Targets in Sequential Choice," (with N. Novemsky), *Journal of Consumer Research*, 2005.

47. "Towards extending the Compromise Effect to Complex Buying Contexts,"  (with Anil Menon and Bryan Maach), *Journal of Marketing Research*, 2004.

48. " To Buy or Not to Buy: Response Mode Effects on Consumer Choice," (with S. Nowlis), *Journal of Marketing Research, 2004*.

*49.* "Hedging Customers," (with R. Glazer), *Harvard Business Review*, 2003.

50. "The Effect of Forced Choice on Choice," (with I. Simonson), *Journal of Marketing Research,* 2003.

51. "Coping with Ambivalence: The Effect of removing a "fence sitting" option on Consumer Attitude and Preference Judgments (with B. Kahn and S. Nowlis), *Journal of Consumer Research*, 2002.

52. "Consumer Psychology: In Search of Identity," (with Z. Carmon, A. Drolet, S. Nowlis, and I. Simonson), *Annual Review of Psychology*, 2001.

53. "An Empirical Analysis of the Determinants of Category Expenditure," (with W. Putsis), *Journal of Business Research*, 2001.

54. "Trying Hard or Hardly Trying: An Analysis of Context Effects in Choice" (with S. Nowlis and S. Sherman), *Journal of Consumer Psychology*, September 2000.

55. "Consumer Choice between Hedonic and Utilitarian Goods," (with K. Wertenbroch), *Journal of Marketing Research*, February 2000.

56. "Assessing the Competitve Interaction Between Private Labels and National Brands," (with R. Cotterill and W. Putsis), *Journal of Business,* January 2000.

57. "Comparison Effects on Preference Construction," (with S. Nowlis and S. Sherman), *Journal of Consumer Research,* December 1999.

58. "The Effect of Time Pressure on Consumer Choice Deferral," (with S. Nowlis), *Journal of Consumer Research*, March, 1999.

59. "Making complementary choices in consumption episodes: Highlighting Versus Balancing," (with I. Simonson), *Journal of Marketing Research*, February, 1999.

60. "The Many Faces of Competition," (with W. Putsis), *Marketing Letters*, July, 1998.

61. "Consumer Preference for a No-Choice Option," *Journal of Consumer Research*, September, 1997.

62. "Context and Task Effects on Choice Deferral," *Marketing Letters,* January, 1997.

63. "The Effect of Decision Strategy on the Decision to Defer Choice," *Journal of Behavioral Decision Making*, December, 1996.

64. "The Effect of Common and Unique features in Consumer Choice," (with S. J. Sherman), *Journal of Consumer Research*, December, 1996.

65. "Similarity in Context: Cognitive Representation and the Violation of Preference Invariance in Consumer Choice," (with R. Glazer)*, Organizational Behavior and Human Decision Processes*, September, 1996.

66. "The Effect of the focus of comparison on consumer preferences," (with I. Simonson), *Journal of Marketing Research*, November, 1992.


**Publications in Book Chapters / Managerial Summary**

1. Nudging Healthy Choices with the 4 Ps Framework for Behavioral Change (w Zoe Chance, M. Hatzis, M. Bakker, and L. Ash), *Handbook of Marketing Analytics: Methods and Applications in Marketing Management, Public Policy, and Litigation Support"*.

2. "How Google Optimized Office Snacks," (with Zoe Chance, Michelle Hatzis, and Michiel Bakker," Harvard Business Review, 2016.

3. "[Nudging Individuals Toward Healthier Food Choices with the 4Ps Framework for Behavior Change"](#), (with Chance, Zoë, Ravi Dhar, Michelle Hatzis, and Kim Huskey. in *Behavioral Economics and Public Health*, ed. C. Roberto and I. Kawachi. 2015.

4. "The Power of Customer's Mindset," (with Kelly Goldsmith and Jing Xu), *Sloan Management Review*, 2010.

5. "Giving Consumers License to Enjoy Luxury," (with U. Khan and S. Schmidt), *Sloan Management Review*, 2010.

6. "Brand Permission: A Conceptual and Managerial Framework," (with Tom Meyvis), In Handbook on Brand and Experience Management, Bernd H.Schmitt and David L. Rogers (Eds.), Elgar Publishing, Northampton, MA, 2008.

7. "Dynamics of goal-based choice," (with A. Fishbach), In Handbook of Consumer Psychology, (eds. C. P. Haugtvedt, P.M. Herr & F. R. Kardes), Erlbaum Press, 2007.

8. "A Behavioral Decision Theoretic Perspective on Hedonic and Utilitarian Choice,"(with U. Khan and K. Wertenbroch) in Inside Consumption: frontiers of Research on Consumer Motives, Goals, and Desires, (eds. S. Ratneshwar and David Glen Mick), London: Routledge, 2005.

9. "Customer Relations Online," in Wiley Next Generation of Business Thinkers, (ed. Subir Chowdhury), 2004.

10. "Defining Customers' Needs and Values for Marketing Success," in Inside the Minds: Textbook Marketing, Aspatore Press, 2003.

11. "The Online Store," (with D. R. Wittink), in Managing Customer Relationships (eds. Martha Rogers and Don Peppers), Wiley, 2003.

12. "Choice Deferral," in The Elgar Companion to Consumer Research and Economic Psychology (eds. P. Earl and S. Kemp), 1999.

**Select Working Papers / Papers Under Review**

1. "Ironic Effects of Goal Activation on Choice," (with K. Goldsmith), under first review.

2. "The Effect of Goal Breadth on Consumer Preferences," (with E. Kim), under first      review.

3. "Can Investors Multiply and Divide: Investors' response to Stock Splits," (with N. Zhu and Dan Ariely).

4. "Category Expenditure and Promotion: Can Private Labels Expand the Pie," (with W. Putsis), Working Paper.

5. "Mindset over Matter: The Interplay between Goals and Preferences," (with A. Pochepstova), Working Paper.

**Conference Proceedings Publications**

1. Constructing preferences: The role of comparisons in consumer judgment and choice," (with S. Zhang) *Proceedings of the Association for Consumer Research*, University of Chicago Press (1999).

2. "Sequential Choices and Uncertain Preferences," *Proceedings of the Association for Consumer Research*, University of Chicago Press (1997).

3. "Causes and Effects of Reference Effects in Choice," *Proceedings of the Association for Consumer Research*, University of Chicago Press (1997).

4. "New Directions in Mental Accounting," *Proceedings of the Association for      Consumer Research*, University of Chicago Press (1995).

5. "Decision Difficulty and Uncertain Preferences: Implications for Consumer Choice," *Proceedings of the Association for Consumer Research*, University of Chicago Press      (1994).

6. "Behavioral Decision Research: Theory and Applications," *Proceedings of the   Association  for Consumer Research*, University of Chicago Press (1993).

A - 8

7. "To Choose Or Not To Choose: This is the Question," *Proceedings of the Association for Consumer Research*, University of Chicago Press (1992).

**Invited and Conference Presentations**

**Invited Academic Presentations (\* denotes multiple presentations)**
>
> *Boston College*
> *Carnegie-Mellon University*
> *Chinese University, Hong Kong*
> *Columbia University\**
> *Cornell University\**
> *Duke University\**
> *Harvard University*
> *Hong Kong University of Science and Technology*
> *IIPM\**
> *INSEAD\**
> *Indiana University*
> *Korea University*
> *London Business School\**
> *MIT\**
> *National University of Singapore*
> *New York University\**
> *Northwestern University\**
> *Ohio State University*
> *Pennsylvania State University*
> *Stanford University\**
> *Texas A&M University*
> *Tilburg University*
> *Tulane University*
> *University of Alberta*
> *University of British Columbia (planned)*
> *University of California, Berkeley\**
> *University of California, Los Angeles\**
> *University of California, San Diego*
> *University of Chicago\**
> *University of Delaware*
> *University of Colorado*
> *University of Florida*
> *University of Houston*
> *University of Illinois, Urbana-Champaign\**
> *University of Miami*
> *University of Maryland*
> *University of Massachusetts, Amherst*
> *University of Michigan\**
> *University of North Carolina\**
> *University of Peking\**
> *University of Pennsylvania\**

*University of Rotterdam\**
*University of Texas, Austin*
*University of Utah*
*University of Toronto\**
*University of Vienna*
*Washington University, St. Louis\**

**Conference Presentations (Over 200 presentations at conferences, consortiums, keynotes, symposiums, workshops, etc.) Recent presentations include:**

Keynote Addresses to Practitioners, Various Events
Choice Symposium
CEO Roundtables, New York and New Haven
CMO Roundtables, Various Organizations
ACR
Informs
Judgment and Decision Making
Behavioral Decision Research in Management
Society of Consumer Psychology

Appendix B – Ravi Dhar's Case Deposition and Testimony

Prior Testimony of Ravi Dhar (Past 4 years or more)

1. In Re: Emerson Electric Co. Wet/Dry Vac Marketing and Sales Practices Litigation

2. In the Matter of Satellite Radio and "Preexsiting" Subscription Services (SDARS III), Copyright Royalty Board (Deposition and Hearing).

