KIRKLAND & ELLIS LLP
K. Winn Allen (*pro hac vice*)
winn.allen@kirkland.com
Devin S. Anderson (*pro hac vice*)
devin.anderson@kirkland.com
1301 Pennsylvania Avenue NW
Washington, DC  20004
Telephone: (202) 389-5000
Facsimile: (202) 389-5100

*Attorneys for Defendants*

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVE ODDO, RAJENE REARDON, ANTHONY LASALA, LINDA LAMM, KEITH KIMBALL, NORMAN KLINGE, and DAN GALLAGHER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ARCOAIRE AIR CONDITIONING AND HEATING, CARRIER CORPORATION, BRYANT HEATING AND COOLING SYSTEMS, COMFORTMAKER AIR CONDITIONING & HEATING, INTERNATIONAL COMFORT PRODUCTS LLC, and UNITED TECHNOLOGIES CORPORATION,<br><br>Defendants. | CASE NO. 8:15-cv-01985 CAS (Ex)<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO LIMIT CONSIDERATION OF THE EXPERT REPORT OF WAYNE SCHNEYER**<br><br>**UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**<br><br>Judge:       Christina A. Snyder<br>Hearing:    January 27, 2020<br>Time:        10:00 AM<br>Courtroom:        8D |

| | |
|---|---|
| PAUL CORMIER and NICHOLAS SHONER, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| CARRIER CORPORATION, | ) ) |
| Defendant. | ) ) ) |

CASE NO. 2:18-cv-07030 CAS (Ex)

Consolidated with Case No. 8:15-cv-01985 for Pretrial Proceedings

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................. 1

BACKGROUND ................................................................................................... 2

    A.    Mr. Schneyer's Experience And Credentials .................................... 2

    B.    Mr. Schneyer's Inspections Of The Named Plaintiffs' Units ........... 4

    C.    Mr. Schneyer's Opinions ................................................................... 5

ARGUMENT ........................................................................................................ 7

I.     Mr. Schneyer Is Highly Qualified To Offer Opinions Regarding Plaintiffs' Carrier Units ..................................................................... 8

II.    Mr. Schneyer's Opinions Are Relevant ................................................ 10

III.   Mr. Schneyer's Opinions Are Based On A Reliable Methodology ................... 13

CONCLUSION ..................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arthur v. United Indus. Corp.*,
  2018 WL 2276636 (C.D. Cal. May 17, 2018) ............................................. 10

*Cholakyan v. Mercedes-Benz, USA, LLC*,
  281 F.R.D. 534 (C.D. Cal. 2012) ....................................................... 1, 11, 12

*City of Pomona v. SQM N. Am. Corp.*,
  750 F.3d 1036 (9th Cir. 2014) ................................................................ 7

*Frosini v. Bridgestone Firestone N. Am. Tire, LLC*,
  2007 WL 2781656 (C.D. Cal. Aug. 24, 2007) ...................................... 10, 13

*Grodzitsky v. Am. Honda Motor Co.*,
  2015 WL 2208184 (C.D. Cal. Apr. 22, 2015) ........................................... 13

*Gustafson v. Goodman Mfg. Co. LP*,
  2016 WL 1029333 (D. Ariz. Mar. 14, 2016) .............................................. 12

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) .................................................................... 1

*Harris v. Nortek Global HVAC LLC*,
  2016 WL 4543108 (S.D. Fla. Jan. 29, 2016) ........................................... 12

*Kennedy v. Collagen Corp.*,
  161 F.3d 1226 (9th Cir. 1998) ................................................................ 13

*Kennedy v. Gish, Sherwood & Friends, Inc.*,
  2015 WL 6750817 (E.D. Mo. Nov. 5, 2015) .............................................. 8

*Kotsur v. Goodman Global, Inc.*,
  2016 WL 4430609 (E.D. Pa. Aug. 22, 2016) ........................................... 12

*Lundine v. Marzocchi USA, Inc.*,
  2006 WL 3254502 (W.D. Wash. Nov. 9, 2006) .......................................... 8

*Madison Capital Co., LLC v. S & S Salvage, LLC*,
  2011 WL 195639 (W.D. Ky. Jan. 19, 2011) ............................................... 8

ii

*McVicar v. Goodman Global, Inc.*,
  2015 WL 4945730 (C.D. Cal. Aug. 20, 2015) ............................................. 12

*Nguyen v. Nissan North America, Inc.*,
  932 F.3d 811 (9th Cir. 2019) ....................................................................... 12

*PB Prop. Mgmt. Inc. v. Goodman Mfg. Co., L.P.*,
  2016 WL 7666179 (S.D. Fla. May 12, 2016) .......................................... 1, 12

*Smith v. Pfizer, Inc.*,
  714 F. Supp. 2d 845 (M.D. Tenn. 2010) ...................................................... 16

*St. Gregory Cathedral Sch. v. LG Elecs., Inc.*,
  2015 WL 5604763 (E.D. Tex. Sept. 23, 2015) ............................................. 12

*State Nat. Ins. Co. v. Anzhela Explorer LLC*,
  2009 WL 3335422 (S.D. Fla. Jan. 13, 2009) ................................................. 8

*Todd v. Tempur-Sealy Int'l, Inc.*,
  2016 WL 5462428 (N.D. Cal. Sept. 28, 2016) ............................................. 16

