1

**SHEPHERD, FINKELMAN, MILLER**
**& SHAH, LLP**

2

Kolin Tang

3

1401 Dove Street

4

Suite 540
Newport Beach, CA 92660

5

Phone: 323-510-4060

6

Fax: 866-300-7367
Email: ktang@sfmslaw.com

7

*Counsel for Plaintiffs, on behalf of themselves*
*and all others similarly situated*

8

9

[Additional Counsel on signature page]

10

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

11

12

STEVE ODDO, RAJENE
REARDON, ANTHONY LASALA,
LINDA LAMM, KEITH KIMBALL,
NORMAN KLINGE, and DAN
GALLAGHER, on behalf of
themselves and all others similarly
situated,

13

14

15

16

17

Plaintiffs,

18

vs.

19

ARCOAIRE AIR CONDITIONING
AND HEATING, CARRIER
CORPORATION, BRYANT
HEATING AND COOLING
SYSTEMS, COMFORTMAKER AIR
CONDITIONING & HEATING,
INTERNATIONAL COMFORT
PRODUCTS LLC, and UNITED
TECHNOLOGIES CORPORATION,

20

21

22

23

24

25

Defendants.

26

27

28

) Case Number: 8:15-cv-01985 CAS (Ex)
)
)
)
) **PLAINTIFFS' REPLY IN SUPPORT**
) **OF MOTION TO LIMIT**
) **CONSIDERATION OF THE**
) **EXPERT REPORT OF DR. JOHN H.**
) **JOHNSON, IV**
)
)
)
)
) Amended Complaint Filed: March 7, 2016
)
) Judge: Hon. Christina A. Snyder
) Hearing: January 27, 2020
) Time: 10:00AM
) Courtroom: 8D, First Street Courthouse
)
) **REDACTED VERSION OF**
) **DOCUMENT PROPOSED TO BE**
) **FILED UNDER SEAL**
)
)
)

---

PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO LIMIT CONSIDERATION OF DR. JOHNSON
No. 8:15-cv-01985 CAS (Ex)

| | |
|---|---|
| PAUL CORMIER and NICHOLAS SHONER, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    vs.<br><br>CARRIER CORPORATION,<br><br>    Defendant. | Case Number: 8:18-cv-07030-CAS (EX)<br><br>Consolidated with<br>Case No. 8:15-cv-01985<br>for Pretrial Proceedings |

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

ARGUMENT ..............................................................................................................2

I.    *Nguyen* Confirms The Validity Of Plaintiffs' Cost-Of-Repair Damages Model....3

II.   Dr. Johnson's Opinion That Mr. Sikorsky's Damages Model Is Not "Consistent" With Plaintiffs' Theory Of Liability Is An Improper Legal Conclusion ...................................................................................................12

III.  Dr. Johnson's Opinion That Mr. Sikorsky's Damages Model Is Not "Consistent" With Plaintiffs' Theory Of Liability Is Unreliable .........................13

IV.  Dr. Johnson's Opinion Is Also Unreliable Because It Mischaracterizes Plaintiffs' Claims....................................................15

V.   Dr. Johnson Is Not Qualified To Criticize Mr. Sikorsky's Opinion That The Presence Of Ryconox Is A Defect .........................................17

VI.  Dr. Johnson Improperly Calculated Reported Failure Rates................18

CONCLUSION ........................................................................................................20

# TABLE OF AUTHORITIES

## CASES

*Aspinall v. Philip Morris Cos.*,
    813 N.E.2d 476 (Mass. 2004) ...................................................................... 11

*Baker v. Microsoft Corp.*,
    797 F.3d 607 (9th Cir. 2015) ...................................................................... 17

*Brown v. Bennett*,
    136 S.W. 3d 552 (Mo. Ct. App. 2004) ........................................................ 11

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ................................................................................ *passim*

*In re Conagra Foods, Inc.*,
    302 F.R.D. 537 (C.D. Cal. 2014) ................................................................. 2

*Daniel v. Ford Motor Co.*,
    2016 U.S. Dist. LEXIS 65723 (E.D. Cal. May 17, 2016) ............................. 1

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) .................................................................... 2, 4, 12, 20

*Falco v. Nissan N. Am., Inc.*,
    2016 U.S. Dist. LEXIS 46115, 2016 WL 1327474 (C.D. Cal. Apr. 5, 2016) .......... 1, 5

*Faltermeier v. FCA US LLC*,
    2016 WL 10879705 (W.D. Mo. May 26, 2016) .......................................... 11

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ................................................................................ 12, 13

*In re Gen. Motors LLC Ignition Switch Litig.*,
    2019 WL 3564698 (S.D.N.Y. Aug. 6, 2019) ................................................ 9

*Hadley v. Kellogg Sales Co.*,
    324 F. Supp. 3d 1084 (N.D. Cal. 2018) ..................................................... 10

*Hand Elecs., Inc. v. Snowline Joint Unified Sch. Dist.*,
    21 Cal. App. 4th 862 (1994) ........................................................................ 7

*Miller v. Fuhu Inc.*,
  2015 U.S. Dist. LEXIS 162564, 2015 WL 7776794 (C.D. Cal. Dec. 1, 2015)
  (Snyder, J.) .................................................................................2, 5, 6, 19

*Morales v. Kraft Foods Grp., Inc.*,
  2017 U.S. Dist. LEXIS 97433 (C.D. Cal. June 9, 2017) ..................................... 10, 13

*Nguyen v. Nissan N. Am., Inc.*,
  932 F.3d 811 (9th Cir. 2019) ...............................................................*passim*

*In re NJOY, Inc. Consumer Class Action Litig.*,
  120 F. Supp. 3d 1050 (C.D. Cal. 2015) ............................................... 10, 13

*Pulaski & Middleman, LLC v. Google, Inc.*,
  802 F.3d 979 (9th Cir. 2015) ...................................................................5

*Saavedra v. Eli Lilly & Co.*,
  2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) ............................................. 10

*Safeco Ins. Co. v. J & D Painting*,
  17 Cal. App. 4th 1199 (1993) .................................................................8

*Salas v. Toyota Motor Sales, U.S., Inc.*,
  2019 U.S. Dist. LEXIS 77847 (C.D. Cal. Mar. 27, 2019)..................................1

*Sali v. Corona Reg'l Med. Ctr.*,
  909 F.3d 996 (9th Cir. 2018) ...........................................................2, 4, 20

*Shiplet v. Copeland*,
  450 S.W.3d 433 (Mo. Ct. App. 2014) .................................................... 11

*Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co.*,
  837 N.E.2d 1121 (Mass. 2005) .............................................................. 11

*United States v. Sierra Pac. Indus.*,
  2012 WL 1898945 (E.D. Cal. May 23, 2012) ............................................8

*Wasson v. Schubert*,
  964 S.W. 2d 520 (Mo. Ct. App. 1998) ................................................... 11

*Wolin v. Jaguar Land Rover N. Am., LLC*,
  617 F.3d 1168 (9th Cir. 2010) ....................................................15, 16, 17

*Zakaria v. Gerber Prod. Co.*,
  2017 WL 9512587 (C.D. Cal. Aug. 9, 2017) .......................................... 10

# INTRODUCTION

As discussed in Plaintiffs' opening brief (ECF No. 255 ("MTE Johnson")), the Ninth Circuit's decision in *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 818 (9th Cir. 2019), confirms that a cost-of-repair damages model is both "consistent" with omission claims arising out of a product defect and a "reasonable basis of computation of damages." Moreover, the Ninth Circuit rejected the same "mischaracterization" of the plaintiff's claims that Carrier attempts here. The presence of the unapproved rust inhibitor Ryconox within the units *is itself the injury*, not the post-sale manifestation in performance loss. *Nguyen*, thus, unequivocally puts to rest Carrier's attempts to muddy the issues through its rebuttal expert, Dr. Johnson, upon whom Carrier relies for its position that Mr. Sikorsky's cost-of-repair damages model is not "consistent" with Plaintiffs' theory of liability because those damages calculations are not limited to HVAC units where the defect manifests.

Faced with *Nguyen*, Carrier spends a significant portion of its brief attempting to salvage its motion to exclude Mr. Sikorsky's cost-of-repair model, rather than defending the relevance, reliability, or credibility of Dr. Johnson's critiques. When it finally gets to defending Dr. Johnson's analysis and conclusions, Carrier's responses consist of misdirection, implicit concessions, and attempts at minimizing Dr. Johnson's many methodological errors.

The Court, however, need not expend its time ascertaining the extent of the flaws of Dr. Johnson's report because Plaintiffs' cost-of-repair damages model is indistinguishable from the model that the Ninth Circuit recently approved in *Nguyen* and from the models endorsed by numerous district courts in similar cases that concluded repair cost is a viable class-wide measure of damages in cases involving failure to disclose known product defects. *See, e.g.*, *Salas v. Toyota Motor Sales, U.S., Inc.*, 2019 U.S. Dist. LEXIS 77847, at *35-36 (C.D. Cal. Mar. 27, 2019) (UCL and FAL claims); *Daniel v. Ford Motor Co.*, 2016 U.S. Dist. LEXIS 65723, at *22-24 (E.D. Cal. May 17, 2016) (UCL claims); *Falco v. Nissan N. Am., Inc.*, 2016 U.S. Dist. LEXIS 46115, at *37,

2016 WL 1327474 (C.D. Cal. Apr. 5, 2016) (UCL, CLRA, FAL, and common law claims); *Miller v. Fuhu Inc.*, 2015 U.S. Dist. LEXIS 162564, at *58, *60, 2015 WL 7776794 (C.D. Cal. Dec. 1, 2015) (Snyder, J.) (UCL, CLRA, and FAL claims). Following these authorities, the Court does not need to *exclude* Dr. Johnson's opinion to find that Plaintiffs' cost-of-repair model is an acceptable class-wide damages model for omission claims, satisfies *Comcast*, and is "a reasonable basis of computation," just as it was in *Nguyen*. 932 F.3d at 818.

Nevertheless, the Court should afford no weight to Dr. Johnson's core opinion that Mr. Sikorsky's damages model "do[es] not provide an economic theory of class-wide harm that is consistent with Plaintiffs' theory of liability," as well as Dr. Johnson's analysis upon which that conclusion is built, (Def. Ex. 20, at ¶ 6), because it is a clearly improper legal conclusion that violates the province of the Court. It is no coincidence that Dr. Johnson's opinion mirrors the standard set forth in *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013), that Plaintiffs' "damages case must be consistent with [their] liability case." *See In re Conagra Foods, Inc.*, 302 F.R.D. 537, 557 (C.D. Cal. 2014) (quotation omitted) ("Courts have held that expert witnesses' use of 'judicially defined terms,' 'terms that derived their definitions from judicial interpretations,' and 'legally specialized terms' . . . constitute[ ] [an] expression of opinion as to the ultimate legal conclusion."). This offense is separate and apart from Dr. Johnson's foray beyond his expertise as an economist, which would otherwise be examined under the standard set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and only subject to limited consideration, as opposed to complete exclusion, under *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996 (9th Cir. 2018).

Moreover, Dr. Johnson's opinions merit very little consideration, if any, under the *Daubert* standard and *Sali* because Dr. Johnson goes beyond his expertise as an economist to opine on legal as well as engineering issues, mischaracterizes Plaintiffs' claims, and applies a careless and overinclusive approach to his calculations based on

flawed assumptions, all of which Carrier either concedes or fails to meaningfully address in its opposition brief, ECF No. 270.

## ARGUMENT

### I. *Nguyen* Confirms The Validity Of Plaintiffs' Cost-Of-Repair Damages Model

As discussed in Plaintiffs' opening brief, the Ninth Circuit confirmed in *Nguyen* that Plaintiffs' cost-of-repair damages models satisfy *Comcast*. MTE Johnson at 2-4.[1] Just as the *Nguyen* plaintiff "demonstrated the nexus between his legal theory—that Nissan violated California law by selling vehicles with a defective clutch system that was not reflected in the sale price—and his damages model—the average cost of repair," Plaintiffs here "demonstrated the nexus between [their] legal theory"—that Carrier violated California and other state laws by selling HVAC units contaminated with Ryconox—and their damages model—the average cost of repairing the HVAC system by removing the contamination. *See Nguyen*, 932 F.3d at 821. "Whether [Plaintiffs'] proposed calculation of the replacement cost is accurate, whether the [system] was actually defective, and whether [Carrier] knew of the alleged defect are merits inquiries unrelated to class certification." *Id.*

The Ninth Circuit's holding in *Nguyen* alone precludes the applicability of Dr. Johnson's report to Plaintiffs' motion for class certification, notwithstanding its other problems. Carrier relies on Dr. Johnson's report mainly in its effort to exclude Mr. Sikorsky's cost-of-repair damages model based on Dr. Johnson's conclusion that the model "do[es] not provide an economic theory of class-wide harm that is consistent with Plaintiffs' theory of liability." (Def. Ex. 20, at ¶ 6); *see* Defs.' Motion to Exclude

---

[1] Mr. Sikorsky proposes two cost-of-repair damages models: one based on the cost of removing the contaminant from the air conditioners at the time of sale (Pl. Ex. 7, at ¶¶ 101-12, 131-41), and the second based on the cost of injecting Zerol Ice, (*id.*, at ¶¶ 102-30), which Carrier claims is a viable repair at any time, even long after sale. As Mr. Sikorsky explains, the post-sale and post-use Zerol Ice treatment causes damage and creates new risks for the HVAC unit (*id.*, at ¶¶ 142-68), but Plaintiffs present the alternative models for the factfinder to determine which is the most appropriate model to apply.

