**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

Kolin C. Tang (SBN 279834)
**MILLER SHAH LLP**
19712 MacArthur Boulevard
Suite 222
Irvine, CA 92612
P: (866) 540-5505
kctang@millershah.com

*Counsel for Plaintiffs, on behalf of themselves and all others similarly situated*

[Additional Counsel on signature page]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

STEVE ODDO, RAJENE REARDON, ANTHONY LASALA, LINDA LAMM, KEITH KIMBALL, NORMAN KLINGE, and DAN GALLAGHER, on behalf of themselves and all others similarly situated,

        Plaintiffs,

    vs.

ARCOAIRE AIR CONDITIONING AND HEATING, CARRIER CORPORATION, BRYANT HEATING AND COOLING SYSTEMS, COMFORTMAKER AIR CONDITIONING & HEATING, INTERNATIONAL COMFORT PRODUCTS LLC, and UNITED TECHNOLOGIES CORPORATION,

        Defendants.

Case Number: 8:15-cv-01985 CAS (Ex)

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Judge:      Christina A. Snyder
Hearing:   To be scheduled
Time:      To be scheduled
Courtroom:  8D

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................... 1

ARGUMENT .................................................................................................... 2

I.   Mr. Oddo Can Prove His Omission Claims Based
     On Carrier's Failure To Disclose Air Conditioner Contamination ...................... 2

     A.   Carrier Owed A Duty to Disclose Under
          The Central-Function Test, If It Applies ....................................... 2

     B.   Carrier Owed A Duty To Disclose Under The *Limandri* Factors................ 8

     C.   Mr. Oddo Relied On Carrier's Omissions.................................. 17

     D.   Carrier Intended To Defraud Consumers.................................. 20

II.  The Court Cannot Grant Summary Judgment On Claims
     For Omission Related To A/C Re-New Because No Such
     Claims Were Ever Asserted........................................................ 21

III. Mr. Oddo Can Prove His Unjust Enrichment Claims ........................... 23

IV.  Mr. Oddo Can Prove His Negligent Misrepresentation Claim ........................ 24

CONCLUSION................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

## <u>CASES</u>

*Ahern v. Apple Inc.*,
411 F. Supp. 3d 541 (N.D. Cal. 2019)........................................................6

*Anderson v. Apple Inc.*,
500 F. Supp. 3d 993 (N.D. Cal. 2020)...........................................8, 13, 23

*Apodaca v. Whirlpool Corp.*,
2013 U.S. Dist. LEXIS 176363 (C.D. Cal. Nov. 8, 2013) ........................3

*In re Apple Inc. Device Performance Litig.*,
386 F. Supp. 3d 1155 (N.D. Cal. 2019)......................................................5

*Beyer v. v. Symantec Corp.*,
333 F. Supp. 3d 966 (N.D. Cal. 2018)........................................................5

*Brand v. Nissan N. Am.*,
2017 U.S. Dist. LEXIS 234271 (C.D. Cal. Feb. 24, 2017) ......................12

*Brothers v. Fortis Ins. Co.*,
2004 U.S. Dist. LEXIS 16358 (N.D. Cal. Aug. 11, 2004) .......................25

*Bryde v. GM, LLC*,
2016 U.S. Dist. LEXIS 159707 (N.D. Cal. Nov. 17, 2016) .....................12

*Collins v. eMachines, Inc.*,
134 Cal. Rptr. 3d 588 (Cal. Ct. App. 2011)................................................4

*Daniel v. Ford Motor Co.*,
806 F.3d 1217 (9th Cir. 2015) .................................................................18

*Decker v. Mazda Motor Am., Inc.*,
2011 U.S. Dist. LEXIS 124182 (C.D. Cal. Oct. 24, 2011) ........................4

*Defrank v. Samsung Elecs. Am., Inc.*,
2020 U.S. Dist. LEXIS 198893 (D.N.J. Oct. 26, 2020) .............................4

*Digby Adler Grp., LLC v. Mercedes-Benz U.S.A., LLC*,
2015 U.S. Dist. LEXIS 116427 (N.D. Cal. Sept. 1, 2015)........................12

*Dixon v. Ford Motor Co.*,
2015 U.S. Dist. LEXIS 146263 (E.D.N.Y. Sept. 30, 2015) .....................19

*Dreher v. PNC Fin. Servs. Grp.*,
   2020 U.S. Dist. LEXIS 198677 (C.D. Cal. Sep. 23, 2020) ........................20

*Falco v. Nissan N. Am., Inc.*,
   2013 U.S. Dist. LEXIS 147060 (C.D. Cal. Oct. 10, 2013) ..........................9

*Falco v. Nissan N. Am., Inc.*,
   2016 U.S. Dist. LEXIS 46115 (C.D. Cal. Apr. 5, 2016) ...........................11

*Glen Holly Entm't, Inc. v. Tektronix Inc.*,
   352 F.3d 367 (9th Cir. 2003) .........................................................19

*Gray v. BMW of N. Am., LLC*,
   22 F. Supp. 3d 373 (D.N.J. 2014) .................................................12

*Gregorio v. Ford Motor Co.*,
   2021 U.S. Dist. LEXIS 37410 (E.D. Mich. Mar. 1, 2021) ........................11

*Hadley v. Kellogg Sales Co.*,
   273 F. Supp. 3d 1052 (N.D. Cal. 2017) ..........................................25

*Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*,
   61 Cal. 4th 988 (Cal. 2015) .........................................................24

*Hodsdon v. Mars, Inc.*,
   891 F.3d 857 (9th Cir. 2018) .........................................................5

*In re Intel Corp. CPU Mktg., Sales, Practices & Products Liability Litigation*,
   2020 U.S. Dist. LEXIS 53829 (D. Or. Mar. 27, 2020)............................6

*Kommer v. Ford Motor Co.*,
   2018 U.S. Dist. LEXIS 131449 (N.D.N.Y. Aug. 6, 2018) ........................11

*Kosta v. Del Monte Foods, Inc.*,
   308 F.R.D. 217 (N.D. Cal. 2015)..................................................17

*In re Macbook Keyboard*,
   2019 U.S. Dist. LEXIS 68130 (N.D. Cal. Apr. 22, 2019)..........................5

*MacDonald v. Ford Motor Co.*,
   37 F. Supp. 3d 1087 (N.D. Cal. 2014) ............................................12

*Madrigal v. Allstate Indem. Co.*,
   2015 U.S. Dist. LEXIS 193784 (C.D. Cal. Sep. 30, 2015) ........................20

*Majdipour v. Jaguar Land Rover N. Am., LLC*,
   2013 U.S. Dist. LEXIS 146209 (D.N.J. Oct. 9, 2013) ...............................12

*Marsikian v. Mercedes Benz USA, LLC*,
   2009 WL 8379784 (C.D. Cal. May 4, 2009) ...................................................9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ..............................................................................2, 3

*Milman v. FCA U.S., LLC*,
   2019 U.S. Dist. LEXIS 125342 (C.D. Cal. Apr. 15, 2019) .........................13

*Moore v. Mars Petcare US, Inc.*,
   966 F.3d 1007 (9th Cir. 2020) ......................................................................20

*Morcom v. LG Elecs. USA, Inc.*,
   2017 U.S. Dist. LEXIS 198935 (D.N.J. Nov. 30, 2017) .............................11

*Nguyen v. Nissan N. Am., Inc.*,
   932 F.3d 811 (9th Cir. 2019) ..................................................................6, 23

*In re NJOY Consumer Class Action Litig.*,
   2014 U.S. Dist. LEXIS 196586 (C.D. Cal. May 27, 2014) ...........................8

*Norcia v. Samsung Telcoms. Am. LLC*,
   2018 U.S. Dist. LEXIS 169521 (N.D. Cal. Oct. 1, 2018) ..............................5

*In re NVIDIA*,
   2009 U.S. Dist. LEXIS 108500 ......................................................................4

*Rubenstein v. The Gap, Inc.*,
   222 Cal. Rptr. 3d 397 (Cal. Ct. App. 2017)....................................................4

*Sadeghi-A v. Daimler Trucks N. Am. LLC*,
   2021 U.S. Dist. LEXIS 42756 (D. Minn. Mar. 8, 2021) .............................15

*Salas v. Toyota Motor Sales, U.S.A., Inc.*,
   2016 U.S. Dist. LEXIS 195222 (C.D. Cal. Sept. 27, 2016) ...........................8

*Sloan v. GM LLC*,
   2020 U.S. Dist. LEXIS 71982 (N.D. Cal. Apr. 23, 2020)......................20, 21

*Sosenko v. LG Elecs. U.S.A., Inc.*,
   2019 U.S. Dist. LEXIS 199462 (C.D. Cal. Aug. 29, 2019) ...........................4

iv

*Stockinger v. Toyota Motor*,
   2020 U.S. Dist. LEXIS 49943 (C.D. Cal. Mar. 3, 2020)................................5