3. Biscotti Inc. v. Microsoft Corp. (Deposition and Trial).

4. FTC v. DirecTV, Inc. (Deposition)

5. Zakaria v. Gerber Products Co. (Deposition).

6. Moab Industries, LLC v. Chrysler Group, LLC (Deposition and Trial)

7. In Re: Tropicana Orange Juice Marketing and Sales Practices Litigation (Deposition)

8. FTC v. Amazon.com, Inc. (Deposition)

9. Ericsson, et al. v. TCL Communication Technology Holdings, Ltd., et al. (Deposition)

10. Parallel Network Licensing v. International Business Machines Corporation (Deposition)

11. Select Comfort Corp. v. Tempur Sealy and Mattress Firm Holding Corp. (Deposition)

12. Exxon Mobil Corporation v. FX Networks LLC et al. (Deposition)

13. Playtex Products, LLC v. Munchkin, Inc. (Deposition)

14. Francisco Marty, et al. v. Anheuser-Busch Cos., LLC (Deposition)

15. Smartflash LLC, et al. v. Apple Inc., et al. (Deposition and Trial)

16. Suarez v. Anheuser-Busch Cos., LLC (Deposition)

17. SIMPLEAIR, INC., vs. Google et al. (Deposition and Trial)

18. *Johnathan and Trude Yarger v. ING Bank, fsb d/b/a/ ING DIRECT* (Deposition)

19. Laplant v. The Northwestern Mutual Life Insurance Company (Deposition)

20. MobileMedia Ideas LLC v. HTC Corporation and HTC America, Inc. (Deposition)

21. Johns v. Bayer Corporation and Bayer Healthcare LLC (Deposition)

Appendix C - Materials Reviewed

Literature:

- Diamond, Shari S,. "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Third Edition, Federal Judicial Center, 2011.

- G. Gelb and B. Gelb, "Internet Surveys for Trademark Litigation: Ready or Not, Here They Come," *Trademark Rep.* Vol. 97, 2007.

- B. Isaacson, et al, "Why Online Consumer Surveys Can Be A Smart Choice in Intellectual Property Cases," *IPL Newsletter* (ABA Section of Intellectual Property Law) Vol. 26, No. 3, 2008.

- Keller, Kevin L. and Philip Kotler, *Marketing Management, 14th Edition*. Prentice Hall, 2012 p. 166.

- Poret, H. "A Comparative Empirical Analysis of Online versus Mall and Phone Methodologies for Trademark Surveys," *Trademark Rep.* Vol. 100, 2010.

- Simonson, A. "Online Interviewing for Use in Lanham Act Litigation," *Intell. Prop. Strategist* Vol. 14, 2007.

- Bonneville Power Administration, HVAC Market Actor Interviews, 2018.

- Bonneville Power Administration HVAC Market Intelligence Report, 2016.

Legal Documents:

- Amended Class Action Complaint (Dkt. 027)
- 1/24/17 Order (Dkt. 57)
- Affidavit of Megan Hacker
- Pamela Hoppel Dep. Tr.
- Pamela Hoppel Dep. Ex. 3
- Christopher. Kafura Dep. Tr.
- Norman Klinge Dep. Tr.
- Daniel Gallagher Dep. Tr.
- Daniel Gallagher Dep. Ex. 49.
- Linda Lamm Dep. Tr.
- Linda Lamm Dep. Ex. 29
- Steve Oddo Dep. Tr.
- Steve Oddo Dep. Ex. 52
- Dan Gallagher's Objections and Responses to Defendants' First Interrogatories
- Norman Klinge's Objections and Responses to Defendants' First Interrogatories
- Linda Lamm's Objections and Corrected Responses to Defendants' First Interrogatories
- Steve Oddo's Objections and Corrected Responses to Defendants' First Interrogatories

<u>Production Documents:</u> *

- CARRIER_0006796
- CARRIER_0006867
- CARRIER_0007650
- CARRIER_0008349
- CARRIER_0008353
- CARRIER_0008371
- CARRIER_0008379
- CARRIER_0008385
- CARRIER_0008454
- CARRIER_0025596
- CARRIER_0013718
- CARRIER_0013721
- CARRIER_0015048
- CARRIER_0016265
- CARRIER_0016434
- CARRIER_0024433
- CARRIER_0024786
- CARRIER_0033883.
- CARRIER_0033899.
- CARRIER_0033922
- CARRIER_0033936
- CARRIER_0033952
- CARRIER_0034021
- CARRIER_0043887
- CARRIER_0044495
- CARRIER_0044687
- CARRIER_0044733
- CARRIER_0044778

*I was given access to all documents produced in this litigation.

<u>Websites:</u>
- https://www.carrier.com
- https://www.carrier.com/residential/en/us/products/heat-pumps/25hnb9/
- https://www.cdc.gov/nchs/data/nhis/earlyrelease/wireless201712
- http://www.captcha.net

Appendix D – Survey Questionnaire

**Sources of Info Survey**

**[PROGRAMMER NOTES IN BOLD CAPS AND BRACKETS]**
*Notes to respondent in italics*

Sample will be inbound US representative (click-balanced)

**Introduction and Screening**

**[NO SURVEY TITLE TO BE DISPLAYED TO RESPONDENTS]**

Thank you for your willingness to participate in our study. The responses you give to our questions are very important to us. If you don't know an answer to a question or if you don't have an opinion, please indicate this in your response. Please do not guess.

Your answers will be kept in confidence. The results of this study will not be used to try to sell you anything.

When you are ready to get started, please click the "NEXT" button.

**[NEXT PAGE]**

QS0. Please enter the code exactly as it appears in the image above, and then click "NEXT" to continue.

**[INSERT CAPTCHA]**

**[NEXT PAGE]**

QS1. What type of electronic device are you using to complete this survey? *(Select one only)*
**[RANDOMIZE LIST; ANCHOR 'OTHER MOBILE OR ELECTRONIC DEVICE' LAST]**
⊙ Desktop computer **[CONTINUE]**
⊙ Laptop computer **[CONTINUE]**
⊙ Tablet computer (e.g., Apple iPad, Kindle Fire, Samsung Galaxy Tab) **[CONTINUE]**
⊙ Smartphone (e.g., iPhone, Android, Samsung) **[ON HOLD]**
⊙ Other mobile or electronic device **[ON HOLD]**

**[DISPLAY A MESSAGE TO ON-HOLD RESPONDENTS AND ASK THEM TO RE-ENTER USING AN APPROPRIATE DEVICE (USING THE SAME LINK): "This survey is not formatted for viewing on a smartphone or other mobile device. Please return to the survey, using the same link, from a desktop, laptop, or tablet computer."]**

**[NEXT PAGE]**

QS2. Are you…? *(Select one only)*
- ⊙ Male **[CONTINUE]**
- ⊙ Female **[CONTINUE]**

**[NEXT PAGE]**

QS3. Into which of the following categories does your age fall? *(Select one only)*
- ⊙ Under 18 **[TERMINATE]**
- ⊙ 18-34 **[CONTINUE]**
- ⊙ 35-49 **[CONTINUE]**
- ⊙ 50-64 **[CONTINUE]**
- ⊙ 65+ **[CONTINUE]**

**[TERMINATE IF AGE AND GENDER DO NOT MATCH THE VALUES PASSED BY PANEL PROVIDER]**

**[NEXT PAGE]**

QS4. In which state do you live? *(Select one only)* **[DROP DOWN LIST OF 50 STATES + DC; TERMINATE IF "MY AREA NOT LISTED" SELECTED]**

**[REGION – HIDDEN VARIABLE BASED ON STATE SELECTED IN QS4]**

**[NEXT PAGE]**

QS5. Do you or does any member of your household work for any of the following types of companies or in any of the following industries? *(Select all that apply)* **[RANDOMIZE]**
- ❒ A company that makes or sells heating or cooling systems **[TERMINATE]**
- ❒ A company that makes or sells automobiles
- ❒ A company that makes or sells consumer electronics
- ❒ A marketing or market research firm **[TERMINATE]**
- ❒ A public relations or advertising agency **[TERMINATE]**
- ❒ None of the above **[ANCHOR; EXCLUSIVE]**

**[NEXT PAGE]**

For the following questions, please focus on your primary residence. That is, if you live in or own more than one residence, please focus on the residence where you spend the most time.

Please click the "NEXT" button when you are ready to continue.

**[NEXT PAGE]**

QS6. Do you…? *(Select one only)* **[ROTATE FIRST TWO RESPONSE OPTIONS; ANCHOR NEITHER]**
- ⊙ Own your primary residence
- ⊙ Rent your primary residence **[TERMINATE]**
- ⊙ Or are you neither a homeowner nor a renter (for example, you live at home with parents, in dorms, etc.) **[ANCHOR; TERMINATE]**

**[NEXT PAGE]**

QS7. Which, if any, of the following features does your home have? *(Select all that apply)*
**[RANDOMIZE LIST; NONE OF THE ABOVE LAST]**
- ❑ Heating and/or cooling system(s) **[CONTINUE]**
- ❑ Automatic garage door opener
- ❑ Electric range or stove top
- ❑ Security system
- ❑ None of the above **[EXCLUSIVE]**

**[TERMINATE UNLESS "HEATING AND/OR COOLING SYSTEM" IS SELECTED]**

**[NEXT PAGE]**

QS8Intro1. You indicated that your home has a heating and/or cooling system.  Next you will be shown four different types of heating and cooling systems and then asked to select the system(s) in your home.

**[DELAY NEXT BUTTON FOR 5 SECONDS; DISPLAY MESSAGE: "The "NEXT" button will appear in just a moment"]**

**[NEXT PAGE]**

**[RANDOMIZE QS8Intro2-QS8Intro5; DISPLAY "(X/4)" AT THE TOP OF EACH PAGE, WHERE X={1,2,3,4}]**

QS8Intro2. A **central air conditioner** is an appliance consisting of an outdoor unit and an indoor unit that **circulates cool air** through your home.

**[DELAY NEXT BUTTON FOR 5 SECONDS; DISPLAY MESSAGE: "The "NEXT" button will appear in just a moment"]**

**[NEXT PAGE]**

QS8Intro3. A **heat pump** is an appliance consisting of an outdoor unit and an indoor unit that **both circulates cool air (air conditioning)** through your home during warm weather and **circulates warm air** through your home during cold weather.