*Travelers Prop. Cas. Ins. Co. v. Serv. Experts Heating & Air Conditioning, LLC*,
  2015 WL 13608394 (C.D. Ill. July 27, 2015) ................................................ 8

*United States v. Merritt*,
  2002 WL 1821821 (S.D. Ind. June 26, 2002) ............................................ 2, 8

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ....................................................................................... 1

*Webb v. Carter's Inc.*,
  272 F.R.D. 489 (C.D. Cal. 2011) ................................................................ 13

*Wolin v. Jaguar Land Rover N. Am., LLC*,
  617 F.3d 1168 (9th Cir. 2010) ..................................................................... 12

*Yu-Santos v. Ford Motor Co.*,
  2009 WL 1392085 (E.D. Cal. May 14, 2009) ............................................. 13

**Rules**

Fed. R. Evid. 702 ................................................................................................. 7

iii

**Other Authorities**

Nick Kostora, *How and Why You Should Conduct Static Pressure Readings*
(June 20, 2016)..............................................................................................14

**INTRODUCTION**

Plaintiffs' motion to limit the opinions of Wayne Schneyer—a former HVAC technician, dealer, distributor service manager, and trade school instructor with more than 40 years of experience in the HVAC industry—is an attempt to elide the individualized issues surrounding injury and the typicality requirement that preclude certification here of plaintiffs' broad classes.  Mr. Schneyer's inspections and analysis of each named plaintiff's HVAC system helped to explain *why* Ryconox did not uniformly harm all or even most units.   In the named plaintiffs' systems, there were serious design, installation, or maintenance-related issues (none of which were attributable to Carrier) that could have independently caused or at least contributed to the frozen coils plaintiffs experienced.  In fact, *no* plaintiff's HVAC system was set up in a way that "met industry standards for design and installation."  Ex. 27 (Schneyer Rep.) ¶ 73; Ex. 25 (Schneyer *Cormier* Rep.) ¶ 6.[1]  Mr. Schneyer's inspections and analysis are thus relevant and confirm that plaintiffs cannot show that all putative class members "have suffered the same injury," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011), based on "proof that a common defect affects all the [units] in question," *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 554–55 (C.D. Cal. 2012.  His observations also reveal that the named plaintiffs will be subject to "unique defenses which threaten to become the focus of the litigation." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992); *see also PB Prop. Mgmt. Inc. v. Goodman Mfg. Co., L.P.*, 2016 WL 7666179 at *26 (S.D. Fla. May 12, 2016) ("individual questions related to causation might ask whether the coil failed due to environmental factors, normal wear and tear, improper installation, other types of corrosion, or misuse") (denying certification of broad class of HVAC purchasers).

Plaintiffs pejoratively reference Mr. Schneyer having "a high-school diploma," Pls. Schneyer Mot. 3 [ECF No. 256], while ignoring that Mr. Schneyer's career in the HVAC

---

[1] Exhibits 1–40 were attached to the Declaration of Devin S. Anderson in Opposition to Class Certification [ECF No. 226].  Exhibits 41–58 are attached to the Declaration of Devin S. Anderson in Opposition to Plaintiffs' *Daubert* Motions, filed with this brief. Citations to "Pls. Ex." are to the exhibits have plaintiffs have filed with their motion for and reply in support of class certification.

industry includes working as an HVAC technician, owning and operating an HVAC dealership, working as a service manager for an HVAC distributor, and serving as a full-time instructor and head of the HVAC department at a trade school.  Ex. 27 ¶¶ 4–18.  Courts have long recognized that tradespersons can serve as experts.  *See, e.g.*, *United States v. Merritt*, 2002 WL 1821821, at *3 (S.D. Ind. June 26, 2002).  Mr. Schneyer's extensive experience selling, installing, repairing, and teaching HVAC contractors about Carrier HVAC systems more than qualifies him to offer his opinions, and those opinions are the product of a reliable methodology.

Plaintiffs' challenges to Mr. Schneyer's opinions about the named plaintiffs' HVAC systems also fail.  Plaintiffs do not take issue with Mr. Schneyer's inspection methodology or the tests that he administered during his inspections.  Plaintiffs' highly technical disagreements with his analysis, however, misstate basic facts about Mr. Schneyer's analysis and otherwise rest on unsupported speculation from Mr. Sikorsky, who did no testing or analysis of the named plaintiffs' units.  Plaintiffs' motion should be denied.

## BACKGROUND

### A.    Mr. Schneyer's Experience And Credentials

Wayne Schneyer has more than 45 years of experience at many levels of the HVAC industry.  Over the course of his lengthy career, he has worked as an HVAC technician, owned and operated a dealership, served as a service manager for a distributor, and taught courses to entry-level HVAC students and existing HVAC contractors.  Ex. 27 ¶¶ 4–20 & Ex. A.  Mr. Schneyer has experience with many brands of HVAC equipment, but has worked most extensively with Carrier products.  *Id.* ¶¶ 5, 8, 10–17.