1  Sikorsky, ECF No. 238 ("MTE Sikorsky"), at 16. But *Nguyen* plainly and clearly rejects
2  that premise in its entirety and, thus, establishes that Dr. Johnson's conclusion, which is,
3  incidentally, also an improper legal conclusion, is completely wrong.

4     Despite *Nguyen's* clear rejection of Dr. Johnson's challenge to Mr. Sikorsky's
5  damages model, Carrier still responds with four arguments disputing the propriety of this
6  model under *Comcast*. Br. at 7-13. These arguments do not actually address Plaintiffs'
7  challenges to Dr. Johnson's report—which is the sole subject of Plaintiffs' motion—nor
8  do they have any merit. Instead, they largely regurgitate arguments Carrier made in its
9  attempt to exclude Mr. Sikorsky's damages model from consideration based on a
10 *Daubert* analysis, a request inappropriate at class certification. MTE Sikorsky at 19-21;
11 *see Sali*, 909 F.3d at 1006 ("[I]n evaluating challenged expert testimony in support of
12 class certification, a district court should evaluate admissibility under the standard set
13 forth in *Daubert*. . . . But admissibility must not be dispositive.").

14    ***First***, Carrier asserts that "the cost of repair only works as a viable proxy for
15 damages when an actual, viable repair is possible that could be performed in the field to
16 address the alleged defect," and then claims that Plaintiffs' cost-of-repair model is
17 "wholly hypothetical" because it has never been performed in the field and cannot be
18 performed in the field. Br. at 8-10. The "in the field" requirement that Carrier seeks to
19 impose for a "benefit-of-the-bargain"-type damages model is drawn from whole cloth
20 and contrary to *Nguyen*.

21    In *Nguyen*, the Ninth Circuit endorsed the plaintiff's position that the "cost of
22 replacing [ ] a defective component . . . is a *proxy* for [his] overpayment of the vehicle *at*
23 *the point of sale*." 932 F.3d at 821 (emphasis added). This is because the *Nguyen*
24 plaintiff, like Plaintiffs here, sought compensation for a defect "that was not reflected in
25 the sale price." *Id.* The cost-of-repair at the time of sale is a proper proxy of damages, as
26 it "satisf[ies] the expectancy interest of the defrauded [P]laintiff[s]" and is a non-

27

28

---

speculative and reasonable measure of Plaintiffs' loss of their "benefit-of-the-bargain." *See id.* (quoting *Stout v. Turney*, 586 P.2d 1228, 1232 (Cal. 1978)).[2]

Though Carrier cites the record in *Nguyen* to suggest that the named plaintiff "had already had the component replaced" and that the "components were available from a Nissan supplier," the Ninth Circuit did not rely on or even mention those facts to reach its decision, much less impose an "in the field" requirement. Instead, the Ninth Circuit found that the district court's "focus[ ] on potential post-purchase value" led the district court to err. *Id.* at 820. If anything, the cost-of-repair at the time of sale is a more accurate proxy of damages than post-sale, a point that Carrier even agrees with later in its brief. Br. at 14 n.6 ("[I]n cases alleging an omission-based theory of liability, a valid damages model must 'focus . . . on the value at the time of purchase.'").

Meanwhile, none of the authorities Carrier cites—all of which predate *Nguyen*—hold to the contrary. In *Falco*, the court found that the average cost-of-repair model was sufficient because it captured the "money that [the plaintiffs] would not have needed to spend had Nissan either disclosed the defect or repaired [it] itself." 2016 WL 1327474, at *12. Likewise, here, Mr. Sikorsky's cost-of-repair model, i.e., the cost to remove the contaminant at the point of sale, captures the cost had Carrier "repaired [the defect] itself." *See id.* In *Miller*, this Court disregarded the expert's proposed cost-of-repair model because the expert "implicitly acknowledge[ed]" that it was unclear whether the "means of repairing the defect . . . exists." 2015 WL 7776794, at *20. In contrast, Mr. Sikorsky is clear that his cost-of-repair model is not "theoretical"; he describes the steps to do so without any of the expert's hedging in *Miller*. *Compare* Pl. Ex. 7, at ¶ 135

---

[2] Carrier also argues that the air conditioner may have run for some time prior to the time of purchase for new home purchasers. Br. at 9 n.3. That is irrelevant, however, because the cost of repair is merely a proxy for benefit-of-the-bargain damages. The calculation of damages "requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation." *Nguyen*, 932 F.3d at 818 (quoting *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1183 (9th Cir. 2017)); *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015).

("Accordingly, removing Ryconox from a new system before it has run in the field would require the following steps . . . ."), *with Miller*, 2015 WL 7776794, at *20, *20 n.8 (noting that the plaintiff's expert had not identified a viable means of repair and that his declaration stated, "*[I]f* it is determined that a 'repair' of the defect *could be* accomplished, then the cost of repair would provide another way to measure classwide damages. . . . Of course, not all defects are capable of being repaired, because doing so would require redesigning the product'").

Moreover, Carrier ignores Mr. Sikorsky's alternative cost-of-repair damages model, which is based on the cost of treating the affected HVAC units with Zerol Ice, which was Carrier's own method of "repairing" the units after sale and use. (Pl. Ex. 7, at ¶¶ 102-30.) Again, while it is not a complete repair because it causes additional damage to the system (███████████████████████████████) it does mitigate the effects caused by Ryconox and, thus, presents a minimum repair cost. (*Id.*, at ¶ 102.) As relevant here, such a partial repair can be performed "in the field" post-purchase and use. (*See id.*, at ¶ 130.)