*Sumer v. Carrier Corp.*,
   2015 U.S. Dist. LEXIS 75266 (N.D. Cal. June 10, 2015).........................16

*Swafford v. IBM*,
   408 F. Supp. 3d 1131 (N.D. Cal. 2019)...............................................20

*Taleshpour v. Apple Inc.*,
   2021 U.S. Dist. LEXIS 134238 (N.D. Cal. July 19, 2021) ..........................3

*Taragan v. Nissan N. Am., Inc.*,
   2013 U.S. Dist. LEXIS 87148 (N.D. Cal. June 20, 2013)............................8

*In re Tobacco II Cases*,
   207 P.3d 20 (Cal. 2009) .................................................................18

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*,
   754 F. Supp. 2d 1145 (C.D. Cal. 2010) ...............................................15

*In re Toyota RAV4 Hybrid Fuel Tank Litig.*,
   2021 U.S. Dist. LEXIS 69643 (N.D. Cal. Apr. 9, 2021).........................4, 9

*Transgroup Worldwide Logistics v. Eternity Mems.*,
   2010 U.S. Dist. LEXIS 159619 (C.D. Cal. Oct. 15, 2010) .........................24

*Victorino v. FCA US Ltd. Liab. Co.*,
   2018 U.S. Dist. LEXIS 32846 (S.D. Cal. Feb. 27, 2018)...........................24

*Williams v. Gerber Prod. Co.*,
   552 F.3d 934 (9th Cir. 2008) ...........................................................20

*Wolin v. Jaguar Land Rover N. Am., LLC*,
   617 F.3d 1168 (9th Cir. 2010) .............................................................6

**STATUTES**

Cal. Com. Code § 2801 ...............................................................................3

1

2   **<u>OTHER AUTHORITIES</u>**

3   Fed. R. Civ. P. 54(b) ........................................................................................7

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INTRODUCTION

There is no disputing that Carrier knowingly sold air conditioners contaminated with an "unapproved" and "unauthorized" rust inhibitor that it had "conclusively" determined to be the "root cause" of a failure "epidemic." Def Ex. 10, Ex. 23.[1] After discovering the defect, Carrier concealed it from consumers, like Mr. Oddo, because it knew that disclosing would impact its sales, and Carrier was unwilling to "██████████ ██████████" Ex. 48. For example, Carrier labeled service bulletins related to the defect "Confidential & Proprietary Information – Not for Further Distribution," expressly because Carrier did not want distributors or dealers ██████████████ ████████" Ex. 36, at 2.

The merits of this case are exceptionally strong, but in its order denying Plaintiffs' renewed motion for class certification (ECF 292), the Court made two legal holdings based on undisputed facts that, unless the Court changes them, are dispositive of the only remaining claims in this case, which are Mr. Oddo's individual claims.

The first holding is that Plaintiffs failed to come forward with sufficient evidence to show that Carrier owed a duty to disclose the defect to California consumers under the safety-hazard and/or central-function legal tests. The second holding is that Plaintiffs failed to come forward with sufficient evidence of objective materiality – i.e., that a reasonable consumer would attach importance to the defect, if it had been disclosed.

Mr. Oddo respectfully submits that the Court applied erroneous legal standards in reaching these two holdings, discussed below. Therefore, the Court should reverse them.

But, unless the Court changes its mind, these two holdings are dispositive of all of Mr. Oddo's remaining individual claims because the duty to disclose and objective materiality are required elements for his individual claims, and the Court's holdings were based on undisputed facts. In other words, the elements of duty to disclose and objective

---

[1] Citations to "Ex." are to exhibits attached to the Mathews Declaration in Support of Plaintiff's Statement of Genuine Disputes. Citations to "Def. Ex." are to the exhibits Defendant filed with its motion for summary judgment.

materiality are the same as to all California consumers—they do not depend on any facts specific to Mr. Oddo. Since the Court held, based on undisputed evidence, that they cannot be met as to California consumers, they cannot be met as to Mr. Oddo either.

The scope of any judgment must end there, however, because every other issue on which Carrier seeks summary judgment would require resolution of disputed factual issues. There is a mountain of evidence showing that Carrier had exclusive knowledge of the defect, concealed it, and also suppressed material facts, each of which imposed a duty to disclose under the *LiMandri* factors. Moreover, Mr. Oddo testified in no uncertain terms that he relied on Carrier's omission and would not have purchased the air conditioner if the defect had been disclosed. The Court cannot resolve these and other disputed facts on summary judgment.

## ARGUMENT

When deciding a motion for summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment should only be granted when a rational trier of fact would not be able to find for the nonmoving party. *See id.*

## I. Mr. Oddo Can Prove His Omission Claims Based On Carrier's Failure To Disclose Air Conditioner Contamination.

### A. Carrier Owed A Duty to Disclose Under The Central-Function Test, If It Applies.

The Court held in its class certification decision that Plaintiffs could not prove that Carrier owed a duty to disclose the alleged defect to California consumers under the safety-hazard and/or central-defect tests. Carrier never raised this issue. Instead, the Court raised it *sua sponte* at the hearing and ruled on it without inviting briefing.

Specifically, the Court held that: (1) the defect at issue "indisputably does not present a safety hazard"; and (2) "[e]ven assuming *arguendo* that California law recognizes a duty to disclose where an alleged defect . . . relates to a product's central function, . . . . [Plaintiffs' expert] Sikorsky does not . . . opine that all, or virtually all, of

the HVAC units containing Ryconox have, or will suffer acute failure . . . ." ECF 292, at 46–47. Moreover, "the failure rate . . . may differ among the range of units that make up plaintiffs' proposed classes, meaning that a duty to disclose, pursuant to California law, may exist as to some, but not all, of the . . . HVAC systems." *Id.* at 48.

The facts upon which the Court reached this conclusion were, and are, undisputed. However, as explained herein—which is the first opportunity plaintiffs have had to brief this issue, for the reason noted above—the Court applied erroneous legal standards. Therefore, Mr. Oddo respectfully submits that the Court should reverse itself.[2]

First, the safety-hazard requirement does not apply to defects that arise in-warranty like the defect here. In *Wilson v. Hewlett-Packard Co.*, the Ninth Circuit held that a manufacturer has no duty to disclose defects arising *outside of the warranty period* absent an unreasonable safety hazard. 668 F.3d 1136, 1143 (9th Cir. 2012). *Wilson* expressly distinguished cases where "the defect manifested during the express warranty period," to which no safety requirement applied.[3] *Id.* (citing *Baba v. Hewlett-Packard Co.*, 2010 U.S. Dist. LEXIS 59747 (N.D. Cal. June 16, 2010)). Courts consistently hold that "*Wilson* does not apply to omission-based claims for malfunctions during the warranty period." *Apodaca v. Whirlpool Corp.*, 2013 U.S. Dist. LEXIS 176363, at *18 (C.D. Cal. Nov. 8, 2013) (citing cases); *see Taleshpour v. Apple Inc.*, 2021 U.S. Dist. LEXIS 134238, at *19–21 (N.D. Cal. July 19, 2021) (citing a long list of cases). Here, the defect exists and arises during the warranty period, which has not ended for any California consumer.[4] Therefore,

---

[2] The Court can reconsider its decision at any time consistent with Rules 23(c)(1)(C) and 54(b). Mr. Oddo understands, of course, that the Court may follow its prior holding. If so, it is necessarily dispositive of his individual claims because he does not claim that Carrier owed him a duty different from other California consumers.

[3] The safety-hazard requirement derived from concern that absent such a limitation, the "[f]ailure of a product to last forever would become a 'defect,'" effectively making warranties perpetual. *Wilson*, 668 F.3d at 1141–42 (quoting *Daugherty v. Am. Honda Motor Co.*, 51 Cal. Rptr. 3d 118, 122 (Cal. Ct. App. 2006)).

[4] Carrier's warranty for California consumers is 10 years, and because these units were manufactured and sold in 2014 and later, all units are still under warranty until at least

there is no safety-hazard requirement.

Second, even assuming the central-function test applies to in-warranty defects, it is satisfied here.

Most courts do not apply the central-function test to in-warranty defects, like the defect here, but, rather, apply the traditional *LiMandri* test (discussed below) unadorned by any safety-hazard or central-function requirement. *See, e.g., Sosenko v. LG Elecs. U.S.A., Inc.*, 2019 U.S. Dist. LEXIS 199462, at *9 n.2 (C.D. Cal. Aug. 29, 2019) (applying *LiMandri* and noting that neither the central-function nor safety tests apply to in-warranty defects).[5] In *In re Toyota RAV4 Hybrid Fuel Tank Litig.*, 2021 U.S. Dist. LEXIS 69643, at *66 (N.D. Cal. Apr. 9, 2021), for example, Judge Chen recently held that the "[safety-hazard] and [central-function] tests, on the one hand, and the *LiMandri* test, on the other, represent *alternative* means of pleading a pure-omission claim."