**[DELAY NEXT BUTTON FOR 5 SECONDS; DISPLAY MESSAGE: "The "NEXT" button will appear in just a moment"]**

**[NEXT PAGE]**

QS8Intro4. A **boiler or furnace system** is an appliance that uses oil, gas, or electricity to **heat** your home. Typically housed in a garage, basement, or attic.

**[DELAY NEXT BUTTON FOR 5 SECONDS; DISPLAY MESSAGE: "The "NEXT" button will appear in just a moment"]**

**[NEXT PAGE]**

QS8Intro5. A **window air conditioner** is a portable air conditioner unit that typically mounts in a window and **circulates cool air.**

**[DELAY NEXT BUTTON FOR 5 SECONDS; DISPLAY MESSAGE: "The "NEXT" button will appear in just a moment"]**

**[NEXT PAGE]**

QS8. Again, you indicated that your home has a heating and/or cooling system.  Which, if any, of the following types of heating and/or cooling systems do you have? *(Select all that apply)*
**[DISPLAY LIST IN SAME ORDER AS QS8Intro-SERIES; ANCHOR "OTHER" AND "DON'T KNOW" LAST; CENTRAL A/C AND HEAT PUMP ARE MUTUALLY EXCLUSIVE]**

| | Type of system | Heats | Cools | Description |
|---|---|---|---|---|
| ☐ | **Central air conditioner** | | ✓ | An appliance consisting of an outdoor unit and an indoor unit that **circulates cool air** through your home. |
| ☐ | **Heat pump** | ✓ | ✓ | An appliance consisting of an outdoor unit and an indoor unit that **both circulates cool air (air conditioning)** through your home during warm weather and **circulates warm air** through your home during cold weather. |
| ☐ | **Boiler or furnace system** | ✓ | | An appliance that uses oil, gas, or electricity to **heat** your home. Typically housed in a garage, basement, or attic. |
| ☐ | **Window air conditioner** | | ✓ | A portable air conditioner unit that typically mounts in a window and **circulates cool air.** |
| ☐ | Other.  Please specify: _____ **[FORCE RESPONSE; ANCHOR]** | | | |
| ☐ | Don't know/Unsure **[EXCLUSIVE; ANCHOR]** | | | |

**[TERMINATE IF NEITHER "HEAT PUMP" NOR "CENTRAL AIR CONDITIONER" IS SELECTED]**

**[ASSIGN RELEVANT SYSTEM BASED ON QS8, "CENTRAL AIR CONDITIONER" OR "HEAT PUMP"]**

**[NEXT PAGE]**

QS9. Without looking at your **[SYSTEM]**, what is the brand of your **[SYSTEM]**? *(Select one only)*
**[ALPHABETIZE LIST; ANCHOR "OTHER" AND "DR" LAST]**

- ⊙ Airease
- ⊙ Aire-Flo
- ⊙ Airquest
- ⊙ Allegiance
- ⊙ Allied
- ⊙ Ameristar
- ⊙ Arcoaire
- ⊙ Bard
- ⊙ Bryant
- ⊙ Carrier
- ⊙ Century
- ⊙ Coleman
- ⊙ Comfortmaker
- ⊙ ComfortStar
- ⊙ Cumberland
- ⊙ Daikin
- ⊙ Day & Night
- ⊙ Dayton
- ⊙ Ducane
- ⊙ Frasier-Johnston
- ⊙ Frigidaire
- ⊙ Gibson
- ⊙ Goodman
- ⊙ Grandaire
- ⊙ Haier
- ⊙ Heil
- ⊙ Intertherm
- ⊙ Janitrol
- ⊙ Keep Rite
- ⊙ Kelvinator
- ⊙ Kenmore
- ⊙ Lennox
- ⊙ Lincoln
- ⊙ Luxaire
- ⊙ MaraTherm
- ⊙ Maytag
- ⊙ Medallion
- ⊙ Miller
- ⊙ Mitsubishi Electric
- ⊙ National Comfort
- ⊙ Nordyne
- ⊙ Olsen
- ⊙ Osgood **[FAKE BRAND FOR QC]**
- ⊙ Payne
- ⊙ Philcom
- ⊙ Rheem
- ⊙ Ruud
- ⊙ Tappan
- ⊙ Trane
- ⊙ Tempstar
- ⊙ Toshiba
- ⊙ Weather King
- ⊙ Westinghouse
- ⊙ Whirlpool
- ⊙ York
- ⊙ Other. Please specify: **[ANCHOR; FORCE RESPONSE]**
- ⊙ Don't know/Unsure **[ANCHOR]**

**[NEXT PAGE]**

QS10. Approximately, when was your **[SYSTEM]** installed in your primary residence? *(Select one only)*
**[ROTATE ORDER OF RESPONSE OPTIONS TOP TO BOTTOM]**
- ⊙ More than ten years ago
- ⊙ More than five years ago, less than ten years ago
- ⊙ Within the last five years **[CONTINUE]**
- ⊙ Don't recall/Unsure **[ANCHOR]**

**[TERMINATE UNLESS "WITHIN THE LAST FIVE YEARS" SELECTED]**

**[NEXT PAGE]**

QS11. Which of the following best describes your role in the selection of the brand of the **[SYSTEM]** in your home? *(Select one only)* **[ROTATE ORDER OF RESPONSE OPTIONS TOP TO BOTTOM; ALWAYS KEEPING OPTION 3 BEFORE OPTION 4]**

⊙ I was fully responsible for the selection of the brand of the **[SYSTEM]** in my home **[CONTINUE (FULL SURVEY)]**

⊙ I was partially responsible for the selection of the brand of the **[SYSTEM]** in my home **[CONTINUE (FULL SURVEY)]**

⊙ A professional (e.g., a contractor, repair person, dealer, or salesperson) was fully responsible for the selection of the brand of the **[SYSTEM]** in my home **[SKIP TO END (IN DENOMINATOR)]**

⊙ A friend or someone else in my household was fully responsible for the selection of the brand of the **[SYSTEM]** in my home **[TERMINATE]**

⊙ I did not select the brand of the **[SYSTEM]** because the **[SYSTEM]** was already installed when I moved into my home **[SKIP TO END (IN DENOMINATOR)]**

**[IF QS11=3 OR 5; SKIP TO END; MARK AS COMPLETE2]**


**[NEXT PAGE]**

QS12.  Please select Yellow from the following list in order to continue into the survey. *(Select one only)* **[RANDOMIZE LIST]**

⊙ Yellow
⊙ Blue
⊙ Red
⊙ Green

**[IF "YELLOW" SELECTED CONTINUE, OTHERWISE TERMINATE]**

**[NEXT PAGE]**

QS13.  You have qualified to take this survey.  Before continuing, please carefully read these instructions:

- Please take the survey in <u>one</u> session without interruption.
- While taking the survey, please do not consult any other websites or other electronic or written materials.
- Please answer all questions on your own without consulting any other person.
- If you normally wear eyeglasses or contact lenses when viewing a computer screen, please wear them for the survey.

*(Select one only)*

⊙ I understand and agree to the above instructions
⊙ I do not understand or do not agree to the above instructions **[TERMINATE]**

**[NEXT PAGE]**

**Main Questionnaire**

**[QINTRO2]**
You will now be asked some questions about the **[SYSTEM]** that is installed in your home.

Click the "NEXT" button to continue.

**[NEXT PAGE]**

Q1.  How did you select the <u>brand</u> of the **[SYSTEM]** that is installed in your home?
*(Please be as specific as possible. You are not limited by the size of the answer box.)*
**[TEXT BOX FOR ANSWER; DO NOT ALLOW BLANK]**

**[NEXT PAGE]**

Q2.  Did you consult any sources for information on any of the brands of **[SYSTEM]** <u>before making your purchase</u>? *(Select one only)*
    ⊙ Yes **[CONTINUE]**
    ⊙ No **[SKIP TO END]**
    ⊙ Don't recall/Unsure **[SKIP TO Q2B]**

**[NEXT PAGE]**

Q2a.  What information sources did you consult on any of the brands <u>before making your purchase</u>?
*(Please be as specific as possible. You are not limited by the size of the answer box.)*
**[TEXT BOX FOR ANSWER; DO NOT ALLOW BLANK]**

**[NEXT PAGE]**

D - 7

Q2b. You may have already said this, but which of the following information sources did you consult on

 any of the brands <u>before making your purchase</u>? *(Select all that apply)*

**[ANCHOR "OTHER" AND "DR" LAST; ROTATE "WEBSITE" OPTIONS IN BLOCK TOGETHER; ROTATE
"TALKED" OPTIONS IN BLOCK TOGETHER; ROTATE "VISITED" OPTIONS IN BLOCK TOGETHER; ROTATE
"REVIEWED" OPTIONS IN BLOCK TOGETHER]**

- ❒  Visited a manufacturer's website (e.g., Carrier, Lennox, Goodman, etc.)
- ❒  Visited a contractor's or dealer's website
- ❒  Visited a retail store's website (e.g., Sears, Lowe's, Home Depot, etc.)
- ❒  Visited website containing consumer reviews of a product (e.g., a consumer review forum or
     blog)
- ❒  Reviewed a printed brochure
- ❒  Reviewed Consumer Reports magazines or similar magazines
- ❒  Reviewed social media (e.g., Instagram, Facebook, Twitter)
- ❒  Talked to friends, relatives or colleagues
- ❒  Talked with a contractor or dealer
- ❒  Talked with a retail store representative or salesperson at the store (e.g., at Sears, Lowe's, Home
     Depot, etc.)
- ❒  Called a manufacturer directly (e.g., Carrier, Lennox, Goodman, etc.)
- ❒  Other. Please specify: **[ANCHOR; FORCE RESPONSE]**
- ❒  Don't recall/Unsure **[EXCLUSIVE; ANCHOR]**