After working as a heating and air conditioning mechanic for several years, Mr. Schneyer founded and then ran a full-service HVAC dealership called Aerotemp Inc. for more than a decade.  *Id.* ¶ 5.  As the owner of the dealership, Mr. Schneyer interfaced directly with customers as he sold, installed, and serviced residential and commercial HVAC systems.  *Id.* ¶¶ 6, 8.  Mr. Schneyer initially sold and installed many brands of HVAC equipment, including Climatemaster, Bryant, Lennox, and Whirlpool, before

eventually choosing to exclusively sell Bryant and then Carrier equipment (Bryant is a Carrier brand). *Id.* ¶¶ 5, 8. During his time as a dealer, Mr. Schneyer installed or supervised the installation of hundreds of pieces of Carrier equipment, both residential and commercial. *Id.* ¶¶ 5, 8.

Mr. Schneyer eventually transitioned into a role with a Bryant distributor as a Service and Application Manager. *Id.* ¶ 10. In this role, he assisted Bryant dealers with all service and installation-related inquiries concerning Bryant equipment sold in his geographic region. *Id.* Mr. Schneyer also developed a training course to teach Bryant dealers about the installation and servicing of Bryant equipment. *Id.* ¶ 11. Mr. Schneyer personally made hundreds of field visits to customers' homes assisting dealers in troubleshooting various problems, including many field visits to investigate frozen evaporator coils. *Id.* ¶ 12. Mr. Schneyer was also responsible for communicating service bulletins and the information contained therein to dealers and contractors. *Id.* ¶ 52.

After more than a decade as a service manager, Mr. Schneyer began servicing Carrier products again when the Bryant distributorship where he worked was bought by the regional Carrier distributor, Peirce-Phelps. *Id.* ¶ 14. Peirce-Phelps is not owned, operated, or controlled by Carrier. Ex. 56 (Schneyer Dep.) at 54:19–21. Mr. Schneyer's responsibilities at Peirce-Phelps included developing new training programs and assisting dealers with resolving customer complaints and troubleshooting problems. Ex. 27 ¶ 14. Throughout his career, Mr. Schneyer received ongoing training from the Refrigeration Service Engineers Society and several trade schools. *Id.* ¶ 9. These programs covered topics such as factory-required installation requirements for equipment, system design principles, residential air duct requirements, troubleshooting residential air conditioning, and the thermostatic expansion valve (TEV or TXV). *Id.*

Mr. Schneyer became a full-time trade school instructor at Pennco Tech in Blackwood, New Jersey in 1999 and eventually was appointed the head of Pennco's HVAC department. *Id.* ¶ 15. In that role, Mr. Schneyer taught "all" of the classes "insofar as

refrigeration, air conditioning is concerned.  From A to Z, all aspects."  Ex. 56 at 50:25–51:2.

Mr. Schneyer eventually returned to Peirce-Phelps, where he was responsible for "all product related training programs" that Carrier provided and where he also developed his own custom programs.  Ex. 27 ¶ 16 & Ex. A.  "These courses included courses on electrical troubleshooting, specific product troubleshooting, Manual J load calculation, Manual D duct design, fundamentals of airflow, geothermal installation, geothermal troubleshooting, equipment maintenance, troubleshooting airflow problems, troubleshooting heat pumps and numerous different product installation courses." *Id.* ¶ 16.[2]  Mr. Schneyer continued to work in the field during this time period as well.  *Id.*  Since his retirement in 2012, Mr. Schneyer continues to assist dealers with training. *Id.* ¶ 19.

## B.    Mr. Schneyer's Inspections Of The Named Plaintiffs' Units

As part of his work in connection with this matter, Mr. Schneyer conducted inspections of the named plaintiffs' homes and HVAC systems and performed non-destructive testing.  *Id.* ¶ 1.  Mr. Schneyer designed an inspection protocol that "involved taking various diagnostics and performing visual examinations of the indoor and outdoor units, along with the air delivery systems."  *Id.* ¶ 73.  At each inspection, Mr. Schneyer was assisted by a local licensed HVAC contractor, whom he directed to perform various tests. *Id.* ¶ 76.  The inspection protocol was provided to plaintiffs' counsel, and there were no objections.  Ex. 57 (Parties' Inspection Protocol).  Plaintiffs also had the opportunity to bring their own expert or HVAC contractor to conduct inspections, but declined to do so.

Mr. Schneyer recorded visual observations about each unit, took several diagnostic measurements, and administered tests in order to gain a comprehensive picture of the health

---

[2] Manual J is a technical manual published by the Air Conditioning Contractors of America (ACCA), and is considered the industry standard for calculating "load" for a space that needs to be cooled or heated. Ex. 27 ¶¶ 16, 19 & n.3; Ex. 56 at 41:16–21, 58:17–25, 63:10–13.  Manual D is ACCA's industry standard guide for designing air duct delivery systems. Ex. 27 ¶¶ 16, 19 & n.3; Ex. 56 at 41:16–21, 58:17–25, 63:10–13.

of each named plaintiff's system. Ex. 27, Ex. C. Mr. Schneyer also took many photographs of each system. The measurements taken under Mr. Schneyer's direction included the following:

- **Static pressure:** Mr. Schneyer measured the "total external static pressure," which "measures the pressure exerted against the duct system (similar to the outward pressure of air filling a balloon), and also measures the back pressure exerted on the blower from the pressure built up with the duct system." *Id.* ¶ 78. In general, the static pressure reading "tells you how well your duct system is delivering the air generated by the blower." *Id.*

- **Superheat:** Superheat "is the degrees of heat added to the refrigerant after it changes state from liquid to vapor," and provides "key insight into how the unit is performing in real time." *Id.* ¶¶ 37, 82. The "normal, expected superheat is between 9 and 12 degrees." *Id.* ¶ 37. High superheat can signal that the TXV "may be restricted" or the system may be "overcharged," *i.e.*, have too much refrigerant. *Id.* ¶ 109.