**Second**, Carrier argues that Mr. Sikorsky's cost-of-repair model is distinguishable from that in *Nguyen* because the time-of-sale model "would generate enormous windfalls that do not fairly approximate the alleged price inflation that resulted from the purported omission." Br. at 10-11. As a preliminary matter, Carrier's "windfall" argument contradicts its first argument because the cost of repair at the time of purchase can only be less than the complete cost of repair today.[3] (*See* Pl. Ex. 7, at ¶ 132.) In any event, Carrier bases this assertion on Plaintiffs and class members receiving a greater percent of the purchase price of an HVAC unit using Mr. Sikorsky's cost-of-repair model than the *Nguyen* plaintiff did; a result, Carrier argues, purportedly rendered even more implausible because (a) some class members already had their HVAC unit

---

[3] Again, the post-sale and post-use treatment using Zerol Ice that Mr. Sikorsky proposes creates other problems, which renders it an incomplete fix. (Pl. Ex. 7, at ¶¶ 142-68.) A complete post-sale and post-use fix would require an extensive overhaul of the HVAC unit, which Plaintiffs do not propose.

"repaired" with a Zerol Ice injection or a replaced TXV at no cost and did not "suffer[] any kind of failure or other harm," or (b) "purchased a larger 3.5- to 5-ton unit for which there was no increased rate in failure."[4] Br. at 10-11. Carrier does not claim that any class member received the repair that Mr. Sikorsky advises should have been performed, which would remove the Ryconox from the system, as opposed to the "band-aid" solutions of replacing stuck TXVs or injecting Zerol Ice. (See Pl. Ex. 7, at ¶ 18.D.) Moreover, Carrier's argument ignores that the cost-of-repair is a proxy for overpayment.

As for 3-5 ton units, as explained in Plaintiffs' class certification reply brief (ECF No. 252, at 26-27), these contain Ryconox, just like 1.5-2.5 ton units. There is no difference in Plaintiffs' theory of liability between different sizes—they are all defective due to the presence of Ryconox. Carrier is once again attempting to mischaracterize the claims as being based on *manifestation*, as opposed to the defect itself. Moreover, the reason Carrier did not see an increased failure rate in 3-5 ton units is because Carrier never tracked Ryconox-related failures in them and admitted that "Ryconox-related claims for these larger 3-5 ton units cannot reliably be gathered based on [Carrier's] warranty data." (Defs.' Interrogatory Response 10 [Pl. Ex. 63]; see Pl. Ex. 64, at 5494; Pl. Ex. 7, at ¶¶ 94-97.)

Tellingly, Carrier relies on three inapposite authorities addressing damages in the context of the tortious destruction of property under California common law to support its position. *See Hand Elecs., Inc. v. Snowline Joint Unified Sch. Dist.*, 21 Cal. App. 4th 862, 865 (1994) (where a school district employee "either failed to stop at a stop sign or proceeded prematurely into traffic and broadsided [plaintiff]'s truck, which had the right-of-way" and damaged "[plaintiff]'s equipment . . . include[ing] two pantographs,

---

[4] The cost-of-repair is relatively high because the compressor, where Ryconox was used as a rust preventative, is the heart of an HVAC unit, akin to the engine of a car. (Pl. Ex. 7, ¶ 135.) But neither *Nguyen* nor any other authority gives manufacturers a free pass when the undisclosed defect is expensive to fix. The high cost of repair is one of the reasons Carrier elected to sell the units without fixing the defect first (and without disclosing it either).

used for manufacturing printed circuit boards"); *Safeco Ins. Co. v. J & D Painting*, 17 Cal. App. 4th 1199, 1202 (1993) ("As a general rule, a plaintiff in a suit for negligent damage to real property is allowed to recover either the cost of repair or the diminution in value, but not both."); *United States v. Sierra Pac. Indus.*, 2012 WL 1898945, at *3 (E.D. Cal. May 23, 2012) ("For tortious injury to real property, the general rule is that the plaintiff may recover the lesser of (1) the diminution in the property's fair market value, as measured immediately before and immediately after the damage; or (2) the cost to repair the damage and restore the property to its pretrespass condition, plus the value of any lost use."). Obviously, none of these authorities concerned whether the "benefit-of-the-bargain model of damages aligns with [Plaintiffs'] legal theory." *Nguyen*, 932 F.3d at 821. Cases concerning tortious destruction of property are simply irrelevant here.

That Carrier was forced to resort to relying on these irrelevant authorities speaks to the weakness of its position. As the Ninth Circuit explained in *Nguyen*, whether Mr. Sikorsky's calculations were correct, whether the defect is adequately remedied with a compressor replacement or Zerol Ice injection, and whether the defect exists in all units are all merits questions unrelated to class certification. *See Nguyen*, 932 F.3d at 821 ("Whether his proposed calculation of the replacement cost is accurate [and] whether the clutch was actually defective . . . are merits inquiries unrelated to class certification."). What matters is that all of those questions will be answered through the presentation of class-wide evidence. "Plaintiff[s'] theory is that the allegedly defective [compressor contaminated with an unapproved rust inhibitor] is itself the injury, regardless of whether the faulty [contamination] caused performance issues," so whether the affected units suffered from performance issues is irrelevant. *Id.* at 822.

Moreover, Carrier's "windfall" argument falls apart under a "benefit-of-the-bargain" analysis. For example, in Mr. Oddo's instance, he bargained for a defect-free HVAC unit priced at $1,169.48, which he purchased from a Carrier distributor and installed himself, and Mr. Sikorsky calculated that the cost to remove the contamination at the time of purchase is $946 (which is 81% of the purchase price, not 88% as Carrier

1  contends), and the cost to inject Zerol Ice, in the alternative, is $150. (*See* Pl. Ex. 29, at

2  6, 10; Pl Ex. 7, at ¶¶ 18.D, 138-39, App'x D [listing for Mr. Oddo's compressor model

3  ZP24K5E-PFV-130]; Def. Ex. 20, at ¶ 37].) The measure of damages under the benefit-

4  of-the-bargain analysis is the cost of "putting him in the position he would have enjoyed

5  if the false representation [or omission] relied upon had been true," whether it be $1,

6  $100, or $1,000. *Nguyen*, 932 F.3d at 821 (quoting *Stout*, 586 P.2d at 1232). That the

7  cost of repair is a significant percentage of the overall purchase price is not a valid basis

8  to deny damages, much less class certification. Manufacturers do not get a free pass

9  simply because the undisclosed defect is expensive to fix.[5] On the contrary, that is all the

10 more reason that Carrier should have disclosed the defect. If anything, Carrier would

11 obtain a windfall if Mr. Oddo and the other Plaintiffs and members of the proposed

12 classes are not compensated for receiving less than what they bargained for. (*See* Pl. Ex.