Assuming the central-defect requirement applies, however, the defect at issue here qualifies. The central function of an air conditioner is to provide cooling. The unauthorized rust inhibitor causes loss of cooling performance in virtually all contaminated units and, in many cases, it causes a complete failure.[6] Ex. 1, at 42468, 42517–21; Ex. 2, at 10; Ex.

---

2024. Ex. 18, at ODDO031–32; Cal. Com. Code § 2801 (manufacturer cannot shorten warranty period based on failure to register).

[5] *See also In re NVIDIA*, 2009 U.S. Dist. LEXIS 108500, at *34 (applying *LiMandri* test to in-warranty defect); *Collins v. eMachines, Inc.*, 134 Cal. Rptr. 3d 588, 595 (Cal. Ct. App. 2011) (applying the *LiMandri* test to an in-warranty defect and noting that such claims do not raise any concern about an "end-around the warranty laws"); *Rubenstein v. The Gap, Inc.*, 222 Cal. Rptr. 3d 397, 405 (Cal. Ct. App. 2017) (applying the *LiMandri* factors without any additional safety or central-function test); *Decker v. Mazda Motor Am., Inc.*, 2011 U.S. Dist. LEXIS 124182, at *9 (C.D. Cal. Oct. 24, 2011) ("[A] manufacturer has a duty to disclose any defects that fall within the warranty period, whether relating to safety or to costly repairs . . . ."); *Defrank v. Samsung Elecs. Am., Inc.*, 2020 U.S. Dist. LEXIS 198893, at *28–29 (D.N.J. Oct. 26, 2020) ("California law recognizes a duty to disclose defects which go to the central function of the product regardless of the warranty period . . . .").

[6] Carrier found a reported failure rate of nearly ███ in 1.5- to 2.5-ton units over a period of just four years—less than half the warranty period—but this is just the tip of the iceberg, as many failures are unreported and failures continued to occur after Carrier stopped

4

1    20; Ex. 3 (Kafura Tr.) 65:17–66:11, 121:3–122:19; Ex. 4, at 10–11; Ex. 5, at ¶¶ 59–80;

2    Ex. 19, at 3323; Statement of Genuine Disputes ("SGD") ¶¶ 98–132. This satisfies the

3    central-defect test.

4        In *Hodson*, the Ninth Circuit described the central-function test as requiring that the

5    "alleged defect be physical and important to the product's function." *Hodsdon v. Mars,*

6    *Inc.*, 891 F.3d 857, 864 n.4 (9th Cir. 2018). The clear majority of lower courts have held

7    that the central-function test is satisfied where a defect affects or impairs the central

8    function of the product; they have not required that the defect render the product

9    completely unusable. *See, e.g.*, *In re Apple Inc. Device Performance Litig.*, 386 F. Supp.

10    3d 1155, 1179 (N.D. Cal. 2019) (holding that central-function test is satisfied by

11    allegations that a smartphone battery ages too quickly); *In re Macbook Keyboard*, 2019

12    U.S. Dist. LEXIS 68130, at *19 (N.D. Cal. Apr. 22, 2019) (holding that a defect that

13    seriously impairs functionality suffices); *Beyer v. v. Symantec Corp.*, 333 F. Supp. 3d 966,

14    980 (N.D. Cal. 2018) (holding that an alleged vulnerability in security software satisfies

15    the central-function test); *Norcia v. Samsung Telcoms. Am. LLC*, 2018 U.S. Dist. LEXIS

16    169521, at *3–4 (N.D. Cal. Oct. 1, 2018) (stating, "[n]o reasonable person could disagree

17    that speed and performance go to the heart of a smartphone's central function"). Chief

18    Judge Phillips recently held that "whether [air conditioner] *odor* undermines the central

19    function of [a motor vehicle] is a triable question of fact," which is an even less restrictive

20    standard. *Stockinger v. Toyota Motor*, 2020 U.S. Dist. LEXIS 49943 (C.D. Cal. Mar. 3,

---

23    tracking them. Ex. 3, at 223:7–224:24 (Carrier's designee testifying that the failure rate

24    was ▮▮▮▮ based on the number of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Ex. 5 ¶

25    59; Exs. 6–8 (noting ▮▮▮▮▮▮▮▮ on warranty claims); Ex. 3, at 160:7–162:18

26    (explaining take-rate is an "estimate on an estimate"); Ex. 9 ¶ 3 (bulletin program expired

27    in December 2017); Ex. 10 ¶¶ 65, 67. Carrier did not track failures in 3- to 5-ton units, but

28    the evidence shows those units failed due to Ryconox too and in the same way. Ex. 11, at

7 ("Ryconox-related claims for these larger 3-5 ton units cannot reliably be gathered based

on [Carrier's] warranty data."); Ex. 12, at 5494; Ex. 13–16; Ex. 17, at 6; Ex. 2, at 17; Ex.

5 ¶¶ 81–100.

2020) (emphasis added).[7]

The defect here unquestionably impacts central functionality, as it causes performance impairment in virtually all contaminated air conditioners, in addition to complete failure of many, including Mr. Oddo's. Ex. 1, at 42468, 42521; Ex. 2, at 10; Ex. 3, at 65:17–66:11, 94:19–96:3, 121:3–122:19; Ex. 4, at 10–11; Ex. 5, at ¶¶ 59–80; Ex. 81; SGD ¶¶ 98–132.

Further, no matter what version of the standard applies, the central-function test does not require a 100% failure rate. The Ninth Circuit has repeatedly rejected the notion that product defect claims require a 100% manifestation rate. *See, e.g.*, *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168 (9th Cir. 2010) (overturning a lower court's decision that required proof of manifestation in a "majority" of vehicles); *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 820 (9th Cir. 2019) (holding that "the sale of [a product] with [a] known defect is the liability-triggering event," and that it is not necessary to prove that the defect has or will manifest in every unit).

The same reasoning applies with particular force to a duty to disclose because the

---

[7] This Court cited a small minority of decisions applying an "incapable of use" standard, but those decisions are consistent with recognizing a duty to disclose here. In *Knowles v. Arris Int'l plc*, 2019 U.S. Dist. LEXIS 142293, at *47 (N.D. Cal. Aug. 20, 2019), the alleged computer modem defect resulted only in occasional milliseconds of delay on certain tasks and an occasional need to reboot. The modems never failed completely requiring repair, nor did they suffer continuous degraded performance, unlike the contaminated air conditioners at issue here. In affirming *Knowles* in an unpublished, non-precedential decision, the Ninth Circuit found the alleged defect "not material" given that the modems could perform most tasks without issue and had only "occasional issues" with certain functions. 847 F. App'x 512, 514 (9th Cir. 2021). In *Ahern v. Apple Inc.*, 411 F. Supp. 3d 541, 568 (N.D. Cal. 2019), the plaintiffs alleged that Apple failed to install a fan filter on laptops, which could allow dirt to collect in the corners behind the screen, creating a small dark smudge. The court held that this did not "impair" computers' central function or render them unusable. Here, however, the defect frequently renders the product unusable—more than ██ failed in less than half the warranty period—and it impairs the function of virtually all. The Court also cited *In re Intel Corp. CPU Mktg., Sales, Practices & Products Liability Litigation*, 2020 U.S. Dist. LEXIS 53829, at *49 (D. Or. Mar. 27, 2020), but that decision considered the "central function" and "incapable of use" tests in the alternative. *See* ECF 292, at 47–49.

duty arises *at the time of sale*, whereas the failure rate can only be determined, if at all, in retrospect. Thus, any attempt to pin the duty to disclose on a particular failure-rate percentage is misguided and is inconsistent with the very duty itself.[8]

Courts, therefore, focus on the *nature* of the alleged defect, not on the percentage of units that will fail, which, in many cases, is totally unknown. To Plaintiff's knowledge, no other court has ever suggested that the duty to disclose depends on failure rate. Here, even ignoring the failure rate entirely, there is more than enough evidence to establish that the unapproved rust inhibitor is a central-function defect. Just as one example, ███████ ██████████████████████████████████████████████ (Ex. 1, at 42468), and as Carrier's own expert admitted, anytime "the flow of refrigerant through the expansion valve is restricted—for instance, due to materials depositing on the TXV pin—the [performance of the air conditioner is impaired]." Def. Ex. 31 ¶ 31; Ex. 1 at 42468, 42512–21; *see also* Ex. 81, at 34415; Ex. 3, at 99:15-100:17 (explaining Ex. 81, at 35514 the testing shows—short of an acute failure—████████████████████████ ████████████████████████████████████████████████ ████████████████████ ); Ex. 82, at 4, 10, 14; Ex. 22; Ex. 2, at 10; Ex. 3, at 94:19–96:3; Ex. 3, at 101:5-15; Ex. 5 ¶¶ 64–80.