**[SKIP TO END AND MARK AS A COMPLETE IF NEITHER "REVIEWED A PRINTED BROCHURE" NOR
"VISITED A MANUFACTURER'S WEBSITE" SELECTED]**

**[NEXT PAGE]**

**[ONLY ASK Q2C-Q2E IF Q2B=REVIEWED A PRINTED BROCHURE]**
Q2c.  Which brochure(s) did you look at <u>before making your purchase</u>? *(Please be as specific as possible.
You are not limited by the size of the answer box.)*
**[TEXT BOX FOR ANSWER; DO NOT ALLOW BLANK]**

**[NEXT PAGE]**

Q2d. You many have said this already, but which of the following best describes the brochure(s) you
looked at <u>before making your purchase</u>? *(Select all that apply)*
**[RANDOMIZE LIST; ANCHOR "OTHER" AND "DR" LAST]**

- ❒  A brochure from a manufacturer (e.g., Carrier, Lennox, Goodman, etc.)
- ❒  A brochure from a contractor or dealer
- ❒  A brochure from a retailer (e.g., Sears, Lowe's, Home Depot, etc.)
- ❒  Other. Please specify: **[ANCHOR; FORCE RESPONSE]**
- ❒  Don't recall/Unsure **[EXCLUSIVE; ANCHOR]**

**[NEXT PAGE]**

Q2e. You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase</u>? *(Select all that apply)*

**[ALPHABETIZE LIST; ANCHOR "OTHER" AND "DR" LAST]**

- ☐ Airease
- ☐ Aire-Flo
- ☐ Airquest
- ☐ Allegiance
- ☐ Allied
- ☐ Ameristar
- ☐ Arcoaire
- ☐ Bard
- ☐ Bryant
- ☐ Carrier
- ☐ Century
- ☐ Coleman
- ☐ Comfortmaker
- ☐ ComfortStar
- ☐ Cumberland
- ☐ Daikin
- ☐ Day & Night
- ☐ Dayton
- ☐ Ducane
- ☐ Frasier-Johnston
- ☐ Frigidaire
- ☐ Gibson
- ☐ Goodman
- ☐ Grandaire
- ☐ Haier
- ☐ Heil
- ☐ Interthem
- ☐ Janitrol
- ☐ Keep Rite
- ☐ Kelvinator

- ☐ Kenmore
- ☐ Lennox
- ☐ Lincoln
- ☐ Luxaire
- ☐ MaraTherm
- ☐ Maytag
- ☐ Medallion
- ☐ Miller
- ☐ Mitsubishi Electric
- ☐ National Comfort
- ☐ Nordyne
- ☐ Olsen
- ☐ Osgood **[FAKE BRAND FOR QC]**
- ☐ Payne
- ☐ Philcom
- ☐ Rheem
- ☐ Ruud
- ☐ Tappan
- ☐ Trane
- ☐ Tempstar
- ☐ Toshiba
- ☐ Weather King
- ☐ Westinghouse
- ☐ Whirlpool
- ☐ York
- ☐ Other. Please specify: **[ANCHOR; FORCE RESPONSE]**
- ☐ Don't recall/Unsure **[EXCLUSIVE; ANCHOR]**

**[NEXT PAGE]**


**[ONLY ASK Q2F-Q2G IF Q2B=VISITED A MANUFACTURER'S WEBSITE]**

Q2f.  Which manufacturer's websites did you look at <u>before making your purchase</u>? *(Please be as specific as possible. You are not limited by the size of the answer box.)*

**[TEXT BOX FOR ANSWER; DO NOT ALLOW BLANK]**


**[NEXT PAGE]**

Q2g. You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase</u>? *(Select all that apply)*

**[ALPHABETIZE LIST; ANCHOR "OTHER" AND "DK" LAST]**

- ☐ Airease
- ☐ Aire-Flo
- ☐ Airquest
- ☐ Allegiance
- ☐ Allied
- ☐ Arcoaire
- ☐ Ameristar
- ☐ Bard
- ☐ Bryant
- ☐ Carrier
- ☐ Century
- ☐ Coleman
- ☐ Comfortmaker
- ☐ ComfortStar
- ☐ Cumberland
- ☐ Daikin
- ☐ Day & Night
- ☐ Dayton
- ☐ Ducane
- ☐ Frasier-Johnston
- ☐ Frigidaire
- ☐ Gibson
- ☐ Goodman
- ☐ Grandaire
- ☐ Haier
- ☐ Heil
- ☐ Intertherm
- ☐ Janitrol
- ☐ Keep Rite
- ☐ Kelvinator

- ☐ Kenmore
- ☐ Lennox
- ☐ Lincoln
- ☐ Luxaire
- ☐ MaraTherm
- ☐ Maytag
- ☐ Medallion
- ☐ Miller
- ☐ Mitsubishi Electric
- ☐ National Comfort
- ☐ Nordyne
- ☐ Olsen
- ☐ Osgood **[FAKE BRAND FOR QC]**
- ☐ Payne
- ☐ Philcom
- ☐ Rheem
- ☐ Ruud
- ☐ Tappan
- ☐ Trane
- ☐ Tempstar
- ☐ Toshiba
- ☐ Weather King
- ☐ Westinghouse
- ☐ Whirlpool
- ☐ York
- ☐ Other. Please specify: **[ANCHOR; FORCE RESPONSE]**
- ☐ Don't recall/Unsure **[EXCLUSIVE; ANCHOR]**

**[NEXT PAGE]**

**[END OF SURVEY]**

Appendix E: Screenshots and Questionnaire

INTRODUCTION 0



Thank you for your willingness to participate in our study. The responses you give to our questions are very important to us. If you don't know an answer to a question or if you don't have an opinion, please indicate this in your response. Please do not guess.

Your answers will be kept in confidence. The results of this study will not be used to try to sell you anything.

When you are ready to get started, please click the "NEXT" button.

**NEXT**

Copyright © 2018, Applied Marketing Science, Inc.

0%  100%
% complete

QS0

Please enter the code exactly as it appears in the image above, and then click "NEXT" to continue.

NEXT

Copyright © 2018, Applied Marketing Science, Inc.

0%  100%
% complete

E - 1

QS1



QS2

What type of electronic device are you using to complete this survey?

*(Select one only)*

○ Desktop computer
○ Laptop computer
○ Tablet computer (e.g., Apple iPad, Kindle Fire, Samsung Galaxy Tab)
○ Smartphone (e.g., iPhone, Android, Samsung)
○ Other mobile or electronic device

NEXT

Copyright © 2018, Applied Marketing Science, Inc.

0% ▮▮▮ 100%
% complete

Are you...?

*(Select one only)*

○ Male
○ Female

NEXT

Copyright © 2018, Applied Marketing Science, Inc.

0% ▮ 100%
% complete

QS3

Into which of the following categories does your age fall?

*(Select one only)*

○ Under 18
○ 18 - 34
○ 35 - 49
○ 50 - 64
○ 65+

NEXT

Copyright © 2018, Applied Marketing Science, Inc.

0% ▮▮▮ 100%
% complete

QS4

In which state do you live?

*(Select one only)*

[ ▼ ]

NEXT

Copyright © 2018, Applied Marketing Science, Inc.

0% ▮▮▮ 100%
% complete

QS5



Do you or does any member of your household work for any of the following types of companies or in any of the following industries?

*(Select all that apply)*

- A marketing or market research firm
- A company that makes or sells heating or cooling systems
- A company that makes or sells automobiles
- A public relations or advertising agency
- A company that makes or sells consumer electronics
- None of the above

NEXT

Copyright © 2018, Applied Marketing Science, Inc.

0% 100%
% complete

INTRO



For the following questions, please focus on your primary residence. That is, if you live in or own more than one residence, please focus on the residence where you spend the most time.

Please click the "NEXT" button when you are ready to continue.

NEXT

Copyright © 2018, Applied Marketing Science, Inc.

0% 100%
% complete

QS6



QS7



QS8Intro1



QS8Intro2



QS8Intro3



QS8Intro4



QS8Intro5



**(4/4)**

A <u>**window air conditioner**</u> is a portable air conditioner unit that typically mounts in a window and **circulates cool air**.

NEXT

Copyright © 2018, Applied Marketing Science, Inc.

0% ▬▬▬▬▬▬ 100%
% complete

QS8

Again, you indicated that your home has a heating and/or cooling system. Which, if any, of the following types of heating and/or cooling systems do you have?

*(Select all that apply)*

| | Type of system | Heats | Cools | Description |
|---|---|---|---|---|
| ☐ | Central air conditioner | | ✔ | An appliance consisting of an outdoor unit and an indoor unit that **circulates cool air** through your home. |
| ☐ | Heat pump | ✔ | ✔ | An appliance consisting of an outdoor unit and an indoor unit that **both circulates cool air (air conditioning)** through your home during warm weather and **circulates warm air** through your home during cold weather. |
| ☐ | Boiler or furnace system | ✔ | | An appliance that uses oil, gas, or electricity to **heat** your home. Typically housed in a garage, basement, or attic. |
| ☐ | Window air conditioner | | ✔ | A portable air conditioner unit that typically mounts in a window and **circulates cool air**. |
| ☐ | Other. Please specify: | | | |
| ☐ | Don't know/Unsure | | | |

NEXT

Copyright © 2018, Applied Marketing Science, Inc.