- **Subcooling:** The subcooling "measures the degrees of heat removed from the refrigerant after that refrigerant has condensed back to a liquid state in the condenser." *Id.* ¶ 83. A low subcooling number can indicate that the unit is "undercharged," *i.e.*, does not have sufficient refrigerant. *Id.*

- **Moisture/acid:** Mr. Schneyer administered a Totaltest acid and moisture test to check for actionable levels of moisture and acid in Mr. Klinge and Mr. Cormier's HVAC systems. *Id.* ¶ 98; Ex. 25 ¶ 20. At Mr. Oddo's inspection, Mr. Schneyer administered a Qwickcheck36 QT 2000 acid test. Ex. 27 ¶ 84.

Mr. Schneyer provided all pictures and data he recorded to the plaintiffs.

## C.    Mr. Schneyer's Opinions

Based on his decades of experience as a dealer and distributor manager, as well as his review of relevant information in the record, Mr. Schneyer opined on the many potential reasons why a system might develop a frozen coil or operate inefficiently, as plaintiffs allege here. *Id.* ¶¶ 59–72. In particular "[m]any other system issues could simulate, mimic, or compound any issues that could be traced to Ryconox." *Id.* ¶ 59. For example, frozen coils can be the result of a number of variables independent of the presence of Ryconox, including debris, dirt, or moisture in the system, improper air flow, improperly installed feeler bulbs, improper refrigerant charge, incorrect coil alignment, and improperly installed zoned systems, all independent of Ryconox. *Id.* ¶¶ 63–69. Thus to "know whether a unit that purportedly contained Ryconox failed due to Ryconox as opposed to some other cause, one would have to examine each system individually." *Id.* ¶ 59. And "there are even more

potential causes of inefficiency than there are of a frozen coil." *Id.* ¶ 71. As a result, it "is simply impossible to make any generalized statements regarding whether or why a number of systems installed in different places by different contractors at different periods of time are operating inefficiently." *Id.* Plaintiffs have not moved to exclude any portion of these opinions.

Mr. Schneyer also explained that "most consumers would not see the unit itself until the time of installation, after purchase." Ex. 25 ¶ 9. He further explained that labels on the compressor or evaporator coil "provide technical specifications, such as model number, serial number, and voltage" that is standard across all HVAC manufacturers. *Id.* These specifications provide information that is useful to contractors and dealers during installation and service and are not intended for consumers who are considering whether to purchase an HVAC system. *Id.* The location of these labels is often "obscured by pipes or located at the rear of the unit." *Id.* Plaintiffs have not moved to exclude this opinion either.

Finally, Mr. Schneyer reviewed the data collected and observations made during the course of the inspections of the named plaintiffs' units. Ex. 27 ¶¶ 73–139; Ex. 25 ¶¶ 6, 12–28. Mr. Schneyer found that "multiple variables associated with design, installation, and maintenance of each unit are present and could have caused or contributed to a system experiencing high superheat or developing a frozen coil, could have caused or contributed to any alleged past system inefficiencies, and could still be contributing to any alleged system inefficiencies." Ex. 27 ¶ 25. These issues are due to faulty installation, poor ductwork, or inadequate maintenance by contractors or plaintiffs themselves, none of which is attributable to Carrier. Ultimately, "none of the plaintiffs have a unit that experienced a failure that they claim is due to Ryconox where the system met industry standards for design and installation." *Id.* ¶ 73.

In particular, Mr. Schneyer identified the following issues with each named plaintiff's unit:

- **Mr. Klinge:** Mr. Klinge's system suffers from design issues and incorrect location of the liquid line filter dryer. *Id.* ¶ 90. Mr. Schneyer identified several examples of poor quality duct fittings that choke off air and cause significant air turbulence in Mr. Klinge's system. *Id.* ¶ 92. There was also a large amount of dirt inside Mr. Klinge's system, which is emblematic of restricted air flow. *Id.* ¶ 94. Additionally, Mr. Klinge's evaporator coil was underperforming, his superheat was very high at 34 degrees, and his subcooling was well below the recommended subcooling for his condenser. *Id.* ¶ 96. Finally, his filter dryer was incorrectly installed on the outdoor unit, rather than directly before the TXV in the indoor unit. *Id.* ¶ 97.

- **Mr. Oddo:** Mr. Oddo's air delivery system was poorly designed, resulting in insufficient air delivery to various parts of his home and adversely affecting his system's ability to achieve its rated efficiency. *Id.* ¶ 77. Mr. Schneyer identified multiple instances where the air ducts were restricted, installed improperly, and reducing the amount of air flowing across the coil. *Id.* ¶ 81. Additionally, Mr. Oddo's system was undercharged, which places increased strain on the system. *Id.* ¶ 83.