13 8.)

14       In any event, as a district court summarized, "cases applying California law have

15 held that the cost of repair is an appropriate measure of damages in product-defect cases,

16 in particular 'because it sets damages equal to the amount necessary to make a defective

17 part serviceable,' thereby excluding any 'windfall' in excess of that amount." *In re Gen.*

18 *Motors LLC Ignition Switch Litig.*, 2019 WL 3564698, at *6 (S.D.N.Y. Aug. 6, 2019)

19 (citing *Salas*, 2019 U.S. Dist. LEXIS 77847, 2019 WL 1940619, at *12; *In re Toyota*

20 *Motor Corp. Hybrid Brake Mktg., Sales Practices & Prods. Liab. Litig.*, 288 F.R.D. 445,

21 449-50 (C.D. Cal. 2013) *aff'd sub nom. Kramer v. Toyota Motor Corp.*, 668 Fed. App'x

22 765 (9th Cir. 2016); *Nguyen*, 932 F.3d at 821)).

23       ***Third***, Carrier conjures a convoluted argument demanding that Plaintiffs establish

24 Mr. Sikorsky's damages model abide by some vague "principles of supply and demand."

25 Br. at 11-12. But this requirement is, like the contrived "in the field" requirement, also

26 drawn from whole cloth. Though Carrier references *Nguyen*, the Ninth Circuit there

27

28 [5] Conversely, Mr. Oddo would not be entitled to pay less than the price he bargained for
    if he discovered later that Carrier's cost of producing the unit was negligible.

never considered or even mentioned the "availability" of the repair, the "small percentage" of the cost of repair relative to the product, or the "dilemma of seeking a repair or risking their safety and property," "factors" that Carrier states are necessary for a cost-of-repair damages model, which is reflected by Carrier's failure to cite any portion of *Nguyen*. *See generally Nguyen*, 932 F.3d 811. Instead, it appears that Carrier cobbled this specious argument from instances where courts found that the proposed class-wide damages models were incomplete because they were based only on a conjoint analysis—which measures a consumer's "subjective willingness to pay for a product in the absence of misleading omissions or misrepresentations"—without tethering the analysis to "supply and market factors," such as through a hedonic regression. *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1121 (C.D. Cal. 2015); *see Saavedra v. Eli Lilly & Co.*, 2014 WL 7338930, at \*4 (C.D. Cal. Dec. 18, 2014) ("This raises the question of how to turn the relative valuation ascertained via conjoint analysis into an absolute valuation to be awarded as damages."); *Zakaria v. Gerber Prod. Co.*, 2017 WL 9512587, at \*15, \*21 (C.D. Cal. Aug. 9, 2017).

Of course, Mr. Sikorsky's cost-of-repair damages model does not involve a conjoint analysis. Carrier is attempting to confuse the analysis by inserting inapposite concepts from conjoint analysis, which is typically used to measure damages where valuing a product as-received depends on subjective factors.[6] Where a product is not merely mislabeled but, rather, defectively manufactured, valuing the defective product

---

[6] Conjoint analysis is a means of determining valuations that are largely subjective by surveying consumers to determine how they value a particular attribute. For example, if a food product is labeled as "healthy," when in fact it is loaded with sugar, a conjoint analysis would seek to determine the how consumers subjectively value the "healthy" attribute through a series of survey questions and subsequent economic analysis. At bottom, however, this technique relies on collecting subjective responses. Thus, it is often used in cases where the value of the product as-received depends on consumers' subjective valuations of a mislabeled attribute, like: "safe" (*In re NJOY*, 120 F. Supp. 3d at 1118); "healthy" (*Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1110 (N.D. Cal. 2018)); or "natural" (*Morales v. Kraft Foods Grp., Inc.*, 2017 U.S. Dist. LEXIS 97433, at \*3 (C.D. Cal. June 9, 2017)).

as-received does not require conjoint analysis. Here, but for the contamination with the unapproved rust inhibitor, a contaminated air conditioner would be worth the exact same amount as a non-contaminated air conditioner. Thus, the cost to make the product non-defective—here, the cost to remove the contaminant—is an objective and straightforward method of determining damages, and as the Ninth Circuit concluded in *Nguyen*, it is consistent with omission claims and constitutes "a reasonable basis of computation." 932 F.3d at 818.

Carrier's challenge on "principles of supply demand" has no application here because this is not a conjoint analysis damages model.

***Fourth***, Carrier argues that Mr. Sikorsky's cost-of-repair damages model only applies to California. But as Plaintiffs previously explained, the benefit-of-the-bargain model is the most common form of measuring damages for fraud claims under Chapter 93A and the MMPA. *Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co.*, 837 N.E.2d 1121, 1135 (Mass. 2005); *Shiplet v. Copeland*, 450 S.W.3d 433, 441 (Mo. Ct. App. 2014);[7] *Shaulis v. Nordstrom*, Inc., 865 F.3d 1, 12 (1st Cir. 2017). Further, there is ample authority allowing repair costs under the MMPA and for common law fraudulent concealment and negligent misrepresentation under Missouri law, as well as Massachusetts Chapter 93A. *See Faltermeier v. FCA US LLC*, 2016 WL 10879705, at *7 (W.D. Mo. May 26, 2016); *Brown v. Bennett*, 136 S.W. 3d 552, 557 (Mo. Ct. App. 2004); *Aspinall v. Philip Morris Cos.*, 813 N.E.2d 476, 490 (Mass. 2004); *Shaulis*, 865 F.3d at 12.[8]

---

[7] Carrier asserts, in a footnote, that Missouri law does not "require" damages that would result in a windfall. Br. at 13 n.5. As explained above, the only windfall that would occur is Carrier retaining the full profits it collected on defective units it knowingly sold without disclosure.

[8] Carrier once again misrepresents the law on damages under Missouri law set forth in *Wasson v. Schubert*, 964 S.W. 2d 520 (Mo. Ct. App. 1998) and *Brown v. Bennet*, 136 S.W.3d 552 (Mo. Ct. App. 2004). *Wasson*, which *Brown* quotes, explained the limitations to costs of repair regarding "damages to *real property*." *Wasson*, 964 S.W. 2d at 525 (emphasis added); *Brown*, 136 S.W.3d at 557 n.3.