In short, the evidence *is* sufficient to meet the central-function test. The Court should reverse its prior holding and hold that Oddo has adduced sufficient evidence to prove a duty to disclose the defect to California consumers under the central-function test.[9]

---

[8] For example, if the percentage is pegged at 5%, 10%, or even 25%, how would a manufacturer know prior to sale whether the requisite number of products would later fail, thereby triggering the duty at the time of sale? Further, how would a plaintiff prove the requisite failure rate where, like here, many failures are unreported or, as with Carrier's 3- to 5-ton units, simply untracked? Pegging the duty to a failure rate percentage is arbitrary and impractical in the real world. Indeed, even if there were no evidence of the acute failure rate here, the evidence is still enough to establish a central-function defect.

[9] Correspondingly, if the Court concludes, as it should, that there is enough evidence for a trier of fact to find a duty to disclose under the central-function test, then it should *sua sponte* reverse its decision denying class certification to the extent based on this holding.

7

**B.    Carrier Owed A Duty To Disclose Under The *Limandri* Factors.**

Even if the Court reaffirms its holding that Carrier had no duty under the safety and/or central-function tests, however, it cannot grant summary judgment on the basis of the traditional *LiMandri* test because there is ample evidence to support a duty to disclose under those factors. At minimum, genuine issues of material fact preclude summary judgment on the *LiMandri* factors as to Mr. Oddo's individual claims.

Under *LiMandri*, a defendant has an affirmative duty to disclose: "[1] when a defendant had exclusive knowledge of material facts not known to plaintiff; [2] when a defendant actively conceals a material fact from plaintiff; or [3] when a defendant makes partial representations but also suppresses some material facts." 60 Cal. Rptr. 2d at 543.[10]

Based on the evidence summarized below, a trier of fact could reasonably conclude that Carrier owed a duty under any one, or all three, of these factors. *See generally* SGD ¶¶ 157–87.

As to the first factor, "courts have not defined 'exclusive' literally, but have found such claims cognizable if the defendant had **'superior' knowledge of a defect** that was not readily apparent and there is no or only . . . **limited publicly available information about the defect**." *Salas v. Toyota Motor Sales, U.S.A., Inc.*, 2016 U.S. Dist. LEXIS 195222, at *29 (C.D. Cal. Sept. 27, 2016) (emphasis added) (quoting *Daniel v. Ford Motor Co.*, 2016 U.S. Dist. LEXIS 65723, 2016 WL 2899026, at *4 (E.D. Cal. 2016)); *see also In re NJOY Consumer Class Action Litig.*, 2014 U.S. Dist. LEXIS 196586, at *42 (C.D. Cal. May 27, 2014) ("A defendant has exclusive knowledge of material facts giving rise to a duty to disclose under California law where . . . the defendant knew of a defect while plaintiffs did not, and, given the nature of the defect, it was **difficult to discover**.") (cleaned up; emphasis added). In other words, exclusivity is not defeated if information can be publicly found; rather courts examine "the nature of the product, the nature of the alleged omission, and the difficulty in reasonably finding the omitted information from sources other than the defendant." *Anderson v. Apple Inc.*, 500 F. Supp. 3d 993, 1015

---

[10] Mr. Oddo does not contend that Carrier had a fiduciary relationship to him.

(N.D. Cal. 2020). Here, it is easy to conclude that Carrier had superior knowledge and that there was no, or only limited or difficult to discover, publicly available information about the defect when Mr. Oddo purchased his air conditioner.

As to the second factor, a defendant actively conceals a material fact when the defendant "sought to suppress information in the public domain or obscure the consumers' ability to discover it." *Taragan v. Nissan N. Am., Inc.*, 2013 U.S. Dist. LEXIS 87148, at *23 (N.D. Cal. June 20, 2013) (citation omitted). Active concealment can be demonstrated numerous ways, including where a manufacturer issues bulletins to repair facilities and dealerships but does not inform customers about an alleged defect. *See Falco v. Nissan N. Am., Inc.*, 2013 U.S. Dist. LEXIS 147060, at *21-22 (C.D. Cal. Oct. 10, 2013); *Marsikian v. Mercedes Benz USA, LLC*, 2009 WL 8379784 at *14 (C.D. Cal. May 4, 2009) (defendant issued internal bulletins to dealers but concealed the problem from the general customer base). Here, not only did Carrier issue service bulletins without disclosing anything publicly, it labeled bulletins "Confidential & Proprietary Information – Not for Further Distribution," expressly because Carrier did not want distributors or dealers ███ ██████████████████████ Def. Exs. 25–26, 28; Ex. 36, at 2.

The third factor requires a "lesser" showing than active concealment and imposes a duty where a defendant manufacturer makes partial representations but also suppresses material facts. *See, e.g., In re Toyota RAV4 Hybrid Fuel Tank Litig.*, 2021 U.S. Dist. LEXIS 69643, at *72 (N.D. Cal. Apr. 9, 2021) (holding that disclosure of fuel tank size while failing to disclose that the tanks cannot, in practice, be filled to capacity could constitute suppression of material fact). Once again, suppression is easily demonstrated here because, even if Carrier's bulletins could be considered a disclosure, Carrier concealed material information about the defect. Carrier also made affirmative representations concerning the SEER ratings of its air conditioners ████████████ ██████████████████████████████████████████████ *See, e.g.*, SGD ¶¶ 185–97.

Beginning with knowledge, there is no question Carrier was aware that the air

conditioner Mr. Oddo purchased was contaminated with the "unapproved" rust inhibitor, Ryconox. Ex. 2, at 17–18; Ex. 28; Ex. 29. By August 2014, Carrier had determined "conclusively" that Ryconox was the "root cause" of widespread sticky debris forming on the TXVs of new air conditioning systems. Ex. 2, at 17. In Carrier's words, it caused an "█████████████" rate. Ex. 23. In August 2014, Carrier was projecting a ██████ failure rate. Ex. 21.[11] Carrier's records show that TXV failures increased *at least* ████ in the first year alone due to Ryconox. Ex. 5 ¶ 61.

Mr. Oddo purchased his air conditioner from a Carrier distributor, United Refrigeration, on May 4, 2015. Ex. 24 (Oddo Aff.) ¶ 14; Ex. 25. Mr. Oddo builds and repairs medical laboratory refrigeration equipment for a living. Ex. 24 ¶ 3. He is highly-trained and knowledgeable about cooling technology.[12] Ex. 24 ¶¶ 3–5; Ex. 26 (Oddo Tr.), 14:12–23, 22:20–23:15, 25:2–27:17. He spent *six months* researching his purchase, reviewed Carrier's website, reviewed a Carrier brochure, discussed his purchase with the distributor, and saw the product labeling. Ex. 24 ¶¶ 8–10, 14; Ex. 26, at 66:24–67:22; 73:14–75:14; Ex. 27, at 6–11. The contamination defect was never revealed to Mr. Oddo in any form prior to his purchase. Ex. 24 ¶¶ 11–14.

Carrier does not contend that it actually made any effort to disclose the defect to consumers. Instead, it contends that it made a disclosure in just one place: service bulletins made available to distributors and dealers. Br. 9–11. But service bulletins do not constitute, nor did Carrier intend them to be, a disclosure to consumers. On the contrary, Carrier actively attempted to conceal them from the public.

***First,*** as Carrier's designee testified, service bulletins are "not intended to be

---

[11] Although Exhibit 21 has a header indicating it was prepared on January 13, 2018, this was automatically generated when the document was printed by counsel. The document was created in August 2014. Ex. 104.

[12] Mr. Oddo is also licensed to handle refrigerant, which is the only license he needed to install his own air conditioner under California law. Ex. 26, at 22:11–15; Ex. 24 ¶ 3–4; Ex. 10 ¶ 13. Carrier has repeatedly and falsely claimed that he is "unlicensed," but that is simply not true. In any event, the omission claims at issue arise out of the purchase of his air conditioner—not its installation.

communicated . . . outside of our distributors and our dealers." Ex. 3, at 141:5–9. In a 2014 email, Carrier plainly instructed its dealers and distributors that they "█████████████████████████████████████████████████████" Ex. 30.

Carrier's designee further explained that the bulletins are not intended to be product quality disclosures but, instead, merely instructed service personnel how to fix the issue when it does occur. Ex. 3, at 139:1–7 ("[F]rom a dealer perspective, … "they wanted to know how to fix the issue when it does occur"); *id*. at 145:14–22 (confirming that the bulletins "deal with fixing a failure".)