0% ▬▬▬▬▬▬ 100%
% complete

QS9

Without looking at your central air conditioner, what is the brand of your central air conditioner?

*(Select one only)*

- ○ Airease
- ○ Aire-Flo
- ○ Airquest
- ○ Allegiance
- ○ Allied
- ○ Ameristar
- ○ Arcoaire
- ○ Bard
- ○ Bryant
- ○ Carrier
- ○ Century
- ○ Coleman
- ○ Comfortmaker
- ○ ComfortStar
- ○ Cumberland
- ○ Daikin
- ○ Day & Night
- ○ Dayton
- ○ Ducane
- ○ Frasier-Johnston

- ○ Frigidaire
- ○ Gibson
- ○ Goodman
- ○ Grandaire
- ○ Haier
- ○ Heil
- ○ Interthem
- ○ Janitrol
- ○ Keep Rite
- ○ Kelvinator
- ○ Kenmore
- ○ Lennox
- ○ Lincoln
- ○ Luxaire
- ○ MaraTherm
- ○ Maytag
- ○ Medallion
- ○ Miller
- ○ Mitsubishi Electric
- ○ National Comfort

- ○ Nordyne
- ○ Olsen
- ○ Osgood
- ○ Payne
- ○ Philcom
- ○ Rheem
- ○ Ruud
- ○ Tappan
- ○ Trane
- ○ Tempstar
- ○ Toshiba
- ○ Weather King
- ○ Westinghouse
- ○ Whirlpool
- ○ York

- ○ Other. Please specify:

- ○ Don't know/Unsure

**NEXT**

Copyright © 2018, Applied Marketing Science, Inc.

0% ▬▬▬▬▬ 100%
% complete

QS10



QS11



QS12



Please select Yellow from the following list in order to continue into the survey.

*(Select one only)*

- ○ Yellow
- ○ Blue
- ○ Red
- ○ Green

**NEXT**

Copyright © 2018, Applied Marketing Science, Inc.

QS13



You have qualified to take this survey. Before continuing, please carefully read these instructions:

- Please take the survey in <u>one</u> session without interruption.

- While taking the survey, please do not consult any other websites or other electronic or written materials.

- Please answer all questions on your own without consulting any other person.

- If you normally wear eyeglasses or contact lenses when viewing a computer screen, please wear them for the survey.

*(Select one only)*

- ○ I understand and agree to the above instructions
- ○ I do not understand or do not agree to the above instructions

**NEXT**

Copyright © 2018, Applied Marketing Science, Inc.

INTRO2



You will now be asked some questions about the central air conditioner that is installed in your home.

Click the "NEXT" button to continue.

**NEXT**

Copyright © 2018, Applied Marketing Science, Inc.

0% [====] 100%
% complete

Q1

How did you select the _brand_ of the central air conditioner that is installed in your home?

_(Please be as specific as possible. You are not limited by the size of the answer box.)_

**NEXT**

Copyright © 2018, Applied Marketing Science, Inc.

0% [====] 100%
% complete

Q2



Did you consult any sources for information on any of the brands of central air conditioner before making your purchase?

*(Select one only)*

○ Yes
○ No
○ Don't recall/Unsure

NEXT

Copyright © 2018, Applied Marketing Science, Inc.

0% ▭▭▭▭ 100%
% complete

Q2A

What information sources did you consult on any of the brands before making your purchase?

*(Please be as specific as possible. You are not limited by the size of the answer box.)*

NEXT

Copyright © 2018, Applied Marketing Science, Inc.

0% ▭▭▭▭ 100%
% complete

Q2B

You may have already said this, but which of the following information sources did you consult on any of the brands before making your purchase?

*(Select all that apply)*

- ☐ Called a manufacturer directly (e.g., Carrier, Lennox, Goodman, etc.)
- ☐ Talked to friends, relatives or colleagues
- ☐ Talked with a contractor or dealer
- ☐ Talked with a retail store representative or salesperson at the store (e.g., at Sears, Lowe's, Home Depot, etc.)
- ☐ Reviewed a printed brochure
- ☐ Reviewed Consumer Reports magazines or similar magazines
- ☐ Reviewed social media (e.g., Instagram, Facebook, Twitter)
- ☐ Visited a manufacturer's website (e.g., Carrier, Lennox, Goodman, etc.)
- ☐ Visited a contractor's or dealer's website
- ☐ Visited a retail store's website (e.g., Sears, Lowe's, Home Depot, etc.)
- ☐ Visited website containing consumer reviews of a product (e.g., a consumer review forum or blog)
- ☐ Other. Please specify: [_____]
- ☐ Don't recall/Unsure

**NEXT**

Copyright © 2018, Applied Marketing Science, Inc.

0% [======] 100%
% complete

Q2C

Which brochure(s) did you look at before making your purchase?

*(Please be as specific as possible. You are not limited by the size of the answer box.)*

[                                        ]

**NEXT**

Copyright © 2018, Applied Marketing Science, Inc.

0% [======] 100%
% complete

E - 14

Q2D

You many have said this already, but which of the following best describes the brochure(s) you looked at before making your purchase?

*(Select all that apply)*

☐ A brochure from a retailer (e.g., Sears, Lowe's, Home Depot, etc.)
☐ A brochure from a manufacturer (e.g., Carrier, Lennox, Goodman, etc.)
☐ A brochure from a contractor or dealer
☐ Other. Please specify: [                              ]
☐ Don't recall/Unsure

**NEXT**

Copyright © 2018, Applied Marketing Science, Inc.

0% ▨▨▨▨▨▨▨▨▨▨ 100%
% complete

Q2E

You may have said this already, but which of the following brand's brochures did you
look at before making your purchase?

*(Select all that apply)*

| | | |
|---|---|---|
| ☐ Airease | ☐ Frigidaire | ☐ Nordyne |
| ☐ Aire-Flo | ☐ Gibson | ☐ Olsen |
| ☐ Airquest | ☐ Goodman | ☐ Osgood |
| ☐ Allegiance | ☐ Grandaire | ☐ Payne |
| ☐ Allied | ☐ Haier | ☐ Philcom |
| ☐ Ameristar | ☐ Heil | ☐ Rheem |
| ☐ Arcoaire | ☐ Interthem | ☐ Ruud |
| ☐ Bard | ☐ Janitrol | ☐ Tappan |
| ☐ Bryant | ☐ Keep Rite | ☐ Trane |
| ☐ Carrier | ☐ Kelvinator | ☐ Tempstar |
| ☐ Century | ☐ Kenmore | ☐ Toshiba |
| ☐ Coleman | ☐ Lennox | ☐ Weather King |
| ☐ Comfortmaker | ☐ Lincoln | ☐ Westinghouse |
| ☐ ComfortStar | ☐ Luxaire | ☐ Whirlpool |
| ☐ Cumberland | ☐ MaraTherm | ☐ York |
| ☐ Daikin | ☐ Maytag | |
| ☐ Day & Night | ☐ Medallion | ☐ Other. Please specify: |
| ☐ Dayton | ☐ Miller | |
| ☐ Ducane | ☐ Mitsubishi Electric | |
| ☐ Frasier-Johnston | ☐ National Comfort | ☐ Don't recall/Unsure |

**NEXT**

Copyright © 2018, Applied Marketing Science, Inc.

0%  ▬▬▬▬▬▬  100%
% complete

E - 16

Q2F

Which manufacturer's websites did you look at <u>before making your purchase</u>?

*(Please be as specific as possible. You are not limited by the size of the answer box.)*

**NEXT**

Copyright © 2018, Applied Marketing Science, Inc.

0% 100%
% complete

Q2G

You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase</u>?

*(Select all that apply)*

- Airease
- Aire-Flo
- Airquest
- Allegiance
- Allied
- Ameristar
- Arcoaire
- Bard
- Bryant
- Carrier
- Century
- Coleman
- Comfortmaker
- ComfortStar
- Cumberland
- Daikin
- Day & Night
- Dayton
- Ducane
- Frasier-Johnston

- Frigidaire
- Gibson
- Goodman
- Grandaire
- Haier
- Heil
- Interthem
- Janitrol
- Keep Rite
- Kelvinator
- Kenmore
- Lennox
- Lincoln
- Luxaire
- MaraTherm
- Maytag
- Medallion
- Miller
- Mitsubishi Electric
- National Comfort

- Nordyne
- Olsen
- Osgood
- Payne
- Philcom
- Rheem
- Ruud
- Tappan
- Trane
- Tempstar
- Toshiba
- Weather King
- Westinghouse
- Whirlpool
- York

- Other. Please specify:

- Don't recall/Unsure

NEXT

Copyright © 2018, Applied Marketing Science, Inc.