- **Mr. Cormier:** Diagnostic tests performed on Mr. Cormier's unit "showed an alarming amount of moisture present in the system." Ex. 25 ¶ 21. Mr. Schneyer also observed that Mr. Cormier's air duct system was operating at an elevated static pressure and that the fittings of his air duct system were of poor quality. *Id.* ¶¶ 14, 17.[3]

Mr. Schneyer also explained that there was nothing wrong with using an additive in principle, and that his inspections did not turn up any issues that could be attributed to Zerol Ice. Ex. 27 ¶¶ 57–58.

## ARGUMENT

Mr. Schneyer's opinions and testimony clearly meet the *Daubert* standard for admissibility: he is, *inter alia*, "sufficiently qualified as an expert by knowledge, skill, experience, training, [and] education"; has "scientific, technical, [and] other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue"; and his "testimony is based on sufficient facts [and] data." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014); Fed. R. Evid. 702. Plaintiffs' challenges to Mr. Schneyer's opinions at best go only to the weight of the evidence and provide no basis for excluding Mr. Schneyer's testimony.

---

[3] Mr. Schneyer also identified issues with the units of Mr. Gallagher and Ms. Lamm, but those issues are not discussed in this Opposition because they have not renewed their motion for class certification.

## I. Mr. Schneyer Is Highly Qualified To Offer Opinions Regarding Plaintiffs' Carrier Units

Plaintiffs ignore Mr. Schneyer's decades of experience selling, installing, and servicing HVAC systems, instead referring to the fact that Mr. Schneyer has "a high-school diploma." Pls. Schneyer Mot. 3. Plaintiffs' personal attacks on Mr. Schneyer are regrettable and betray plaintiffs' inability to grapple with his actual opinions. Mr. Schneyer is plainly qualified to serve as an expert. Mr. Schneyer has extensive experience at all levels of the HVAC industry: as an HVAC technician, operating an HVAC dealership, serving as a service manager for an HVAC distributor, and teaching full-time as head of the HVAC department at a trade school. Ex. 27 ¶¶ 4–18. Plaintiff's demeaning tone notwithstanding, courts have repeatedly accepted and relied on opinions from experienced tradespersons such as Mr. Schneyer. *See, e.g.*, *United States v. Merritt*, 2002 WL 1821821, at *3 (S.D. Ind. June 26, 2002) (explaining that "[t]here are many areas of expertise for which advanced schooling is unnecessary, for example a car mechanic," and "[t]hese areas of expertise are no less valid because the people that practice them learned their skills through apprenticeships rather than in universities"); *State Nat. Ins. Co. v. Anzhela Explorer LLC*, 2009 WL 3335422, at *3 (S.D. Fla. Jan. 13, 2009) (noting that "[a]lthough education or scientific training are other grounds to qualify an expert, another path to expert status may be experience alone in [a] particular field," and holding that an experienced Coast Guardsman could give expert testimony as to cause of a vessel's sinking); *see also, e.g.*, *Travelers Prop. Cas. Ins. Co. v. Serv. Experts Heating & Air Conditioning, LLC*, 2015 WL 13608394, at *3 (C.D. Ill. July 27, 2015) (HVAC technician qualified to testify as to standard of care); *Kennedy v. Gish, Sherwood & Friends, Inc.*, 2015 WL 6750817, at *2 (E.D. Mo. Nov. 5, 2015) (similar); *Madison Capital Co., LLC v. S & S Salvage, LLC*, 2011 WL 195639, at *2 (W.D. Ky. Jan. 19, 2011) (similar); *Lundine v. Marzocchi USA, Inc.*, 2006 WL 3254502, at *1 (W.D. Wash. Nov. 9, 2006) (similar).

Plaintiffs also attempt to question Mr. Schneyer's independence solely because he sold Carrier equipment and worked for a distributor of Carrier equipment for many years. This extensive familiarity with Carrier is a virtue, not a reason for disregarding Mr.

8

Schneyer's opinions. That experience makes Mr. Schneyer *especially* qualified to inspect and opine on the named plaintiffs' Carrier-branded systems. Mr. Schneyer has personally made hundreds of field visits, installed or supervised the installation of hundreds of pieces of Carrier equipment, and assisted dealers in troubleshooting various problems, including by diagnosing and repairing frozen evaporator coils in Carrier units. Ex. 27 ¶¶ 5, 8, 12. Mr. Schneyer has never been a Carrier employee and does not currently work for a Carrier dealer or distributor.

Plaintiffs' citations to Mr. Schneyer's testimony implying that Carrier offered Mr. Schneyer a job he "couldn't refuse" are misleading. Pls. Schneyer Mot. 3. As Mr. Schneyer testified at his deposition, Peirce-Phelps—the independent distributor, not Carrier—offered him a position as a training manager. Ex. 56 at 53:24–54:18. And as Mr. Schneyer further explained, Peirce-Phelps was "absolutely not" owned by Carrier. *Id.* at 54:19–21. In his work for Peirce-Phelps, Mr. Schneyer certainly worked with Carrier equipment, but that fact makes him especially qualified to opine on how those systems function in the field.