## II.   Dr. Johnson's Opinion That Mr. Sikorsky's Damages Model Is Not "Consistent" With Plaintiffs' Theory Of Liability Is An Improper Legal Conclusion

Plaintiffs explained in their opening brief that Dr. Johnson's opinion that Mr. Sikorsky's cost-of-repair damages model does "not provide an economic theory of class-wide harm that is *consistent with Plaintiffs' theory of liability*" is an improper legal conclusion. MTE Johnson at 4-5 (emphasis added); (Def. Ex. 20, at ¶ 6). It is a thinly-veiled, if at all, conclusion that Plaintiffs' damages model does not meet the Supreme Court's pronouncement in *Comcast* that "at the class-certification stage (as at trial), any model supporting a 'plaintiff's damages case must be *consistent with its liability* case . . . .'" 569 U.S. at 35 (emphasis added).

Carrier's response is that Dr. Johnson's opinion is an "economic critique, not a legal one" because Dr. Johnson included the magic "economic" label to his conclusion. Br. at 13-15. But simply slapping on the term "economic" does not make it so. *Cf. Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). Indeed, the Court's decision in *MJC Am., Ltd. v. Gree Elec. Appliances, Inc. of Zhuhai*, which Carrier cites, shows that Dr. Johnson's opinion exceeds his purview as an economist and intrudes upon the province of the Court. 2015 WL 12747947 (C.D. Cal. Apr. 14, 2015). There, the rebuttal expert's opinion merely pointed out that the affirmative expert was "silent as to any mitigation by [MJC Supply] or [MJC America]." *Id.* at *5. The Court explained that this was not a legal conclusion because the rebuttal expert "d[id] not opine that MJC failed to mitigate its damages, or purport to instruct the fact finder as to the legal meaning of mitigation, but instead merely notes that MJC's experts failed to address this issue entirely." *Id.* Here, Dr. Johnson quite clearly offers an improper legal conclusion when he asserts that Plaintiffs' damages model—i.e., their "economic theory of class-

wide harm"—is not "consistent" with their liability theory, using the exact terminology of *Comcast*.[9]

Meanwhile, another Court in this District found an expert opinion similar to Dr. Johnson's to be an impermissible legal conclusion. In *Morales v. Kraft Foods Grp., Inc.*, the defendant's rebuttal expert, like Dr. Johnson here, concluded that the damages model was "not an acceptable methodology for calculating class-wide damages to a reasonable degree of certainty." 2017 WL 2598556, at *18 (C.D. Cal. June 9, 2017). Judge Kronstadt rejected it as "a legal conclusion, not an admissible expert opinion" and noted that it was "contradicted by persuasive district court decisions," just as Dr. Johnson's conclusion is contradicted by *Nguyen*, a controlling decision. *Id*. The Court should find the same here.

## III. Dr. Johnson's Opinion That Mr. Sikorsky's Damages Model Is Not "Consistent" With Plaintiffs' Theory Of Liability Is Unreliable

As Plaintiffs also explained in their opening brief, Dr. Johnson's conclusion that Mr. Sikorsky's cost-of-repair damages model does "not provide an economic theory of class-wide harm that is consistent with Plaintiffs' theory of liability" is also, unsurprisingly, unreliable. MTE Johnson at 6-7. Dr. Johnson, an economist, predictably does not comprehend the legal standard or Plaintiffs' legal "theory of liability" to render that opinion. Carrier apparently has no substantive response to this, instead pirouetting to Dr. Johnson's critique that Mr. Sikorsky's analysis does not touch upon "the worth or value of plaintiffs' units, or about the prices plaintiffs paid for their units." Br. at 16. Of course, this is not the subject of Plaintiffs' challenge, and Carrier's inability to respond again confirms the impropriety of Dr. Johnson's conclusion that Mr. Sikorsky's cost-of-repair damages model does "not provide an economic theory of class-wide harm that is

---

[9] Carrier's other authority, *In re NJOY*, did not address whether the challenged opinion was a legal conclusion. There, the plaintiffs sought to disqualify the rebuttal expert only on the grounds that she was "not an economics expert," which the court rejected based on the rebuttal expert's "education and academic experience." *In re NJOY*, 120 F. Supp. 3d at 1082.

consistent with Plaintiffs' theory of liability," as well as its unreliability. (*See* Def. Ex. 20, at ¶ 6.)

Further, as already explained, Plaintiffs damages model does account for "the worth or value of Plaintiffs' units," and the value exchanged for them. Plaintiffs and class members bargained for non-defective air conditioners. The value they exchanged (i.e., price paid) was the bargained-for value of a non-defective air conditioner. In exchange, however, they received air conditioners that were defective because they are contaminated with Ryconox. *But for* the contamination, the value received would have been the same as the value of a non-contaminated unit, so the only difference between the value actually received and the value that should have been received is the cost of removing the contaminant. In other words, if the cost of removing the contaminant is added into the bargain, then class members will receive the full value of their bargain.

Stated as an equation:

$$(damages) = (value\ exchanged) - (value\ received).$$

Here, because of the omission, the value exchanged (i.e. price paid) was the bargained-for value of a non-defective unit:

$$(value\ exchanged) = (value\ of\ defect\text{-}free\ product).$$

The value received, however, was a defective product:

$$(value\ received) = (value\ of\ defective\ product).$$

Here, the only difference between a defective product and a non-defective product is the presence of the defect. If the defect is fixed, a defective product is the same value as a non-defective product. So, if the cost to repair is added to the value of a defective product, it equals the value of a defect-free product.

$$(value\ of\ defective\ product) + (cost\ to\ repair\ defect) = (value\ of\ defect\text{-}free\ product).$$

Using the principle of equality, this is the same as saying that the value of a defective product is the value of a defect-free product minus the cost to repair the defect:

$$(defective\ product) = (value\ of\ defect\text{-}free\ product) - (cost\ to\ repair\ defect).$$

So, the value received can be stated as:

(value received) = (value of a defect-free product) − (cost to repair defect).

Putting these inputs into the original equation (i.e., (damages) = (value exchanged) − (value received)), the entire equation is:

Damages = (value of a defect-free product) − (value of a defect-free product) − (cost to repair defect)

Since the "value of a defect-free product" is subtracted from the "value for a defect-free product," those terms cancel out, and the simplified equation is:

Damages = cost to repair defect

Thus, the model perfectly accounts for the value of what was exchanged and what was received.

For the less mathematically inclined, the model boils down to this: "[A] reasonable jury could conclude that a consumer would demand that the purchase price of a vehicle with a defect be reduced by the cost of remedying that defect." *Nguyen*, at 820 (quoting *Daniel*, 2016 U.S. Dist. LEXIS 65723, 2016 WL 2899026, at *7). That is why the Ninth Circuit concluded that cost of repair is a "reasonable basis of computation" in product defect cases. *Id.* at 818.