The fact that they are not intended to be consumer disclosures is also evident from the highly technical language used in the bulletins, incomprehensible to most consumers, which describes the "situation" as "[o]ngoing testing and report from the field indicate that Thermostatic Expansion Valves (TXV) in 1.5, 2 and 2.5 ton indoor coils installed with the above listed condensing units may not maintain the correct SuperHeat (SH) in certain situations." *See* Def. Exs. 25–28.

Not surprisingly, Courts routinely hold that service bulletins distributed to repair personnel do not constitute consumer disclosures and do not defeat exclusive knowledge—even when they can be found online by someone who spends time searching. *See, e.g.*, *Gregorio v. Ford Motor Co.*, 2021 U.S. Dist. LEXIS 37410, at *32 (E.D. Mich. Mar. 1, 2021) ("[J]ust because consumers may have been able to find some information, like consumer complaints (or even service bulletins) online does not defeat the fact that Ford had exclusive knowledge."); *Falco v. Nissan N. Am., Inc.*, 2016 U.S. Dist. LEXIS 46115, at *22 (C.D. Cal. Apr. 5, 2016) (granting class certification and rejecting defendants' argument that service bulletins freely available on the internet could raise individual knowledge issues); *Morcom v. LG Elecs. USA, Inc.*, 2017 U.S. Dist. LEXIS 198935, at *32–33 (D.N.J. Nov. 30, 2017) (upholding concealment claims where a defect was described in a service bulletin but not disclosed to consumers); *Kommer v. Ford Motor Co.*, 2018 U.S. Dist. LEXIS 131449, at *9 (N.D.N.Y. Aug. 6, 2018) (upholding claims where alleged defect was described in service bulletins but not distributed

widely).[13]

Indeed, the existence of service bulletins is frequently held to be *evidence* of exclusive knowledge—it does not *disprove* exclusive knowledge. *See, e.g.*, *Bryde v. GM, LLC*, 2016 U.S. Dist. LEXIS 159707, at *29 (N.D. Cal. Nov. 17, 2016) (finding allegation of exclusive knowledge was supported by the existence of a service bulletin); *Brand v. Nissan N. Am.*, 2017 U.S. Dist. LEXIS 234271, at *28 (C.D. Cal. Feb. 24, 2017) (same).[14]

**Second,** Carrier actively attempted to conceal its service bulletins by labeling them "Confidential & Proprietary Information – Not for Further Distribution" expressly because Carrier did not want distributors or dealers "███████████████████████ █████"[15] Def. Ex. 24–26, 28; Ex. 36, at 2. As Carrier explained to a distributor, the confidentiality statement "████████████████████████████████████ ████████████████████████████████████████ ███████" Ex. 30 (emphasis added).

---

[13] In fact, in its opposition to class certification, Carrier conceded the point when it affirmatively argued that the "existence of bulletins . . . does nothing to establish that information from a manufacturer passes uniformly through the distribution chain to a consumer prior to the consumer's decision to purchase the product." ECF 236, at 18.

[14] *See also Digby Adler Grp., LLC v. Mercedes-Benz U.S.A., LLC*, 2015 U.S. Dist. LEXIS 116427, at *6 (N.D. Cal. Sept. 1, 2015) (same); *MacDonald v. Ford Motor Co.*, 37 F. Supp. 3d 1087, 1095 (N.D. Cal. 2014) (same); *Gray v. BMW of N. Am., LLC*, 22 F. Supp. 3d 373, 383 (D.N.J. 2014) (same); *Majdipour v. Jaguar Land Rover N. Am., LLC*, 2013 U.S. Dist. LEXIS 146209, at *50 (D.N.J. Oct. 9, 2013) (same).

[15] Most of the bulletins Carrier attaches cannot constitute a disclosure about air conditioners because they do not refer to air conditioners at all. Carrier's Exhibits 11–24, which are pre-October 2014 bulletins, refer solely to *Residential Furnace Coils*, not air conditioners. Carrier did not issue any bulletins referencing air conditioners until October 23, 2014, and they were labeled "Confidential & Proprietary Information – Not for Further Distribution." Def. Exs. 25–26, 28. There is only a single post-October 2014 "Dealer Bulletin" in the record that is not so labeled ("Dealer Bulletin D047"), Def. Exs. 27 & 36, but as explained by Carrier's designee, these Dealer Bulletins were distributed to dealers, if at all, only by the local distributors, Ex. 33, at 70:19-25, and the corresponding distributor version of that bulletin ("Service Bulletin S047") was marked "Confidential & Proprietary Information – Not for Further Distribution," Def. Ex. 26. Of course, even if Carrier inadvertently failed to mark one bulletin "Confidential," that does not change the fact that Carrier undertook efforts intended to conceal the defect from the public.

1    Additionally, Carrier prohibits ████████████████████████████████████

2    ██████████████████████████████████████████████████████" Ex. 31, at

3    ¶ 3.9; Ex. 32, at ¶ 2.2.12. Thus, confidential or not, distributors could not disclose the

4    bulletins publicly unless Carrier had done so, which it did not.

5        Carrier knew that if information about the defect became public it would impact

6    Carrier's sales, Ex. 3, at 144:14–145:13, and, therefore, it actively concealed it.

7        ***Third***, consistent with Carrier's intent, the bulletins were not widely available to

8    the public. Mr. Oddo's extensive pre-purchase research did not turn up anything about the

9    bulletins or the defect. Ex. 24 ¶ 11–14. Mr. Oddo only found a copy of bulletin in August

10   2015, after his unit failed, and that required "extensive" searches, first, to find website

11   where air conditioner service professionals "hang out" and, then, by searching those sites

12   in an effort to determine why the TXV in his new air conditioner had failed. Ex. 26, at

13   187:12–188:2; Ex. 24 ¶ 19; *see Anderson*, 500 F. Supp. 3d at 1015 ("[T]he mere online

14   availability of the information does not necessarily doom an exclusive knowledge

15   claim."). Mr. Oddo testified that his distributor "knew absolutely nothing about [the

16   bulletin]," when Mr. Oddo brought it to the distributor's attention in August 2015.[16] Ex.

17   26, at 190:12–191:10. This was not a situation where the information was "easily

18   accessible in the public domain" prior to his purchase—indeed, his distributor professed

19   to not know about it a full year after Carrier "conclusively" identified the defect.[17] *See* Ex.

20

21   [16] Carrier claims that United Refrigeration had the bulletin because they produced it in

22   response to a subpoena, Ex. 36, but that response came from United Refrigeration's

23   headquarters in Pennsylvania, and there is also no evidence in the record when they

     received it, or that the United Refrigeration branch in Santa Ana, California had the

24   bulletin when Mr. Oddo bought his system. *See* Ex. 105, at 1.

25   [17] In fact, Carrier knew that its service bulletins were often overlooked by distributors and

     dealers because, consistent with the fact that the service bulletins are intended only to

26   instruct service personnel "how to fix the issue when it does occur," Carrier's process for

27   distributing service bulletins generally requires distributors and dealers to log in to a

     Carrier website to locate and view the service bulletins. Ex. 3, at 139:1–7; *id.* at 31:24–

28   34:3; Ex. 33, at 13:16–14:8. Carrier admitted in its opposition to class certification that

     distributor and dealer knowledge of bulletins "varies significantly." ECF 236, at 28.

2, at 17; *cf. Milman v. FCA U.S., LLC*, 2019 U.S. Dist. LEXIS 125342, at *16 (C.D. Cal. Apr. 15, 2019) (holding that the allegations in the complaint made clear that information about the defect was easily accessible in the public domain *before* the plaintiff purchased her vehicle).

***Fourth***, the bulletins themselves concealed highly material information about the defect. Thus, even if they could be taken as *some* disclosure, they suppressed other material information about the defect. For one, no bulletin ever disclosed the failure rate. Carrier internally projected a ▮▮▮▮ failure rate but suppressed that information.[18] Ex. 21; Ex. 3, at 121:3–122:19. Carrier's affiliated distributor, Carrier Enterprises ("CE"), expressed that they were "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮" and asked, point blank, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"[19] Ex. 37. But Carrier refused to answer, stating: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." *Id.* Carrier never disclosed this in bulletins because Carrier did not want to get ▮▮▮▮▮▮ ▮▮▮▮▮" from distributors. Ex. 46, at 1. Carrier was not willing to "▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." Ex. 48, at 1. As Carrier's designee testified, the bulletins simply "provided [dealers] the information needed to *remedy the issue in the field*." Ex. 3, at 121:3–122:19 (emphasis added).

Carrier also never disclosed the fact that the contaminated systems could suffer decreased performance even in the absence of an acute failure. Carrier's ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 1 at 42468, 42517–21. And, as Carrier's own expert admitted, anytime "the flow of refrigerant through the expansion valve is restricted—for instance, due to materials depositing on the TXV pin— the [performance of the air conditioner is impaired]." Def. Ex. 31 ¶ 31. Many systems tested by Carrier showed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ Ex. 5 ¶¶ 66–69; Ex. 2, at 8, 10; Ex. 82, at 4, 10, 14; Ex. 81; Ex. 106. Carrier suppressed the potential for performance loss in the absence of complete failure.