0% ▬▬▬▬▬▬▬ 100%
% complete

[END OF SURVEY]

E - 18

Appendix F – Survey Codebook

**Codebook for Q1/Q2A.**

| Q1. How did you select the brand of the [SYSTEM] that is installed in your home?/Q2a. What information sources did you consult on any of the brands before making your purchase? | Code | Net Includes |
|---|---|---|
| **Received a recommendation/Consulted with someone else (NET)** | 100 | 110-130 |
| Recommendation from/consulted with friends, relatives, neighbor or colleagues, or general recommendation (i.e., an unspecified source) | 110 | |
| Recommendation from/consulted with a contractor, installer or dealer (i.e., a professional) | 120 | |
| Recommendation from/consulted with a retail store representative or salesperson (e.g., at Sears, Lowe's, Home Depot, etc.) | 130 | |
| **Researched online or offline (NET)** | 200 | 210-250 |
| Specific mention of online research (SUB-NET) | 210 | 211-214, 411 |
| Visited a manufacturer's website (e.g., Carrier, Lennox, Goodman, etc.) | 211 | |
| Specific mention of visiting Carrier manufacturer website | 411 | |
| Visited a contractor's or dealer's website | 212 | |
| Visited a retail store's website (e.g., Sears, Lowe's, Home Depot, etc.) | 213 | |
| Visited social media, ConsumerReports.com, forums, review sites, etc. | 214 | |
| Specific mention of offline research (SUB-NET) | 220 | 221-224, 412 |
| Reviewed a printed brochure | 221 | |
| Specific mention of reviewing Carrier brochure | 412 | |
| Reviewed magazines or other literature | 222 | |
| In store research | 223 | |
| Called a manufacturer directly (e.g., Carrier, Lennox, Goodman, etc.) | 224 | |
| General mentions of online research (SUB-NET) | 230 | |
| General mentions of offline research (SUB-NET) | 240 | |
| General mention of research (online/offline not specified) (SUB-NET) | 250 | |
| **Mentions of features (e.g., price, on sale, warranty, SEER, reliability)** | 300 | |
| **Mention of past brand use or brand familiarity (NET)** | 400 | 400, 410 |
| Specific mention of Carrier or Carrier sub-brand | 410 | |
| **Availability (e.g., my contractor uses brand(s), or the store carried this brand)** | 500 | |
| Other | 89 | |
| Don't know/Don't recall/Unsure | 90 | |

Appendix G - Survey Invitation

<u>Research Now Invitation</u>



Appendix H – Demographic Comparison:
Primary U.S. Representative Sample vs. U.S. Census[1]

| Gender | Census Click Target | Actual Clicks into Survey |
|---|---|---|
| Male | 49% | 46.4% |
| Female | 51% | 53.6% |

| Age | Census Click Target | Actual Clicks into Survey |
|---|---|---|
| 18-34 | 31% | 31.7% |
| 35-49 | 27% | 23.5% |
| 50-64 | 25% | 26.2% |
| 65+ | 17% | 18.5% |

| Region | Census Click Target | Actual Clicks into Survey |
|---|---|---|
| Midwest | 22% | 20.7% |
| Northeast | 18% | 21.9% |
| South | 37% | 34.2% |
| West | 23% | 23.3% |

---

[1] Gender, age, and census region quotas for the Primary U.S. Representative Sample were set using 2010 U.S. Census Bureau data and applied to inbound "clicks" (i.e., responses to the survey invitation). See U.S. Census Bureau, DP-1General Demographic Characteristics: 2010 Census, https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=DEC_10_DP_DPDP1&src=pt, and U.S. Census Bureau, Population Distribution and Change: 2000 to 2010, Table 1, p. 2, https://www.census.gov/prod/cen2010/briefs/c2010br-01.pdf. Oversamples in California, Georgia, Indiana and Missouri were recruited randomly as to gender and age.

Appendix I – Survey Frequency Tables

**Table A-1**: Coded Factors for Selecting the Brand of [SYSTEM] /
Sources of Information Consulted before Making the Purchase
*(Combined Results for All Respondents in the Primary U.S. Representative Sample)*

| Coded Responses to Q1/Q2a (NET)[1] | # | % of Total (n=1787) |
|---|---|---|
| **Received a recommendation/Consulted with someone else (NET)** | 547 | 30.6% |
| Recommendation from/consulted with friends, relatives, neighbor or colleagues or general recommendation (i.e., an unspecified source) | 143 | 8.0% |
| Recommendation from/consulted with a contractor, installer or dealer (i.e., a professional) | 449 | 25.1% |
| Recommendation from/consulted with a retail store representative or salesperson (e.g., at Sears, Lowe's, Home Depot, etc.) | 25 | 1.4% |
| **Researched online or offline (NET)** | 456 | 25.5% |
| Specific mention of online research (SUB-NET) | 152 | 8.5% |
| Visited any manufacturer's website (e.g., Carrier, Lennox, Goodman, etc.) | 70 | 3.9% |
| Specific mention of visiting manufacturer website of Carrier brand at issue | 8 | 0.4% |
| Visited a contractor's or dealer's website | 7 | 0.4% |
| Visited a retail store's website (e.g., Sears, Lowe's, Home Depot, etc.) | 7 | 0.4% |
| Visited social media, ConsumerReports.com, forums, review sites, etc. | 99 | 5.5% |
| Specific mention of offline research (SUB-NET) | 63 | 3.5% |
| General mention of reviewing a printed brochure | 17 | 1.0% |
| Specific mention of reviewing a printed brochure from Carrier brand at issue | 0 | 0.0% |
| Reviewed magazines or other literature | 17 | 1.0% |
| In store research | 31 | 1.7% |
| Called a manufacturer directly | 4 | 0.2% |
| General mentions of online research (SUB-NET) | 293 | 16.4% |
| General mentions of offline research (SUB-NET) | 11 | 0.6% |
| General mention of research (online/offline not specified) (SUB-NET) | 123 | 6.9% |
| **Mentions of features (e.g., price, on sale, warranty, SEER, reliability)** | 207 | 11.6% |
| **Mention of past brand use or brand familiarity** | 203 | 11.4% |

---

[1] Q1. "How did you select the brand of the [SYSTEM] that is installed in your home?"; Q2a. "What information sources did you consult on any of the brands before making your purchase?" See Appendix D for more detail.

| | | |
|---|---|---|
| **Specific mention of Carrier brand at issue[2]** | 41 | 2.3% |
| **Availability (e.g., my contractor uses brand(s), or the store carried this brand)** | 23 | 1.3% |
| Other | 35 | 2.0% |
| Don't know/Don't recall/Unsure | 9 | 0.5% |
| NET (reviewed a printed brochure, visited a manufacturer's website, visited a contractor's or dealer's website, or called a manufacturer directly)[3] | 86 | 4.8% |
| A professional (e.g., a contractor, repair person, dealer, or salesperson) was fully responsible for the selection of the brand | 584 | 32.7% |
| I did not select the brand of the [SYSTEM] because the [SYSTEM] was already installed when I moved into my home | 368 | 20.6% |
| **Total** | **1787** | **100.0%** |

---

[2] Includes all mentions of the Carrier brands at issue, (i.e., not limited to visiting the website, viewing a printed brochure or calling the manufacturer directly).

[3] If I conservatively include "Visited a retail store's website (e.g., Sears, Lowe's, Home Depot, etc.)" in the aggregate analysis of the coding across Q1 and Q2a, I find that 5.1% of respondents in the Primary U.S. Representative Sample consulted a print brochure, visited a website, or called a manufacturer directly prior to purchase.

**Table A-2**: Information Sources Consulted before Purchase
*(Combined Results for All Respondents in the Primary U.S. Representative Sample)*

| Q2b. You may have already said this, but which of the following information sources did you consult on any of the brands before making your purchase? (Select all that apply) | # | % of Total (n=1787) |
|---|---|---|
| Visited a manufacturer's website (e.g., Carrier, Lennox, Goodman, etc.) | 285 | 15.9% |
| Visited a contractor's or dealer's website | 125 | 7.0% |
| Visited a retail store's website (e.g., Sears, Lowe's, Home Depot, etc.) | 90 | 5.0% |
| Visited website containing consumer reviews of a product (e.g., a consumer review forum or blog) | 284 | 15.9% |
| Reviewed a printed brochure | 110 | 6.2% |
| Reviewed Consumer Reports magazines or similar magazines | 200 | 11.2% |
| Reviewed social media (e.g., Instagram, Facebook, Twitter) | 46 | 2.6% |
| Talked to friends, relatives or colleagues | 209 | 11.7% |
| Talked with a contractor or dealer | 330 | 18.5% |
| Talked with a retail store representative or salesperson at the store (e.g., at Sears, Lowe's, Home Depot, etc.) | 53 | 3.0% |
| Called a manufacturer directly (e.g., Carrier, Lennox, Goodman, etc.) | 32 | 1.8% |
| Other. Please specify: | 17 | 1.0% |
| Don't recall/Unsure | 7 | 0.4% |
| NET (manufacturer website, contractor website, called a manufacturer directly, and/or brochure)[4] | 370 | 20.7% |
| A professional (e.g., a contractor, repair person, dealer, or salesperson) was fully responsible for the selection of the brand | 584 | 32.7% |
| I did not select the brand of the [SYSTEM] because the [SYSTEM] was already installed when I moved into my home | 368 | 20.6% |
| **Total** | **1787** | **100.0%** |

---

[4] If I conservatively include "Visited a retail store's website (e.g., Sears, Lowe's, Home Depot, etc.)" in the aggregate analysis of Q2b, I find that 22.0% of respondents in the Primary U.S. Representative Sample consulted a print brochure, visited a manufacturer's website, visited a contractor's or dealer's website, or called a manufacturer directly prior to purchase.