Mr. Schneyer's experience stands in stark contrast to plaintiffs' expert Mr. Sikorsky, who did not inspect a single Carrier system and who has never worked for a dealer or distributor of Carrier HVAC systems. Mr. Sikorsky spent most of his career working at Trane, a Carrier competitor, where he was a "materials engineer" and "director of global supply chain engineering." Ex. 18 (Sikorsky Tr.) at 20:2–6. Unlike Mr. Schneyer, Mr. Sikorsky performed no independent testing or analysis in connection with his work in this case. *Id.* at 31:1–6. In the absence of such analysis, Mr. Sikorsky's opinions are based solely on his "experience" and review of materials in the record. *E.g.*, *id.* at 128:12–22. Mr. Schneyer's vast knowledge and field experience with Carrier-branded systems is not a basis for excluding his opinions—instead it underscores his qualifications to serve as an expert in this case.

9

## II.    Mr. Schneyer's Opinions Are Relevant

Plaintiffs claim that Mr. Schneyer's opinions regarding the design and installation of the plaintiffs' systems are "irrelevant" to their omission-based claims.  Pls. Schneyer Mot. 4–5.  That is incorrect.  Although this Court previously ruled that plaintiffs' proposed classes failed multiple Rule 23 requirements, plaintiffs nonetheless seek to certify the exact same classes as before, once again lumping together (i) consumers who purchased new HVAC systems with consumers who bought new homes; (ii) consumers who reviewed materials from Carrier with those who did not; (iii) consumers whose systems have experienced no issue with those whose systems experienced a temporary failure; and (iv) consumers who were fully compensated for a repair under Carrier's warranty with those who may have paid a repairperson out of pocket.  As Carrier has explained and Mr. Schneyer's opinions confirm, plaintiffs' "different alleged injuries" require different proofs, making class treatment inappropriate.  *Arthur v. United Indus. Corp.*, 2018 WL 2276636, at *6 (C.D. Cal. May 17, 2018).  In claiming otherwise, plaintiffs assert (1) that they "allege a singular injury," namely that they "did not receive the benefit of the bargain to which they were entitled, i.e., a transaction that included non-defective air conditioner"; and (2) that in explaining how plaintiffs' classes encompass differently-situated groups, Carrier is referring only to "manifestations of the defect."  Pls. Class Reply 25; Pls. Schneyer Mot. 4–5.  Plaintiffs are wrong on both counts.

*First*, a fundamental assumption of a benefit-of-the-bargain theory is that the product at issue suffered from a common defect.  *See Frosini v. Bridgestone Firestone N. Am. Tire, LLC*, 2007 WL 2781656 *7, 13–15 (C.D. Cal. Aug. 24, 2007) (rejecting argument that "it is the purchase of a defective tire, regardless of whether it has failed, that defines class membership and damages" where there were 75 different tire populations, and whether a tire "had failed or was likely to fail due to a ... defect" would require individual inquiry).  There is no common defect here at all.  Plaintiffs' classes encompass hundreds of different models, multiple pairing options, and multiple sizes, not to mention people who acquired these varied units from HVAC professionals or through the very different process of buying

10

a new home.  This Court already found that the latter difference between new home buyers (RNC) and add-on replacement (AOR) purchasers precluded certification.  3/22/19 *Oddo* Op. 13 [*Oddo* ECF No. 202]; 3/28/19 *Cormier* Op. 7 [*Cormier* ECF No. 103].[4]    Mr. Schneyer's opinions show that plaintiffs' purported overpayment injury is not common among class members because there are multiple reasons their units may have experienced an alleged "frozen coil" and loss of cooling, including debris in the system, improper air flow, and improper refrigerant charge (among others).  Ex. 27 ¶¶ 63–68.  Thus the fact that a unit experienced a frozen coil does not mean it had a defect attributable to Ryconox.

The *Cholakyan* case out of this District confirms the relevance and importance of an opinion like that Mr. Schneyer offers here.  The court there denied a motion for class certification of similar consumer protection claims in an automotive context where the plaintiff had alleged that "the class vehicles have a unitary 'water management system' that is uniformly defective" and made the vehicles "susceptible to clogging."  281 F.R.D. at 552.  The Court then observed that, "[a]ssuming *arguendo* that class vehicles experience water leaks, and that the leaks have a propensity to cause electrical malfunctions, the crucial question that must be answered is why each class member's vehicle experienced water leaks."  *Id.*; *see also id.* (noting that the alleged water leak defect "form[s] the gravamen of his complaint" and is "critical to his ability to show materiality on his consumer protection claims").  The evidence in that case showed that the leaks could have multiple causes, given the interconnected nature of the system.  *See id.* at 552–53.

Here, as in *Cholakyan*, Mr. Schneyer's inspections show that the frozen coils of which plaintiffs complain could be "trace[d] … to one of several independently operating vehicle components, each of which may or may not be functioning properly."  *Id.* at 553.

---

[4] Plaintiffs claim the Court "previously expressed no concern about the injury requirement as to AOR purchasers."  Pls. Class Reply 24.  That is incorrect.  The Court previously found that "the inclusion of homebuyers in the Proposed Classes renders plaintiffs unable to satisfy the commonality requirement of Rule 23(a)."  *Oddo* Class Cert. Op. 13 [*Oddo* ECF No. 202]; *Cormier* Class Cert. Op. Ex. A at 13 (same) [*Cormier* ECF No. 103].  That the Court did not need to reach many of the issues Carrier raised previously due to plaintiffs' failure to satisfy even the threshold commonality requirement in no way means that the Court had "no concern" about the injury requirement for AOR purchasers.