## IV.   Dr. Johnson's Opinion Is Also Unreliable Because It Mischaracterizes Plaintiffs' Claims

As Plaintiffs explained in their opening brief, Dr. Johnson's opinion is also unreliable because Dr. Johnson analyzes Mr. Sikorsky's damages model under the incorrect prism that Plaintiffs' claims are based on the manifestation of the Ryconox defect, rather than the failure to disclose the defect itself. MTE Johnson at 7-8. Carrier's response is to, once again, mischaracterize the Ninth Circuit's analysis in *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1176 (9th Cir. 2010) and *Nguyen*. As the Ninth Circuit repeatedly held (which is perhaps necessary as defendants like Carrier repeatedly attempt to confuse the issue), "the sale of the [product] with the known defect is the liability-triggering event, not when [or if] the [defect] manifests." *Nguyen*, 932 F.3d at 820 (citing *Daniel*, 2016 U.S. Dist. LEXIS 65723, 2016 WL 2899026, at *7; *Kearney v. Hyundai Motor Co.*, 2010 U.S. Dist. LEXIS 68242, 2010 WL 9093204, at *5

(C.D. Cal. June 4, 2010) (internal quotations omitted) ("[I]f the receipt of a vehicle whose alleged defects reduced the car's value and deprived the consumer of the benefit of the bargain, *even when the alleged defects did not later materialize*, then the loss was suffered at the moment of purchase . . . .")).

In other words, Plaintiffs here "do not seek damages for the faulty performance [of the product]." *Id.* at 822. Rather, Plaintiffs' "theory is that the allegedly defective [product component] is itself the injury, regardless of whether [it] caused performance issues." *Id.* The fact that there are different unit "models" is irrelevant if the same defect is present across all models. Indeed, *Wolin* imposes no requirement that commonality can only be achieved for products of the same "make and model"; instead, those facial attributes were only part of the many indications that there was commonality, including the most significant, i.e., the "claims of all prospective class members involve the same alleged defect." *Wolin*, 617 F.3d at 1172.[10]

Similarly, Carrier mischaracterizes *Wolin* as setting forth variations in damages based on the manifestation of the common defect because *Wolin* commented that "[w]hether [class members] experienced premature tire wear at six months, nine months, or later goes to the extent of their damages." *Id.* at 1175. But *Wolin* immediately went on to state that "Gable and Wolin, like the rest of the class, may have a viable claim *regardless of the manifestation of the defect*." *Id.* (emphasis added). Critically, the claims in *Wolin* included breach of warranty claims, which include any proximate damage in addition to the standard "benefit of the bargain" damages, and so for those claims, damages may have depended on how frequently class members had to change their tires. *See id.* at 1171 ("Appellants also allege that Land Rover breached its warranties by failing to cover the entire cost of . . . replacing the tires."). *Wolin* never

---

[10] Moreover, just 46 compressor models account for 99% of the class units. (Pl. Ex. 7 at 35 n.12.) Carrier's argument that there are "hundreds of different makes, models, and sizes of units that can be paired into thousands of combinations in the home," is a distortion that has no real relevance, since all of the class units can be identified with precision and all of them unquestionably contain Ryconox.

suggested, however, that damages for omission or misrepresentation claims depended on the number or frequency of tire changes. *Nguyen* makes clear that is not the case. *See Nguyen*, 932 F.3d at 818 (quoting Cal. Com. Code § 2714) ("The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount."); *Wolin*, 617 F.3d at 1175 ("Gable and Wolin and the class seek to recover pursuant to the same legal theories: violation of consumer protection laws, breach of warranty, and unjust enrichment.").[11]

Indeed, the Ninth Circuit in *Nguyen* explained that there was no individualized inquiry necessary as the plaintiff there, like Plaintiffs here, did "not seek damages for the faulty performance" caused by the defect and was narrowly focused on the "benefit of the bargain" lost as the "allegedly defective [component] is itself the injury." *Nguyen*, 932 F.3d at 822.

## V.   Dr. Johnson Is Not Qualified To Criticize Mr. Sikorsky's Opinion That The Presence Of Ryconox Is A Defect

As Plaintiffs discussed in their opening brief, Dr. Johnson's opinion that Mr. Sikorsky "improperly assumes that all units containing Ryconox are defective" is beyond his qualifications as an economist with no engineering or HVAC manufacturing experience. MTE Johnson at 9; (Def. Ex. 20, at ¶ 6). Notwithstanding two pages of bluster, Carrier implicitly concedes this with its clarification that "Dr. Johnson is not offering any opinion regarding whether the class units were . . . defective." Br. at 20.

The two pages of bluster appear to be a continuation of Carrier's continued inability to accept the Ninth Circuit's holding in *Wolin* that the existence of the defect is distinct from the manifestation of the defect. 617 F.3d at 1173. Specifically, Carrier

---

[11] Carrier also cites *Baker v. Microsoft Corp.*, 797 F.3d 607 (9th Cir. 2015), but the language it quotes from *Baker* is simply drawn from the Ninth Circuit's summary in *Wolin* in the context of reviewing the district court's order striking class actions. It is of no relevance here.

argues that Dr. Johnson's background in econometrics qualifies him to opine that only products that fail are defective and that damages vary because the units experience different types of failures. Br. at 18-20. But Carrier does not, because it cannot, explain how econometrics, i.e., "the application of statistics to economics," sheds light on legal principles distilled by the Ninth Circuit.

Instead, Dr. Johnson's understanding of the nature of the defect, its manifestation, and their relation to Plaintiffs' claims, have, again, been repeatedly rejected by the Ninth Circuit. *See Nguyen*, 932 F.3d at 822 ("Nissan's argument, however, conflates cases where a defect causes an injury, and those, like this one, where the defect itself *is* the injury.").

Mr. Sikorsky, a professional engineer with long experience with air conditioners, is well-qualified to opine that the air conditioners here are defective. Dr. Johnson's observation that Carrier received failure reports for "only" about ▮▮ of the units in the first 3-4 years of operation (which is only about one-fourth or less of the useful life of an air conditioner) does not qualify him to dispute Mr. Sikorsky's opinion. Moreover, while ▮▮▮▮▮ is a startlingly high *reported* failure rate for just the first few years of operation, it is also far less than the *actual* failure rate for reasons Plaintiffs have already explained. MTE Johnson at 10 n.5. Dr. Johnson has veered far out of his lane in opining that Ryconox contamination is not a defect.