---

[18] Carrier also refuses to allow public dissemination of the failure rate in this case.
[19] CE accounts ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 33, at 39:7.

Carrier also never disclosed that the contamination could impact other parts of the system even though Carrier's designee conceded, "anytime you have refrigerant not flowing correctly, it's a risk to . . . the compressor and other parts of the system." Ex. 3, at 106:23–107:9.

Carrier knew perfectly well that it's bulletins were not fully forthcoming, as they did not even disclose the affected component (the compressor) ███████████████. Carrier's supply chain director, Ripley Ross, indicated that █████████████ these bulletins to add █████ and ██████████████████████ Ex. 38, at 44304; *see also* Ex. 70, at 1 (Carrier's bulletins could ███████████████████ ████████████████████). In short, Carrier both actively concealed the defect and suppressed material facts. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 754 F. Supp. 2d 1145, 1192 (C.D. Cal. 2010) ("Toyota actively concealed the real reason for the recall and concealed the fact that floor mats were not the only culprit.").

Moreover, as discussed more fully below, the bulletins suppressed material information about the "solution" of injecting A/C Re-New. The bulletins stated that the "SOLE solution" to remedy stuck TXVs was to inject an additive, A/C Re-New, but the bulletins failed to disclose that the additive is extremely harmful, and that the only way to repair the defect without harming the system involves complicated and expensive replacement of many parts, including the compressor. *See infra* Section II; Def. Exs. 24–28; Ex. 5 ¶¶ 131–41.

So, even if bulletins could be deemed a disclosure at all, they were misleading because they made a partial disclosure while suppressing other material information about the defect and the recommended solution. *See, e.g.*, *Sadeghi-A v. Daimler Trucks N. Am. LLC*, 2021 U.S. Dist. LEXIS 42756, at *41–42 (D. Minn. Mar. 8, 2021) (upholding claims where a service bulletin provided partial and misleading information about a defect and repair solution).

***Fifth,*** concealment and suppression is evident in the fact that Carrier never advised

its distributor and dealers to make any disclosure to consumers, never made a disclosure in any of the extensive marketing materials it provides distributors and dealers, never made a disclosure in its direct-to-consumer advertising, and never made a disclosure in any of the direct-to-consumer written materials it provides with the air conditioners nor on the air conditioners themselves. *See, e.g.*, Ex. 43, at 45212; Ex. 44, at 44103; Ex. 45, at 92; Ex. 33, at 117:14–121:21; SGD ¶¶ 164-168. Carrier can and does regularly provide product information through *all* of those channels.[20] That Carrier did not do so here demonstrates that it intended to conceal the defect from consumers.

Carrier's motive for concealment and suppression is obvious, but Carrier also admitted it. Carrier wanted to offload its inventory of contaminated compressors and admitted that full disclosure would impact sales and ███████████████████████. *See* Ex. 3, at 144:14-145:13; Ex. 46. Carrier also quickly recognized that it did not have enough alternative inventory and that some of its distributors would need to sell affected units ████████████████████████████████████ Ex. 47. Even after Carrier started manufacturing "clean" air conditioners in September 2014, however, Carrier employees confided that they needed ████████████████████████ ████████████████ because Carrier did not want to get █████████████ █████████. Ex. 46, at 1. Carrier was not willing to ███████████████ ████████ Ex. 48, at 1. So, further to that goal, Carrier's bulletins merely described how to fix a stuck TXV while concealing highly material information. *See* Ex. 3, at 121:3–122:19; SGD ¶¶ 157–84.

---

[20] Carrier has required dealers to obtain consumer signatures to verify that information had been disclosed, but it did not do so here. Ex. 39, at 7 of 11. Carrier has also provided a consumer-facing flier with each unit, but it did not do so here. *See Sumer v. Carrier Corp.*, 2015 U.S. Dist. LEXIS 75266, at *6 (N.D. Cal. June 10, 2015). Carrier has provided template letters for dealers give homeowners about a specific defect, but it did not do so here. Ex. 40, at 2. And in many situation Carrier simply instructs its distributors and dealers to disclose information, but again it did not do so here. Ex. 41 (bulletin instructing dealers that "the customer must be informed" of system capacity reductions); Ex. 42, at 3 (requiring dealers to "[d]iscuss [a] situation with the homeowner").

16

***Finally,*** Carrier disclosed on product information provided to Mr. Oddo that his air conditioner was capable of achieving an energy efficiency of 16 SEER, but Carrier failed to disclose that in its tests, ███████████████████████████████████████ ███████████████████████████ [21] SGD ¶¶ 185–87. Thus, Carrier suppressed material information about the SEER rating too.[22]

Given all of these facts, a trier of fact could readily conclude that one or more *LiMandri* factors is met.

## C.  Mr. Oddo Relied On Carrier's Omissions.

The Court also cannot grant summary judgment as to Mr. Oddo's individual reliance. He has testified that he relied on Carrier's omissions and would not have purchased the air conditioner if the defect had been disclosed, which is sufficient evidence.

Nevertheless, if the Court reaffirms its class certification holding as to *objective materiality*, which is a proxy for reliance on a classwide basis, that too is dispositive of Mr. Oddo's individual claims because objective materiality is an independent element of his claims.[23] Once again, however, the Court should reverse its prior holding.

At the class certification stage, objective materiality—i.e., whether a reasonable consumer would view a defect as material—serves as a proxy for reliance. In its class certification decision, the Court held that Plaintiffs failed to present sufficient evidence of objective materiality because, although Plaintiffs' survey evidence demonstrated that the vast majority of air conditioner purchasers would have viewed the defect as material and changed their purchasing behavior if the defect had been disclosed to them, Ex. 50 at 4–

---

[21] SEER rating is based, in part, on the operation of the air conditioner at "DOE B" conditions. Ex. 3, 55:10–58:16; Ex. 10 ¶ 66; Ex. 5 ¶ 76. In Carrier's testing, ███████████ ████████████████████████████████████████████████████████ *E.g.*, Ex. 3, at 65:23–66:1; Ex. 2, at 10; Ex. 49; Ex. 10 ¶ 66; Ex. 5 ¶¶ 48, 67.

[22] This claim is not based on an affirmative misrepresentation. Rather, it is an omission claim based on Carrier's failure to disclose material facts, which the Court did not dismiss. ECF 57, at 31, 39. It is the omitted facts that matter.

[23] *See, e.g.*, *Kosta v. Del Monte Foods, Inc.*, 308 F.R.D. 217, 224 (N.D. Cal. 2015) (objective materiality is an element of CLRA, FAL, UCL, and other claims, separate from reliance).

5, the survey did not "indicate how consumers 'valued' Carrier's alleged omissions, '*compared to other attributes of the product and relevant market generally.*'"[24] ECF 292, at 55–56 (emphasis added).

Mr. Oddo respectfully submits that the Court applied an erroneous legal standard. No other court has ever held that proving objective materiality requires evidence of how reasonable consumers would hypothetically compare, or rank, various product attributes relative to an undisclosed manufacturing defect. To establish materiality, it is not necessary to show that disclosure of the defect would be the "sole or even the predominant or decisive factor in influencing [a reasonable person's] conduct. . . . A misrepresentation [or omission] is judged to be material if a reasonable [person] would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *In re Tobacco II Cases*, 207 P.3d 20, 39 (Cal. 2009). But unless the Court changes its mind, its conclusion necessitates dismissal of Mr. Oddo's individual omission claims, because objective materiality is a required element of them too.

The Court cannot, however, grant summary judgment as to Mr. Oddo's individual reliance on omissions. Reliance on omission is demonstrated by showing that a plaintiff would have behaved differently if a disclosure had been made. *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) (quoting *Mirkin v. Wasserman*, 858 P.2d 568, 574 (Cal. 1993)). Mr. Oddo's testimony easily meets that standard.

Mr. Oddo states in sworn testimony that he would not have purchased his air conditioner if the defect had been disclosed to him and that he would have demanded a "clean" unit or purchased another brand from one of the other distributors with whom he had pre-existing relationships. Ex. 24 ¶ 11; Ex. 27, at 6. That is sufficient for reliance.

Carrier asks the Court to reach a counterfactual conclusion that Mr. Oddo's

[24] The evidence of materiality also included Carrier's own survey evidence showing that ███████████████████████████████████████ (Ex. 51, at 12; *see also* Ex. 45, at 14, 72) and evidence of materiality from an engineering perspective, including Carrier's own actions in ████████████████████████████████████████████ (Ex. 2, at 17; Exs. 52, 53).

purchase had everything to do with his pre-existing relationship with United Refrigeration. Br. 13–14. That is not true. In reality, Carrier's attorneys simply never asked Mr. Oddo at his deposition what he would have done if the defect had been disclosed to him.