Appendix J - Survey Data Glossary

| Variable | Description | Code |
|---|---|---|
| ID | Unique respondent ID | |
| Qs1 | What type of electronic device are you using to complete this survey? | 1 = Desktop computer<br>2 = Laptop computer<br>3 = Tablet computer<br>4 = Smartphone<br>5 = Other mobile or electronic device |
| Qs2 | Are you…? | 1 = Male<br>2 = Female |
| Qs3 | Into which of the following categories does your age fall? | 1 = Under 18<br>2 = 18-34<br>3 = 35-49<br>4 = 50-64<br>5 = 65+ |
| Qs4 | In which state do you live? | |
| Qs5_1 | Do you or does any member of your household work for any of the following types of companies or in any of the following industries? | 1 = A company that makes or sells heating or cooling systems |
| Qs5_2 | Do you or does any member of your household work for any of the following types of companies or in any of the following industries? | 1 = A company that makes or sells automobiles |
| Qs5_3 | Do you or does any member of your household work for any of the following types of companies or in any of the following industries? | 1 = A company that makes or sells consumer electronics |
| Qs5_4 | Do you or does any member of your household work for any of the following types of companies or in any of the following industries? | 1 = A marketing or market research firm |
| Qs5_5 | Do you or does any member of your household work for any of the following types of companies or in any of the following industries? | 1 = A public relations or advertising agency |
| Qs5_6 | Do you or does any member of your household work for any of the following types of companies or in any of the following industries? | 1 = None of the above |

| Qs6 | Do you…? | 1 = Own your primary residence<br>2 = Rent your primary residence<br>3 = Or are you neither a homeowner nor a renter (for example, you live at home with parents, in dorms, etc.) |
|---|---|---|
| Qs7_1 | Which, if any, of the following features does your home have? | 1 = Heating and/or cooling system(s) |
| Qs7_2 | Which, if any, of the following features does your home have? | 1 = Automatic garage door opener |
| Qs7_3 | Which, if any, of the following features does your home have? | 1 = Electric range or stove top |
| Qs7_4 | Which, if any, of the following features does your home have? | 1 = Security System |
| Qs7_5 | Which, if any, of the following features does your home have? | 1 = None of the above |
| Qs8_1 | Which, if any, of the following types of heating and/or cooling systems do you have? | 1 = Central air conditioner |
| Qs8_2 | Which, if any, of the following types of heating and/or cooling systems do you have? | 1 = Heat pump |
| Qs8_3 | Which, if any, of the following types of heating and/or cooling systems do you have? | 1 = Boiler or furnace system |
| Qs8_4 | Which, if any, of the following types of heating and/or cooling systems do you have? | 1 = Window air conditioner |
| Qs8_5 | Which, if any, of the following types of heating and/or cooling systems do you have? | 1 = Other (please specify) |
| Qs8_6 | Which, if any, of the following types of heating and/or cooling systems do you have? | 1 = Don't know/Unsure |
| Qs8X | Which, if any, of the following types of heating and/or cooling systems do you have? | Other (please specify) open-ended response |
| Qs9 | Without looking at your [SYSTEM], what is the brand of your [SYSTEM]? | 1 = Airease<br>2 = Aire-Flo<br>3 = Airquest<br>4 = Allegiance<br>5 = Allied<br>6 = Ameristar<br>7 = Arcoaire<br>8 = Bard<br>9 = Bryant<br>10 = Carrier<br>11 = Century<br>12 = Coleman<br>13 = Comfortmaker<br>14 = ComfortStar<br>15 = Cumberland<br>16 = Daikin<br>17 = Day & Night |

| | | 18 = Dayton |
| | | 19 = Ducane |
| | | 20 = Frasier-Johnston |
| | | 21 = Frigidaire |
| | | 22 = Gibson |
| | | 23 = Goodman |
| | | 24 = Grandaire |
| | | 25 = Haier |
| | | 26 = Heil |
| | | 27 = Interthem |
| | | 28 = Janitrol |
| | | 29 = Keep Rite |
| | | 30 = Kelvinator |
| | | 31 = Kenmore |
| | | 32 = Lennox |
| | | 33 = Lincoln |
| | | 34 = Luxaire |
| | | 35 = MaraTherm |
| | | 36 = Maytag |
| | | 37 = Medallion |
| | | 38 = Miller |
| | | 39 = Mitsubishi Electric |
| | | 40 = National Comfort |
| | | 41 = Nordyne |
| | | 42 = Olsen |
| | | 43 = Osgood |
| | | 44 = Payne |
| | | 45 = Philcom |
| | | 46 = Rheem |
| | | 47 = Ruud |
| | | 48 = Tappan |
| | | 49 = Trane |
| | | 50 = Tempstar |
| | | 51 = Toshiba |
| | | 52 = Weather King |
| | | 53 = Westinghouse |
| | | 54 = Whirlpool |
| | | 55 = York |
| | | 56 = Other (please specify) |
| | | 57 = Don't recall/Unsure |
| Qs9X | Without looking at your **[SYSTEM]**, what is the brand of your **[SYSTEM]**? | Other (please specify) open-ended response |
| Qs10 | Approximately, when was your **[SYSTEM]** installed in your primary residence? | 1 = More than ten years ago<br>2 = More than five years ago, less than ten years ago<br>3 = Within the last five years<br>4 = Don't recall/Unsure |

| Qs11 | Which of the following best describes your role in the selection of the brand of the **[SYSTEM]** in your home? | 1 = I was fully responsible for the selection of the brand of the **[SYSTEM]** in my home<br>2 = I was partially responsible for the selection of the brand of the **[SYSTEM]** in my home<br>3 = A professional (e.g., a contractor, repair person, dealer, or salesperson) was fully responsible for the selection of the brand of the **[SYSTEM]** in my home<br>4 = A friend or someone else in my household was fully responsible for the selection of the brand of the **[SYSTEM]** in my home<br>5 = I did not select the brand of the **[SYSTEM]** because the **[SYSTEM]** was already installed when I moved into my home |
| --- | --- | --- |
| Qs12 | Please select Yellow from the following list in order to continue into the survey | 1 = Yellow<br>2 = Blue<br>3 = Red<br>4 = Green |
| Qs13 | You have qualified to take this survey.  Before continuing, please carefully read these instructions | 1 = I understand and agree to the above instructions<br>2 = I do not understand or do not agree to the above instructions |
| Q1 | How did you select the brand of the **[SYSTEM]** that is installed in your home? | |
| Code1_Q1 | Open-ended coding of Q1 (1st code) | See Codebook (Appendix F) |
| Code2_Q1 | Open-ended coding of Q1 (2nd code) | See Codebook (Appendix F) |
| Code3_Q1 | Open-ended coding of Q1 (3rd code) | See Codebook (Appendix F) |
| Code4_Q1 | Open-ended coding of Q1 (4th code) | See Codebook (Appendix F) |
| Code5_Q1 | Open-ended coding of Q1 (5th code) | See Codebook (Appendix F) |
| Q2 | Did you consult any sources for information on any of the brands of **[SYSTEM]** before making your purchase? | 1 = Yes<br>2 = No<br>3 = Don't recall/Unsure |
| Q2a | What information sources did you consult on any of the brands before making your purchase? | |
| Code1_Q2a | Open-ended coding of Q2a (1st code) | See Codebook (Appendix F) |
| Code2_Q2a | Open-ended coding of Q2a (2nd code) | See Codebook (Appendix F) |
| Code3_Q2a | Open-ended coding of Q2a (3rd code) | See Codebook (Appendix F) |
| Code4_Q2a | Open-ended coding of Q2a (4th code) | See Codebook (Appendix F) |

| Code5_Q2a | Open-ended coding of Q2a (5th code) | See Codebook (Appendix F) |
|---|---|---|
| Q2b_1 | You may have already said this, but which of the following information sources did you consult on any of the brands <u>before making your purchase</u>? | 1 = Visited a manufacturer's website (e.g., Carrier, Lennox, Goodman, etc.) |
| Q2b_2 | You may have already said this, but which of the following information sources did you consult on any of the brands <u>before making your purchase</u>? | 1 = Visited a contractor's or dealer's website |
| Q2b_3 | You may have already said this, but which of the following information sources did you consult on any of the brands <u>before making your purchase</u>? | 1 = Visited a retail store's website (e.g., Sears, Lowe's, Home Depot, etc.) |
| Q2b_4 | You may have already said this, but which of the following information sources did you consult on any of the brands <u>before making your purchase</u>? | 1 = Visited website containing consumer reviews of a product (e.g., a consumer review forum or blog) |
| Q2b_5 | You may have already said this, but which of the following information sources did you consult on any of the brands <u>before making your purchase</u>? | 1 = Reviewed a printed brochure |
| Q2b_6 | You may have already said this, but which of the following information sources did you consult on any of the brands <u>before making your purchase</u>? | 1 = Reviewed Consumer Reports magazines or similar magazines |
| Q2b_7 | You may have already said this, but which of the following information sources did you consult on any of the brands <u>before making your purchase</u>? | 1 = Reviewed social media (e.g., Instagram, Facebook, Twitter) |
| Q2b_8 | You may have already said this, but which of the following information sources did you consult on any of the brands <u>before making your purchase</u>? | 1 = Talked to friends, relatives or colleagues |
| Q2b_9 | You may have already said this, but which of the following information sources did you consult on any of the brands <u>before making your purchase</u>? | 1 = Talked with a contractor or dealer |
| Q2b_10 | You may have already said this, but which of the following information sources did you consult on any of the brands <u>before making your purchase</u>? | 1 = Talked with a retail store representative or salesperson at the store (e.g., at Sears, Lowe's, Home Depot, etc.) |
| Q2b_11 | You may have already said this, but which of the following information sources did you consult on any of the brands <u>before making your purchase</u>? | 1 = Called a manufacturer directly (e.g., Carrier, Lennox, Goodman, etc.) |