As another court explained in denying class certification in an HVAC case, "an HVAC unit failing to heat or cool malfunctions, but the [alleged defect] may not be the source of the malfunction." *Kotsur v. Goodman Global, Inc.*, 2016 WL 4430609, at *8 (E.D. Pa. Aug. 22, 2016). The complexity of an HVAC system renders claims like these ill-suited to certification of broad classes, as every court to consider the question has concluded. *See PB Prop.*, 2016 WL 7666179, at *27 ("Even if Plaintiffs could produce evidence that Goodman's copper evaporator coils contain a common defect—the propensity to develop formicary corrosion and leak refrigerant—the question of *whether* and *why* a particular coil failed are individual questions that will be unique to each class member and would overwhelm the litigation."); *Kotsur*, 2016 WL 4430609, at *8; *Gustafson v. Goodman Mfg. Co. LP*, 2016 WL 1029333, at *13 (D. Ariz. Mar. 14, 2016); *Harris v. Nortek Global HVAC LLC*, 2016 WL 4543108, at *14 (S.D. Fla. Jan. 29, 2016); *St. Gregory Cathedral Sch. v. LG Elecs., Inc.*, 2015 WL 5604763, at *6 (E.D. Tex. Sept. 23, 2015).

**Second**, and relatedly, Carrier's arguments about the lack of predominance on the element of injury are not about the manifestation of the defect. Plaintiffs cite *Nguyen v. Nissan North America, Inc.*, 932 F.3d 811 (9th Cir. 2019), to claim that they can simply assert that there was a "defect" and then avoid actually coming forward with class-wide evidence showing that the "defect" commonly affected the units at issue. But *Ngyuen* never endorsed this evidence-free approach. On the contrary, *Ngyuen* simply repeated what the Ninth Circuit held previously in *Wolin v. Jaguar Land Rover North American, LLC* that "proof of the manifestation of the defect is not a prerequisite to class certification." *Ngyuen*, 932 F.3d at 820 (quoting *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1173 (9th Cir. 2010)). As one court in this District explained in denying class certification in an HVAC case, the *Wolin* principal does not mean "*all* product defect cases must be certified." *McVicar v. Goodman Global, Inc.*, 2015 WL 4945730, at *13 (C.D. Cal. Aug. 20, 2015). In *Wolin*, the issue was a "geometry defect," where the "defect was such … that the injury was inevitable and would require earlier than normal tire replacement." *Webb v. Carter's Inc.*, 272 F.R.D. 489, 498 (C.D. Cal. 2011). Whereas an

12

improper alignment by its nature will inevitably lead to premature tire wear, there is no evidence that Ryconox will lead to any performance issues. Carrier's years of warranty data shows the opposite is in fact true.

More broadly, Carrier's arguments on injury are focused on showing how plaintiffs' broad classes actually encompass different groups for whom Ryconox played very different roles (people who bought units which had no increased risk of failure, people who bought homes versus replacement units, and so forth). Mr. Schneyer's opinions reinforce these basic facts about plaintiffs' proposed classes, and as Carrier explained, classes containing such disparate groups should not be certified. *See Frosini*, 2007 WL 2781656, at \*15; *Grodzitsky v. Am. Honda Motor Co.*, 2015 WL 2208184, at \*10–11 (C.D. Cal. Apr. 22, 2015).

## III.   Mr. Schneyer's Opinions Are Based On A Reliable Methodology

The remainder of plaintiffs' motion is a series of technical criticisms regarding some of Mr. Schneyer's opinions about some of the named plaintiffs' systems. Each of these specific arguments for excluding Mr. Schneyer's opinions fails—they at best go to the weight of the evidence and do not warrant disregarding Mr. Schneyer entirely. *See, e.g.*, *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998); *Yu-Santos v. Ford Motor Co.*, 2009 WL 1392085, at \*11 (E.D. Cal. May 14, 2009).

Plaintiffs assert that Mr. Schneyer's analysis of the design and installation of the named plaintiffs' systems is not based on an accepted or reliable methodology. Pls. Schneyer Mot. 4–7. But plaintiffs provide no support for this assertion. Mr. Schneyer's inspections were completed according to an inspection protocol that the plaintiffs were provided with and did not object to. At each inspection, Mr. Schneyer was assisted by a local licensed HVAC contractor, whom he directed to perform various tests. Ex. 27 ¶ 76. Plaintiffs also had the opportunity to bring their own expert or HVAC contractor to conduct inspections, but decided not to.

*First*, plaintiffs take issue with Mr. Schneyer's reliance on total external static pressure readings, which support his observations regarding the plaintiffs' air delivery

systems. Pls. Schneyer Mot. 5–6. Plaintiffs rely exclusively on the impermissible opinion of their expert, Mr. Sikorsky, who did not attend any of the inspections or perform any work of his own relating to the named plaintiffs' systems. Mr. Sikorsky's opinions should therefore be disregarded. Moreover, that Mr. Sikorsky disagrees with Mr. Schneyer is not a reason for excluding Mr. Schneyer. In contrast, Mr. Schneyer's measurements followed a reliable methodology, and his analysis rests on sound principles found in the industry-standard publications Manual D and Manual J, which Mr. Sikorsky does not address. Ex. 27 ¶¶ 16, 19, n.3.