## VI.   Dr. Johnson Improperly Calculated Reported Failure Rates

Plaintiffs also identified in their opening brief Dr. Johnson's improper calculation of the reported failure rate, as the denominator used in his calculation includes 123,000 units that unquestionably did not contain the defect, i.e., Ryconox. MTE Johnson at 10-12. As Plaintiffs noted, even Carrier's other expert, Dr. White, agreed that the use of that denominator is incorrect. *See id.*

As it is wont to do, Carrier first responds with more irrelevant rhetoric that Dr. Johnson and Mr. Sikorsky "appl[ied] the same general methodology to calculate failure rate," i.e., finding the reported failure rate percentage by dividing the number of

defective units where the defect manifests by the total number of defective units. Br. at 20. Rhetoric aside, Carrier defends Mr. Johnson's use of the incorrect denominator first by characterizing it as a factual dispute that does not merit exclusion, and then it doubles down on Dr. Johnson's incorrect denominator claiming that those units were on an overinclusive list prepared by Carrier that "*may* have" contained Ryconox, *id.* at 20-22 (emphasis added), even though Carrier knows that a large number of them *actually did not* contain Ryconox. But as this Court found in *Miller*, such equivocal language renders Dr. Johnson's conclusion unreliable. *See Miller*, 2015 WL 7776794, at *20, *20 n.5 (rejecting expert conclusions couched with impreciseness such as "*if* it is determined" and "suggests that it may be possible"). Carrier also refers to Dr. Johnson's deposition testimony that his "ultimate opinion" would not change because, whether using Mr. Sikorsky's numbers or his, the failure rate is still below 100%, 50%, or 20%.

In an effort to deflect attention from Dr. Johnson's erroneous failure-rate calculation, Carrier again points at Mr. Sikorsky and claims he used a denominator that did not include affected units manufactured in August 2014. Br. at 21. Mr. Sikorsky, however, used as his denominator the number of affected units from Carrier's White Paper. (*See* Pl. Ex. 1, at 18; Pl. Ex. 7, at ¶ 59; Def. Ex. 13, at 19.) That denominator is what Carrier's own designee testified "is the number that I roughly recall." (Pl. Ex. 104, at 223:17-22; *see also* Pl. Ex. 104, at 220:17-224:13 [Carrier's designee testifying that using the White Paper denominator, the calculated failure rate of ██████ was approximately "what [Carrier] ████████████████." ]; Pl. Ex. 1, at 18; Def. Ex. 13, at 19 ["Updated December 2014" version of the White Paper].)[12] Dr. Johnson did not use that number—despite Carrier's own testimony of its accuracy. Instead, Dr. Johnson used some other number that actually included over 120,000 units that did not contain

---

[12] Exhibit 104 is attached to the Second Supplemental Mathews Declaration in Support of Plaintiffs' Renewed Motion for Class Certification filed concurrently with this motion.

Ryconox, and Dr. Johnson admitted that he *never* even asked Carrier to confirm that they in fact did contain Ryconox. (Pl. Ex. 72, at 128:13-17.)

Carrier states that if Dr. Johnson were to limit the denominator that he used to only those units that contain Ryconox—including those manufactured in August 2014—the failure rate would be ███ (Br. at 22-23), which is not materially different from Mr. Sikorsky's calculated failure rate of ███. (*See* Pl. Ex. 7, at ¶ 59.) Dr. Johnson's calculated failure rate of ███ however, is ███ too low.

Worse, when confronted with his clear error, Dr. Johnson refused to admit it. (*See* Pl. Ex. 72, at 127:3-16.) Carrier's attempts to downplay this error and deflect attention from Dr. Johnson are seriously misguided, but the fact remains that Dr. Johnson included 123,000 units in his denominator that did not contain Ryconox, and this is no trivial error—it materially understates his results by at least ███. *See* MTE Johnson at 10-11.

At bottom, Carrier's meandering defense concedes that the denominator Dr. Johnson used was overinclusive (and thus deflated the actual failure rates), confirms Dr. Johnson's inability to distinguish between the existence of a defect and its manifestation, establishes Dr. Johnson's unwavering adherence to his conclusions regardless of the facts, and suggests that Dr. Johnson's sloppy and misguided approach towards this straightforward calculation is of no moment because the figures are relatively close anyway. Of course, these reliability lapses cannot warrant exclusion on *Daubert* grounds at the class certification stage under *Sali*. Nevertheless, they establish that Dr. Johnson's opinions are simply not reliable or credible as a whole, and merit little, if any, attention from the Court in deciding class certification.

## CONCLUSION

For the reasons explained above, Plaintiffs respectfully request that the Court give little, if any, weight to the Dr. Johnson's Report in connection with Plaintiffs' Renewed Motion For Class Certification.

DATED: December 20, 2019

Respectfully submitted,

By:   _Timothy N. Mathews_

Timothy N. Mathews (*Pro Hac Vice*)
Zachary P. Beatty (*Pro Hac Vice*)
**Chimicles Schwartz Kriner &**
**Donaldson-Smith LLP**
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633
Email: tnm@chimicles.com
        zpb@chimicles.com

James C. Shah (SBN 260435)
**SHEPHERD FINKELMAN**
**MILLER & SHAH, LLP**
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (610) 891-9880
Facsimile: (866) 300-7367
Email: jshah@sfmslaw.com

Kolin C. Tang (SBN 279834)
**SHEPHERD FINKELMAN MILLER &**
**SHAH, LLP**
1401 Dove Street
Suite 540
Newport Beach, CA 92660
Phone: 323-510-4060
Fax: 866-300-7367
ktang@sfmslaw.com

## CERTIFICATE OF SERVICE

I certify that on December 20, 2019, a copy of the foregoing *Plaintiffs' Reply in Support of Motion to Limit Consideration of the Expert Report of Dr. John H. Johnson* was served electronically through the court's electronic filing system upon all parties appearing on the court's ECF service list.

*/s/ Timothy N. Mathews*
Timothy N. Mathews
Attorney for Plaintiffs

## ATTESTATION PURSUANT TO CIVIL L.R. 5-4.3.4(a)(2)

The filer attests that the other signatory listed, and on whose behalf the filing is submitted, concur in the filing's content and has authorized the filing.

Dated: December 20, 2019

*Kolin C. Tang*

Kolin C. Tang (SBN 279834)
**SHEPHERD, FINKELMAN,
MILLER & SHAH, LLP**
1401 Dove Street
Suite 540
Newport Beach, CA 90660
Telephone: (323) 510-4060
Facsimile: (866) 300-7367
Email: ktang@sfmslaw.com