None of his deposition testimony contradicts Mr. Oddo's testimony that he would not have purchased the air conditioner if the defect had been disclosed.

- That he had a pre-existing relationship with United Refrigeration is immaterial. He had relationships with other distributors too, including Johnstone Supply from which he purchased A/C Re-New in 2015. Ex. 26, at 31:19–32:4; 35:18–36:5; 192:18–193:1. Had the defect been disclosed he would have demanded a non-contaminated unit from United Refrigeration or purchased another brand from one of the distributors with whom he has had business dealings. Ex. 24 ¶ 11.

- That he bought the air conditioner on sale is also immaterial because he has testified that he would not have bought it if the defect was disclosed regardless of the sale. *Id.* at ¶ 15. Moreover, the discount he received was a standardized discount off the list price, not a negotiated price. *Id.*

- Further, the fact that he understands "it is a fact of life" air conditioners sometimes need repair is also immaterial.[25] The air conditioner he purchased had a specific, known defect that created an exceptionally high chance of failure and ███████ ████████████████████████. *See, e.g.,* Ex. 2, at 10; Ex. 3, at 65:17–66:11; SGD ¶¶ 98–120. Efficiency was one of the most important factors to Mr. Oddo, and "quality" was the "single factor that dominated [his decision]." Ex. 26, at 99:21–100:4; Ex. 24 ¶ 9–10.

Carrier cannot simply dismiss with a wave of the hand Mr. Oddo's testimony that he would not have purchased the air conditioner if the defect had been disclosed. Carrier's argument is meritless.[26]

---

[25] In *Dixon v. Ford Motor Co.*, 2015 U.S. Dist. LEXIS 146263, at *24-25 (E.D.N.Y. Sept. 30, 2015), the court rejected a substantially similar argument, finding the defendant's argument that "the warranty specifically states that defendant does not guarantee a defect-free vehicle" was "not convincing" where, like here, the defendant failed to disclose a specific, known defect.

[26] The only caselaw Carrier cites is readily distinguishable. In *Glen Holly Entm't, Inc. v. Tektronix Inc.*, 352 F.3d 367, 379–80 (9th Cir. 2003), the court held that certain alleged false statements could not be the basis for reliance because the statements were made *after* the plaintiff made the relevant decision.

### D.    Carrier Intended To Defraud Consumers.

There is also ample evidence of Carrier's intent to defraud.  Therefore, the Court cannot grant summary judgment on this ground either.

Evidence of intent to defraud is required only for Mr. Oddo's fraudulent concealment claim.[27]  For that claim, circumstantial evidence is enough to establish an inference of intent. *See, e.g.*, *Dreher v. PNC Fin. Servs. Grp.*, 2020 U.S. Dist. LEXIS 198677, at *18 (C.D. Cal. Sep. 23, 2020). "Questions of intent are normally questions of fact properly reserved for the jury." *Sloan v. GM LLC*, 2020 U.S. Dist. LEXIS 71982, at *54 (N.D. Cal. Apr. 23, 2020).

In *Sloan*, 2020 U.S. Dist. LEXIS 71982, at *53–54, the court held that a reasonable juror could conclude that "GM intended to deceive customers in order to induce them to purchase GM vehicles" based on evidence that (1) "GM may have been motivated to withhold information . . . because of a desire to make profit"; or (2) GM was aware "that many GM customers rated 'Reliability/Durability' as the most important factor in their purchase decision about which vehicle to purchase," so "GM might have concluded that releasing information about engine defects would have reduced customers' perceptions about the reliability and durability of their vehicles and reduced sales." At minimum, the same is true here.

As stated above, Carrier concealed the defect because, *inter alia*, it: wanted to offload its inventory of contaminated compressors to make a profit; knew that disclosure of the defect ████████████████████████████████████; did not have

---

[27] Proof of intent to defraud is not necessary for Mr. Oddo's UCL, FAL, CLRA, and negligent misrepresentation claims; mere negligence is enough. *See Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1019 n.11 (9th Cir. 2020); *see also Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (cleaned up) (noting those "California statutes are governed by the reasonable consumer test" wherein a plaintiff need only "show that members of the public are likely to be deceived"); *Madrigal v. Allstate Indem. Co.*, 2015 U.S. Dist. LEXIS 193784, at *54 n.14 (C.D. Cal. Sep. 30, 2015) (citing *Anderson v. Deloitte & Touche*, 66 Cal. Rptr. 2d 512, 516 (Cal. Ct. App. 1997)); *Swafford v. IBM*, 408 F. Supp. 3d 1131, 1148 (N.D. Cal. 2019).

1    ███████████████████████; and was not willing to "██████████████

2    ████" *See* Exs. 46–48. Carrier was very clear that it did not want its distributors or

3    dealers sharing the bulletins with consumers. *See, e.g.*, Ex. 30. Also, like in *Sloan*, Carrier

4    knew from its own ████████████████████████████████████████████

5    ████████████████. Ex. 51, at 12; *see also* Ex. 45, at 14, 72. Given the

6    evidence here, a trier of fact could reasonably conclude that Carrier intended to deceive

7    consumers, including Mr. Oddo.

8    **II.    The Court Cannot Grant Summary Judgment On Claims For Omission**

9         **Related To A/C Re-New Because No Such Claims Were Ever Asserted.**

10        Carrier also asks the Court to grant judgment "[t]o the extent Oddo is asserting

11   claims based on alleged omissions related to the Zerol Ice additive . . . ." Br. at 16. But

12   Mr. Oddo has never asserted omission claims related to Zerol Ice (also known as A/C Re-

13   New). His omission claims derive from Carrier's failure to disclose the *rust inhibitor*

14   contamination in connection with the sale of the air conditioners—not Carrier's

15   subsequent advice to inject Zerol Ice when the original defect caused a failure.[28] The Court

16   cannot enter judgment on a claim never asserted.

17        Zerol Ice is relevant to Mr. Oddo's omission claims in only one respect, as stated

18   above: Carrier's bulletins actively concealed and/or suppressed material information

19   *about the rust inhibitor defect* because they stated that the "SOLE solution" to failures

20   caused by the rust inhibitor was to inject Zerol Ice, but never disclosed that Carrier knew

21   injecting Zerol Ice is extremely harmful and that only the *non-harmful* solution is to

22   remove the rust inhibitor from the system, which requires costly replacement of many

23   parts. *See, e.g.*, Def. Exs. 25–28; Ex. 5 ¶¶ 142–78; SGD ¶¶ 133–56. This is not a "claim"

24   for omission pertaining to Zerol Ice, but rather evidence of suppressed material

25   information related to the underlying rust inhibitor defect, which satisfies *LiMandri*.

26        As discussed above, suppression of material information about the means of

27   ─────────────────────

28   [28] Mr. Oddo did assert breach of warranty claims based on the fact that injecting Zerol Ice
     was not in compliance with Carrier's warranty obligations, but the Court dismissed those
     claims at the motion to dismiss stage. ECF 57, at 13, 26.

repairing the defect was just one of many facts giving rise to a duty under the *LiMandri* factors.  Even if there was no evidence of the harm caused by Zerol Ice, the *LiMandri* test would still be met.  Nevertheless, Carrier's self-serving conclusory statement that Zerol Ice is not harmful is easily belied by the mountain of evidence showing that Zerol Ice is extremely harmful.

Extensive testing shows that Zerol Ice causes ███████████████ ██████████████████████████████████████████████████ █████████████████████████████████████ Exs. 54–55; Ex. 56, at 5565; Ex. 57, at 6, 13; Exs. 58, 59; Ex. 60, at 3; Ex. 5 ¶¶ 142–68; SGD ¶¶ 133–56.

Perhaps most telling is that Carrier told the manufacturer of Zerol Ice that Carrier was only using it to ████████████████████████████████████ ████████████████████████████ Ex. 61, at SCP000317. And Emerson admitted that the "████████████████████████████████████████████ ████████████████████. *Id.*

Nor is it true that "Oddo cannot identify a single issue with his unit attributable to Zerol Ice." Br. at 18. Mr. Oddo's own testing showed that his air conditioner never fully recovered performance after it was injected with Zerol Ice. Ex. 26, at 200:17–203:19. Further, he testified that his compressor is now extremely noisy (consistent with premature compressor wear) and that the system shows signs of liquid refrigerant returning to the compressor, which is very harmful and likely the result of continued debris at the TXV. Ex. 24 ¶ 23. Moreover, in a recent test he found that the TXV is not fully closing, likely due to continued rust-inhibitor debris, which has a significant negative effect on performance and efficiency. *Id.* at ¶ 25. Thus, Zerol Ice did not actually fix the problem and created new ones. *See generally* Ex. 5 ¶¶ 142–68.