| Q2b_12 | You may have already said this, but which of the following information sources did you consult on any of the brands <u>before making your purchase</u>? | 1 = Other (please specify) |
|---|---|---|
| Q2b_13 | You may have already said this, but which of the following information sources did you consult on any of the brands <u>before making your purchase</u>? | 1 = Don't recall/Unsure |
| Q2bX | You may have already said this, but which of the following information sources did you consult on any of the brands <u>before making your purchase</u>? | Other (please specify) open-ended response |
| Q2c | Which brochure(s) did you look at <u>before making your purchase?</u> | |
| Q2d_1 | You many have said this already, but which of the following best describes the brochure(s) you looked at <u>before making your purchase?</u> | 1 = A brochure from a manufacturer (e.g., Carrier, Lennox, Goodman, etc.) |
| Q2d_2 | You many have said this already, but which of the following best describes the brochure(s) you looked at <u>before making your purchase?</u> | 1 = A brochure from a contractor or dealer |
| Q2d_3 | You many have said this already, but which of the following best describes the brochure(s) you looked at <u>before making your purchase?</u> | 1 = A brochure from a retailer (e.g., Sears, Lowe's, Home Depot, etc.) |
| Q2d_4 | You many have said this already, but which of the following best describes the brochure(s) you looked at <u>before making your purchase?</u> | 1 = Other (please specify) |
| Q2d_5 | You many have said this already, but which of the following best describes the brochure(s) you looked at <u>before making your purchase?</u> | 1 = Don't recall/Unsure |
| Q2dX | You many have said this already, but which of the following best describes the brochure(s) you looked at <u>before making your purchase?</u> | Other (please specify) open-ended response |
| Q2e_1 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Airease |
| Q2e_2 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Aire-Flo |
| Q2e_3 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Airquest |
| Q2e_4 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Allegiance |
| Q2e_5 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Allied |

| | | |
|---|---|---|
| Q2e_6 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Ameristar |
| Q2e_7 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Arcoaire |
| Q2e_8 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Bard |
| Q2e_9 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Bryant |
| Q2e_10 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Carrier |
| Q2e_11 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Century |
| Q2e_12 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Coleman |
| Q2e_13 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Comfortmaker |
| Q2e_14 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = ComfortStar |
| Q2e_15 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Cumberland |
| Q2e_16 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Daikin |
| Q2e_17 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Day & Night |
| Q2e_18 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Dayton |
| Q2e_19 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Ducane |
| Q2e_20 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Frasier-Johnston |

| | | |
|---|---|---|
| Q2e_21 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Frigidaire |
| Q2e_22 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Gibson |
| Q2e_23 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Goodman |
| Q2e_24 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Grandaire |
| Q2e_25 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Haier |
| Q2e_26 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Heil |
| Q2e_27 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Interthem |
| Q2e_28 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Janitrol |
| Q2e_29 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Keep Rite |
| Q2e_30 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Kelvinator |
| Q2e_31 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Kenmore |
| Q2e_32 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Lennox |
| Q2e_33 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Lincoln |
| Q2e_34 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Luxaire |
| Q2e_35 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = MaraTherm |

| Q2e_36 | You may have said this already, but which of the following brand's brochures did you look at before making your purchase? | 1 = Maytag |
|---|---|---|
| Q2e_37 | You may have said this already, but which of the following brand's brochures did you look at before making your purchase? | 1 = Medallion |
| Q2e_38 | You may have said this already, but which of the following brand's brochures did you look at before making your purchase? | 1 = Miller |
| Q2e_39 | You may have said this already, but which of the following brand's brochures did you look at before making your purchase? | 1 = Mitsubishi Electric |
| Q2e_40 | You may have said this already, but which of the following brand's brochures did you look at before making your purchase? | 1 = National Comfort |
| Q2e_41 | You may have said this already, but which of the following brand's brochures did you look at before making your purchase? | 1 = Nordyne |
| Q2e_42 | You may have said this already, but which of the following brand's brochures did you look at before making your purchase? | 1 = Olsen |
| Q2e_43 | You may have said this already, but which of the following brand's brochures did you look at before making your purchase? | 1 = Osgood |
| Q2e_44 | You may have said this already, but which of the following brand's brochures did you look at before making your purchase? | 1 = Payne |
| Q2e_45 | You may have said this already, but which of the following brand's brochures did you look at before making your purchase? | 1 = Philcom |
| Q2e_46 | You may have said this already, but which of the following brand's brochures did you look at before making your purchase? | 1 = Rheem |
| Q2e_47 | You may have said this already, but which of the following brand's brochures did you look at before making your purchase? | 1 = Ruud |
| Q2e_48 | You may have said this already, but which of the following brand's brochures did you look at before making your purchase? | 1 = Tappan |
| Q2e_49 | You may have said this already, but which of the following brand's brochures did you look at before making your purchase? | 1 = Trane |
| Q2e_50 | You may have said this already, but which of the following brand's brochures did you look at before making your purchase? | 1 = Tempstar |

| Q2e_51 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Toshiba |
|---|---|---|
| Q2e_52 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Weather King |
| Q2e_53 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Westinghouse |
| Q2e_54 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Whirlpool |
| Q2e_55 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = York |
| Q2e_56 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Other (please specify) |
| Q2e_57 | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | 1 = Don't recall/Unsure |
| Q2eX | You may have said this already, but which of the following brand's brochures did you look at <u>before making your purchase?</u> | Other (please specify) open-ended response |
| Q2f | Which manufacturer's websites did you look at <u>before making your purchase?</u> | |
| Q2g_1 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Airease |
| Q2g_2 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Aire-Flo |
| Q2g_3 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Airquest |
| Q2g_4 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Allegiance |
| Q2g_5 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Allied |
| Q2g_6 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Ameristar |
| Q2g_7 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Arcoaire |

| Q2g_8 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase</u>? | 1 = Bard |
| Q2g_9 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase</u>? | 1 = Bryant |
| Q2g_10 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase</u>? | 1 = Carrier |
| Q2g_11 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase</u>? | 1 = Century |
| Q2g_12 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase</u>? | 1 = Coleman |
| Q2g_13 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase</u>? | 1 = Comfortmaker |
| Q2g_14 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase</u>? | 1 = ComfortStar |
| Q2g_15 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase</u>? | 1 = Cumberland |
| Q2g_16 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase</u>? | 1 = Daikin |
| Q2g_17 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase</u>? | 1 = Day & Night |
| Q2g_18 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase</u>? | 1 = Dayton |
| Q2g_19 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase</u>? | 1 = Ducane |
| Q2g_20 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase</u>? | 1 = Frasier-Johnston |
| Q2g_21 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase</u>? | 1 = Frigidaire |
| Q2g_22 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase</u>? | 1 = Gibson |

| | | |
|---|---|---|
| Q2g_23 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Goodman |
| Q2g_24 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Grandaire |
| Q2g_25 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Haier |
| Q2g_26 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Heil |
| Q2g_27 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Intertherm |
| Q2g_28 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Janitrol |
| Q2g_29 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Keep Rite |
| Q2g_30 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Kelvinator |
| Q2g_31 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Kenmore |
| Q2g_32 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Lennox |
| Q2g_33 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Lincoln |
| Q2g_34 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Luxaire |
| Q2g_35 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = MaraTherm |
| Q2g_36 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Maytag |
| Q2g_37 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Medallion |

| Q2g_38 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Miller |
|---|---|---|
| Q2g_39 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Mitsubishi Electric |
| Q2g_40 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = National Comfort |
| Q2g_41 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Nordyne |
| Q2g_42 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Olsen |
| Q2g_43 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Osgood |
| Q2g_44 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Payne |
| Q2g_45 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Philcom |
| Q2g_46 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Rheem |
| Q2g_47 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Ruud |
| Q2g_48 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Tappan |
| Q2g_49 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Trane |
| Q2g_50 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Tempstar |
| Q2g_51 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Toshiba |
| Q2g_52 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase?</u> | 1 = Weather King |

| | | |
|---|---|---|
| Q2g_53 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase</u>? | 1 = Westinghouse |
| Q2g_54 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase</u>? | 1 = Whirlpool |
| Q2g_55 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase</u>? | 1 = York |
| Q2g_56 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase</u>? | 1 = Other (please specify) |
| Q2g_57 | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase</u>? | 1 = Don't recall/Unsure |
| Q2gX | You may have said this already, but which of the following manufacturer's websites did you look at <u>before making your purchase</u>? | Other (please specify) open-ended response |
| State_Sub-sample | Indication if respondent was analyzed as part of the Residents of Sub-class States sample (i.e., resident of MO, IN, CA, GA) | 1 = Part of Sub-class States Sample<br>0 = Not part of the Sub-class States Sample |
| Brand_Group | Indication if respondent was analyzed as part of the Carrier (or Carrier Sub-brand) Owner sub-sample or the Non-Carrier Owner sub-sample | 1=Carrier (or Carrier Sub-brand) Owner<br>2=Non-Carrier Owner |
| System_Type | Indication if respondent answers survey questions referencing a Heat Pump or Central Air Conditioner | Heat Pump<br>Central Air Conditioner |
| Status | Indicates if respondent saw the full survey questions (Q1-2g), or if they completed after the screening and skipped to the end of the survey (based on the responsibility of respondent in regard to the selection of their brand in Qs11) | Complete = Respondent continued to full survey (i.e., indicated in screening question QS11 that they were fully or partially responsible for the selection of the brand of the [SYSTEM] in their home)<br>Complete2 = Respondent skipped to the end of the survey after qualification (i.e., indicated in screening question QS11 that a professional was fully responsible for selection of the brand [SYSTEM] in their home, or indicated that the system was already installed in their home) |
| StartTime | Time survey started | |
| EndTime | Time survey ended | |

| | | |
|---|---|---|
| Primary_Sample | Indication if respondent was analyzed as part of the Primary U.S. Representative Sample | 1 = Part of Primary U.S. Representative Sample<br>0 = Not part of the Primary U.S. Representative Sample |