Plaintiffs stress that Mr. Schneyer "never measured air flow, the very metric he claims is problematic." Pls. Schneyer Mot. 5. But Mr. Schneyer did not need to measure air flow. Instead, he relied on the total external pressure, which "tells you how well your *duct system* is *delivering* the air generated by the blower." *Id.* ¶ 78 (emphasis added). Plaintiffs claim this is "completely wrong." Pls. Schneyer Mot. 6. But as Mr. Schneyer explained, "total external static pressure measures the pressure exerted against the duct system (similar to the outward pressure of air filling a balloon) and also measures the back pressure exerted on the blower from the pressure built up with the duct system." Ex. 27 ¶ 78. This is consistent with how a leading trade article describes static pressure readings, which "can be broken down into three things: 1. The bursting pressure or outward force in a duct system; 2. The pressure of air pushing against the walls of a duct system; and 3. The resistance air encounters as it is traveling through a duct system can show." Nick Kostora, *How and Why You Should Conduct Static Pressure Readings* (June 20, 2016), The News, https://www.achrnews.com/articles/132771-how-and-why-you-should-conduct-static-pressure-readings (Ex. 58).

Plaintiffs further claim that a static pressure reading "says nothing about the air delivered by the blower." Pls. Schneyer Mot. 6. That is wrong—a critical component of any HVAC system is the ductwork that conveys the air that is generated from the blower and that is cooled as it passes through the evaporator coil and through the house and back again. Ex. 27 ¶¶ 39–40, 47b. The air delivery system can become "largely imbalanced

14

across the [indoor evaporator] coil," due to pockets of turbulence created by pressure drops (just like a kink in a water hose can increase pressure in a hose), when there are design or installation issues with the ducts that deliver the air generated by the blower. *Id.* ¶¶ 64a, 80; Ex. 58 ("High static pressure is often caused by blockages in ducts, improper duct sizing, closed dampers, and kinked flex ducts."). As Mr. Schneyer explained, this turbulence in the air ducts can lead to a frozen coil. Ex. 27 ¶ 64a. Because "the airborne heat needed to bring the refrigerant boil is not sufficiently present on those sections of the coil," the "refrigerant in those sections of the coil remains at a lower temperature, the coil becomes colder in that section, and the condensate running over that section freezes." *Id.* Thus high static pressure is a crucial indicator that airflow through the system is restricted.

*Second*, plaintiffs' arguments for disregarding Mr. Schneyer's observations about the moisture in Mr. Cormier's system lack merit. Plaintiff argues that Mr. Schneyer's observations about Mr. Cormier's system are based on "unreliable speculation." Pls. Schneyer Mot. 7. But plaintiffs do not challenge Mr. Schneyer's methodology to take the moisture reading. Nor do plaintiffs challenge Mr. Schneyer's opinion that moisture can lead to frozen coils. Plaintiffs concede that the moisture may have been introduced at the time of installation, but also claim that it is "more likely" moisture could also have been introduced when Mr. Cormier's system was treated with Zerol Ice. *Id.* Plaintiffs have provide no evidence that moisture was introduced when Zerol Ice was applied and, in any event, this argument at best goes to weight. It also underscores the inherently individualized nature of the claims plaintiffs seek to certify here. Plaintiffs' reliance on Mr. Sikorsky's opinions is again misplaced, as Mr. Sikorsky performed no testing on Mr. Cormier's system, Zerol Ice itself, or on its application to any HVAC system.[5]

*Third*, Plaintiffs' argument that Mr. Schneyer's report is unreliable due to a few typos is wrong. Pls. Schneyer Mot. 7. Transcription errors and minor mathematical

[5] Mr. Sikorsky's view that the acidity levels would be higher if the moisture was introduced at installation is unsupported by any testing or analysis whatsoever. Pls. Schneyer Mot. 5; Ex. 18 at 224:4–20.

mistakes are not a basis for exclusion. *See, e.g.*, *Todd v. Tempur-Sealy Int'l, Inc.*, 2016 WL 5462428, at *6 n. 5(N.D. Cal. Sept. 28, 2016) (mathematical conversion error and other "technical errors are not cause for excluding an entire opinion"); *Smith v. Pfizer, Inc.*, 714 F. Supp. 2d 845, 851 (M.D. Tenn. 2010) (math mistakes and typographical errors did not warrant exclusion of expert's opinion). If they were, then Mr. Sikorsky's report would require exclusion on this basis as well, as it contained numerous errors. Ex. 44 (Sikorsky Dep.) at 98:21–100:12, 397:12–399:19.

## CONCLUSION

For these reasons, plaintiffs' motion to limit consideration of the expert report of Mr. Schneyer should be denied.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DATED:  December 4, 2019

Respectfully submitted,


By:  */s/ K. Winn Allen*
      K. Winn Allen

KIRKLAND & ELLIS LLP

K. Winn Allen (*pro hac vice*)
winn.allen@kirkland.com
Devin S. Anderson (*pro hac vice*)
devin.anderson@kirkland.com
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington, DC  20004
Telephone: (202) 389-5000
Facsimile: (202) 389-5100

Jonathan Jeffrey Faria (State Bar No. 274019)
jonathan.faria@kirkland.com
333 South Hope Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

Attorneys for Defendants