Carrier seeks to capitalize on the fact that damage caused by Zerol Ice cannot be confirmed without performing destructive testing by arguing that Mr. Oddo and his expert, Mr. Sikorsky, cannot point to any specific damage caused by Zerol Ice. That argument is

1   disingenuous. To confirm the damage (i.e., ██████████████████████

2   ████████████████████ in any particular unit, one would need to "tear-down" the

3   compressor, which is hermetically sealed, thereby destroying it. Ex. 10 ¶ 22.[29] But Mr.

4   Oddo does not need to destroy his own compressor to prove that Zerol Ice is harmful

5   because ████████████████████████████████████████████████████

6   ████ Exs. 54–55, 65; Ex. 5 ¶ 154. Carrier's and Emerson's ████████████████

7   ████████████████████████████████████████████████████ Ex. 56,

8   at 5565; Ex. 57, at 6, 13; Exs. 58, 59; Ex. 60, at 3.

9        In short, the Court cannot grant summary judgment on any issue related to Zerol

10  Ice, first, because Mr. Oddo does not make a claim for omission based directly on Zerol

11  Ice and, second, because ample evidence shows that it is harmful.

12  **III.   <u>Mr. Oddo Can Prove His Unjust Enrichment Claims.</u>**

13        Mr. Oddo has already conceded that the Court's holdings as to materiality and duty

14  to disclose, unless reversed, are dispositive of his claims, including his unjust enrichment

15  claim because, as the Court recognized, "in California, there is not a standalone cause of

16  action for unjust enrichment." ECF 57, at 37 (cleaned up) (quoting *Astiana v. Hain*

17  *Celestial Grp., Inc.*, 783 F.3d 753 (9th Cir. 2015)). The Court cannot enter judgment on

18  his unjust enrichment claims on the additional grounds that Carrier seeks, however.

19        First, Mr. Oddo does not have an adequate remedy at law because, absent equitable

20  relief, he cannot recover the full cost to repair his air conditioner today. A plaintiff can

21  seek equitable relief when he cannot recover his full damage at law. *See Anderson v. Apple*

22  *Inc.*, 500 F. Supp. 3d 993, 1009–10 (N.D. Cal. 2020). For his omission claims, Mr. Oddo

23  is entitled to recover damages equal to the amount it would have cost, at the time of his

24  purchase, to render his defective air conditioner non-defective—i.e., the cost of repair at

25

26  [29] Carrier claims that its expert found no actionable amounts of acid in Mr. Oddo's system,
    but its expert's "acid test" did not test for the type of acid that would be expected as a
27  result oil breakdown due to A/C Re-New, nor did Mr. Schneyer conduct a tear-down test
    of Mr. Oddo's compressor to observe pre-mature compressor wear or copper plating. Ex.
28  10 ¶¶ 21–22.

the time of purchase. *Nguyen*, 932 F.3d at 822. However, as Plaintiffs' expert testified, the cost to repair Mr. Oddo's unit today is "significantly higher than at the time of purchase, since the [rust inhibitor] has spread from the outdoor unit, through the lineset, to the indoor unit." Ex. 10 ¶ 118; Ex. 5 ¶ 103. So, his damages recoverable at law are insufficient to make him whole. Further, pursuant to Carrier's instructions, Mr. Oddo's air conditioner was injected with Zerol Ice, which is even more costly to repair. Ex. 5 ¶¶ 169–78; Ex. 24 ¶ 21. These costs are recoverable, however, as equitable relief via Mr. Oddo's claim for unjust enrichment because Carrier unjustly benefitted by selling the defective air conditioner and by not performing adequate repairs.

For similar reasons, the existence of Carrier's warranty is immaterial. A warranty does not invalidate an unjust enrichment claim where the dispute is beyond the scope of the warranty. *See Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*, 61 Cal. 4th 988, 999 (Cal. 2015) ("[I]t would be unjust for the insured to retain the benefit of the insurer paying for defense costs that are beyond the scope of the insurance contract."); *Victorino v. FCA US Ltd. Liab. Co.*, 2018 U.S. Dist. LEXIS 32846, at *38 (S.D. Cal. Feb. 27, 2018) ("These facts raise triable issues whether FCA's express warranty coverage includes the Clutch System."). Here, the warranty covers parts only, not the full cost of repair. Carrier was unjustly enrichment by selling defective air conditioners without disclosing a known defect, while also knowing that its warranty would not cover the cost of repair.

Based on all the evidence discussed herein, a juror could find that it is unjust for Carrier to retain the benefits that Mr. Oddo bestowed upon it in addition to awarding other damages. *See Transgroup Worldwide Logistics v. Eternity Mems.*, 2010 U.S. Dist. LEXIS 159619, at *14–15 (C.D. Cal. Oct. 15, 2010) (explaining broad measure of damages for unjust enrichment).

## IV.   Mr. Oddo Can Prove His Negligent Misrepresentation Claim.

Mr. Oddo has also conceded that, unless reversed, the Court's class certification holdings on duty to disclose and objective materiality are dispositive of his negligent misrepresentation claim. But his claim for negligent misrepresentation is not based solely

on a "pure omission." Therefore, the Court cannot dismiss Mr. Oddo's negligent misrepresentation claim on the additional grounds that Carrier seeks here. Br. 22–23.

Mr. Oddo alleges that Carrier made a misleading "half-truth" that his air conditioner was capable of 16 SEER. True, his air conditioner was capable of achieving 16 SEER for right out of the box, but Carrier knew that once the rust inhibitor spread through the system it would no longer be so efficient. Carrier knew that the rust inhibitor would cause performance loss in virtually every contaminated system, SGD ¶¶ 98–132, and also knew that, ████████████████████████████████████████████████████████████

██████████████████████████████, Ex. 3, 55:10–58:16, 65:23–66:1; SGD ¶¶ 185–87. "[M]isleading 'half-truths' may satisfy the positive assertion element of negligent misrepresentation." *Brothers v. Fortis Ins. Co.*, 2004 U.S. Dist. LEXIS 16358, at *17 (N.D. Cal. Aug. 11, 2004).[30] Carrier negligently misrepresented the efficiency rating of Mr. Oddo's air conditioner by failing to disclose this additional information, which was necessary to make the SEER rating not misleading. Therefore, Mr. Oddo can prove a negligent misrepresentation by half-truth.

## CONCLUSION

Respectfully, the Court should only grant judgment, if at all, on its two prior holdings: duty to disclose under the safety/central function tests and objective materiality. The Court can go no further because Carrier's other arguments require resolution of genuine disputes of material fact.

---

[30] In its last footnote Carrier argues that Mr. Oddo's surviving UCL claims should be dismissed for the same reasons as his fraud claims. Carrier's description of the nature of his surviving UCL claim is not fully accurate (*compare* Carrier Br. at 23 n. 7 *with* MTD Op. (ECF 57), at 35), but its argument is also wrong because, for the reasons stated above, summary judgment should <u>not</u> be entered against Mr. Oddo's CLRA and other non-UCL claims. Therefore, Mr. Oddo's UCL claims based on the "fraudulent," "unlawful," and "unfair" prongs survive as well (except to the extent previously dismissed). *See Hadley v. Kellogg Sales Co.*, 273 F. Supp. 3d 1052, 1063, 1096, 1099 (N.D. Cal. 2017) (surviving CLRA claim sufficient to sustain UCL claim on all three prongs).

DATED: September 20, 2021   By:   /s/ Timothy N. Mathews
Timothy N. Mathews (*pro hac vice*)
Zachary P. Beatty (*pro hac vice*)
**CHIMICLES SCHWARTZ**
**KRINER & DONALDSON-SMITH LLP**
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633
Email: tnm@chimicles.com
    zpb@chimicles.com

James C. Shah
**MILLER SHAH LLP**
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (610) 891-9880
Telephone: (610) 891-9880
Facsimile: (866) 300-7367
Email: jcshah@millershah.com

Kolin C. Tang
**MILLER SHAH LLP**
19712 MacArthur Boulevard
Suite 222
Irvine, CA 92612
P: (866) 540-5505
kctang@millershah.com

*Attorneys for Plaintiff*

26

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 20, 2021 a copy of the foregoing document was served electronically through the court's electronic filing system upon all parties appearing on the court's ECF service list.

*/s/ Timothy N. Mathews*

Timothy N. Mathews

## <u>ATTESTATION PURSUANT TO CIVIL L.R. 5-4.3.4(a)(2)</u>

The filer attests that the other signatories listed, on whose behalf the filing is also submitted, are registered CM/ECF filers and concur in the filing's content and have authorized the filing.

Dated: September 19, 2021                    *Kolin C. Tang*

Kolin C. Tang

27